UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

YOUSEF AHMED,
JAY AYOUB,                                          Civil Action No.:
MAJD AYOUB,
ELVI JO DOUGHERTY,
SOLIEGH M. DOUGHERTY,                               **COMPLAINT**
JAZMINE C. FRAZIER,
TIMOTHY P. GEORGER,
IBRAHIM KHATIB,                                     **JURY TRIAL REQUESTED**
HANNAH R. KRULL, AND
NOOR A. MOHAMMED,
                              Plaintiffs,

vs.

CITY OF BUFFALO,
COUNTY OF ERIE,
TOWN OF AMHERST,
TOWN OF TONAWANDA,
TOWN OF CHEEKTOWAGA,
VILLAGE OF KENMORE,
TOWN OF EVANS,
TOWN OF ORCHARD PARK,
TOWN OF WEST SENECA,
SATISH K. TRIPATHI, individually
and in his official capacity as President
of the University at Buffalo
CHIEF KIMBERLY L. BEATY,
DEPUTY CHIEF SCOTT MARCISZEWSKI,
CAPTAIN JONATHAN FLETCHER,
LIEUTENANT TIMOTHY BACON,
LIEUTENANT CHRISTOPHER KERR,
OFFICER ROBERT ADAMSKI,
OFFICER LUKE GALMARINI,
OFFICER CHRISTOPHER GRUTTARIA,
OFFICER MATTHEW KOSTEK,
OFFICER GREGORY KUROWSKI,
OFFICER ALEXIS PEARCE,
OFFICER MICHAEL PUERNER,
OFFICER AMY REVELAS,

OFFICER MICHAEL SARACENO,
OFFICER CHRISTOPHER SPRIGG,
OFFICER DOUGLAS TAKAC,
INVESTIGATOR TIMOTHY THOMPSON,
OFFICER KOPACZ (FIRST NAME UNKNOWN),
OFFICER MAJEWSKI (FIRST NAME UNKNOWN),
OFFICER WILL (FIRST NAME UNKNOWN),
LIEUTENTANT KARL B. SCHULTZ,
POLICE OFFICER QUINCY ALEXANDER,
POLICE OFFICER RONALD AMMERMAN,
POLICE OFFICER CHRISTOPHER BAUER,
POLICE OFFICER DANIEL CANDELARIO,
POLICE OFFICER JONATHAN CRAWFORD,
POLICE OFFICER ANDREW DALGLEISH,
POLICE OFFICER ZACHARY DRESSLER,
POLICE OFFICER SEAN FORD,
POLICE OFFICER CONNOR FRASCATORE,
POLICE OFFICER TERRIS GARNER,
POLICE OFFICER JOHN GRAVIUS,
POLICE OFFICER TYLER HAYDEN,
POLICE OFFICER ERIC HOFSCHNEIDER,
POLICE OFFICER DAVID KIMMINS,
POLICE OFFICER PATRICK KINSELLA,
POLICE OFFICER MICHAEL MARITATO,
POLICE OFFICER FRANK MENZA,
POLICE OFFICER MICHAEL PALIZAY,
POLICE OFFICER JONATHAN PIETRZAK,
POLICE OFFICER MATTHEW SERAFINI,
POLICE OFFICER ALARIC SANTIAGO,
POLICE OFFICER STEPHEN SCHULZ,
POLICE OFFICER KRIS TOMASULA,
ERIE COUNTY SHERIFF JOHN C. GARCIA, individually,
SERGEANT BIEGASIEWICZ (FIRST NAME UNKNOWN),
DEPUTY DIEBEL (FIRST NAME UNKNOWN),
DEPUTY MCCLELLAND (FIRST NAME UNKNOWN),
DEPUTY SCOTT (FIRST NAME UNKNOWN),
LIEUTENANT SOLURI (FIRST NAME UNKNOWN),
DEPUTY VACCARO (FIRST NAME UNKNOWN),
DEPUTY WAHL (FIRST NAME UNKNOWN),
CAPTAIN KARI MCFAYDEN,
CAPTAIN CHARLES PERSONS,
LIEUTENANT MATTHEW LOBUGLIO,
LIEUTENANT CRAIG PELT,
INVESTIGATOR RICHARD WALTER,

POLICE OFFICER BRETT CHRISTMANN,
POLICE OFFICER MICHAEL KUBEK,
POLICE OFFICER PATRICK LUVENDER,
POLICE OFFICER JOSHUA MILITELLO,
POLICE OFFICER DERERK NEUMAN,
POLICE OFFICER GRANT F. CURREY,
POLICE OFFICER NICHOLAS J. LUND,
POLICE OFFICER MITCHELL F. MARASCHIELLO,
POLICE OFFICER JEREMIAH J. WALSH STEINER,
POLICE OFFICER KELLY J. WRIGHT,
POLICE OFFICER MATTHEW ARNOLD,
POLICE OFFICER MILLER (FIRST NAME UNKNOWN),
POLICE OFFICER SHANE ROGERS,
POLICE OFFICER BRADLEY CARUANA,
POLICE OFFICER EVAN BONCZAR,
POLICE OFFICER JEFFREY MAYER,
POLICE OFFICER JEREMEY MAJEWICZ,
POLICE OFFICER MATTHEW J. GREENAN,
POLICE OFFICER JONATHAN E. LUTEREK,
POLICE OFFICER JESSE REED,
POLICE OFFICER GREGORY J. WARNER, AND
JOHN DOE OFFICERS 1–50,

Defendants.

---

*"But somewhere I read of the freedom of assembly.*
*Somewhere I read of the freedom of speech.*
*Somewhere I read of the freedom of press.*
*Somewhere I read that the greatness of America is the right to protest for right."*


— Dr. Martin Luther King Jr.,
*"I've Been to the Mountaintop" (April 3, 1968)*

Plaintiffs, by and through their attorneys, bring this action for violations of their civil rights and other wrongful conduct, and allege as follows:

## I.     PRELIMINARY STATEMENT

1)     This civil rights action arises from the mass arrest and violent dispersal of a peaceful protest at the State University of New York at Buffalo ("UB") on the evening of May 1, 2024.

2)     Plaintiffs are ten individuals — students, faculty, alumni, and community members — who assembled on UB's North Campus to express opposition to ongoing state-led violence in Gaza, to raise awareness as to the human rights violations against Palestinians, and to urge the university to divest from institutions allegedly complicit in that violence.  Plaintiffs include individuals who were present for purposes of prayer, observation, or peaceful assembly.

3)     The demonstration was peaceful and orderly.  It included prayer, speeches, and chants.  There were no threats to public safety, no blocked walkways or building entrances, no weapons, no vandalism, and no violence.

4)     The demonstration was relatively modest in size.  Official statements from UB and reports from news agencies reflect that there were between a few dozen and 80 people present during the May 1, 2024 event.

5)     Despite the absence of any imminent threat or unlawful conduct, law enforcement officers from multiple agencies descended on the protest in a coordinated and militarized response.  In addition to the University at Buffalo Police Department and the New York State Police, many other departments responded to the orderly protest. Departments from all reaches of Erie County converged upon the UB North campus,

including the Buffalo Police Department, the Erie County Sheriff's Office, the Town of

Amherst Police Department, and numerous others.  Footage from the incident reflects

that the number of officers outnumbered the number of demonstrators present at UB on

May 1, 2024.

6)    Defendants are multiple municipal entities and officers who orchestrated,

facilitated, or directly participated in the violent suppression of the protest without

justification, lawful policy, or adequate notice.

7)    Shortly before sunset, UB officials and police officers issued a vague

dispersal order, demanding that protesters vacate the university grounds by 8:23 p.m.  No

written curfew or UB policy supported that deadline.  Protesters were given no

opportunity to comply — and many, including Plaintiffs, were actively engaged in

Maghrib prayer at the time the order was issued and executed.

8)    At exactly 8:23 p.m., dozens of officers charged the protest site while the

Muslim sunset prayers were ongoing.  Almost all individuals present at the protest

complied with the dispersal order, leaving the protest site.  However, the police officers

chased the individuals to other locations on campus and re-engaged.  The officers

violently tackled students and community members, punched and kneed individuals who

had been restrained, dislodged religious garments, zip-tied wrists so tightly that fingers

went numb, and taunted crying arrestees with profanity and threats.

9)    Many of the Plaintiffs were targeted while praying, filming, or linking

arms in silent solidarity.  Others were attempting to retreat when they were chased,

tackled, and restrained. Not a single Plaintiff committed a crime, posed a threat, or

resisted arrest.

10)     All criminal charges issued were later dismissed — confirming what the Plaintiffs, bystanders, and public footage all made clear: this was not a public safety operation, but a coordinated act of suppression.

11)     This lawsuit seeks to hold Defendants accountable for violating Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments of the United States Constitution, the New York State Constitution, and New York Civil Rights Law §§ 40-c and 79-n.  Plaintiffs seek damages for physical injuries, emotional trauma, religious humiliation, and loss of liberty, as well as declaratory and injunctive relief to prevent recurrence of such unconstitutional conduct.

## II.     JURISDICTION AND VENUE

12)     This action is brought pursuant to 42 U.S.C. § 1983 and the First, Fourth, and Fourteenth Amendments to the United States Constitution.  Plaintiffs also assert supplemental claims under the laws and Constitution of the State of New York.

13)     This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

14)     This Court has supplemental jurisdiction over Plaintiffs' New York State constitutional and statutory claims, including claims under New York Civil Rights Law §§ 40-c and 79-n, pursuant to 28 U.S.C. § 1367(a), as they form part of the same case or controversy.

15)     Venue is proper in the Western District of New York under 28 U.S.C. § 1391(b) because the events giving rise to the claims occurred in Erie County, New York (specifically on the University at Buffalo's North Campus in Amherst/Buffalo), which is within this District.

### III.   PARTIES

16)     Plaintiffs are ten individuals who were arrested, detained, injured, and/or assaulted on May 1, 2024 during a peaceful protest at the University at Buffalo's North Campus.

17)     Plaintiffs include students, recent graduates, and community members, all of whom participated in a nonviolent demonstration opposing ongoing military action in Gaza and the alleged financial complicity of the State University of New York (SUNY) system.

18)     Local news agencies reported that, at its height, approximately 85 individuals were present at the protest in front of UB's Hochstetter Hall.  15 individuals, including students, faculty members, and community members, were arrested.

19)     Plaintiffs include individuals who were present for purposes of prayer, observation, or peaceful assembly.

20)     **Plaintiff Yousef Ahmed** is an adult individual and a student at UB who participated in the May 1, 2024 protest.  Mr. Ayoub was one of the organizers of the initial May 1, 2024 walk through UB's campus as Secretary of UB's Students for Justice in Palestine (SJP).  Mr. Ahmed complied with unconstitutional dispersal orders and left the protest site as instructed.  Mr. Ahmed was specifically targeted by multiple officers and violently tackled from behind, slammed into the ground, and zip-tied.  He sustained serious injuries and violations of his rights as described herein.

21)     **Plaintiff Jay M. Ayoub** is an adult resident of New York State, a leader in the local Muslim community, and the father of Plaintiff Majd Ayoub.  Mr. Ayoub arrived at UB North Campus during the May 1, 2024 protest to bring food to his child and his

friends.  After arriving with the food, Mr. Ayoub quietly and peacefully observed the demonstration at some distance.  Mr. Ayoub participated in the Maghrib prayer with the other Muslim individuals present at the site.  Mr. Ayoub complied with unconstitutional dispersal orders and left the protest site as instructed.  Mr. Ayoub was later assaulted and arrested while attempting to assist in keeping the peace.  Mr. Ayoub was tackled, restrained, and zip-tied.  He sustained serious injuries and deprivations of his rights as described herein.

22)     **Plaintiff Majd Ayoub** is an adult resident of New York and a student at UB.  Mr. Ayoub was one of the organizers of the initial May 1, 2024 walk through UB's campus as President of UB's SJP.  Majd Ayoub complied with unconstitutional dispersal orders and left the protest site as instructed.  He was violently tackled while attempting to assist a fellow Muslim whose hijab was removed by officers.  He sustained serious injuries and violations of his rights as described herein.

23)     **Plaintiff Elvi Jo Dougherty** is an adult resident of New York and an active community member.  Ms. Dougherty peacefully participated in the May 1, 2024 protest together with her daughter, Plaintiff Soliegh Dougherty.  She intended to disperse from UB's campus after the Muslim evening prayer had concluded but was arrested while the prayer was ongoing.  Ms. Dougherty was violently arrested at the protest and sustained injuries and violations of her rights as described herein.

24)     **Plaintiff Soliegh M. Dougherty** is an adult resident of New York and the daughter of Plaintiff Elvi Jo Dougherty.  Ms. Dougherty is a Buffalo State University student who peacefully participated in the May 1, 2024 demonstration.  She intended to disperse from UB's campus after the Muslim evening prayer had concluded but was arrested

while the prayer was ongoing. She was violently thrown to the ground and restrained by multiple officers during her arrest at the protest and sustained serious injuries and violations of her rights as described herein.

25)     **Plaintiff Jazmine C. Frazier** is an adult resident of New York who participated in the May 1, 2024 protest as a peaceful demonstrator and community member. Jazmine Frazier complied with unconstitutional dispersal orders and left the protest site as instructed. They were violently arrested at the protest and sustained serious injuries and violations of their rights as described herein.

26)     **Plaintiff Timothy P. Georger** is an adult resident of New York who participated in the May 1, 2024 protest as a UB graduate student and Teaching Assistant. Mr. Georger complied with unconstitutional dispersal orders and left the protest site as instructed. He was violently arrested at the protest and sustained emotional injuries and violations of his rights as described herein.

27)     **Plaintiff Ibrahim Vincent Khatib** is an adult resident of New York and an active member of the community. Mr. Khatib peacefully participated in the May 1, 2024 protest. Mr. Khatib was arrested while shoeless (due to officers charging the group while he was engaged in Maghrib), as he attempted to comply with the unconstitutional discharge orders. Mr. Khatib sustained injuries and violations of his rights as described herein.

28)     **Plaintiff Hannah R. Krull** is an adult resident of New York and was a UB graduate student at the time of her arrest. Ms. Krull peacefully participated in the May 1, 2024 protest, where she was documenting the events, and was arrested. Ms. Krull

complied with unconstitutional dispersal orders and left the protest site as instructed. She

sustained injuries and violations of her rights as described herein.

29)    **Plaintiff Noor A. Mohammed** is an adult resident of New York and a UB

student. Ms. Mohammed was one of the organizers of the initial May 1, 2024 walk

through UB's campus as a member of UB's SJP. Ms. Mohammed peacefully observed

the May 1, 2024 protest and complied with all orders from officers relating to dispersal.

While inside a UB academic building, without provocation, Ms. Mohammed was

slammed to the ground, restrained by multiple officers, and arrested. Ms. Mohammed's

hijab was forcibly removed by officers who also verbally berated her. She sustained

serious injuries, including public humiliation, religious distress, and emotional injury, and

violations of her rights as described herein.

30)    Defendants are multiple municipal entities and officers who orchestrated,

facilitated, and/or directly participated in the violent suppression of the protest without

justification, lawful policy, or adequate notice.

31)    **Defendant City of Buffalo** is a municipal corporation in the State of New

York. The City of Buffalo operates the Buffalo Police Department (BPD) and at all

relevant times employed **DEFENDANTS LIEUTENTANT KARL B. SCHULTZ,**

**POLICE OFFICER QUINCY ALEXANDER, POLICE OFFICER RONALD**

**AMMERMAN, POLICE OFFICER CHRISTOPHER BAUER, POLICE OFFICER**

**DANIEL CANDELARIO, POLICE OFFICER JONATHAN CRAWFORD,**

**POLICE OFFICER ANDREW DALGLEISH, POLICE OFFICER ZACHARY**

**DRESSLER, POLICE OFFICER SEAN FORD, POLICE OFFICER CONNOR**

**FRASCATORE, POLICE OFFICER TERRIS GARNER, POLICE OFFICER**

**JOHN GRAVIUS, POLICE OFFICER TYLER HAYDEN, POLICE OFFICER ERIC HOFSCHNEIDER, POLICE OFFICER DAVID KIMMINS, POLICE OFFICER PATRICK KINSELLA, POLICE OFFICER MICHAEL MARITATO, POLICE OFFICER FRANK MENZA, POLICE OFFICER MICHAEL PALIZAY, POLICE OFFICER JONATHAN PIETRZAK,  POLICE OFFICER MATTHEW SERAFINI, POLICE OFFICER ALARIC SANTIAGO, POLICE OFFICER STEPHEN SCHULZ, POLICE OFFICER KRIS TOMASULA**, and certain John Doe officers who participated in the protest response.  The City of Buffalo was responsible for the policies, practices, and conduct of the BPD and its officers during the events at issue.  On May 1, 2024, BPD officers knowingly planned and participated in the unconstitutional suppression of the protest and the unlawful arrest and use of force against Plaintiffs.  BPD officers directly caused or failed to prevent the constitutional violations described herein.  The City of Buffalo, through its supervising officers on site, coordinated the illegal suppression of free speech and protest with the other Municipal Defendants, and the State of New York, through its involvement in a Mutual Aid Agreement.

32)    **Defendant County of Erie** is a municipal entity organized under the laws of the State of New York.  The County operates and is responsible for the policies, practices, training, and supervision of the Erie County Sheriff's Office ("ECSO").  At all relevant times, the County employed **DEFENDANTS SERGEANT BIEGASIEWICZ (FIRST NAME UNKNOWN), DEPUTY DIEBEL (FIRST NAME UNKNOWN), DEPUTY MCCLELLAND (FIRST NAME UNKNOWN), DEPUTY SCOTT (FIRST NAME UNKNOWN), LIEUTENANT SOLURI (FIRST NAME**

UNKNOWN), **DEPUTY VACCARO (FIRST NAME UNKNOWN), DEPUTY WAHL (FIRST NAME UNKNOWN)** and certain John Doe officers who participated in the protest response.  Deputies from ECSO knowingly planned and participated in the unconstitutional suppression of the protests, the mass arrest operation, and directly caused or failed to prevent the constitutional violations described herein.  The County of Erie coordinated the illegal suppression of free speech and protest with the other municipal defendants, and the State of New York, through its involvement in a Mutual Aid Agreement.

33)     **Defendant Town of Amherst** is a municipal corporation in New York. The Town of Amherst operates the Amherst Police Department and at all relevant times employed **DEFENDANTS CAPTAIN KARI MCFAYDEN, CAPTAIN CHARLES PERSONS, LIEUTENANT MATTHEW LOBUGLIO, LIEUTENANT CRAIG PELT, INVESTIGATOR RICHARD WALTER, POLICE OFFICER BRETT CHRISTMANN, POLICE OFFICER MICHAEL KUBEK, POLICE OFFICER PATRICK LUVENDER, POLICE OFFICER JOSHUA MILITELLO, POLICE OFFICER DERERK NEUMAN** and certain John Doe officers who responded to the protest on UB's North Campus (located in Amherst).  Defendant Town of Amherst and its Police Department maintain jurisdiction over the University at Buffalo's North Campus and played a lead role in coordinating and executing the protest dispersal.  The Town of Amherst was responsible for the policies, practices, and conduct of its police officers during the events.  Amherst officers directly caused or failed to prevent the constitutional violations described herein.  The Town of Amherst coordinated the illegal

suppression of free speech and protest with the other municipal defendants, and the State of New York, through its involvement in a Mutual Aid Agreement.

34)    **Defendants Town of Tonawanda, Town of Cheektowaga, Village of Kenmore, Town of Evans, Town of Orchard Park, and Town of West Seneca** (with the City of Buffalo, County of Erie and the Town of Amherst, the "Municipal Defendants") are municipal entities in Erie County, New York.  Each entity operates its own police department, and officers from each participated in the coordinated protest response on May 1, 2024.  At all relevant times, the municipalities employed certain respective officers as reflected in Paragraph 42 herein and John Doe officers who participated in the protest response.  Each municipality is responsible for the policies, practices, and conduct of its respective officers during the events.  Officers from each respective municipality directly caused or failed to prevent the constitutional violations described herein.  Each of these municipalities coordinated the illegal suppression of free speech and protest with the other Municipal Defendants, and the State of New York, through its involvement in a Mutual Aid Agreement.

35)    **Defendant Satish K. Tripathi ("Tripathi")** is, and at all relevant times was, the President of the University at Buffalo, a public institution operated by the State University of New York (SUNY) system.  Upon information and belief, Tripathi personally developed, approved, and/or instructed others to enforce an arbitrary and unconstitutional curfew against peaceful protestors on May 1, 2024, without providing adequate notice or lawful basis.  Tripathi is sued in his individual capacity for damages under 42 U.S.C. § 1983 and in his official capacity for purposes of prospective declaratory and injunctive relief.

36)     At all times relevant hereto, Defendants **CHIEF KIMBERLY L. BEATY, DEPUTY CHIEF SCOTT MARCISZEWSKI, CAPTAIN JONATHAN FLETCHER, LIEUTENANT TIMOTHY BACON, LIEUTENANT CHRISTOPHER KERR, OFFICER ROBERT ADAMSKI, OFFICER LUKE GALMARINI, OFFICER CHRISTOPHER GRUTTARIA, OFFICER MATTHEW KOSTEK, OFFICER GREGORY KUROWSKI, OFFICER ALEXIS PEARCE, OFFICER MICHAEL PUERNER, OFFICER AMY REVELAS, OFFICER MICHAEL SARACENO, OFFICER CHRISTOPHER SPRIGG, OFFICER DOUGLAS TAKAC, INVESTIGATOR TIMOTHY THOMPSON, OFFICER KOPACZ (FIRST NAME UNKNOWN), OFFICER MAJEWSKI (FIRST NAME UNKNOWN), AND OFFICER WILL (FIRST NAME UNKNOWN)** (collectively, "NYS Defendant Officers") were employed by the University at Buffalo Police Department ("UBPD") or the New York State Police ("NYSP") and were acting under color of state law.

37)     Each NYS Defendant Officer directly caused or failed to prevent the constitutional violations described herein.

38)     Each of the NYS Defendant Officers is sued in his or her individual capacity for actions taken under color of law, and not in any official capacity.

39)     At all times relevant hereto, each NYS Defendant Officer was acting within the scope of his or her employment and under the supervision and control of the University at Buffalo Police Department.

40)     Plaintiffs reserve the right to amend this Complaint to assert additional allegations against these officers in their individual capacities.

41)    **Defendant John C. Garcia ("Garcia")** is, and at all relevant times was, the elected Sheriff of Erie County, New York.  Upon information and belief, Garcia personally approved, authorized, and/or directed the deployment of Erie County Sheriff's deputies to the University at Buffalo on May 1, 2024, under a Mutual Aid Agreement request.  Garcia further authorized, instructed, and ordered his deputies to unlawfully disperse and arrest lawful protestors on the UB campus and to enforce an arbitrary and unconstitutional curfew against peaceful protestors without lawful basis or individualized warnings, leading directly to the constitutional violations suffered by Plaintiffs.  Garcia is sued in his individual capacity for damages under 42 U.S.C. § 1983.

42)    At all times relevant hereto, **DEFENDANTS LIEUTENANT KARL B. SCHULTZ, POLICE OFFICER SANTIAGO ALARIC, POLICE OFFICER QUINCY ALEXANDER, POLICE OFFICER RONALD AMMERMAN, POLICE OFFICER CHRISTOPHER BAUER, POLICE OFFICER DANIEL CANDELARIO, POLICE OFFICER JONATHAN CRAWFORD, POLICE OFFICER ANDREW DALGLEISH, POLICE OFFICER ZACHARY DRESSLER, POLICE OFFICER SEAN FORD, POLICE OFFICER CONNOR FRASCATORE, POLICE OFFICER TERRIS GARNER, POLICE OFFICER JOHN GRAVIUS, POLICE OFFICER TYLER HAYDEN, POLICE OFFICER ERIC HOFSCHNEIDER, POLICE OFFICER DAVID KIMMINS, POLICE OFFICER PATRICK KINSELLA, POLICE OFFICER MICHAEL MARITATO,  POLICE OFFICER FRANK MENZA, POLICE OFFICER MICHAEL PALIZAY, POLICE OFFICER JONATHAN PIETRZAK,  POLICE OFFICER MATTHEW SERAFINI, POLICE OFFICER ALARIC SANTIAGO, POLICE OFFICER**

**STEPHEN SCHULZ, POLICE OFFICER KRIS TOMASULA** (each employed as a sworn police officer of the Buffalo Police Department ("BPD")), **SERGEANT BIEGASIEWICZ (FIRST NAME UNKNOWN), DEPUTY DIEBEL (FIRST NAME UNKNOWN), DEPUTY MCCLELLAND (FIRST NAME UNKNOWN), DEPUTY SCOTT (FIRST NAME UNKNOWN), LIEUTENANT SOLURI (FIRST NAME UNKNOWN), DEPUTY VACCARO (FIRST NAME UNKNOWN), DEPUTY WAHL (FIRST NAME UNKNOWN)** (each employed as a sworn police officer of the Erie County Sheriff's Office ("ECSO")), **CAPTAIN KARI MCFAYDEN, CAPTAIN CHARLES PERSONS, LIEUTENANT MATTHEW LOBUGLIO, LIEUTENANT CRAIG PELT, INVESTIGATOR RICHARD WALTER, POLICE OFFICER BRETT CHRISTMANN, POLICE OFFICER MICHAEL KUBEK, POLICE OFFICER PATRICK LUVENDER, POLICE OFFICER JOSHUA MILITELLO, POLICE OFFICER DERERK NEUMAN**(each employed as a sworn police officer of the Amherst Police Department), **OFFICER GRANT F. CURREY**, **OFFICER NICHOLAS J. LUND, OFFICER MITCHELL F. MARASCHIELLO**, **OFFICER JEREMIAH J. WALSH STEINER**, **OFFICER KELLY J. WRIGHT** (each employed as a sworn police officer of the Town of Tonawanda Police Department), **POLICE OFFICER MATTHEW ARNOLD, POLICE OFFICER MILLER (FIRST NAME UNKNOWN), POLICE OFFICER SHANE ROGERS** (each employed as a sworn police officer of the Cheektowaga Police Department), **POLICE OFFICER BRADLEY CARUANA** (employed as a sworn police officer of the Kenmore Police Department), **POLICE OFFICER EVAN BONCZAR, POLICE OFFICER JEFFREY MAYER** (each employed as a sworn police officer of the Evans Police Department), **POLICE**

**OFFICER JEREMEY MAJEWICZ** (employed as a sworn police officer of the Orchard Park Police Department), and **POLICE OFFICER MATTHEW J. GREENAN, POLICE OFFICER JONATHAN E. LUTEREK, POLICE OFFICER JESSE REED, POLICE OFFICER GREGORY J. WARNER** (each employed as a sworn police officer of the West Seneca Police Department) (collectively, the "Municipal Defendant Officers") were acting under color of state law.

43)     On May 1, 2024, each Municipal Defendant Officer was present on the UB campus as part of the multi-agency police response to the protest.  Each Municipal Defendant Officer is sued in his individual capacity (and official capacity as needed for injunctive relief).

44)     Each Municipal Defendant Officer directly caused or failed to prevent the constitutional violations described herein.

45)     At all times relevant hereto, each Municipal Defendant Officer was acting within the scope of his or her employment and under the supervision and control of their respective municipal or county law enforcement agency.

46)     Plaintiffs reserve the right to amend this Complaint to assert additional allegations against these officers in their individual and official capacities.

47)     **Defendant John Doe Officers 1–50** are officers, deputies, and other agents of various law enforcement agencies (including, on information and belief, the SUNY University Police at UB, New York State Police, and the municipal police departments named above) who participated in the law enforcement operation at the May 1, 2024 protest but whose identities, despite best efforts, are not yet known to Plaintiffs. The Doe Defendants include supervisors and line officers who directed or engaged in the

unconstitutional conduct described.  These officers directly caused or failed to prevent the constitutional violations described herein.  Herein, these officers are referred to as "unknown," "unidentified," "yet-to-be-identified," or similarly.

48)     Each John Doe Defendant directly caused or failed to prevent the constitutional violations described herein.

49)     The true names and identities of **Defendants JOHN DOE 1 through JOHN DOE 50** are presently unknown to Plaintiffs despite diligent efforts and will be substituted by amendment when ascertained.

50)     Each of the John Doe Defendants is sued in his or her individual capacity for actions taken under color of law, and not in any official capacity.  At all times relevant hereto, each John Doe Defendant was acting within the scope of his or her employment.

51)     Plaintiffs have identified certain law enforcement agencies whose officers personally participated in the unconstitutional acts described herein, including the City of Buffalo Police Department and the Town of Tonawanda Police Department.  Plaintiffs are actively investigating, through available public records and anticipated discovery, the specific identities of the individual officers involved.  Plaintiffs expressly reserve the right to amend this Complaint, pursuant to Rule 15 of the Federal Rules of Civil Procedure, to substitute named Defendants for John Doe Defendants once their identities and agency affiliations are ascertained through discovery.

52)     Upon information and belief, certain officers who were present during the protest (for example, BPD Officer Andrew Dalgleish) were present during the protest and involved in the unconstitutional response thereto but did not produce any body camera

footage.  A number of Municipal Defendants only produced limited body camera footage (and in certain instances, none at all).  Many agencies did not provide information to allow a recipient to determine the identity for each body cam.  Much of the footage was produced without audio.

53)    Numerous officers on site, including some BPD officers and some plainclothes officers from unknown agencies, did not have any badge reflecting their particular name (or the badges could not be seen because of protective vests).

54)    Additionally, body cam footage produced by multiple agencies in response to FOIL requests reflects that Defendant Officers from each agency were manipulating their body cameras throughout the incident.  Plaintiffs' ability to fully ascertain which individual officers (among the nearly 100 who were present during the protest) were involved in certain constitutional violations.

55)    Plaintiffs reserve the right to amend this Complaint to assert additional allegations against these officers in their individual and official capacities.

## IV.    FACTUAL BACKGROUND: THE PROTEST AND CRACKDOWN

### *The Crackdown's Origins and Unlaw Execution*

56)    On April 29, 2024, in response to pro-Palestinian protests on campuses throughout the state and nation, New York State Governor Kathy Hochul wrote a letter to New York college and university presidents, urging them to "aggressively guard against antisemitism and all forms of hateful or discriminatory rhetoric" and dictated that "extensive security preparations . . must be considered now."

57)    On May 1, 2024, students, faculty, and community members gathered at the University at Buffalo's North Campus to participate in a peaceful protest organized

by the University's chapter of Students for Justice in Palestine ("SJP") and other allied groups.  SJP was involved in the organization of the May 1, 2024 march through certain UB North property but it did not organize the demonstration on the lawn near Flint Loop after the march.

58)     The May 1, 2024 protest sought to bring awareness to the ongoing humanitarian crisis in Gaza, to advocate for a ceasefire in Gaza, and to demand that the University divest from companies and institutions allegedly complicit in human rights abuses against the Palestinian people.

59)     The demonstration drew support from a diverse group of students, faculty, alumni, and community allies, all advocating passionately, yet peacefully and non-violently for Palestinian rights.  The demonstration was conducted in full accordance with UB's Picketing and Assembling Policy and all other UB policies.

60)     The event began with a peaceful march around campus. In the mid-afternoon, the protesters marched through buildings located on UB North campus.

61)     Once outside Capen Hall, the protestors set up a demonstration on a lawn area near the University's "Flint Loop" area.  The Flint Loop lawn area is a regularly used public gathering space at UB North, near Capen Hall and Hochstetter Hall

62)     The purpose of the demonstration at Flint Loop was for students, faculty, and community members to fraternize, share food, and advocate for peace.  The event included speeches, chanting, the creation of symbolic signs and banners, and an open invitation for Muslim participants to observe Maghrib prayer.

63)     Shortly after people began to gather near Flint Loop, a number of individuals involved in the demonstration at Flint Loop embarked upon the early stages

of attempting to set up an encampment in a symbolic attempt to maintain an ongoing presence in support of their cause. The goal was to set up a small encampment on the lawn between Capen Hall and Hochstetter Hall. The encampment was intended as a location for a peaceful protest vigil, inspired by similar student demonstrations happening at other universities at that time.

64) The demonstrators erected a small number of tents in the early afternoon to represent protest encampments emerging at universities nationwide.

65) University officials and police soon reacted to the encampment. Officers of the UB Police (campus police) and other law enforcement (including Erie County Sheriff's deputies, Amherst Police, Kenmore Police, New York State Police, and Tonawanda Police) approached the protesters and ordered them to remove the tents within 15–20 minutes. The officers cited a UB policy issued in 2020 that prohibited outdoor encampments.

66) The demonstrators immediately fully complied with law enforcement directives, without incident, and removed all materials intended for the encampment from the grounds, as instructed.

67) Meanwhile, the demonstration on the Flint Loop lawn went forward without a single incident for a number of hours. Protesters were calm and cooperative. They sat or stood, held signs, shared food and water, and chanted peacefully in opposition to the ongoing human rights violations and in support of Palestinian liberation.

68) Protesters chanted slogans ("Free Palestine" and "End the genocide," among others) and held signs, while some gave impromptu speeches decrying the suffering in Gaza.

69)     University personnel acknowledged that the protesters had the right to demonstrate, so long as they did not disrupt campus operations.  A spokesperson from UB stated that UB "recognizes and respects students' right to protest" and expects "that protests occur lawfully in public spaces, and protestors will not disrupt or prevent the orderly conduct of classes, lectures, events and meetings."

70)     Indeed, classes and campus business continued normally, as the protest was confined to a public lawn and did not interfere with any classes, lectures, meetings, academic activities, university events, or freedom of movement around campus.

71)     For the next several hours—approximately from 4:00 p.m. to 8:15pm—the protest remained entirely peaceful and orderly.

72)     Throughout the late afternoon and into the early evening, law enforcement presence increased dramatically.  At least ten police agencies were visibly present on campus by 7:30 p.m., including many officers in tactical gear.

73)     The number of protesters eventually dwindled to a smaller core group by early evening.  In a press release issued at approximately 7:00 p.m. on May 1, UB stated "approximately 50 people . . . continue to protest on North Campus."

74)     The UB press release acknowledged that the demonstrators removed the "approximately five tents" after being informed by police of UB's policy relating to encampments.

75)     Upon information and belief, Defendant Tripathi was aware that a peaceful protest regarding Palestinian human rights and university policies was planned for May 1, 2024, on the University at Buffalo campus.

76)     Prior to and/or during the protest, Tripathi personally approved and/or directed the creation of an arbitrary curfew policy to forcibly disperse demonstrators after an approximately 8:00 p.m. deadline designed to suppress the protest, without providing reasonable notice, individualized orders, or lawful justification.  Tripathi knew or should have known that enforcing such a curfew against peaceful, lawful protestors would violate their constitutional rights.

77)     Upon information and belief, Tripathi instructed University officials, including University Police leadership, and Municipal Defendants, to enforce the curfew by arresting peaceful protestors who remained on campus after the arbitrary deadline, regardless of whether they posed any security threat or had been given lawful orders to disperse.  Tripathi's deliberate decisions and directives were a moving force behind the constitutional deprivations suffered by Plaintiffs.

78)     Upon information and belief, Defendant Garcia personally approved the deployment of Erie County Sheriff's Office deputies to the University at Buffalo protest site, knowing that officers were being instructed to enforce an unlawful curfew against peaceful demonstrators.  Garcia authorized the use of force and arrests in connection with this policy, and directed or ratified the unconstitutional enforcement practices that resulted in the violation of Plaintiffs' constitutional rights.

79)     The 7:00 p.m. UB press release stated that protestors "need to disperse by dusk."  UB Spectrum, UB's newspaper, reported that "[l]ast light is 8:48 p.m."

80)     By 8:00 p.m., dozens of officers were staged in the areas surrounding the protest, many wearing tactical gear.  A majority of Plaintiffs observed the arrival of riot-

ready officers from multiple agencies but were given no specific orders or indication that dispersal was imminent.

81)     Shortly after 8:00 p.m., some protesters, who were Muslim, prepared to perform their evening Maghrib (sunset) prayer as their faith prescribes.  The timing of the prayer is dictated by Muslim scripture and teachings.  The prayer circle was established on the grass near the protest site.  Many other remaining protesters formed a protective circle around those praying, in a show of solidarity and to create a safe space for the religious undertaking. A protective circle is a common protest tactic used to preserve religious freedom and guard against interference.

82)     The overall mood was calm – participants were exercising their rights to free speech and assembly on their campus, and there was no violence, no threats, and no safety emergency that would justify forceful intervention.

### *Lack of Clear Dispersal Policy and the Arbitrary 8:23 p.m. Deadline*

83)     Around 8:00 p.m., despite the lack of any disturbance and during the sacred act of prayer that was underway, officers announced by megaphone that all individuals must vacate the protest site by 8:23 p.m. or face arrest. The stated basis for this "curfew" was unclear.  Several protesters approached on-site officers and requested that the Muslim demonstrators be allowed to finish the evening sunset prayer before dispersing. Initially, officers acquiesced to the requests.

84)     Defendants Fletcher and Beaty from UBPD briefed all responding agencies on law enforcement's plan and protocol prior to dispersal efforts.

85)     Around 8:15 p.m., Defendant Beaty and other Defendant Officers announced over a megaphone an 8:23 p.m. deadline.  Plaintiffs and other attendees again

requested additional time to conclude Maghrib prayer, which was already underway and
would last only a few minutes (in fact, body cam confirms that Plaintiff Jay Ayoub was
speaking with Defendant Beaty prior to the announcement of the dispersal order about his
request for an extension).  Plaintiff Jay Ayoub told Defendant Beaty and Officer Fletcher
that the crowd would be amenable to leaving at 8:30pm, after the prayer concluded.
Officers refused.  The officers stated that if protesters did not vacate the area by 8:23
p.m., they would be arrested.

86)    Defendant Fletcher of the UBPD also issued unconstitutional directives to
disperse via a public address system on site.  At 8:22 p.m., Defendant Beaty instructed all
Defendant Officers to "move forward to disperse the unlawful protesters."  Defendant
Beaty also instructed all Defendant Officers to "push the crowd from north to south
towards the parking lots in order to disperse them."

87)    All UBPD Officers present on the site were designated as "front line" and
were primarily responsible for arresting the demonstrators.

88)    At the time of issuing the 8:23 p.m. dispersal order and throughout the
enforcement of the mass arrests, Defendant Chief Kimberly Beaty, along with other
supervisory Defendant Officers, and Defendant Officers, knew or reasonably should have
known that Plaintiffs were engaged in protected religious observance and peaceful
protest.  Despite this knowledge, Defendants deliberately proceeded without providing
accommodation or lawful justification, thereby violating Plaintiffs' constitutional rights.

89)    Plaintiffs observed Defendant Chief Kimberly Beaty present at the protest
site, where she and Defendant Fletcher issued the 8:23 p.m. curfew order via megaphone.
Chief Beaty and Defendant Fletcher ignored the protestors' religious-based pleas for a

brief extension and proceeded to direct the dispersal and subsequent arrests, demonstrating their active roles in the enforcement actions.

90)    The 8:23 p.m. deadline was arbitrary, ad hoc, and unsupported by any written UB policy.  No prior UB demonstration had been curtailed in this manner, and nothing about the May 1 event justified such a sudden dispersal."  UB's Policies for Assembling & Protesting included a requirement that the duration of assemblies was not to exceed 12 hours in one day and that "no overnight assemblies are allowed."

91)    "Overnight" refers to assemblies that last from a night into the following morning.  Protests after sundown are a commonly accepted practice at UB and have never been curtailed prior to May 1, 2024.

92)    Upon information and belief, UB officials made ad hoc changes to the language of the Picketing and Assembly Policy on May 1, 2024, or immediately thereafter.  University administrators then deleted the policy and removed public access to it via the University website and other channels.

93)    Despite the University's claim that the protest violated a ban on "overnight assemblies," no such language barred demonstrations occurring shortly after dusk.  The May 1, 2024 demonstration was entirely dismantled before sunset, and the act of peaceful prayer or remaining on a public lawn after 8:23 PM cannot reasonably be construed as "overnight" activity.

94)    In fact, multiple high-profile campus protests in recent years — including protests against Allen West (2022) and Michael Knowles (2023) — extended well beyond sunset without police interference.  The Knowles protest involved hundreds of

demonstrators, including non-affiliates of the University, and proceeded without any claims of curfew violation.

95)    The warnings were not clearly communicated or accompanied by any meaningful opportunity to comply.   Officers did not explain or provide any safe route or location to which protesters should disperse, nor did they attempt less intrusive crowd control measures.   The policy behind the dispersal was confusing – earlier, UB had told certain protesters they could stay "until sunset" or until evening sunset prayers were concluded, yet the police enforced an 8:23 p.m. cutoff to the minute.   This arbitrary deadline and abrupt enforcement indicate an absence of a clear, consistently applied dispersal policy for protests.

96)    The situation was further complicated because many protesters were in the middle of prayer during the final warning.   Several Plaintiffs (including Yousef Ahmed, Jay Ayoub, Majd Ayoub, and Ibrahim Khatib) were engaged in Islamic prayer at that time, kneeling and bowing on prayer mats within the protest circle. They heard snippets of the dispersal orders but reasonably believed police would allow them to finish the brief prayer before taking action.

97)    In fact, Plaintiff Jay Ayoub explicitly asked officers for a few more minutes to complete the prayer when the warnings began.   Plaintiff Elvi Dougherty similarly recalled that she did not immediately leave because she "thought the timing would fit the prayer" – i.e., that the prayer would conclude by the time the officers' stated deadline arrived.   Instead, the police did not accommodate or pause for the religious observance. The final warning came and went while the prayer was still underway.

98)    Without giving individualized warnings, and while prayer continued, officers from multiple agencies charged into the crowd at or just after 8:23 p.m. and began a mass arrest operation.

***Religious Observance and Discriminatory Enforcement***

99)    Multiple Plaintiffs, including Yousef Ahmed, Jay Ayoub, Majd Ayoub, and Ibrahim Khatib, were actively engaged in Maghrib prayer at the moment the mass arrest was initiated.  Prayer mats had been placed on the ground, and a protective circle had been formed around those praying — a common tactic used to preserve sacred religious observance during demonstrations.  The timing of Maghrib prayer is dictated by Islamic tradition and occurs shortly after sunset, aligning with the dispersal time selected by police.

100)    Plaintiffs and other attendees asked officers to allow Muslim demonstrators to complete their short prayer.  These requests were explicitly made to Defendant Chief Kimberly Beaty and other UBPD officers and other supervising officers, as captured on body-worn camera footage (see ¶82).  Officers refused.  The final dispersal deadline — 8:23 p.m. — was enforced without accommodation, and officers began charging the crowd before some individuals had even completed their prayer.

101)    The enforcement of the arrest order specifically targeted individuals in visible religious observance.  Protesters kneeling in prayer were among the first to be seized.  Officers disregarded religious garb, forcibly restrained praying Muslims, and made no effort to avoid interfering with ongoing worship.  This disregard for religious observance occurred despite the peaceful, non-obstructive nature of the protest and clear opportunity to wait or issue individual dispersal notices.

102)    Plaintiff Noor Mohammed was not part of the prayer circle and had complied with dispersal instructions by moving indoors.  She was wearing a hijab and keffiyeh — garments that reflect her religious and cultural identity.  Despite her full compliance, officers entered Capen Hall, violently threw her to the ground, and forcibly removed her hijab in the presence of male officers.  Ms. Mohammed was then mocked by officers, who taunted: "you wanna keeping talking your shit? Here. Here's your f**king shit."  These statements were made without provocation and reflect discriminatory animus based on religion, ethnicity, and viewpoint.

103)    In stark contrast, counter-protesters who mocked or insulted demonstrators — including one recorded shouting "F**k those terrorists" — were never touched by police.  Body camera footage confirms that visibly non-Muslim individuals were allowed to remain on-site or shout at officers without arrest or physical restraint.  The targeting of Muslim arrestees, especially those engaged in prayer or visibly wearing religious attire, shows discriminatory enforcement and animus.

***Overview of Arrest Locations and Protest Phases***

104)    Although officers claimed the arrests were each made to enforce dispersal orders beginning at 8:23 p.m., many Plaintiffs had already complied with police instructions and left the Flint Loop lawn area before being arrested.  Others were targeted while praying or shielding those in prayer.  The arrests occurred in three distinct geographic and temporal clusters, each reflecting different circumstances and levels of compliance by Plaintiffs.

105)    **Part 1: Prayer Circle Arrests (Flint Loop Lawn).**  Plaintiff Ibrahim Khatib was engaged in Maghrib prayer when he was tackled from behind by multiple

officers, including members of the UBPD and Tonawanda PD.  He was shoeless due to the requirements of Islamic prayer and believed he would be allowed to finish and disperse.  Plaintiffs Elvi Jo Dougherty and Soliegh Dougherty were still in a protective circle surrounding the worshippers when they were forcefully arrested by officers from multiple agencies. All three were non-violent and stationary at the time of arrest.

106)    **Part 2: Dispersed Protesters Apprehended Away from the Lawn.**

Plaintiffs Jazmine Frazier, Hannah Krull, and Timothy Georger had already left the Flint Loop protest site in compliance with dispersal orders and relocated to an adjacent area between the lawn and the parking lots.  Despite retreating as directed, each was individually attacked and manhandled by officers.  These arrests occurred away from the original protest circle and after the Plaintiffs had complied with commands.

107)    **Part 3: Arrests Near or Inside Capen Hall After Full Compliance.**

Plaintiffs Yousef Ahmed, Noor Mohammed, Jay Ayoub, and Majd Ayoub were arrested near or inside Capen Hall.  Each had dispersed from the protest site in accordance with dispersal orders.  Plaintiff Mohammed entered the building seeking safety from her university and instead was arrested inside without cause.  Plaintiff Ahmed attempted to enter Capen Hall but was prevented from entering and was chased and tackled.  Plaintiff Majd Ayoub attempted to assist Ms. Mohammed after her arrest, and Plaintiff Jay Ayoub tried to assist Majd while he was being attacked by police for attempting to assist Ms. Mohammed.  None of these four Plaintiffs was on the Flint Loop lawn at the time of arrest.

***Violent Multi-Agency Crackdown and Mass Arrests***

108)     The police, who outnumbered the protesters, initiated a sudden and overwhelming raid on the individuals engaged in prayer and the remaining protesters. Without giving any further audible warning such as "you are now under arrest" or a countdown, a large contingent of officers from multiple agencies charged into the group of demonstrators.  Body cameras and witness videos show a phalanx of officers converging on the seated protesters from different sides.  This included officers from UB Campus Police, the New York State Police, the Buffalo Police Department, Erie County Sheriff's Office, Town of Amherst Police, and the other Municipal Defendants that had been staging nearby.

109)     In essence, law enforcement from at least a half-dozen agencies "descended" on the protest at once, executing a coordinated plan to encircle and arrest the demonstrators at the arbitrary deadline.  The protesters — mostly students — were not directed to calmly leave; instead, police immediately grabbed and subdued anyone present, effectively giving no practical chance to disperse voluntarily at 8:23 p.m.

110)     Law enforcement officers tackled, restrained, zip-tied, and handcuffed dozens of protesters — including students, parents, observers, and individuals wearing visible religious attire.  Several officers used force on individuals already seated or kneeling.  Multiple Plaintiffs were tackled while trying to walk away or while actively filming.

111)     Some protesters instinctively ran or tried to flee when they saw officers coming in force, while others — including several Plaintiffs — held their ground, linking arms or remaining in place in a posture of non-violent resistance.

112)    There was yelling and confusion as officers in different uniforms (city police, sheriff's deputies, etc.) began grabbing people.  No agency or officer took charge to issue calm instructions or facilitate a peaceful exit; instead, the approach was one of immediate physical domination.  A chaotic scene resulted, with police tackling people and protesters screaming in fear.

113)    One portion of the crowd was chased by officers down a nearby walkway (Mary Talbert Way) as they tried to retreat, with officers pursuing and forcefully taking individuals to the ground far from the original lawn.  Another portion, including those who had been praying, was quickly surrounded and subdued on the spot.  Throughout the dispersal, protesters could be heard crying out in pain and shouting that they were complying or to stop, to little avail.

114)    Many officers applied physical restraints in a manner that caused injuries: knees placed on backs and heads, arms twisted behind backs, wrists bound with excessively tight zip ties or cuffs.  Several Plaintiffs were pinned by multiple officers.  Others were subjected to verbal taunts or ignored while crying out in pain or distress.

115)    No alternative route was offered to those seeking to comply.  No individualized orders were given.  The dispersal time — precisely 8:23 p.m. — was arbitrary and disconnected from any written university policy or legitimate safety concern.

116)    Defendants' use of force in this operation was grossly excessive and unnecessary.  The officers – many of whom were outfitted with body armor – tackled peaceful, unarmed students who offered no active resistance, slamming them onto the ground with great force.

117)    For example, one officer ran up to a young woman, Plaintiff Soliegh
Dougherty, who was standing still, swept her legs out from under her, and drove her face-
first into the ground.

118)    Other officers simultaneously ripped protestors apart from each other,
throwing them down.  Numerous protesters – including Plaintiffs – ended up pinned on
the ground under piles of officers.

119)    Police applied knee pressure to people's backs, shoulders, and heads, in
some cases pressing protesters' faces into the dirt or concrete.  This was far beyond the
minimum force necessary (if any was necessary at all) to effectuate arrests of non-violent
individuals.

120)    The law enforcement presence was extremely intimidating and
disproportionate.  There were dozens upon dozens of officers on scene – at least a 2-to-1
ratio of police to remaining protesters by that point.  Many officers were dressed in
tactical gear or helmets, as if preparing for a riot, even though the protesters were not
aggressive or numerous.

121)    This multi-agency show of force had been summoned "as a precaution,"
according to UB officials, but in practice it was intended to serve as an overwhelming
crackdown.  The overabundance of officers practically ensured that excessive force
would be used: with so many police and so few protesters, multiple officers ganged up on
single individuals.  For instance, several officers tackled Plaintiff Hannah Krull
simultaneously.  Such over-response contributed to the conscience-shocking level of
force used against these peaceful civilians.

122)    The police did not stop at the initial arrests; they chased down fleeing protesters well beyond the immediate protest area.  Some students who had managed to run from the lawn were pursued across campus.  Officers tackled people near Mary Talbert Way (a road a short distance away) and in other nearby areas.

123)    Following the post-dispersal acts of intimidation, officers returned their attention to remaining individuals near Capen Hall — many of whom were visibly Muslim or had already complied with dispersal orders. This next phase of the crackdown demonstrated a renewed focus on religious and ethnic identity, as well as on those perceived to have documented or supported the earlier protest.

124)    One group of frightened students sought refuge by running into Capen Hall (the administration building).  However, officers from numerous agencies, including the City of Buffalo, entered Capen Hall and continued to chase individuals through the UB building's hallway.  Inside Capen Hall, officers arrested certain individuals who had not even participated in the protest.

125)    Notably, officers appeared to target certain protesters who were visibly Muslim or engaged in prayer at the moment of the raid. Eyewitness accounts and video indicate that as the police rushed in, they went straight toward the group that was praying, effectively interrupting the prayer by grabbing those individuals first.

126)    Protesters who were visibly of Middle Eastern descent or wearing traditional religious attire were handled with particular roughness.  Plaintiff Noor Mohammed, a young woman wearing a hijab, and who did not even participate in the protest or the prayer circle (and who fully complied with the dispersal order) was violently thrown down and pinned.  Shockingly, an officer ripped the hijab off Ms.

Mohammed during her arrest, exposing her head and neck against her will.  As Ms. Mohammed's hijab was pulled off her head, she was aggressively and vitriolically verbally berated by numerous officers.

127)    After the dispersal of the protest, Defendant Officers corralled individuals who had been present at the demonstration and prayer and non-participants into an area outside Capen Hall.  The scene below reflects the moments before Defendant Officers arrested and assaulted Mr. Ahmed (after refusing to allow him to enter Capen Hall) and Ms. Mohammed (who was peacefully inside of Capen Hall).  Both Mr. Ahmed and Ms. Mohammed were wearing garments demonstrably consistent with their Muslim faith. The counter-protestors were not harassed, arrested, assaulted, or displaced by the Defendant Officers.  In fact, a non-party can be seen in bodycam footage asking the line of Defendant Officers, "you're not going to arrest them?" while pointing to the counter-protestors.



128)   Defendant Officers, including specifically yet-to-be-identified Buffalo Police Department Officers, can be heard discussing their intention to apprehend the "guy in the black shirt" (Plaintiff Ahmed) before moving in on the crowd.  As Plaintiff Ahmed attempted to enter Capen Hall (an academic building of a university which he attends), Defendant Officers, including specifically unidentified Buffalo Police Department Officers, refused to allow him to enter the building.  Many Defendant Officers, including specifically unidentified Buffalo Police Department Officers, then chase Mr. Ahmed (while shouting "f**ker" at him) before tackling and assaulting him.

129)   Many Defendant Officers, including Defendants Ford, Ammerman, and other Buffalo Police Department Officers, took part in the attack on Mr. Ahmed.  Shortly after the attack, Defendant Ford can be seen fist-bumping another officer and bragging that he played football with a different officer involved in the tackle and assault.

130)   Such an act was deeply distressing and culturally insensitive, serving no purpose other than to humiliate and intimidate.  The focus on those in prayer and the targeting of visibly Muslim individuals present at UB North on May 1, 2024 strongly suggests that the crackdown had a discriminatory motive or effect, singling out Muslim students and community members for harsh treatment.

131)   On body cam footage, Pro-Palestinian protestors, not of visibly Muslim descent, can be seen screaming "free Palestine and "f**k 12" repeatedly at officers without retribution.

132)   Defendant Officers, including unknown BPD officers, returned to the site of the protest after the lawn was cleared and joked about the protest and the protestors. As officers scrummage through the property (including water, food, and Palestinian

flags), one officer stated: "Hopefully they didn't plant an IED in there," while others

laugh. Another BPD officer remarked "should someone tell them that the United States

have nothing to do with the Palestinian-Israel conflict."

133)    Defendant BPD Officer Serafini, minutes after taking part in the violent

attacks on Plaintiffs Yousef Ahmed and Jay Ayoub, upon hearing a dog barking in the

distance stated: "Dude, I wish I had a K-9, bring the dog out here, let the dog just f**king

run loose." An unidentified BPD officer commented, "I think that would have solved a

lot of issues." Defendant Serafini responded: "absolutely."

134)    A non-party study asked Defendant Ammerman why Mr. Ahmed was

targeted and arrested, he responded: "probably for inciting everyone." Chanting for a

cause is not "incitement"; it is constitutionally protected speech.

135)    Within minutes, the police had effectively crushed the protest and detained

all remaining protesters. Approximately 15 people were arrested in total during the raid.

Each of the ten Plaintiffs in this action was among those arrested. Many were wrestled

into plastic zip-tie handcuffs (flex-cuffs) or metal handcuffs on the spot. The arrestees

were then gathered and led away from the lawn one by one.

136)    Notably, Defendants had arranged for a UB Stampede bus (a campus

shuttle bus) to be on scene to transport arrestees – a clear indication that mass arrests had

been pre-planned. Several Plaintiffs were loaded onto this bus with their hands bound

behind their backs. Others were placed into marked police cruisers. The Stampede bus,

carrying the detained protesters, departed for another location on the UB campus around

9:00 p.m., heading to a booking location (the UB "Center for Tomorrow"). As the bus

was driven past the protest site, the young arrestees inside could be heard chanting "Free Palestine" from the windows, defiantly continuing their protest even in custody.

137)    The May 1, 2024 protest, which had begun as a peaceful, lawful campus demonstration, thus ended in a scene of violence and trauma. Plaintiffs and their fellow protesters were exercising core constitutional rights – speaking out on a matter of great public concern and assembling peacefully to petition their university for change. They posed no threat to any person or property. Nonetheless, Defendants shut down their protest by force, inflicting injuries and instilling fear.

138)    Each Plaintiff suffered physical pain (to varying degrees) and profound emotional distress from being treated as a criminal and brutalized by officers of their community. The only "cause" of any of the arrests was the content of Plaintiffs' message and the fact of their peaceful assembly, which is not a lawful basis at all.

139)    Indeed, Defendants levied charges like disorderly conduct, trespass, loitering, and resisting arrest against the protesters, but these were trumped-up charges with no factual support. Eventually, judges and/or prosecutors dismissed all charges against the arrestees, underscoring that Plaintiffs had engaged in no wrongdoing.

140)    Not a single Plaintiff was armed. Not a single Plaintiff made threats or used force. Each was engaged in peaceful protest, religious observance, documentation, or passive assembly at the time they were arrested or assaulted.

***Post-Arrests Conduct by Defendants***

141)    Even after the protest had been dispersed and arrests completed, Defendant Officers remained on campus and engaged in ongoing acts of intimidation, harassment, and viewpoint-based hostility. After the demonstrations at Flint Loop lawn

and other sites on campus were broken up, officers from BPD (including Defendants Ammerman, Bauer, Gravius, Hayden, Hofschneider, Santiago, Serafini), UBPD and other agencies remained on campus and began patrolling the areas surrounding Capen Hall, Knox Hall, and Hochstetter Hall in a menacing and coercive manner.

142)    Multiple Defendant Officers harassed, taunted, and berated innocent students on UB's campus.  In the materials obtained to date, Defendant Officers can be heard screaming remarks such as repeatedly shouting "You're just mad at your dad" and seen smirking at protestors.

143)    In one instance, BPD officers, including Defendant Bauer, harass a young man, sarcastically chiding him "write that down so you can tell your dad . . . daddy, daddy, the cops daddy, daddy, the cops, they harassed me."

144)    The BPD officers, including lieutenants, based outside Capen Hall after the protests were disbanded pointed their flashlights at innocent students, with an intention to annoy and harass, and placed the lights in strobe mode because "they don't like the strobe light" and asked students to dance the light, stating that the officers would pay the students to dance.

145)    Several students attempting to enter or leave academic buildings were verbally harassed or followed by police.  Officers did not confront or interfere with individuals on campus who were unaffiliated with the protest, indicating a pattern of continued targeting based on viewpoint or perceived association with the demonstration.

146)    A number of students uninvolved in any protest were told to "go home" as they walked through campus by a line of BPD and UBPD officers.  One student asked

"why, do we have a curfew?" And the BPD Officer responded, "yeah, because you cant act like adults."  Other BPD officers chimed in: "yeah, Antifa!"

### *Institutional Ratification and Extrajudicial Retaliation*

147)    The actions of Defendants reflect a coordinated policy to suppress protest through unlawful force and arrest. No municipality or agency has acknowledged wrongdoing, disciplined involved officers, or issued any policy revision. University officials and city leadership have defended the operation publicly.

148)    On June 4, 2024, criminal charges against eight of the ten Plaintiffs were dismissed in full at their first appearance in Amherst Town Court for lack of evidence. No convictions or pleas were entered by any Plaintiff.  Despite this complete lack of prosecutorial follow-through, the University and law enforcement continued to impose extrajudicial sanctions on many of the Plaintiffs.

149)    Following the May 1, 2024 protest, agents of the State University of New York, acting under color of state authority, issued persona non grata ("PNG") notices to each individual who was arrested on May 1, 2024 who was not an enrolled UB student. These notices bar Plaintiffs from accessing any property owned or controlled by the University at Buffalo, including academic buildings, public gathering areas, and university-sponsored events.

150)    The PNG notices are indefinite in duration and are not subject to immediate review or rescission.  According to the University's own published procedures, recipients are ineligible to request reconsideration of the PNG designation until at least one full calendar year has passed from the date of issuance.

151)     The PNG designations function as an extrajudicial punishment imposed without due process and without any finding of current threat, danger, or disruption.  No hearings were provided.  No individualized findings were issued.  The PNG restrictions continue to impede Plaintiffs' academic, professional, and expressive activities and risk further stigmatization and exclusion.

152)     UB officials, including Tripathi, thereby violated Plaintiffs' rights to due process, freedom of expression, and assembly under the New York State Constitution and the First and Fourteenth Amendments to the U.S. Constitution.  These restrictions reflect ongoing retaliation and viewpoint-based discrimination against Plaintiffs due to their protected speech.

### *Overwhelming UB Faculty Response Highlights Defendants' Wrongdoing*

153)     307 members of the UB Faculty signed a May 3, 2024 letter to UB President Tripathi stating that they were "deeply disturbed by the University's decision to violently escalate the peaceful protest that students organized" on May 1, 2024.  The letter noted that about 50 protestors had assembled and that "[t]he gathering was entirely peaceful," noting that the demonstrators immediately complied with policy when told to discontinue the erection of tents.  The faculty observed that "The university policy barring overnight picketing and assembly does not mention sundown."

154)     The faculty letter stated that the protest rules "were being updated in real time on the day of the protest," which made it difficult for students to understand or follow University expectations.   The signatories described UB's conduct as exhibiting "intolerance towards free expression and flagrant disregard for student safety."

155)    The letter explained: "Hyper surveillance, fear, and physical and psychological harm caused by violent policing is a well-documented structural determinant of health inequity, and on May 1st our University's decision undermined our own students' health and wellbeing."

156)    It concluded: "The University's response is detrimental to the campus climate, the health and safety of students, and their ability to engage in peaceful protest."

157)    On May 7, 2024, the UB Faculty Senate passed a resolution supporting the May 3 letter, stating "there are reliable reports that the University responded dangerously and disproportionately to the peaceful protests held on UB's North Campus on May 1, 2024."

158)    The UB Faculty Senate resolved:

(1) That UB should request all charges be dropped and abandon any Code of Conduct proceedings against student protestors;

(2) That the Senate opposes calling outside law enforcement for peaceful protests;

(3) That UB should conduct a public review of police protocols and policies; and

(4) That an investigation be conducted into ad hoc policy changes to UB's picketing and assembly policy.

159)    On May 25, 2024, 31 members of the UB Law School faculty sent a letter to President Tripathi, similarly demanding that charges be dropped. They emphasized that the protest was peaceful, that encampments had already been removed before dusk, and that the Muslim prayer occurred just prior to the arrests.

160)    The Law School Faculty compellingly explained:

It would be particularly inappropriate for the University at Buffalo to deviate from this prudent course [requesting that all criminal charges be dropped] given the particular circumstances of the May 1 police action. The facts concerning the arrests on May 1 are largely undisputed. Before any arrests were made, the protesters had dismantled their encampment. They confined themselves to an outdoor public area of the campus. Shortly before sunset, which occurred by the calendar that day at 8:22 pm, the Muslims in attendance began the last of five mandatory prayers of the day. Mere seconds after the prayer was concluded, the police moved in to make their arrests. **Throughout this time, the protesters, students and non-students alike, were conducting themselves in a peaceful manner.** The SUNY Rules for the Maintenance of Public Order stipulate that, **"No student…or authorized visitor shall be subject to any limitation or penalty for expressing his or her views or for assembling with others for such purpose."** *See* Section I.E.1. The Rules then go on to specify that "peaceful picketing and other orderly demonstrations in public areas of campus grounds and buildings are not subject to interference provided there are no violations of the rules in section I.A. of this policy." *Id.* Section I.E.1.a.

There are sixteen rules stated in terms of prohibited conduct under Section I.A**. None of these rules had been violated at the time of the arrests**. To read the applicable rules otherwise would be to nullify the command of Section I. E., noted above. The Rules For the Maintenance of Public Order also provide for the promulgation of additional campus rules. *See* Section I.B. These supplementary rules applicable to the SUNY Buffalo campus are found in the Picketing & Assembling Policy. The only supplementary rule that would even arguably relate to the events of May 1 is the following: "Assemblies cannot last more than one day, duration not to exceed 12 hours in one day. No overnight assemblies/assemblies [sic] are allowed."

***The public protest on May 1, 2024, even to the extent that it may have extended beyond the official time of sunset, cannot reasonably be deemed a violation of the rule prohibiting "overnight assemblies."*** As noted above, any encampment had already been dismantled. ***The word "overnight" does not by its ordinary meaning imply the presence of assembled persons on public property for a brief duration beyond the moment of sunset.*** No one has suggested that the protesters were preparing to spend the night on campus. ***Even New York Penal Law Section 140.00, which provides definitions for terms found in those statutes governing criminal trespass and burglary, states that "'Night' means the period between thirty minutes after sunset and thirty minutes before sunrise***. *See* NYPL § 140.00(4).

(emphasis added).

161)    The overwhelming response from faculty across UB reflects the stark reality that UB's response to May 1, 2024 was illegal, unjustified, and an affront to ideals of freedom and democracy.

## V.    PLAINTIFF-SPECIFIC ALLEGATIONS

162)    Plaintiff **Yousef Ahmed** is a UB student and former Secretary of SJP.  Mr. Ahmed was one of the organizers of the initial May 1, 2024 walk through UB's campus.

163)    Shortly after completing the first portion of Muslim evening prayer, Mr. Ahmed stood up as officers began to charge the circle.  He dispersed from the protest site in accordance with the Officers' dispersal orders.  As Mr. Ahmed stood outside Capen Hall and filmed the Defendant Officers, officers, including BPD officers, audibly discussed targeting him.  Body camera footage confirms officers targeted him as "the guy in the black shirt."

164)    Mr. Ahmed tried to enter Capen Hall (an academic building at his university) and a group of Defendant Officers, including Defendant Ammerman, prevented him from entering the building.  Then, a group of many officers, primarily from the BPD sprinted at him and tackled him violently (despite Mr. Ahmed presenting no threat).

165)    Plaintiff Ahmed was chased by many Defendant Officers, including Defendants Ammerman, Bauer, Ford, Frascatore, Palizay and other officers from the Buffalo Police Department.  Defendant Officers verbally berated Plaintiff Ahmed.  After he was violently tackled by Defendant Officers from the Buffalo Police Department, including Defendants Ford, Serafini, Frascatore, Gravius, and other Defendants Officers, multiple (yet to be identified) Defendant Officers piled on top of him, slammed his head

into the ground, and pulled at his hair and face.  A non-party student witness to the attack remarked with horror to a yet-to-be-identified BPD officer that it was unacceptable that six officers felt the need to "slam his face into the ground."

166)    Immediately afterwards, Defendant Frascatore laughed with a group of Defendant Officers, as he bragged: "I f**king blasted him – he went flying."  In another discussion, Defendant Frascatore laughed about how 12-15 other Defendant Officers were on top of him and Mr. Ahmed as Frascatore pinned him.

167)    Mr. Ahmed was zip-tied and transported while disoriented and in pain. Mr. Ahmed suffered serious injuries to his head, mid-section, and left thumb.  He was diagnosed with a concussion and nerve damage to his thumb.  He experienced religious and psychological distress and emotional trauma as a result.

168)    Plaintiff **Jay Ayoub** is a 61-year-old community member and father of Plaintiff Majd Ayoub.  Mr. Ayoub arrived at UB North Campus during the May 1, 2024 protest to bring food to his child and his friends.  After arriving with the food, Mr. Ayoub quietly and peacefully observed the demonstration at some distance from the gathering on the lawn in front of Hochstetter Hall because of the shocking number of police officers gathering near the protestors.  As obligated by his faith, Mr. Ayoub participated in the Maghrib prayer with the other Muslim individuals present at the site.  Mr. Ayoub participated in the prayer circle during Maghrib prayer, as mandated by his religion.  He dispersed from the protest site in accordance with the Officers' dispersal orders.

169)    A few minutes later, Mr. Ayoub attempted to keep the peace as Defendant Officers, including Defendant Ford and other Buffalo Police attacked his son Majd. When Mr. Ayoub approached Defendant Ford and the other Defendant Officers,

Defendants Ford, Palizay, Santiago, Schultz, Serafini, Soluri a BPD lieutenant (without a name badge) and multiple Defendant Officers, including other Buffalo Police, unknown Town of Cheektowaga, and unknown UBPD officers, violently tackled Mr. Ayoub to the ground and piled their body weight upon him.  Video footage reflects Defendant Officers, including Defendant Lieutenant Schultz, punching and kneeing Mr. Ayoub as he is restrained under the body weight of numerous officers.

170)    Mr. Ayoub cried out "I can't breathe, I have asthma" multiple times while restrained.  Defendant Officers responded: "I don't give a f**k," as Mr. Ayoub pled for his breath.  Mr. Ayoub credibly feared for his life and believed he was moments from suffocating to death.  Officers ignored his pleas.  Rather than easing off, officers shouted at Mr. Ayoub to "stop resisting" and remained on top of him, despite Mr. Ayoub never resisting while he was under the numerous officers.  He was eventually lifted and zip-tied.  In the course of pinning and cuffing him, officers wrenched Mr. Ayoub's arms backward with excessive force, twisting it upward beyond its normal range.

171)    As the Buffalo Police officers, including Defendant Ford, led Mr. Ayoub away, he begged for his breath and pleaded, "I swear to God, I am going to die."  Only after multiple pleas did the Buffalo Police and UBPD officers allow Mr. Ayoub to take a moment to attempt to catch his breath.

172)    He suffered bruising to his ribs and a sprain to his left shoulder.  He was treated at Millard Fillmore Suburban Hospital and continued to experience pain, shortness of breath, and psychological distress in the following weeks.

173)    Plaintiff **Majd Ayoub** is a UB student and organizer with Students for Justice in Palestine.  He was involved with the organization of the May 1 protest

participated with the prayer group during Maghrib prayer. Plaintiff Ayoub dispersed in accordance with Defendants' unconstitutional orders.

174)    After Plaintiff Mohammed was assaulted and arrested, she was crying as she was led in handcuffs without her religious attire, which had been dislodged.  Majd attempted to assist Ms. Mohammed with her religious garb when he was pushed in the chest by Defendant Ford, who then shouted at Majd to "back the f***" up.  Majd requested to assist Ms. Mohammed with her discomfort resulting from the exposure caused by Defendants' removal of her religious clothing.  Defendant Ford and other unknown Buffalo, and other Defendant officers shouted at Majd to back up (with Defendant Ford declaring "I am in charge"); Majd complied.  As Majd explained, "I am backing up," and as he did indeed back up, he was rushed by Defendants Ford, Arnold, Rogers, Soluri and multiple other Defendant Officers, including other Buffalo Police officers.  Majd was then violently tackled to the ground.

175)    Majd was slammed into the ground and pavement, pinned down, and violently piled upon as his arms were zip-tied.  He made no effort to resist.

176)    Majd sustained injuries to his right shoulder, right arm, and right hip. He experienced emotional trauma from being targeted and physically attacked while attempting to comply.

177)    Plaintiff **Elvi Jo Dougherty** is a community member who attended the protest with her daughter, Soliegh.  Ms. Dougherty stood in the outer circle of demonstrators, linking arms with others to create a protective circle around the praying Muslims at the protest site.  She intended to disperse from UB's campus after the Muslim evening prayer had concluded but was arrested while the prayer was ongoing.

178)    Despite not resisting or threatening any officer, without warning, she was violently apprehended by unidentified UBPD and NYSP officers, and Defendant Wahl.  Her arms were grabbed, and she was tightly zip-tied, causing numbness, pain, and bruising to her wrists.  The zip ties caused loss of circulation and numbness, and were not loosened despite repeated requests until some time after she was seated on a UB bus for transport. She required therapeutic care and suffered emotional injury.

179)    Plaintiff **Soliegh Dougherty** is a college student at Buffalo State University and is the daughter of Elvi Jo Dougherty. She stood in the protective circle near the prayer group, linking arms to assist with the protective circle around the ongoing prayer.  She intended to disperse from UB's campus after the Muslim evening prayer had concluded but was arrested while the prayer was ongoing.

180)    Despite not resisting or threatening any officer, without warning, she was swept off her feet by an officer, slammed into the ground face-first, and pinned under at least three officers, including UBPD and NYSP officers.   Her face was pressed into the grass as she cried out. She was zip-tied and detained without resisting.  She sustained deep chest bruising, abrasions, and emotional trauma.  Her participation in civic activity, including protests, has ceased due to fear caused by the incident.

181)    Plaintiff **Jazmine Frazier** arrived at the protest shortly before 8:00 p.m., carrying a sign and water. They linked arms in the protective circle while others prayed. Then, Jazmine evacuated the Flint Loop lawn in accordance with Defendant Officers' orders and joined arms with other protestors in a different location on campus.

182) They began filming as officers approached. One hand held their phone; the other was linked with a nearby protester. They dropped the phone while backing away. An officer shoved them at the shoulder while Jazmine's foot was behind his.

183) Jazmine was tackled to the ground, flipped over, and pinned by a number of officers across their legs, hips, and torso. They screamed, "I can't breathe" as officers attempted to zip-tie them. The first set failed; they were tackled again and re-cuffed — first with a second zip tie, then with metal handcuffs.

184) Jazmine was violently apprehended by Defendants UBPD Officers Kostek and Kurowski, ECSO Vaccaro, and unknown members of the Town of Tonawanda Police Department and the ECSO.

185) They were never offered medical attention. Jazmine sustained bruises on their hands, wrists, hips, and knees, and required psychological treatment in the aftermath.

186) Plaintiff **Timothy Georger** is a UB graduate student and Teaching Assistant who stood peacefully on the sidelines of the protest. He stood calmly near the perimeter of the crowd, not chanting or obstructing pathways. He joined the protective formation encircling students who were praying. Then, Mr. Georger evacuated the Flint Loop lawn in accordance with orders issued by Defendant's officers and joined arms with other protesters in a different location on campus. Mr. Georger held a sign supportive of the Palestinian cause and peacefully stood.

187) Mr. Georger was violently apprehended and manhandled by Defendants Caruana, Vaccaro and unknown members of the Tonawanda Police Department. Defendant Caruana ripped Mr. Georger's shirt and then handed Mr. Georger off to yet-to-

be-identified officers to be zip-tied.  He suffered emotional pain and distress as a result of the incident.

188)    Plaintiff **Ibrahim Khatib** is a practicing Muslim and an active community member.  He was engaged in silent prayer when the line of officers approached.

189)    Mr. Khatib was shoeless but attempted to get to his feet and run away in accordance with the dispersal order, as he had no intention of violating any curfew or police order.  While shoeless (due to his participation in holy prayer), he was tackled from behind by multiple officers, including yet-to-be-identified UBPD and Tonawanda officers.  Mr. Khatib was zip-tied tightly despite offering no resistance.  His wrists were bruised and numb for days, and he developed psychological distress related to the religiously insensitive nature of the takedown.  Mr. Khatib's exercise of his First Amendment rights was significantly chilled as a result of the incident.  The experience caused religious trauma and withdrawal from congregational prayer.

190)    Mr. Khatib was not given the opportunity to comply or move.  The use of force against him was not calculated to secure compliance, but to punish and suppress.

191)    Plaintiff **Hannah Krull** was a UB graduate student who was documenting the protest with her phone.  She was standing peacefully in the protective circle around the prayer participants when officers rushed the group.  Then, Ms. Krull evacuated the Flint Loop lawn in accordance with orders issued by Defendant's officers and joined arms with other protesters in a different location on campus.

192)    Ms. Krull was tackled face-first into the pavement and pinned by multiple officers.  Ms. Krull was violently tackled, piled upon, zip-tied, and apprehended by

officers from the Tonawanda Police Department, including Defendants Maraschiel, Lund, Walsh-Stienes, Wahl, unknown UBPD officers, and unknown ECSO officers.

193)    Her left shoulder was badly injured and she suffered abrasions and bruising on her face, arms, and chest.  Additionally, the incident caused Ms. Krull psychological injuries including emotional trauma, and she continues to experience panic and difficulty focusing in academic settings.

194)    Plaintiff **Noor Mohammed** is a UB student, a member of Students for Justice in Palestine, and a practicing Muslim.  She attended the May 1, 2024 protest after class and arrived on site around 7:55 p.m., bringing refreshments at the request of other students.  She wore a keffiyeh and hijab and stood near the prayer group, respectfully observing and filming the police presence on her phone.  She never participated in the demonstration or prayer on May 1, 2024.  She was scared and intimidated by the overwhelming police presence, so she did not participate in the prayer with her fellow Muslims.  She dispersed from the scene in compliance with the officers' orders.

195)    Ms. Mohammed fled to Capen Hall to ensure that she would not be in any conflict with any officer.  Despite her compliance, officers from various agencies, including the BPD, entered Capen Hall, grabbed Ms. Mohammed by her backpack and slammed her to the ground. She was pinned by at least three officers — one on the head, one on the chest, and one on the legs.

196)    Ms. Mohammed was assaulted and berated by Defendants Arnold, Bauer, and Rogers, yet-to-be identified members of the BPD and the UBPD.

197)    Ms. Mohammed's hijab and keffiyeh were forcibly dislodged, exposing her head and hair, in defiance of her committed religious beliefs.  She feared for her life

and cried while being restrained, and was publicly humiliated by the loss of her religious

covering. Officers, without provocation, berated Ms. Mohammed and taunted her, saying:

"you wanna keeping talking your shit? Here. Here's your f**king shit."  As the officers

assaulted and harassed Ms. Mohammed, she can be heard crying and begging for her

hijab (which the officers had purposefully removed).   These comments suggest animus

relating to Ms. Mohammed's religious and/or ethnic appearance, and retaliation for Ms.

Mohammed's filming of the police.

198)    She was placed in handcuffs, not zip ties.  She begged officers to allow her

to readjust her religious garments to comply with her religious beliefs, but her pleas were

ruthlessly refused.  Instead, while she was being led through UB's campus in handcuffs

and without her preferred religious attire, an undercover/non-uniformed/no-nametag

officer (who can be seen throughout various videos dictating orders to multiple agencies,

primarily the BPD) stopped her in her tracks and took a picture of her with his cellphone.

199)    While crying and pleading, Ms. Mohammed was transported in a UB bus

to the Center for Tomorrow, where she was processed and issued a ticket.  She sustained

deep bruises all over her body, including to her face, shoulders, chest, knees, and ankles,

and was caused to miss work.  She experienced profound emotional and psychological

trauma, religious violation, and public humiliation, which she continues to process.

## VI.    DEFENDANT CONDUCT AND FAILURE TO INTERVENE

200)    On May 1, 2024, each of the following groups of Defendant Officers was

personally present at or near the site of the peaceful protest held on the University at

Buffalo campus:

- The Municipal Defendant Officers (comprising sworn officers of the Buffalo Police Department, the Amherst Police Department, the Kenmore Police Department, the Tonawanda Police Department, and the Erie County Sheriff's Office),

- the NYS Defendant Officers (comprising sworn officers of the University at Buffalo Police Department and the New York State Police), and

- the John Doe Defendant Officers (comprising presently unidentified law enforcement officers employed by one or more of the aforementioned agencies or other agencies acting in concert with them).

201)    Several of the Municipal Defendant Officers, NYS Defendant Officers, and the John Doe Defendant Officers (the Municipal Defendant Officers, the NYS Defendant Officers, and the John Doe Defendant Officers, together, are the "Defendant Officers") , including CHIEF BEATY, LIEUTENANT TIMOTHY BACON, INVESTIGATOR TIMOTHY THOMPSON, DEPUTY CHIEF MARCISZEWSKI, CAPTAIN FLETCHER, and LIEUTENANTS KERR and BACON, held supervisory or command authority at the scene and were responsible for overseeing the actions of subordinate officers.

202)    Defendants Bacon and Thompson were among those individuals responsible for identifying (innocent) targets for arrest.  Defendant Bacon of the UBPD (in conjunction with the unidentified/no-name tag supervisor present throughout the protest) dictated orders to UBPD officers and other Defendants for responding to the crowd, instructing officers to make arrests.

203)     Defendant Bacon of the UBPD sought advice from Defendant Lieutenant Schultz of the BPD for guidance on the police response to the active protest, including advice as to how far the police line should go.

204)     During the course of the protest, Plaintiffs and other peaceful demonstrators were subjected to unlawful uses of force, unlawful arrests, retaliatory conduct for protected speech, interference with their rights to record public officials, unlawful seizure of personal property, and other deprivations of constitutional rights.

205)     Each of the Municipal Defendant Officers, NYS Defendant Officers, and John Doe Defendant Officers was personally present at the scene and personally observed or had direct knowledge of the ongoing constitutional violations being committed by officers against peaceful protestors.

206)     The coordinated presence and collective inaction of the Municipal Defendant Officers, NYS Defendant Officers, and the John Doe Defendant Officers allowed and encouraged the constitutional violations to continue unabated.

207)     Each Defendant Officer had a realistic opportunity to intervene to prevent the unlawful acts being committed against Plaintiffs and other peaceful protestors, yet deliberately failed to take any reasonable steps to prevent or mitigate the constitutional violations.

208)     By their direct participation in the unlawful conduct and/or their failure to intervene when they had a realistic opportunity to do so, directly and proximately caused Plaintiffs to suffer constitutional deprivations, including violations of their rights to freedom of speech, freedom of assembly, freedom from retaliation for protected expression, freedom from unreasonable seizure, and freedom from excessive force, as

secured by the First, Fourth, and Fourteenth Amendments to the United States

Constitution, and as secured by the New York Constitution.

209)    The constitutional rights at issue — including, without limitation, the

rights to freedom of speech, freedom of assembly, freedom from retaliation for protected

expression, the right to record public officials, the right to be free from unlawful seizure,

the right to be free from excessive force, and the right to be free from deprivation of

liberty without due process of law — were clearly established at the time of the events at

issue.

210)    No reasonable law enforcement officer in the positions of the Defendant

Officers could have believed that the conduct described herein was lawful under clearly

established constitutional law.

211)    A UB Spectrum student editor attempted to document the arrests but was

shoved by a BPD lieutenant and told to 'get the f—k out of here.' When he identified

himself as media, the officer replied, 'I don't care.' This flagrant disregard for press

protections illustrates Defendants' intent to suppress public oversight.

212)    As a direct and proximate result of the acts and omissions of the

Defendant Officers, Plaintiffs suffered physical injuries, emotional distress, mental

anguish, loss of liberty, damage to property, reputational harm, and the chilling of their

rights to engage in protected speech and expressive conduct.

213)    Each Defendant Officer is therefore liable under 42 U.S.C. § 1983 and the

New York Constitution for his or her personal failure to intervene to prevent the violation

of Plaintiffs' constitutional rights.

214)    Plaintiffs reserve the right to amend this Complaint to assert additional allegations of direct participation by individual Defendant Officers (and identity of John Doe Officers) as discovery reveals further specific facts regarding their conduct.

215)    The story of May 1, 2024, is not one of public safety, nor of neutral law enforcement.  It is a story of viewpoint discrimination, anti-Muslim hostility, and the criminalization of peaceful protest through coordinated state violence.  The events of that day left lasting physical, psychological, and academic scars on Plaintiffs, all of whom were punished not for breaking the law, but for exercising their most sacred American rights

## VII.    CAUSES OF ACTION

216)    All following causes of action are asserted by all Plaintiffs against all Defendants, unless otherwise noted.

217)    Unless otherwise stated in a specific Cause of Action below, the claims herein are asserted against the individual Defendant Officers in their individual capacities. Claims asserted against the Municipal Defendants are specifically identified and plead under applicable theories of Monell liability, respondeat superior, or direct negligence, as set forth below.

218)    Plaintiffs reallege and incorporate by reference each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

219)    At all times relevant hereto, the Municipal Defendant Officers, NYS Defendant Officers, and John Doe Defendant Officers were acting under color of law and within the scope of their employment.

220)    Plaintiffs assert claims for relief against each of the Defendant Officers in their individual capacities for their personal involvement in the violations alleged herein, including:

(a) Direct participation in the unlawful conduct;

(b) Failure to intervene despite having a realistic opportunity to prevent the unlawful conduct; and/or

(c) Deliberate indifference to the violations of Plaintiffs' clearly established constitutional and statutory rights.

221)    Each Cause of Action set forth below is asserted against the Defendant Officers individually, unless otherwise expressly stated, and is based upon the personal conduct and/or deliberate failure to act of each such officer as described herein.

**COUNT I – FIRST AMENDMENT (Freedom of Speech, Assembly, and Petition) (42 U.S.C. § 1983) –** *Retaliation and Suppression of Protected Speech and Assembly (Against All Defendant Officers and Defendants Tripathi and Garcia, Individually)*

222)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 221 above as if fully set forth herein.

223)    Defendants, including Defendant Satish K. Tripathi, acting under color of state law, violated Plaintiffs' rights to freedom of speech, freedom of association (assembly), and to petition the government for redress of grievances as guaranteed by the First Amendment to the U.S. Constitution.

224)    The First Amendment to the United States Constitution, as incorporated against the states through the Fourteenth Amendment, prohibits government actors from abridging the freedoms of speech, assembly, association, religious exercise, and petition.

225)    All ten Plaintiffs were engaged in expressive conduct protected by the First Amendment, including peaceful protest, chanting, praying, linking arms, standing in solidarity with worshippers, documenting police conduct, or holding protest signs.  In every case, the force and arrest used against Plaintiffs was motivated by their expressive activity and resulted in the suppression of constitutionally protected speech and assembly. Their expression related to a matter of public concern (Palestinian human rights and University policies).

226)    The protest occurred on the Flint Loop lawn, a public, outdoor space on the campus of a public university — a traditional and designated public forum where speech protections are at their peak.

227)    Plaintiffs were not engaging in unlawful conduct.  They posed no threat to public safety, blocked no ingress or egress, and complied with requests earlier in the day to remove tents.

228)    Defendants' actions in forcibly dispersing the protest and arresting Plaintiffs were motivated or substantially caused by Plaintiffs' exercise of these rights and were taken in retaliation for Plaintiffs' protected expression.  Defendants sought to suppress expression through arrests, intimidation, and physical force.

229)    Defendants' conduct – including issuing a vague, arbitrary, last-minute dispersal ultimatum and then deploying overwhelming force – was intended to punish Plaintiffs for their message and to silence their viewpoints.  The timing and nature of the crackdown (during prayer and chanting) demonstrate an effort to quash the demonstration and its pro-Palestinian message.

230)    No written policy or university rule supported this arbitrary curfew. No emergency declaration was in place.  The time selected had no basis in law or regulation and was enforced without individualized warnings or opportunities to comply.

231)    UB officials, including Tripathi, violated the SUNY Rules for the Maintenance of Public Order, which stipulate that, "No student . . . or authorized visitor shall be subject to any limitation or penalty for expressing his or her views or for assembling with others for such purpose."

232)    The demonstration was conducted in full accordance with UB's Picketing and Assembling Policy.  No section of that Policy or any other UB policy in effect as of May 1, 2024 prevented gatherings or protests from extending into the dusk or nighttime hours.  There was a prohibition against "overnight assemblies"; an overnight assembly is one that is underway on a particular day and continues "overnight" into the following morning.  "Overnight" begins much later than 8:23 p.m.

233)    The dispersal and arrest order was issued without a lawful basis, selectively enforced, and timed to coincide with the Muslim evening prayer.

234)    At or just after 8:23 p.m., dozens of officers from multiple agencies charged into the protest site, tackling, zip-tying, and dragging away individuals engaged in protected speech, prayer, and observation.

235)    All Plaintiffs were arrested and assaulted without warning or a lawful basis.

236)    This conduct constituted an unlawful prior restraint on Plaintiffs' speech and assembly, executed through force rather than regulation, and triggered strict scrutiny under First Amendment precedent.

237)    Defendants' actions were not content-neutral.  The protest was critical of

U.S. and Israeli military action in Gaza, and multiple Plaintiffs were visibly associated

with Muslim or Arab-American identity or advocacy groups such as Students for Justice

in Palestine.

238)    The suppression of this protest, including its dispersal and the arrests that

followed, was motivated in substantial part by disagreement with Plaintiffs' viewpoint

and affiliation.

239)    Defendants' actions also constituted retaliation against Plaintiffs for

engaging in protected First Amendment activity.  The force, arrests, and humiliation

Plaintiffs endured would deter a person of ordinary firmness from continuing to speak or

assemble.

240)    Defendants' hostility toward protected expression extended beyond the

demonstrators.  When a UB Spectrum editor attempted to film the arrests, a BPD

lieutenant pushed him and shouted, "get the f—k out of here."  When the student

identified himself as media, the officer responded, "I don't care."  This incident

exemplifies Defendants' intent to suppress documentation of their conduct and further

demonstrates viewpoint-based retaliation and disregard for constitutional protections.

241)    Municipal Defendants are liable under Monell because their police

departments operated pursuant to a shared policy, practice, or custom of dispersing

protests based on viewpoint, and without lawful curfew authority, adequate training, or

individualized probable cause.

242)    The May 1, 2024 operation was coordinated, planned, and executed across jurisdictions.  The suppression of this protest was the foreseeable and intended result of unconstitutional municipal policy and failure to train.

243)    As a direct result of Defendants' actions, Plaintiffs' protest was terminated and their message suppressed.  This chilled Plaintiffs' and others' future expression, as evidenced by several Plaintiffs now being fearful to engage in protest.

244)    Following the protest, UBPD and other law enforcement continued to surveil and target Muslim and pro-Palestinian students, including through indefinite campus bans, despite full dismissal of all charges.  Defendants also retaliated against certain Plaintiffs by issuing persona non grata designations.  These extrajudicial bans were imposed without notice, justification, or opportunity to be heard and remain in place despite no evidence of any ongoing threat. This ongoing exclusion further chills Plaintiffs' protected expression and association.

245)    **No Legitimate Justification:** Defendants lacked any legitimate, content-neutral justification for dispersing the assembly in the manner they did. The protest was peaceful and posed no security threat.  Even if enforcing the encampment policy was a goal, the protesters had already removed their tents hours earlier and were lawfully present in a public forum.

246)    The extreme response at 8:23 p.m. was not a reasonable time, place, or manner regulation – it was an unjustified suppression.  Setting the 8:23 p.m. deadline (with little to no notice) was an arbitrary, baseless, unconstitutional act.  Moreover, Defendants' use of force and arrests was far from narrowly tailored; it was an outright silencing.

247)     The retaliatory use of police force and PNG designations was further condemned by over 300 UB faculty members and formalized through a Faculty Senate resolution.  These public responses underscore the absence of any legitimate safety justification and confirm that Plaintiffs' conduct was protected speech under University and SUNY policy.

248)     **Injury:** As a proximate result of this First Amendment violation, Plaintiffs suffered damages including physical injury, emotional distress, chilling of their speech, reputational harm (being branded as arrestees), and other financial and non-financial harms (such as missed work or medical expenses for injuries).

249)     **Declaratory/Injunctive Relief:** Plaintiffs seek a declaratory judgment that Defendants' actions violated their First Amendment rights. Plaintiffs also seek injunctive relief to prevent Defendants from enforcing any unwritten "sunset dispersal" policy or otherwise engaging in similar mass suppression of protected speech without clear, constitutional guidelines.  This includes appropriate training for officers on handling peaceful protests and respecting the rights of demonstrators.

**COUNT II – FIRST AMENDMENT (Freedom to Record Public Officials) (42 U.S.C. § 1983) –** *Retaliation for Observing and Documenting Police Activity (Against All Defendant Officers and Defendants Tripathi and Garcia, Individually)*

250)     Plaintiffs reallege and incorporate by reference Paragraphs 1 through 249 above as if fully set forth herein.

251)     Defendants, including Defendant Satish K. Tripathi, acting under color of state law, violated Plaintiffs' rights to observe and document public officials engaged in their official duties, as protected by the First Amendment to the United States Constitution.

252)    Plaintiffs (including Yousef Ahmed, Noor Mohammed and Hannah Krull) were engaged in conduct protected by the First Amendment—namely, observing and documenting police activity at a public protest—when they were arrested and subjected to physical force by law enforcement.

253)    At the time of their arrests, Mr. Ahmed, Ms. Mohammed and Ms. Krull were standing peacefully, using their phones to record events unfolding around them. Neither posed a threat, interfered with any investigation, nor engaged in any form of active resistance.

254)    Defendant officers explicitly targeted individuals who were filming or speaking out, indicating hostility to Plaintiffs' attempt to document and protest police actions and to exercise their respective rights under the First Amendment.

255)    The circumstances of their arrests strongly suggest retaliatory intent. In each of the cases, officers acted immediately after observing the plaintiffs filming or documenting the protest and police response. Mr. Ahmed was chased and assaulted. Ms. Mohammed was tackled and pinned beneath three officers, who removed her religious head covering and berated her. Ms. Krull was tackled face-first into the pavement shortly after raising her phone to film.

256)    A UB student journalist was also prevented from recording the protest. When the editor of the UB Spectrum attempted to film the arrests, a Buffalo Police lieutenant pushed him and told him to "get the f—k out of here." The editor identified himself as media, to which the officer replied, "I don't care." This exemplifies Defendants' intent to suppress public scrutiny and further evidences a pattern of retaliatory enforcement against individuals exercising First Amendment rights to record.

257)    Defendants' conduct had the purpose and effect of chilling Plaintiffs' speech, preventing the documentation of police misconduct, and punishing individuals for engaging in public oversight.  The conduct was not narrowly tailored to any legitimate law enforcement interest. Retaliatory arrests for documenting police conduct violate clearly established First Amendment law.

258)    As a direct and proximate result of Defendants' retaliatory conduct, Plaintiffs Yousef Ahmed, Noor Mohammed, and Hannah Krull suffered physical injuries, emotional distress, chilling of their future protected activity (including documenting public officials and engaging in peaceful protest), and reputational harm.  Plaintiffs have incurred and continue to incur damages, including but not limited to pain and suffering, emotional trauma, humiliation, and related economic harms.

259)    Plaintiffs seek compensatory damages for the injuries suffered as a result of Defendants' unlawful retaliation.  Plaintiffs further seek punitive damages against the individual Defendant Officers to punish and deter future violations of constitutional rights.  Plaintiffs also seek declaratory relief stating that Defendants' retaliatory arrests for protected recording activities violated the First Amendment, and injunctive relief to prohibit future retaliation against individuals lawfully observing or recording law enforcement activity.

**COUNT III – FOURTH AMENDMENT (42 U.S.C. § 1983)** – *Excessive Force*
*(Against All Defendant Officers Individually)*

260)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 259 above as if fully set forth herein.

261)    Defendants, acting under color of state law, used objectively unreasonable and excessive force against each Plaintiff during the course of their seizure (detention/arrest), in violation of the Fourth Amendment's guarantee against unreasonable seizures.

262)    All ten Plaintiffs were subjected to physical force grossly disproportionate to the circumstances.  None were engaged in violent, threatening, or evasive behavior. Despite this, officers tackled, pinned, zip-tied, or handcuffed each Plaintiff with unnecessary and unreasonable force.  Several Plaintiffs here were seated, linking arms, praying, filming, standing peacefully, or retreating when Defendant Officers applied force far beyond what was reasonable or lawful.   The use of force against Plaintiffs was not calculated to secure compliance, but to punish and suppress.  Plaintiffs suffered documented injuries including sprains, bruises, fractures, concussions, and significant psychological trauma.

263)    At the time that force was used, Plaintiffs were non-violent, non-resisting, and most were either seated, prone, or otherwise subdued.  No Plaintiff posed an immediate threat to officer safety or others, and none were actively fleeing in a manner that justified violent takedowns (even those who moved were simply trying to leave as ordered).

264)    The excessive force included but is not limited to: tackling and throwing Plaintiffs to the ground with great force (e.g., including Yousef Ahmed, Jay and Majd Ayoub, Soliegh Dougherty, Jazmine Frazier, Ibrahim Khatib, Hannah Krull, Noor Mohammed), piling on and kneeing or pressing body weight onto Plaintiffs who were already down, wrenching limbs and over-tightening restraint, and striking sensitive areas

(e.g., heads slammed into doors or ground).  Such force was clearly disproportionate to the need, especially considering all Plaintiffs were already surrounded by multiple officers when additional force was applied.

265)    The force used on Plaintiffs reflects a systemic failure to distinguish between nonviolent protest and actionable threats.  Officers treated passive resistance or peaceful observance as justification for violent takedowns.  The repeated use of pile-ons, restraint holds, and aggressive takedowns on compliant individuals shows deliberate disregard for constitutional boundaries.

266)    **Injury and Causation:** Plaintiffs suffered significant injuries as detailed above as a direct result of this excessive force. These include bruises, contusions, sprains, cuts, a concussion and other head injuries, arm, shoulders, chest, back and other physical and emotional injuries.  The force was a proximate cause of these injuries.  Plaintiffs also endured pain and suffering (physical and mental), some of which required medical treatment and ongoing care.

267)    **Objective Unreasonableness:** No reasonable officer in any of the Defendants' positions would have believed that the level of force used was lawful under the circumstances.

268)    The protest situation was under control (vast police superiority in numbers and equipment), and Plaintiffs were not fighting back or posing threats.  The use of impact techniques (tackles, throws) and pile-ons on peaceful arrestees shocks the conscience and violates clearly established Fourth Amendment standards.

269)    Indeed, all charges against Plaintiffs were dropped, further underscoring the lack of any underlying justification for force.

270)    **Liability:** Each individual Defendant officer who personally used excessive force, or who failed to intervene to stop other officers' excessive force despite a realistic opportunity to do so, is liable under § 1983 for this violation.

271)    Each individual Defendant Officer either directly participated in using force or was a supervisory/lead officer who allowed the excessive force to occur (they are liable both for their own actions and for failure to intervene or supervise).  The John Doe officers from each agency are similarly liable for direct acts and omissions.

272)    **Injury and Relief:** Plaintiffs seek compensatory damages for their physical injuries, pain and suffering, and emotional distress caused by the excessive force.

273)    Plaintiffs also seek punitive damages against the individual officers to punish and deter such conduct, as it was willful, malicious, or shown with reckless indifference to Plaintiffs' rights.

**COUNT IV – FOURTH AMENDMENT (42 U.S.C. § 1983)** – *Unlawful Seizure and False Arrest (Against All Defendant Officers Individually)*

274)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 273 above as if fully set forth herein.

275)    Defendants, acting under color of state law, violated Plaintiffs' Fourth Amendment rights by seizing and arresting them without probable cause.  At the moment each Plaintiff was arrested, he or she was not committing any crime or offense.

276)    Plaintiffs were lawfully present in a public space and engaging in First Amendment activity.  While Defendants might claim Plaintiffs failed to disperse, any

such order was unlawfully applied and, in any event, Plaintiffs were given essentially no opportunity to comply before being arrested.

277)    Each of the ten Plaintiffs was seized and arrested without probable cause. The dispersal directive issued by police lacked legal clarity, and no individualized notice or opportunity to comply was given.  Several Plaintiffs were in the midst of prayer. Others were standing or linking arms and posed no threat.  The arrests were not based on any observed unlawful conduct but rather on the presence at a protest that the State sought to shut down.

278)    There was no probable cause to charge Plaintiffs with crimes like trespass or loitering (the area was open to the public and many arrestees were UB students on their own campus) or disorderly conduct (their conduct was orderly and peaceful) or resisting arrest (none engaged in active resistance; any perceived non-compliance was due to surprise or physical inability under the circumstances). The arrests were pretextual and baseless, as evidenced by the immediate dismissal of the charges.

279)    **Continued Detention and Processing:** Defendants further violated Plaintiffs' rights by continuing to detain, handcuff, and process them even after it should have been clear no crime was committed.  Plaintiffs were transported across UB in custody and held for hours before release on appearance tickets.  This extended seizure compounded the violation, as it was done to intimidate and punish rather than serve any legitimate law enforcement purpose.

280)    **No Qualified Immunity:** No reasonable officer could have believed there was probable cause to arrest these Plaintiffs under the circumstances.

281)    The law is clear that citizens have the right to peaceably protest on public property.  The encampment policy had been complied with, so no infraction remained. The mere presence of protesters after an arbitrarily imposed deadline, without more, does not create probable cause for disorderly conduct or trespass – especially given that UB's own statement recognized students' protest rights.  Any dispersal order was not sufficiently conveyed or lawful.  Therefore, Defendants are not shielded by qualified immunity for (violently) making arrests expressly to inhibit free expression.

282)    **Harm:** Each Plaintiff was subjected to loss of liberty, indignity, and emotional distress by being wrongfully arrested.  Some were publicly handcuffed in front of peers and subjected to the stigma of criminal arrest (videos and photos of many Plaintiffs being arrested appeared on social media and news).  They also incurred time lost and, in some cases, expenses).  These damages were directly caused by Defendants' unlawful seizures.

283)    **Relief:** Plaintiffs seek compensatory damages for the false arrest and imprisonment.  They also seek a declaratory judgment that their arrests were unconstitutional.  Injunctive relief is warranted to expunge any arrest records or fingerprints taken, overturn PNG status, and to require the involved agencies to implement policies ensuring that peaceful protesters are not arrested without cause in the future.  Punitive damages are warranted against individual officers who knowingly violated clearly established law by arresting protesters without justification.

**COUNT V – FOURTEENTH AMENDMENT (Equal Protection Clause) (42 U.S.C. § 1983)** – S*elective Enforcement and Viewpoint Discrimination (Against All Defendant Officers and Defendants Tripathi and Garcia, Individually)*

284)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 283 above as if fully set forth herein.

285)    Defendants, including Defendant Satish K. Tripathi, acting under color of state law, denied Plaintiffs the equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution.

286)    Defendants, acting under color of state law, denied Plaintiffs the equal protection of the laws, in that Defendants intentionally and/or irrationally discriminated against Plaintiffs based on their viewpoint, ethnicity, religion, or perceived religion/ethnicity. The police crackdown was not content-neutral: it was aimed at pro-Palestinian demonstrators.

287)    Notably, at the same time, at the same location on campus, protestors who expressed an opposing viewpoint to the Plaintiffs (pro-Israel counter-speech) were not subjected to force or arrest – for example, some counter-protesters mocking the demonstration and even shouting insults ("F—k those terrorists") were left unencumbered by police while the crackdown on the pro-Palestinian protestors was taking place.  This constitutes selective enforcement and viewpoint discrimination.

288)    Additionally, after the protest, officers patrolled and harassed students near Capen Hall and Knox Hall in a manner that selectively targeted pro-Palestinian students or individuals perceived to be associated with the protest, while leaving others undisturbed. This continued pattern of selective enforcement underscores Defendants' viewpoint- and identity-based animus.

289)    The stark difference in treatment between the largely Muslim and Arab-American protesters and the non-Palestinian counter-protesters raises an inference of

discriminatory intent. Additionally, within the protesters, officers appeared to single out those wearing Islamic attire (hijabs and keffiyeh) for arrests and harsher handling.

290) **Protected Class and Viewpoint:** Many Plaintiffs are of Arab descent and Muslim faith (e.g., Majd and Jay Ayoub are Palestinian-American; Yousef Ahmed, Ibrahim Khatib and Noor Mohammed are Muslim).

291) To the extent Defendants targeted them for who they are (race/ethnicity or religion), strict scrutiny applies. There was no compelling interest or narrow tailoring.

292) Moreover, even absent a formal protected class, targeting individuals for the viewpoint of their speech (advocacy for Palestinian rights) is a form of discrimination that violates equal protection (and First Amendment principles). The police actions effectively imposed a double standard, shutting down a pro-Palestinian protest while permitting others.

293) **Selective Enforcement:** Defendants enforced laws (such as trespass, "loitering," or disorderly conduct regulations) in a selective manner against Plaintiffs. The decision to declare the assembly unlawful at 8:23 p.m. and arrest everyone was substantially motivated by the subject matter of the protest (pro-Palestine) and by UB's or law enforcement's apparent discomfort with that message, especially coming after protests at other campuses. Notably, none of the pro-Israeli counter-protestors were arrested or disturbed.

294) There was no similar enforcement against other student gatherings or protests that were comparable in disruption (indeed, the May, 2024 pro-Palestinian protest did not disrupt campus operations in any way). Defendants plainly engaged in selective enforcement based on content and identity.

295)    **Intent and Causation:** Defendant supervisors or policymakers exhibited animus or bias (for example, communications among agencies referring to protesters in derogatory terms, or differential treatment of similarly situated groups). As a direct result of this discriminatory treatment, Plaintiffs suffered the injuries described – physical harm, arrests, chilling of their expression, and mental anguish – all of which are cognizable under § 1983 equal protection claims.

296)    **Relief:** Plaintiffs seek damages for the equal protection violation, including compensation for the violation of their dignity and rights. They also seek injunctive relief requiring Defendants to institute non-discriminatory protest policing policies, and training on avoiding bias in enforcement. A declaratory judgment that Defendants' actions constituted impermissible viewpoint and identity-based discrimination is also requested. Punitive damages are appropriate to punish the malicious or reckless disregard of equality shown by certain Defendants.

**COUNT VI – FIRST AMENDMENT (Free Exercise Clause) AND FOURTEENTH AMENDMENT (Equal Protection Clause) (42 U.S.C. § 1983)** – *Religious Discrimination (Against All Defendant Officers and Defendants Tripathi and Garcia, Individually)*

297)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 296 above as if fully set forth herein.

298)    Defendants acting under color of state law, violated Plaintiffs' rights to the free exercise of religion and equal protection of the laws by targeting Muslim plaintiffs for force and arrest during prayer and by visibly singling out Islamic attire.

299)    Multiple plaintiffs (Yousef Ahmed, Jay Ayoub, Majd Ayoub, Ibrahim Khatib), were engaged in protected religious exercise — mandatory Islamic evening

prayer — when dozens of officers charged at the demonstrating group and used force against them.  Officers disrupted prayer, targeted visibly Muslim plaintiffs, and in Ms. Mohammed's case, intentionally dislodged her hijab and keffiyeh.

300)     The timing of the Defendants' dispersal notice and the action of dozens of officers charging the demonstration site coincided with the Muslim sunset prayer, which was being conducted by several of the Plaintiffs and others in the protest group.  Several protesters asked for a brief delay in enforcement to complete prayer.  Officers refused.

301)     Defendants failed to provide any accommodation for religious observance, despite knowing that the protest would include a public prayer by Muslim students. Rather, Defendants chose to target the ongoing Muslim prayer circle through their initial demonstration of force during the peaceful gathering.  Their deliberate use of force during and immediately after prayer, and the targeted nature of their actions, demonstrate discriminatory animus and a reckless disregard for Plaintiffs' religious rights.

302)     Defendants' refusal to allow plaintiffs to readjust religious garments in custody further aggravated the emotional and dignitary harm flowing from these violations.

303)     This conduct demonstrates discriminatory animus or, at a minimum, reckless disregard for Plaintiffs' religious rights.  The targeting of prayer participants violated both the Free Exercise Clause of the First Amendment and Equal Protection under the Fourteenth Amendment.

304)     As a direct and proximate result of Defendants' discriminatory conduct, Plaintiffs suffered physical injuries, emotional distress, loss of dignity, chilling of their religious expression, and feelings of fear, humiliation, and marginalization based on their

religion and ethnic background.  Plaintiffs have incurred damages, including but not limited to pain and suffering, emotional trauma, reputational harm, and associated economic losses.

305)    Plaintiffs seek compensatory damages for the injuries suffered as a result of Defendants' religious discrimination, including damages for emotional distress and violation of their First and Fourteenth Amendment rights.  Plaintiffs further seek punitive damages against the individual Defendant Officers to deter and punish discriminatory conduct.  Plaintiffs also seek declaratory relief that Defendants' actions violated the Free Exercise Clause and Equal Protection Clause, and injunctive relief requiring Defendants to implement policies and training to prevent future discrimination based on religion.

**COUNT VII – FOURTEENTH AMENDMENT (Substantive and Procedural Due Process) (42 U.S.C. § 1983)** – *Deprivation of Liberty and Arbitrary Abuse of Power (Against All Defendant Officers and Defendants Tripathi and Garcia, Individually)*

306)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 305 above as if fully set forth herein.

307)    Defendants, including Defendant Satish K. Tripathi, acting under color of state law, deprived Plaintiffs of liberty and property without due process of law, in violation of the Fourteenth Amendment to the United States Constitution.

308)    Defendants, acting under color of state law, deprived Plaintiffs of liberty without due process of law.  The manner in which Defendants abruptly declared the peaceful protest an unlawful assembly and immediately effected arrests denied Plaintiffs any fair notice or opportunity to comply, thereby violating procedural due process.

309)    Defendants' conduct shocks the conscience and constitutes an arbitrary exercise of government power.  Plaintiffs were not only arrested and injured without

cause but were humiliated, restrained, and traumatized in ways that violated human dignity and fundamental fairness.

310)    Plaintiff Noor Mohammed's hijab was removed by force while she sobbed in the presence of male officers.  Plaintiff Jazmine Frazier was tackled twice and restrained with multiple restraint methods after screaming for air.  Plaintiff Jay Ayoub, who suffers from asthma, was pinned while crying out that he could not breathe.  These actions were not necessary to effectuate any arrest — they were punitive and excessive.

311)    Defendants' refusal to pause for prayer, their verbal taunts, and the repeated use of violent, unnecessary pile-ons of non-resisting individuals — all point to a culture of punitive force that shocks the conscience and violates the substantive protections of the Fourteenth Amendment

312)    The rules of engagement shifted arbitrarily and without clear communication – UB rules governing demonstrations allow for events to continue into the night hours.  Then, UB put out a press release in minutes before the arrests setting an arbitrary deadline (contravening UB policy) that was never clearly articulated to the protestors.  This sudden change and immediate arrest deprived Plaintiffs of a protected liberty interest (their right to continue lawful assembly) without due process.

313)    Defendants' ad hoc modification of the University's Assembly Policy on or around May 1, 2024, including the deletion of key terms and online access to the policy, further deprived Plaintiffs of fair notice and the opportunity to conform their conduct to any known standard.

314)    Defendants' post-dispersal conduct, including harassment of students near Capen Hall and Knox Hall, further reflects abuse of governmental power disconnected from any lawful process or legitimate interest.

315)    The issuance of PNG notices to Plaintiffs without any pre-deprivation hearing or post-deprivation process constitutes a further deprivation of liberty and property interests without due process of law.  The PNG designations prevent access to public and educational space and were imposed without any individualized determination or timely recourse, in violation of procedural due process.

316)    **Substantive Due Process – Abuse of Power:** Additionally, Defendants' actions shock the conscience and constitute an abuse of executive power that violates substantive due process. The extreme and brutal tactics used against non-violent, non-resisting demonstrators can be seen as so egregious and disproportionate as to violate fundamental principles of justice.  While the Fourth Amendment covers specific excessive force and seizure issues (as pled above), to the extent any of the Defendants' conduct falls outside the immediate context of seizure, it still violates Plaintiffs' substantive due process rights.

317)    For instance, knocking off a hijab and deliberately humiliating detainees could be viewed as conscience-shocking conduct that is not necessary to any legitimate aim.  Similarly, continuing to detain and charge Plaintiffs with baseless offenses to intimidate them goes beyond mere Fourth Amendment seizure into punitive conduct without trial, violating due process.

318)    **Property Deprivations:** To the extent that Defendants seized and retained Plaintiffs' personal property (such as phones, signs, or other belongings) as "evidence" or

otherwise, without timely due process (like a hearing or prompt return when charges were dropped), this also violates Plaintiffs' property interests without due process. (For example, several tents, banners, and at least one phone were taken and not immediately returned.)

319)    **Resulting Injury:** The due process violations resulted in Plaintiffs being subject to unfair surprise arrests, mistreatment in custody, and deprivation of personal security and dignity.  Plaintiffs felt terror and powerlessness as a result of the unbridled actions of Defendants.  This has contributed to ongoing emotional harm.

320)    **Relief:** Plaintiffs seek appropriate damages for the violation of their due process rights.  This includes compensation for the dignitary and emotional harms associated with being subjected to arbitrary government action and any property loss (to be determined).  Plaintiffs also seek declaratory relief that Defendants' tactics were unconstitutional under the Fourteenth Amendment. Injunctive measures are requested to ensure clear standards and procedures are in place for handling protest activity by the Municipal Defendants so that community members and students are not again subjected to such arbitrary enforcement or excessive brutality.

**COUNT VIII – MUNICIPAL LIABILITY (42 U.S.C. § 1983)** – *Monell Claim (Policies, Practices, Customs, Failure to Train and Supervise) (Against All Municipal Defendants)*

321)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 320 above as if fully set forth herein.

322)    This Cause of Action is asserted solely against the Municipal Defendants: the City of Buffalo, County of Erie, Town of Tonawanda, Town of Cheektowaga, Town

of Amherst, Village of Kenmore, Town of Evans, Town of Orchard Park, and Town of West Seneca.

323)    ***Monell* Liability:** The constitutional violations described herein were not isolated incidents by rogue officers but were the result of policies, practices, and customs adopted and/or ratified by the Municipal Defendants, including the City of Buffalo, County of Erie, and the towns and villages named in this action.

324)    The injuries suffered by all ten Plaintiffs were not caused by a coordinated operation reflecting systemic failures in policy, planning, and training.  Defendants deployed dozens of officers from the Municipal Defendants and UBPD without clear dispersal protocols, without guidance on accommodating religious observance, and without meaningful supervision on the use of force.  The Municipal Defendants each took part in the Mutual Aid Agreement with UB to infringe upon Plaintiffs' civil rights.  The UBPD "requested assistance county wide to help disperse" the protest.

325)    On May 1, 2024, officers from at least ten different police departments— including Buffalo PD, Amherst PD, Kenmore PD, Tonawanda PD, and Erie County Sheriff's Office—executed a coordinated, violent suppression of a peaceful campus protest without meaningful attempt to de-escalate or provide clear, individualized dispersal instructions.

326)    These agencies had a collective presence of dozens of officers on-site and participated in a synchronized tactical response that resulted in excessive force against nonviolent demonstrators, many of whom were kneeling or standing silently at the time of arrest.

327)    Plaintiffs were not engaged in violence or disorder.  Yet, Defendants employed mass-arrest tactics and excessive force consistent with preexisting customs of suppressing protest speech through intimidation, kettling, and arrests without probable cause.

328)    The Municipal Defendants (City of Buffalo, County of Erie, Town of Tonawanda, Town of Cheektowaga, Town of Amherst, Village of Kenmore, Town of Evans, Town of Orchard Park, and Town of West Seneca) are liable under 42 U.S.C. § 1983 because the constitutional violations suffered by Plaintiffs were caused by policies, practices, or customs of these municipal entities, and/or by these entities' failure to train and supervise their officers.

329)    Defendants, through their official policies, customs, or practices, and with deliberate indifference to the constitutional rights of individuals, caused the violations of Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments.

330)    These policies or customs include, but are not limited to:

    a.    Authorizing or condoning the use of excessive force against peaceful protesters;

    b.    Failing to provide adequate training and supervision to law enforcement officers regarding constitutional rights and proper crowd control measures;

    c.    Implementing or tolerating policies that suppress First Amendment rights of free speech and assembly.

331)    Defendant Chief Kimberly Beaty, acting in her capacity as Chief of the University at Buffalo Police Department (UBPD), directed and supervised enforcement

actions during the protest. While UBPD operates under the auspices of the State University of New York and is thus not subject to Monell liability, Plaintiffs allege that supervisory officers from the City of Buffalo Police Department, the Town of Amherst Police Department, and the Town of Tonawanda Police Department were also present and actively involved in enforcement decisions and actions.

332)    These supervisory John Doe officers, along with Defendant Officers from their respective departments, acted pursuant to official municipal policies or longstanding customs, including the issuance and enforcement of the curfew order and the refusal to accommodate religious practices.  Their actions directly caused the constitutional violations experienced by Plaintiffs, thereby establishing Monell liability for the municipal Defendants.

333)    Defendant Wright from the Town of Tonawanda Police Department instructed Tonawanda officers to get "physically involved if necessary for the safety of the public."  Upon information and belief, leadership from the other responding agencies advised their respective officers to arrest individuals who remained present at the demonstration site.

334)    Yet-to-be-identified BPD officers can be seen providing instructions and strategy to BPD officers and officers from other agencies.  An unidentified BPD officer explains to dozens of officers to "get in line around the arrests" after the initial arrests (including those of Plaintiffs Ibrahim Khatib, Elvi Jo Dougherty, and Soliegh Dougherty).

335)    One BPD lieutenant pushed a UB *Spectrum* editor attempting to film the arrests and told him to "get the f—k out of here."  When the editor identified himself as media, the officer said, "I don't care."

336)    BPD Officers gathered after the arrests and joked that they "lost their chaperone" and celebrated the "linebacker tackle back there" (in reference to the assault on Mr. Ahmed).  Defendant Hofschneider remarked to other officers after the crackdowns: "that was fun."

337)    Defendants' deliberate indifference to the constitutional rights of Plaintiffs and others similarly situated directly caused the violations and injuries described herein.

338)    **Multi-Agency Coordination Policy/Custom:** The events of May 1, 2024 did not occur in a vacuum or by rogue action.  They were the product of a coordinated operation among law enforcement agencies.

339)    The municipalities involved knew or should have known that multi-agency deployments on college campuses risked constitutional violations absent adequate training, supervision, and clearly articulated crowd management policies.  They failed to implement or enforce such policies.

340)    UB officials, University police, and each of the named municipalities are parties to a "Mutual Aid Agreement."  UB requested the help of the local police agencies in advance of the scheduled demonstration, and those agencies had an agreed-upon plan to respond to the protest.  The Municipal Defendants authorized their officers to participate in this operation, which included a plan to arrest demonstrators who had committed no crime to silence their respective First Amendment-protected speech and

conduct.  The plan also included an understood tactic of forcibly removing protesters at an arbitrary set time.

341)    Further, no written policy supported the 8:23 p.m. curfew.  Officers referenced that time without a lawful basis.  The entire dispersal operation, including the use of a university shuttle bus to transport detainees, was planned in advance and executed without constitutional safeguards.

342)    The supervisors of the Municipal Defendants failed to establish and implement an organized approach for addressing the protestors.  Moments after the Defendant Officers began walking towards the protest, officers scattered in various directions, resulting in chaos and over-policing.  At 8:23:32, less than 15 seconds after Defendant Offices moved in on the protestors, Defendant Schultz of the BPD shouted, "So much for lines."  At 8:23:42 p.m., Defendant Schultz of the BPD remarked to UBPD officers: "So much for a formation."

343)    Thus, a de facto policy or decision by a final policymaker existed to enforce UB's encampment prohibition and dispersal order through mass arrest.  That decision directly led to the violation of Plaintiffs' rights.  Under *Monell*, this joint decision or policy makes each involved municipality liable for the resulting constitutional harms.

344)    **Failure to Train and Supervise:** Alternatively, and additionally, the municipalities are liable because they failed to properly train and supervise officers in handling First Amendment assemblies and engaging in proper crowd control.

345)    Despite years of public protest litigation in the Second Circuit, Defendant agencies failed to implement policies or training to prevent the very conduct proscribed

by *Amnesty America*.  The absence of such policies here is further evidence of deliberate indifference.

346)    The need for specific training on protest management (e.g., respecting First Amendment rights, using clear dispersal orders, avoiding excessive force with passive resistors, and avoiding discriminatory enforcement) was obvious given the frequency of campus demonstrations and nationwide protests.  Yet, upon information and belief, the officers from these various departments were not adequately trained to deal with a peaceful protest.

347)    The Municipal Defendants failed to instruct officers on how to distinguish between passive protest, prayer, observation, and unlawful conduct.  Plaintiffs were tackled while kneeling in prayer, standing silently, filming, or attempting to retreat. These patterns reflect not isolated mistakes, but policies or customs of suppressing protest with disproportionate force.

348)    This is evidenced by their resorting to extreme force and mass arrest in a situation calling for patience and negotiation.  The municipalities also failed to supervise the officers at the scene: for example, no supervisor intervened to stop the gratuitous violence or to call off the arrests once it was clear that the protesters were complying (by having removed the tents) or that no real threats existed.  This lack of oversight was a moving force behind the Plaintiffs' injuries.

349)    Following the protest, UBPD and other law enforcement continued to surveil and target Muslim and pro-Palestinian students, including through indefinite campus bans, despite full dismissal of all charges.

350)  **Prior Incidents and Condoning of Conduct:** On information and belief, some of the Defendant agencies (particularly the Buffalo Police Department and Erie County Sheriff's Office) have histories of aggressive protest policing and have condoned or ratified excessive force in crowd contexts.

351)  This custom of tolerating brutality manifested here.  Moreover, after the incident, no municipality disciplined any officer involved in the protest response, and officials (including a UB spokesperson) defended the police actions as necessary.  Such post-event ratification signals that the municipalities consider this behavior acceptable – a custom that encourages future violations.

352)  **Buffalo Police Department's Unconstitutional Custom, Culture, and Practices:**  The conduct of the Buffalo Police Department ("BPD") on May 1, 2024 was not anomalous, nor was it the product of momentary confusion.  Rather, the behavior exhibited by BPD officers reflected a deeply ingrained departmental culture that tolerates — and often celebrates — the use of unconstitutional force, humiliation, and verbal abuse against perceived dissenters, particularly those from marginalized backgrounds.

353)  BPD officers were captured on body-worn cameras engaging in gleeful mockery, dehumanizing threats, and casual celebration of brutality. These included:

i)   An officer declaring, "I wish I had a K-9… let the dog just f\*\*king run loose," to which another replied, "I think that would have solved a lot of issues" and Defendant Serafini responded "absolutely";

ii)  Forcibly and intentionally dislodging the hijab of a young Muslim woman after violently assaulting her and berating her;

iii) Fist-bumping after tackling a peaceful student protester, with Defendant Ford bragging about having "played football" with the officer involved;

iv) Defendant Frascatore laughing and boasting that he "f**king blasted him — he went flying," referring to Plaintiff Ahmed;

v) Defendant Hofschneider stating, "That was fun" after the raid concluded;

vi) Multiple officers joking that protesters had planted an "IED" in a food pile, while laughing;

vii) Officers referring to students as "Antifa" and telling uninvolved students to "go home" because "you can't act like adults";

viii)    BPD officers taunting a young man by yelling, "write that down so you can tell your dad... daddy, daddy, the cops..." while laughing;

ix) A BPD lieutenant pushing a student journalist and shouting "get the f**k out of here," then saying "I don't care" when told he was press.

354)    These remarks, and the violent conduct they accompanied, cannot be dismissed as isolated lapses.  These are the customs and practices of the BPD.  The conduct reflects a departmental culture in which violence against peaceful demonstrators is normalized, humiliation is encouraged, and expressive or dissenting speech is met with contempt.  These actions were not reprimanded by supervisors on site; they were endorsed, echoed, and shared in celebration by numerous large groupings of officers.

355)    Upon information and belief, this conduct is consistent with a long-standing custom within BPD of using excessive force in protest and crowd contexts, retaliating against expressive conduct, and failing to discipline officers who commit obvious civil rights violations.  BPD's role in suppressing the May 1 protest —

particularly through coordinated violence, dehumanizing rhetoric, and discriminatory enforcement — provides direct evidence of an unconstitutional municipal policy or custom under *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

356)     The absence of any disciplinary action or public repudiation of this conduct by City of Buffalo officials further demonstrates that the municipality has ratified this culture. BPD's actions were not aberrations — they were predictable outcomes of a department operating without accountability or respect for constitutional norms.

357)     Accordingly, the City of Buffalo is liable under 42 U.S.C. § 1983 for maintaining a policy, practice, or custom of permitting its officers to engage in excessive force, discriminatory enforcement, retaliatory arrests, and unconstitutional protest suppression.

358)     ***Monell* Causation:** Defendants' use of force and mass arrest tactics was not a good-faith response to safety concerns. It was a predictable and preventable consequence of the municipalities' failure to train their officers on First Amendment rights, non-discriminatory enforcement, and safe crowd dispersal practices.

359)     The actions each agency engaged in were neither random nor arbitrary but part of a uniform and concerted policy which represented a coordinated effort by these institutions and their members to violate Plaintiffs' constitutional rights by suppressing their peaceful demonstration and causing them to suffer for exercising these rights.

360)     The above policies, customs, and failures were the moving force behind the constitutional violations alleged herein. For instance, had the officers been properly

trained on First Amendment rights, they would not have attacked peaceful protesters in prayer.

361)    If a better dispersal protocol (policy) existed, the arbitrary and sudden arrests would not have happened. If supervision had been adequate, excessive force could have been halted.  Therefore, the Municipal Defendants are directly liable under *Monell* for the damages to Plaintiffs.

362)    **New York Municipalities and State Law:** This paragraph serves notice that for the state law claims below, the municipal entities are vicariously liable for the torts of their employees under respondeat superior, and also directly liable where a municipality's own negligence is alleged.  However, for the federal §1983 claims, liability is pursuant to Monell as described, not vicarious liability.

363)    **Relief for Monell Claim:** Plaintiffs seek declaratory relief that the involved municipal policies/customs were unconstitutional.  They seek injunctive relief requiring municipalities to implement appropriate policies and training for handling protest activity (including proper use-of-force policies for crowd scenarios and non-discriminatory enforcement guidelines).  Plaintiffs also seek to recover compensatory damages from the Municipal Defendants for the injuries caused by their unconstitutional policies and customs.

**COUNT IX – NEW YORK CONSTITUTION, ARTICLE I, §§ 8 AND 9** *– Freedom of Speech, Assembly, and Petition (Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

364)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 363 above as if fully set forth herein.

365)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities and against the Municipal Defendants on a theory of vicarious liability pursuant to the doctrine of respondeat superior.

366)    Article I, § 8 of the New York Constitution guarantees every citizen the right to freely speak, write, and publish their sentiments (free speech), and § 9 guarantees the right to assemble for the common good and to petition the government.

367)    These provisions are at least co-extensive with, and in some respects broader than, the First Amendment.

368)    Defendants violated these state constitutional rights of Plaintiffs through the same actions described: violently suppressing Plaintiffs' peaceful expression and assembly at the May 1, 2024 protest.

369)    The chilling effect of UB's response is further demonstrated by formal condemnation from over 300 faculty members, including the Faculty Senate and Law School faculty, who found that UB's conduct violated protected speech and assembly rights under both SUNY policy and New York law.

370)    The University's PNG actions further violated Plaintiffs' rights to speak and assemble under the New York Constitution by excluding them from campus and community space as punishment for prior expression.  These restrictions continue to burden Plaintiffs' expressive rights long after the dismissal of all charges.

371)    **Direct Constitutional Claim:** New York law permits a plaintiff to seek a remedy for state constitutional violations when those rights are infringed by government officials.

372)    Here, no alternative remedy (such as 42 U.S.C. § 1983, which does not cover state law rights) fully vindicates the harm to Plaintiffs' state constitutional rights, so a direct action under the New York Constitution is proper.

373)    **Violation of Free Speech and Assembly:** Defendants' actions (mass arrest and forceful dispersal) restrained and abridged Plaintiffs' speech and assembly in violation of Article I §§ 8 and 9.  Plaintiffs were prevented from continuing their demonstration and from observing/recording the police.

374)    The rights under the NY Constitution are at least as protective as the federal ones, and notably New York's free speech protections can be more robust. Defendants' conduct would fail under any level of scrutiny – it was not justified by any sufficient government interest and was not a reasonable restriction.

375)    **State Constitutional Petition Clause:** Article I, § 9 also protects the right to petition the government for redress of grievances (similar to the First Amendment Petition Clause).  Plaintiffs, by protesting university policies and governmental action in Palestine, were effectively petitioning authorities for redress.  Defendants' suppression of that effort violates the state petition right as well.

376)    **Damages:** Plaintiffs suffered the same injuries (physical, emotional, etc.) as described previously, which also constitute damages for this claim.  Under New York law, Plaintiffs seek **compensation for the violation of their state constitutional rights**, including emotional distress damages. Plaintiffs seek punitive damages for the willful violations of their constitutional rights.

377)    **Equitable Relief:** Plaintiffs also seek declaratory relief that Defendants violated their rights under Article I §§ 8 and 9, and injunctive relief to prevent future

infringements (for example, an order requiring agencies to permit reasonable protest activity on campus and to not enforce policies like the encampment ban in a manner that violates these rights).

**COUNT X – NEW YORK CONSTITUTION, ARTICLE I, § 11** – *Equal Protection*
*(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

378)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 377 above as if fully set forth herein.

379)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities and against the Municipal Defendants on a theory of vicarious liability pursuant to the doctrine of respondeat superior.

380)    Article I, § 11 of the NY Constitution provides that no person shall be denied the equal protection of the laws.  This mirrors the Fourteenth Amendment's Equal Protection Clause and also prohibits discrimination in civil rights on account of religion, race, or ethnicity.

381)    Defendants' disparate treatment of Plaintiffs – due to their perceived religion (Muslim), ethnicity (Arab/Palestinian), and viewpoint (pro-Palestine) – violated this state constitutional guarantee.

382)    **Religious and Ancestry Discrimination:** Section 11 explicitly forbids discrimination based on religion or race in civil rights.  By targeting Muslim students praying (not allowing them to finish a short prayer) and by violently removing a religious head covering, Defendants infringed Plaintiffs' civil rights in a discriminatory manner. The intentional knocking off of religious clothing and the aggressive targeting of those of

Middle Eastern descent are evidence of religious/ancestry discrimination. This is actionable under the state constitution.

383) **Viewpoint Discrimination:** While viewpoint is not enumerated in § 11, discrimination against Plaintiffs' political viewpoint (advocacy for Palestinian rights) can be addressed under the equal protection principle as well. New York courts interpret the state's equal protection in line with federal standards. Defendants had no lawful justification to single out Plaintiffs for adverse treatment based on who they were or what they were saying.

384) **Remedies:** Plaintiffs seek damages for the violation of Article I § 11, including for humiliation, emotional suffering, and other injuries stemming from being treated in a discriminatory fashion. They also seek declaratory relief that the Defendants' conduct was discriminatory and unlawful. Injunctive relief is appropriate to mandate policy changes ensuring equal treatment of demonstrators regardless of viewpoint, religion, or ethnicity – for instance, training officers that they must not target individuals based on attire like hijabs or based on the content of their protest.

**COUNT XI – ASSAULT AND BATTERY (New York Common Law)** *(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

385)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 384 above as if fully set forth herein.

386)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities and against the Municipal Defendants on a theory of vicarious liability pursuant to the doctrine of respondeat superior.

387)    The actions of Defendants in violently confronting Plaintiffs constitute assault and battery under New York law.  Each individual Defendant who participated in the use of force intended to cause, and did cause, harmful or offensive contact with Plaintiffs, without consent or justification.

388)    Battery is the intentional physical contact that is harmful/offensive; here, examples include tackling, striking, and handcuffing Plaintiffs with excessive tightness, all done intentionally.

389)    Assault is placing someone in imminent fear of such contact; many Plaintiffs saw officers rushing at them (often with batons or arms raised) and feared immediate harm just before being tackled – that satisfies assault (and even if they didn't see it coming, the battery was consummated regardless).

390)    **Lack of Privilege:** These uses of force were not privileged or justified by law. Plaintiffs were not committing crimes, and even if officers claimed to be effecting an arrest, they used unreasonable and unnecessary force beyond what would be needed to detain a compliant protester.  Therefore, the usual privilege for police to use force in an arrest does not apply or was grossly exceeded.

391)    **Injuries:** Plaintiffs suffered physical injuries (bruises, cuts, sprains, etc.) and pain as a result of battery.  They also suffered emotional trauma (which can be recovered in battery if it flows from the physical impact).  Each instance of offensive contact by Defendants caused some injury, even if transient (e.g., pain from zip-ties).

392)    **Individual and Vicarious Liability:** The individual officers who directly made physical contact (including the officers detailed and referred to in the "PLAINTIFF-SPECIFIC ALLEGATIONS" section) are liable for battery and assault.

Additionally, under respondeat superior, the Municipal Defendants (City of Buffalo, County of Erie, etc.) are vicariously liable for the assault and battery committed by their employees in the scope of their employment (the officers were on duty and performing police functions, albeit unlawfully, so the cities/counties can be held liable for their torts).

393)    **Damages:** Plaintiffs seek compensatory damages for pain, suffering, medical expenses, and emotional distress resulting from the assaults and batteries.  Given the egregiousness of the conduct, Plaintiffs also seek punitive damages to punish and deter the malicious use of force.

**COUNT XII – FALSE ARREST AND FALSE IMPRISONMENT (N.Y. Common Law)** *(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

394)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 393 above as if fully set forth herein.

395)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities and against the Municipal Defendants on a theory of vicarious liability pursuant to the doctrine of respondeat superior.

396)    **False Arrest/Imprisonment:** Defendants intentionally confined Plaintiffs without their consent and without lawful justification, constituting false arrest and imprisonment under New York law.  Plaintiffs were conscious of the confinement (being held by police, handcuffed, taken into custody) and did not consent to it.  The confinement was not privileged because, as detailed, the officers lacked probable cause or any warrant to arrest Plaintiffs.

397)    **Lack of Probable Cause:** At the time of the Plaintiffs' arrests, no reasonable officer would have believed probable cause exi**sted** for any crime.  Plaintiffs

were not disorderly (they were peaceably assembled), were not trespassing or loitering (students and public allowed on campus grounds, and they complied with orders to remove tents), and were not given fair warning that remaining would be deemed unlawful.  In fact, the dismissal of all charges is prima facie evidence of a lack of probable cause (and eliminates any argument that a crime was committed).

398)    **Duration of Confinement:** Plaintiffs were held for a significant period and transported in restraints, further aggravating the tortious conduct.  Each Plaintiff was detained from the moment of arrest until release.  All such confinement was unlawful.

399)    **Liability:** The officers who directly detained and arrested Plaintiffs are liable for false arrest.  The municipalities are vicariously liable under respondeat superior for their officers' tortious arrests.

400)    **Damages:** Plaintiffs suffered damages including deprivation of liberty, emotional distress (fear, humiliation of being arrested), and physical consequences of the confinement (injuries from tight cuffs, etc.). They seek compensatory damages for these harms.  They also seek punitive damages against Defendants given the intentional and reckless nature of the arrests (made knowing no cause, to suppress rights).

**COUNT XIII – ABUSE OF PROCESS (N.Y. Common Law)** *(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

401)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 400 above as if fully set forth herein.

402)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities and against the Municipal Defendants on a theory of vicarious liability pursuant to the doctrine of respondeat superior.

403)    Defendants misused legal process after initiating Plaintiffs' arrests, in that they employed the charging process and detention of Plaintiffs to achieve an improper purpose – namely, to retaliate against and silence Plaintiffs' activism and to intimidate them and others, rather than to bring Plaintiffs to justice for actual crimes.

404)    **Issued Process:** Defendants caused criminal process to issue against Plaintiffs in the form of appearance tickets and initiating charges (trespass, loitering, disorderly conduct, etc.). This is "process" for abuse of process purposes.

405)    **Improper Objective:** The objective of issuing those charges was not to adjudicate an alleged violation of law (since Defendants knew the charges were meritless and would be dropped).

406)    Instead, the process was used to punish Plaintiffs extra-judicially: by making them undergo arrest and the stresses of pending charges, to deter them from future protests, and to chill others.  It was also possibly used to justify the extreme police actions ("cover" for the excessive force by accusing protesters of resisting or being disorderly).  This is an improper, ulterior purpose. Statements by officers at the scene (such as the vitriol used) show an intent to harm and suppress, not a good-faith law enforcement motive.

407)    **Malice and Harm:** Defendants acted with malice (actual or implied), meaning they had a wrongful motive in using the process.  Plaintiffs suffered harm: they had to deal with the stress of legal proceedings and suffered reputational harm. The abuse of process also exacerbated their emotional distress by prolonging the ordeal.

408)    After process issued, Defendants continued to use the criminal justice system to pursue improper objectives, including justifying prior excessive force,

intimidating Plaintiffs and their communities, and deterring future protest activity. Plaintiffs were subjected to ongoing court involvement and burdensome legal process not for legitimate adjudication, but to suppress their protected expression and retaliate against their participation in the protest.

409)    **Liability:** The officers who arrested Plaintiffs and filed charges (or provided information for charges) are directly liable for abuse of process.  The municipal employers are vicariously liable as well, since the abuse was done in the scope of the officers' employment (during and after the arrest incident).

410)    **Damages:** Plaintiffs seek compensatory damages for abuse of process, including mental anguish and any tangible losses from criminal charges. They also seek punitive damages against Defendants to sanction the willful misuse of the justice system for retaliation.

## COUNT XIV – NEGLIGENCE/GROSS NEGLIGENCE (N.Y. Common Law)
*(Against All Defendant Officers Individually and Vicariously and Directly Against All Municipal Defendants)*

411)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 410 above as if fully set forth herein.

412)    This Cause of Action is asserted directly against the individual Defendant Officers in their individual capacities for their negligent and/or grossly negligent acts and omissions, and against the Municipal Defendants — City of Buffalo, County of Erie, Town of Tonawanda, Town of Cheektowaga, Town of Amherst, Village of Kenmore, Town of Evans, Town of Orchard Park, and Town of West Seneca — both vicariously, under the doctrine of respondeat superior, and directly, for their own negligence in hiring, training, supervising, planning, and executing the protest response.

413)    In the alternative to any intentional tort liability (or in addition, to the extent some conduct was reckless or negligent), Defendants owed Plaintiffs a duty of care to conduct their law enforcement activities in a reasonably safe and prudent manner so as not to cause unnecessary injury.

414)    Defendants breached this duty through carelessness, recklessness, and negligence in planning and executing the protest response.  This includes negligently formulating an overly aggressive plan, negligently failing to communicate orders clearly (leading to confusion), and negligently using dangerous tactics (such as uncoordinated takedowns in a crowd which a reasonably prudent police force would know could cause injury).

415)    It also includes negligent failure to properly screen the participating officers for readiness or temperament to deal with student protesters, and failure to have medical support promptly available for those injured.

416)    **Injuries Foreseeable:** It was entirely foreseeable that sending dozens of officers to rush the demonstration would cause injuries.  It was foreseeable that using zip-ties without proper technique would cause wrist injuries.  Defendants had a duty to avoid these foreseeable harms.

417)    Instead, their actions fell below any reasonable standard of care for a law enforcement operation.  The level of force used was reckless.

418)    **Causation:** Defendants' negligent acts and omissions directly and proximately caused Plaintiffs' injuries.  For example, had Defendants refused to enforce the unconstitutional curfew and/or taken reasonable care to allow a peaceful dispersal (like giving clear warnings and time), Plaintiffs would not have been hurt.

419)    Had Defendants not tackled people in a hazardous manner, the physical injuries would have been avoided. Each injury described is traceable to some lapse in ordinary care by the officers and their superiors.

420)    **Gross Negligence:** Moreover, Defendants' conduct constituted gross negligence – through a reckless disregard for the safety of others.  The manner of the police charge demonstrated a substantial lack of concern for whether protesters would be grievously injured.  This qualifies as gross negligence under New York law.

421)    **Liability:** The individual officers are liable for negligence to the extent their actions were not intentional but were carried out in a thoughtlessly unsafe way.  The municipalities are vicariously liable for their employees' negligence under respondeat superior.  Additionally, to the extent that planning failures (at a command level) contributed, the municipalities are directly liable for that negligence through their policymakers.

422)    **Damages:** Plaintiffs incorporate the injuries previously described as damages here. They seek recovery for all physical and emotional harm caused by the Defendants' negligence.  Plaintiffs also seek punitive damages given the gross negligence/recklessness exhibited.

## COUNT XV – NEGLIGENT HIRING, TRAINING, AND SUPERVISION (N.Y. Common Law) *(Against All Municipal Defendants)*

423)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 422 above as if fully set forth herein.

424)    This Cause of Action is asserted solely against the Municipal Defendants for their direct negligence in hiring, training, and supervising officers involved in the May 1, 2024 protest response.

425)    The Municipal Defendants had a duty to employ and retain only those police officers who were fit and competent to perform their duties without endangering the public, and to train and supervise those officers adequately.

426)    The municipalities breached this duty by hiring or retaining officers who were unfit (due to propensity for violence or bias), by failing to train them in constitutional protest response and proper use of force, and by failing to supervise and discipline them in the field.

427)    This cause of action is based on information and belief that, for example, some officers present had prior complaints of excessive force or misconduct that were ignored – thereby negligently retaining officers likely to violate rights.

428)    Additionally, the lack of training was evident; for instance, officers failed to follow basic crowd control best practices (like having a clear leader giving commands, using gradual escalation, or targeting actual instigators rather than indiscriminately arresting).

429)    **Causation:** These training and supervision failures were a substantial factor in causing Plaintiffs' injuries.  An adequately trained force would not have acted as this one did.  Proper supervision (on-site commanders reining in overly aggressive subordinates, or proper briefing beforehand) would have prevented the rights violations. The presence of numerous different agencies suggests that no single chain of command exercised tight control, a supervisory failure.

430)    **Notice:** Municipal Defendants knew or should have known of the need for better training and of the risk of their officers' misconduct.  The events at Columbia University the day before this protest (where hundreds were arrested) were a clear indicator that handling these protests required care, yet, Defendants seemingly went in with a militarized approach without ensuring restraint.  That, coupled with any past incidents of abuse by these departments, put the municipalities on notice of potential issues.  Their failure to act on that notice amounts to negligence.

431)    **Liability:** To the extent any Defendant officers may be found to have been acting outside the proper scope of their duties by engaging in egregious misconduct, the municipalities are alternatively liable for negligently failing to prevent such misconduct by not properly screening or controlling those officers.

432)    **Damages:** Plaintiffs seek damages against the Municipal Defendants for the injuries caused by negligent hiring/training/supervision.  Plaintiffs have incurred pain, suffering, medical costs, and other damages due to the incompetence or unchecked misconduct of the officers – something that proper municipal care could have averted.

**COUNT XVI – Violation of New York Civil Rights Law § 40-c (Discrimination Based on Religion, Ethnicity, and Political Viewpoint) (N.Y. Common Law)** *(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

433)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 432 as if fully set forth herein.

434)    New York Civil Rights Law § 40-c provides that no person shall, because of race, creed, color, national origin, sex, disability, marital status, or sexual orientation, be subjected to any discrimination in their civil rights by any other person or by any firm, corporation, or institution.

435)    Defendants, including the Defendant Officers acting under color of law and within the scope of their employment, discriminated against Plaintiffs on the basis of religion (Islam), ethnicity (Arab or Palestinian descent), and/or perceived political viewpoint (support for Palestinian rights) during the peaceful protest at the University at Buffalo on May 1, 2024.

436)    This discrimination included, but was not limited to:

      a.    Targeting Muslim students engaged in Maghrib prayer for arrest;

      b.    Forcibly dislodging religious garments, including hijabs;

      c.    Selectively enforcing dispersal orders against Plaintiffs based on their religious, ethnic, or political identity;

      d.    Failing to accommodate ongoing religious observances; and

      e.    Permitting counter-protesters of different viewpoints to continue assembling unimpeded.

437)    Defendants' conduct unlawfully deprived Plaintiffs of their civil rights and subjected them to discrimination in violation of New York Civil Rights Law § 40-c.

438)    The discriminatory conduct described above directly interfered with and deprived Plaintiffs of specific civil rights guaranteed under the New York State Constitution and the U.S. Constitution, including their rights to free speech, assembly, religious exercise, and due process of law, in violation of New York Civil Rights Law § 40-c.

439)    As a direct and proximate result of Defendants' unlawful discrimination, Plaintiffs suffered physical injuries, emotional distress, humiliation, loss of liberty,

reputational harm, and economic damages, including medical expenses, missed work, and educational disruption.

440)    Pursuant to New York Civil Rights Law § 40-d, Plaintiffs are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in vindicating their rights.

441)    Plaintiffs seek compensatory damages against all Defendants, punitive damages against the individual Defendants, and such other and further relief as the Court deems just and proper.

**COUNT XVII – Violation of New York Civil Rights Law § 79-n (Harassment and Intimidation Based on Religion and Ethnicity) (N.Y. Common Law)** *(Against All Defendant Officers Individually and Vicariously Against All Municipal Defendants)*

442)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 441 as if fully set forth herein.

443)    New York Civil Rights Law § 79-n prohibits any person from intentionally harassing, intimidating, threatening, or otherwise depriving any individual of their civil rights because of race, color, national origin, ancestry, gender, religion, religious practice, age, disability, or sexual orientation.

444)    Defendants, including the Defendant Officers acting under color of state law and within the scope of their employment, intentionally harassed, intimidated, and deprived Plaintiffs of their civil rights based on their religion (Islam), religious practices (prayer and observance), and/or ethnicity and ancestry (Arab and Palestinian descent).

445)    Defendants' discriminatory conduct included, but was not limited to:

   a.    Targeting Muslim students engaged in Maghrib prayer for physical arrest and removal;

b.   Forcibly dislodging religious garments, including hijabs;

c.   Refusing to accommodate visible, peaceful religious observances;

d.   Using intimidation, physical restraint, and public humiliation selectively against Muslim and Arab/Palestinian-American students; and

e.   Allowing similarly situated counter-protesters of other viewpoints to remain undisturbed.

446)   Defendants' acts were intentional and carried out with discriminatory animus and without lawful justification.

447)   As a direct and proximate result of Defendants' violation of New York Civil Rights Law § 79-n, Plaintiffs suffered physical injuries, emotional distress, humiliation, economic harm, reputational harm, and other consequential damages.

448)   Pursuant to New York Civil Rights Law § 79-n(2), Plaintiffs are entitled to recover compensatory damages, punitive damages against the individual Defendants, and reasonable attorneys' fees and costs.

449)   Plaintiffs seek all appropriate relief, including compensatory damages, punitive damages, attorneys' fees under New York Civil Rights Law § 79-n(2), and such other and further relief as the Court may deem just and proper.

**COUNT XVIII – FOURTH AMENDMENT (Seizure) AND FOURTEENTH AMENDMENT (Due Process) (42 U.S.C. § 1983) – MALICIOUS PROSECUTION**
*(As to Plaintiffs Jazmine Frazier and Jay Ayoub Against All Defendant Officers and Defendants Tripathi and Garcia Individually)*

450)   Plaintiffs reallege and incorporate by reference Paragraphs 1 through 449 as if fully set forth herein.

451)    Defendants, acting under color of state law, initiated and maintained criminal proceedings against Plaintiffs Frazier and Ayoub arising from their arrests on May 1, 2024, without probable cause and with malice.

452)    After the initial charges against Plaintiffs Frazier were dismissed, Defendants' agents and employees recommenced criminal proceedings against them without any new evidence or lawful basis, subjecting them to additional deprivations of liberty, emotional distress, and reputational harm.

453)    Defendants acted with malice, intending to punish and retaliate against Plaintiffs Frazier and Ayoub for their exercise of constitutional rights.

454)    On August 14, 2024, Amherst Town Justice Kara Buscaglia dismissed all charges against Plaintiff Frazier.  One week later, beginning on or about August 21, 2024, Defendant Officers began efforts to arrest Plaintiff Frazier based on Defendant Erie County re-filing the previously dismissed charges against Plaintiff Frazier.  Despite knowledge of the identity of Plaintiff Frazier's criminal attorney, Defendants (including Erie County and UBPD Defendants) participated in a harassment campaign against Plaintiff Frazier.  Plaintiff Frazier's criminal attorney later produced her for additional charges.

455)    The renewed criminal charges against Plaintiff Frazier were ultimately dismissed in their favor in late February 2025.

456)    Defendants baselessly and maliciously continued the prosecution against Claimant Ayoub through mid-September 2024.  Then, the charges were dismissed in Amherst Town Court.

457)    As a result of the renewed criminal proceedings, Plaintiffs Frazier and

Ayoub were required to appear in court, remained under the control of the criminal

justice system, and continued to experience legal, reputational, and emotional burdens.

These government-imposed restrictions on their liberty constitute a seizure within the

meaning of the Fourth Amendment.

458)    As a direct and proximate result of Defendants' malicious prosecution,

Plaintiffs Frazier and Ayoub suffered damages including deprivation of liberty, emotional

trauma, reputational harm, and related economic and non-economic injuries.

459)    Defendants are liable under 42 U.S.C. § 1983 for malicious prosecution in

violation of the Fourth and Fourteenth Amendments.

460)    Plaintiffs Frazier and Ayoub seek compensatory and punitive damages, as

well as declaratory and injunctive relief.

**COUNT XIX – MALICIOUS PROSECUTION (New York Common Law)** *(As to Plaintiffs Jazmine Frazier and Jay Ayoub Against All Defendant Officers and Defendants Tripathi and Garcia Individually)*

461)    Plaintiffs reallege and incorporate by reference Paragraphs 1 through 460

as if fully set forth herein.

462)    Defendants commenced and continued criminal proceedings against

Plaintiffs Frazier and Ayoub without probable cause and with actual malice.

463)    The criminal proceedings against Plaintiffs Frazier and Ayoub were

terminated in their favor by dismissal.

464)    As a result, Plaintiffs Frazier and Ayoub suffered deprivations of liberty,

emotional distress, reputational harm, and other damages.

465)    Defendants are liable for the tort of malicious prosecution under New York law, and the Municipal Defendants are vicariously liable under the doctrine of respondeat superior.

466)    Plaintiffs Frazier and Ayoub seek compensatory and punitive damages, and such other relief as the Court may deem just and proper.

## VIII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against the appropriate Defendants, including Defendant Satish K. Tripathi in both his individual and official capacities as appropriate, as specified below, and award the following relief:

A. Compensatory damages in an amount to be determined at trial for physical injuries, emotional distress, humiliation, loss of liberty, and reputational harm, and other direct and consequential damages suffered by each of the Plaintiffs as a result of Defendants' unlawful conduct;

B. Punitive damages against the individual Defendant Officers, Defendant Tripathi, and Defendant Garcia to punish their willful, malicious, or reckless disregard of Plaintiffs' rights and to deter such conduct in the future;

C. A declaratory judgment that the conduct of Defendants on May 1, 2024, violated Plaintiffs' rights under the First, Fourth, and Fourteenth Amendments to the United States Constitution and analogous provisions of the New York State Constitution;

D. A permanent injunction restraining the individual Defendants, including Defendant Tripathi, in their official capacities and the Municipal Defendants from:

- Enforcing dispersal orders without lawful basis or individualized warnings;
- Using force against individuals engaged in religious observance, peaceful protest, or documentation of public events;
- Retaliating or discriminating against individuals based on viewpoint, religion, ethnicity or perceived political affiliation;

E. An order directing the appropriate University at Buffalo officials and Municipal Defendants to take all necessary steps to clear Plaintiffs' academic records and disciplinary files of any protest-related restrictions, charges, sanctions, or bans, including:

- Rescinding any campus bans or persona non grata designations issued to Plaintiffs;
- Vacating all protest-related referrals, holds, or citations reflected in university systems;
- Publicly acknowledging that Plaintiffs' protest activity was constitutionally protected;

F. An order directing all Municipal Defendants to expunge any arrest records of the Plaintiffs arising from the events of May 1, 2024, and prohibiting any future retaliation against Plaintiffs in connection with this lawsuit or their protected activism;

G. An order directing the Municipal Defendants, and the appropriate University at Buffalo officials acting in their official capacities, to implement and publicly disseminate revised protest response protocols, including:

- Training on First Amendment rights and religious accommodations;
- Policies limiting use of force at nonviolent demonstrations;
- Mechanisms for civilian oversight of protest-related misconduct;

H. Attorneys' fees and costs pursuant to 42 U.S.C. § 1988, New York Civil Rights Law §§ 40-d and 79-n(2) and all applicable state law;

I. Pre- and post-judgment interest as permitted by law; and

J. Such other and further relief as this Court deems just and proper, including any necessary or appropriate remedies to ensure Plaintiffs are made whole and that constitutional rights are protected on the University at Buffalo campus and within the jurisdiction in the future.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

LIPSITZ GREEN SCIME CAMBRIA LLP


By: _____
Robert M. Corp, Esq.
Attorneys for Plaintiffs
42 Delaware Avenue, Suite 120
Buffalo, New York 14202
(716) 849-1333
rcorp@lglaw.com