UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

YOUSEF AHMED,
JAY AYOUB,
MAJD AYOUB,
ELVI JO DOUGHERTY,
SOLIEGH M. DOUGHERTY,
JAZMINE C. FRAZIER,
TIMOTHY P. GEORGER,
IBRAHIM KHATIB,
HANNAH R. KRULL, AND
NOOR A. MOHAMMED,

          Plaintiffs,           Civil Action No.: 25-cv-00391

     v.

CITY OF BUFFALO, et al.,

          Defendants.
_____

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6) OF CHEEKTOWAGA DEFENDANTS

**LIPPES MATHIAS LLP**
James. P. Blenk, Esq.
Anthony J. Masse, Esq.
*Attorneys for Defendants Officer Matthew Arnold, Officer Shane Rogers, Officer Miller, Town of Cheektowaga*
50 Fountain Plaza, Suite 1700
Buffalo, New York 14202
(716) 853-5100
jblenk@lippes.com
amasse@lippes.com

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................. i

PRELIMINARY STATEMENT ........................................................................................... 1

ALLEGATIONS CONCERNING CHEEKTOWAGA DEFENDANTS ............................... 3

LEGAL STANDARD ........................................................................................................... 7

ARGUMENT ........................................................................................................................ 9

I.    Plaintiffs Cannot Sustain a First Amendment Claim (Counts I, II, and VI) Against the Cheektowaga Defendants. ............................................................................................. 9

   a.  Plaintiffs' Claim for Retaliation and Suppression of Protected Speech and Assembly (Count I) Against Cheektowaga Defendants Fails. ........................................................ 10

     i.    There Are Insufficient Allegations Concerning the Cheektowaga Defendants. ........ 10

     ii.   The Curfew was a Permissible Time, Place and Manner Restriction ...................... 11

     iii.   Plaintiffs' Cannot Establish a Retaliation Claim Against the Cheektowaga Defendants. ................................................................................................................. 13

   b.  Plaintiff's Claim for Retaliation for Observing and Documenting Police Activity (Count II) Against Cheektowaga Defendants Fails. ................................................................. 15

   c.  Plaintiff's Free Exercise Claim (Count VI) Against Cheektowaga Defendants Fails. .... 16

II.   The Complaint Fails to Sufficiently Plead an Excessive Force Claim (Count III) Against the Cheektowaga Defendants ....................................................................................... 18

   a.  Excessive Force Standard ............................................................................................... 19

   b.  *De Minimis* Injuries as Evidence of Reasonable Force .................................................. 20

   c.  Attempted Fleeing Can Justify Additional Force. ......................................................... 23

   d.  Interference or Encroachment During Arrest Can Justify Additional Force. ................. 24

   e.  The Cheektowaga Officers Are Entitled to Qualified Immunity on Excessive Force Claims. ............................................................................................................................ 26

   f.  Plaintiff's State Law Assault and Battery Claims (Count XI) Also Fail Against the Cheektowaga Defendants. ............................................................................................. 27

III.  Plaintiffs Cannot Sustain a False Arrest Claim (Count IV) Against the Cheektowaga Defendants. ..................................................................................................................... 27

   a.  Cheektowaga Defendants Had Probable Cause to Arrest the Plaintiffs. ........................ 27

i

b.  Cheektowaga Defendants Are Entitled to Qualified Immunity on False Arrests Claims. 30

c.  Plaintiffs' State Law False Arrest Claims (Count XII) Also Fail....................................31

IV.  The Complaint Fails to Sufficiently Plead a Fourteenth Amendment Claim (Counts V, VI, & VII) Against the Cheektowaga Officers. ...........................................................32

a.  Plaintiffs' Claim for  Selective Enforcement and Viewpoint Discrimination (Count V) Against Cheektowaga Defendants Fails.........................................................32

i.  The Critical Pro-Israeli Students Were Not Similarly Situated................................33

ii.  Plaintiffs' Allegations of Discriminatory Animus Towards Cheektowaga Defendants Are Conclusory.........................................................................................35

b.  Plaintiffs Fail to Plead Facts Supporting Religious Animus in Connection with the Dislodging of Plaintiff's Hijab. ..................................................................................35

c.  Plaintiffs' Claim for  Substantive and Procedural Due Process Violations (Count VII) Against Cheektowaga Defendants Fails........................................................37

V.  The Complaint Fails to Sufficiently Plead a Failure to Intervene Claim Against the Cheektowaga Defendants. .............................................................................................37

a.  Plaintiff's Failure-to-Intervene Allegations Lack the Specificity Required to State a Claim. .........................................................................................................................38

b.  Cheektowaga Officers Did Not Have Realistic Opportunity to Intervene.....................39

i.  Much of the Alleged Force Was Transient. ............................................................39

ii.  The Officers Were from Different Law Enforcement Agencies..............................40

VI.  Plaintiffs Cannot Sustain a Malicious Prosecution Claim (Count XVIII & XIX) Against Cheektowaga Defendants. .................................................................................40

a.  Standard for Malicious Prosecution Claims....................................................................40

b.  Cheektowaga Defendants Were Not Involved in the Prosecution of Plaintiffs..............41

c.  The Arrests of the Plaintiffs Were Supported by Probable Cause. ................................42

VII.  The Complaint Does Not Sufficiently Plead a *Monell* Claim (Count VIII) Against the Cheektowaga Defendants. .........................................................................................42

VIII. Plaintiff's State Law Claims Are Time Barred...........................................................46

IX.  The Complaint Does Not Sufficiently Plead New York State Constitutional (Counts IX & X) Claims Against the Cheektowaga Defendants.......................................................47

X.  The Complaint Does Not Sufficiently Plead New York State Statutory Claims (Count XVI & XVII) Against the Cheektowaga Defendants......................................................48

a.  Plaintiffs' Claim for  New York Civil Rights Law § 40-c  Violations (Count XVI) Against Cheektowaga Defendants Fails.......................................................................48

b.  Plaintiffs' Claim for  New York Civil Rights Law § 79-n Violations (Count XVII) Against Cheektowaga Defendants Fails.......................................................................49

XI.  The Complaint Does Not Sufficiently Plead New York State Common Law Claims (Counts XIII, XIV, & XV)  Against the Cheektowaga Defendants. ..............................50

a.  Plaintiffs' Common Law Claim for Abuse of Process (Count XIII) Against Cheektowaga Defendants Fails..................................................................................50

b.  Plaintiffs' Common Law Claim for  Negligence (Counts XIV & XV) Against Cheektowaga Defendants Fails..................................................................................51

i.  Negligence for Police for Law Enforcement Activity is Not Actionable (Count XIV). 51

ii.  Plaintiffs' Have Not Alleged Facts Sufficient to Support a Negligent Hiring, Training, and Supervision Claim (Count XV). ...............................................................52

iii.  Intentional Conduct Cannot Form Basis of a Negligence Claim. .......................54

iv.  Plaintiffs Have Not Pleaded a Special Duty.........................................................54

XII.  Plaintiffs has not Pleaded Any Cause of Action Against Police Officer Miller..............55

CONCLUSION...................................................................................................................55

# TABLE OF AUTHORITIES

## CASES

*A.P. v. Dannhauser, 23-CV-6687 (PKC) (RML),*
    2025 WL 917233 (E.D.N.Y. Mar. 25, 2025)....................................................................44

*Acosta v. City of N.Y.,*
    2012 No. 11 Civ. 856; 2012 WL 1506954 (2012)..........................................................22

*Adamides v. Warren, 21-CV-6613 (CJS),*
    2022 WL 2788435 (W.D.N.Y. July 15, 2022)................................................................15

*Adamou v. Cty. of Spotsylvania, Virginia,*
    7789, 2016 WL 1064608 (S.D.N.Y. Mar. 14, 2016) ........................................................8

*Agudath Israel of Am. v. Cuomo,*
    980 F.3d 222 (2d Cir. 2020)............................................................................................16

*Aguilar v. County of Nassau,*
    425 F. Supp. 2d 320 (E.D.N.Y. 2006).............................................................................45

*Al-Mohammedi v City of Buffalo,*
    2017 1:13-CV-01020; 2017 WL 163388 (2017)..............................................................41

*Al–Mohammedi v. City of Buffalo,*
    2016 13-CV-1020-RJA-MJR; 2016 WL 1748264 (2016).....................................28, 40, 41

*Albert v. Carovano,*
    851 F.2d 561 (2d Cir. 1988)............................................................................................34

*Anderson v. Branen,*
    17 F.3d 552 (2d Cir. 1994)..............................................................................19, 37, 39

*Anderson v. City of New York,*
    817 F. Supp. 2d 77 (E.D.N.Y. 2011)...............................................................................35

*Anthony v. City of N.Y.,*
    339 F.3d 129 (2d Cir. 2003)............................................................................................29

*Applewhite v. Accuhealth, Inc.,*
    21 N.Y.3d 420 (2013).....................................................................................................54

*Ashcroft v. al-Kidd,*
    563 U.S. 731 (2011)........................................................................................................26

i

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..................................................................................7

*Atuahene v. City of Hartford,*
    10 F. App'x 33 (2d Cir. 2001)..................................................................7

*Batista v. City of New York,*
    2007 No. 05–CV–8444; 2007 WL 2822211 (2007)..........................................47

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................7

*Bermudez v. Waugh, (MAD/DEP),*
    2013 WL 654401 (N.D.N.Y. Feb. 21, 2013) ....................................................22

*Bernard v. United States,*
    25 F.3d 98 (2d Cir. 1994)..........................................................................52

*Biswas v. City of New York,*
    973 F. Supp. 2d 504 (S.D.N.Y. 2013) ..........................................................48

*Bizzarro v. Miranda,*
    394 F.3d 82 (2d Cir. 2005) ........................................................................35

*Boddie v. Schnieder,*
    105 F.3d 857 (2d Cir. 1997) ......................................................................22

*Bogart v. City of New York,*
    1017, No. 13-, 2016 WL 4939075 (S.D.N. Y. Sept. 6, 2016) ............................47

*Boose v. City of Rochester,*
    71 A.D.2d 59 (4th Dept 1979)....................................................................52

*Borowski v. Mordino,*
    2020 No. 16-CV-999-LJV-MJR; 2020 WL 6084941 (2020) ............................21

*Bouchard v. New York Archdiocese,*
    719 F. Supp. 2d 255 (S.D.N.Y. 2010) ..........................................................53

*Bouche v. City of Mount Vernon,*
    2012 No. 11 Civ. 5246; 2012 WL 987592 (2012)............................................53

*Boudreau v. Smith,*
    2018 WL 4426010 (D. Conn. , Sep. 17, 2018) ....................................... 9, 11, 11

*Bradley v. Village of Greenwood Lake*,
    376 F. Supp. 2d 528 (S.D.N.Y. 2005)..................................................................21

*Brown v. Busch*,
    954 F. Supp. 588 (W.D.N.Y. 1997)...................................................................21

*Brown v. City of Oneonta*,
    221 F.3d 329 (2d Cir. 2000).............................................................................32

*Brown v. St. John's Univ.*,
    2010 WL 11627391 (E.D.N.Y. June 29, 2010) ...............................................49

*Bryant*,
    267 F. Supp. 3d 479........................................................................................55

*Busch v. City of New York*,
    2003 No. 00 CV 5211; 2003 WL 22171896 (2003)..........................................54

*Butler v. City of Batavia*,
    1361, 2009 WL 910194 (2d Cir. Apr. 6, 2009) ...............................................13

*Candelaria v. Coughlin*,
    787 F. Supp. 368 (S.D.N.Y. 1992)...................................................................21

*Candelaria v. Coughlin*,
    979 F.2d 845 (2d Cir. 1992)............................................................................21

*Caravalho v. City of New York*,
    13CV4174........................................................................................................28

*Carpenter v. City of New York*,
    984 F. Supp. 2d 255 (S.D.N.Y. 2013)..............................................................29

*Case v. City of New York*,
    233 F. Supp. 3d 372 (S.D.N.Y. 2017)..............................................................18

*Cipolloni v. City of New York*,
    758 F. App'x 76 (2d Cir. 2018)........................................................................44

*City of Canton v. Harris*,
    489 U.S. 378 (1989) ........................................................................................43

*Cohen v. Pearl River Union Free Sch. Dist.*,
    51 N.Y.2d 256; 414 N.E.2d 639 (1980) ..........................................................46

*Collins v. City of New York*,
    295 F. Supp. 3d 350 (S.D.N.Y. 2018)................................................................13

*Collins v. Putt*,
    979 F.3d 128 (2d Cir. 2020)..............................................................................37

*Conn v. Gabbert*,
    526 U.S. 286 (1999) ...........................................................................................37

*Connick v. Thompson*,
    563 U.S. 51 (2011) .......................................................................................43, 45

*Cook v. Sheldon*,
    41 F.3d 73 (2d Cir. 1994)...................................................................................50

*Cox v. State of La.*,
    379 U.S. 536 (1965) ...........................................................................................17

*Cunningham v. Rodriguez*,
    2002 No. 01 Civ. 1123; 2002 WL 31654960 (2002).......................................21

*Davis v. Callaway*,
    2007 No. 3:05CV00127; 2007 WL 1079988 (2007)....................................24, 25

*Davis v. County of Erie*, 2023 WL 145581 (W.D.N.Y. Jan. 10, 2023)........................................46

*Davis v. County of Erie*,
    2022 No. 22-CV-554JLS; 2022 WL 18215866 (2022) ...................................46

*DeArmas v. Jaycox*,
    No. 92 Civ. 6139, 1993 WL 37501 (S.D.N.Y. Feb.8, 1993)...............................23

*Delaney v. City of Albany*,
    2014 No. 1:12–cv–1575; 2014 WL 733913 (2014) ..........................................46

*DiFolco v. MSNBC Cable L.L.C.*,
    622 F.3d 104 (2d Cir. 2010)................................................................................8

*Dist. of Columbia v. Wesby*,
    583 U.S. 48 (2018) .......................................................................................26, 27

*Dorsett v. Cty. of Nassau*,
    732 F.3d 157 (2d Cir. 2013)...............................................................................13

*Dotson v. Farrugia, 11CIV1126PAE*,
    2012 WL 996997 (S.D.N.Y. Mar. 26, 2012)....................................................52

*Dunaway v. New York*,
   442 U.S. 200 (1979) ...........................................................................................28

*Edrei v. City of New York*,
   254 F. Supp. 3d 565 (S.D.N.Y., 2017) ...........................................................15, 53

*Edrei v. Maguire*,
   892 F.3d 525 (2d Cir. 2018) ............................................................................31

*Ehrens v. Lutheran Church*,
   385 F.3d 232 (2d Cir. 2004) ............................................................................52

*Escalera v. Lunn*,
   361 F.3d 737 (2d Cir. 2004) ............................................................................42

*Espinal v. Goord*,
   No. 00 Civ. 2242, 2001 WL 476070 (S.D.N.Y. May 7, 2001)............................22

*Estate of Jaquez ex rel. Public Adm'r of Bronx Cnty. v. City of New York*,
   2014 WL 2696567 (S.D.N.Y. Jun. 9, 2014).....................................................53

*Fincher v. Cty. of Westchester*,
   979 F. Supp. 989 (S.D.N.Y. 1997)...................................................................46

*Flores v. City of Mount Vernon*,
   41 F. Supp. 2d 439 (S.D.N.Y. 1999).................................................................47

*Fraser v. City of New York*,
   2022 WL 3045524 (E.D.N.Y. , Aug. 1, 2022)...................................................52

*Friedl v. City of New York*,
   210 F.3d 79 (2d Cir. 2000) ..............................................................................13

*Garcia v. Bloomberg*,
   865 F. Supp. 2d 478 (S.D.N.Y. 2012) ........................................................44, 45

*Garcia v. Does*,
   779 F.3d 84 (2d Cir. 2015)................................................................................3

*Genas v. State of N.Y. Dep't of Corr. Servs.*,
   75 F.3d 825 (2d Cir. 1996)..............................................................................16

*Gentile v. Nulty*,
   769 F. Supp. 2d 573 (S.D.N.Y. 2011) ..............................................................33

*Giboney v. Empire Storage & Ice Co.*,
  336 U.S. 490 (1949) ................................................................................... 17, 18

*Golino v. City of New Haven*,
  950 F.2d 864 (2d Cir. 1991) ............................................................................ 30

*Gonzalez v. City of Schenectady*,
  728 F.3d 149 (2d Cir. 2013) ............................................................................ 26

*Gonzalez v. Coughlin*,
  No. 92 Civ. 7263, 1996 WL 496994 (S.D.N.Y. Aug.21, 1996) .......................................... 22

*Gounden v. City of New York, , 2015 WL 5793625*,
  2013 WL 4455429 (W.D.N.Y. Aug. 16, 2013) ......................................................... 47

*Gounden v. City of New York*,
  7411, No. 14-, 2015 WL 5793625 (E.D.N.Y. Oct. 2, 2015) ............................................ 47

*Graham v. City of New York*,
  928 F. Supp. 2d 610 (E.D.N.Y. 2013) ................................................................ 27

*Graham v. Connor*,
  490 U.S. 386 (1989) ............................................................................... 19, 20

*Grant v. City of Syracuse*,
  No. 5:15-cv-445, 2017 WL 5564605 (N.D.N.Y. Nov. 17, 2017) ......................................... 46

*Green v. City of New York*,
  465 F.3d 65 (2d Cir. 2006) .......................................................................... 43

*Hammond*,
  727 F. Supp. 3d 97 ................................................................................... 27

*Hardy v. City of New York*,
  2013 WL 5231459 (S.D.N.Y. July 8, 2013) .......................................................... 38, 38

*Hardy v. Daly*,
  748 Fed. Appx. 379 (2d Cir. 2018) ................................................................... 46

*Hardy v. N.Y.C. Health & Hosp. Corp.*,
  164 F.3d 789 (2d Cir. 1999) ......................................................................... 46

*Hernandez v. Mesa*,
  582 U.S. 548 (2017) ................................................................................. 26

*Houghton v. Cardone,*
    295 F. Supp. 2d 268 (W.D.N.Y. 2003) ...................................................................7

*Hu v. City of New York,*
    927 F.3d 81 (2d Cir. 2019) ...............................................................................37

*Humphrey v. Landers,*
    344 F. App'x 686 (2d Cir. 2009) .........................................................................27

*Hunter v. Bryant,*
    502 U.S. 224 (1991) ........................................................................................27

*In re New York City Policing During Summer 2020 Demonstrations,*
    548 F. Supp. 3d 383 (S.D.N.Y. 2021) ..................................................................12

*Jenkins v. City of N.Y.,*
    478 F.3d 76 (2d Cir. 2007) ...............................................................................30

*John v. City of New York,*
    406 F. Supp. 3d 240 (E.D.N.Y. 2017) ..................................................................27

*Johnson v. City of New York,  (PKC),*
    2008 WL 4450270 (S.D.N.Y. Sept. 29, 2008) ........................................................39

*Jones v. Parmley,*
    465 F.3d 46 (2d Cir. 2006) ...............................................................................17

*Jones v. Westchester County,*
    182 F. Supp. 3d 134 (S.D.N.Y. 2016) ..................................................................43

*Karoon v. N.Y.C. Transit Auth.,*
    659 N.Y.S.2d 27 (1st Dep't 1997) .......................................................................52

*KCMHD,*
    2016 WL 1274575 (S.D.N.Y. Mar. 31, 2016) .........................................................28

*Keith v. City of New York,*
    641 Fed. Appx. 63 (2d Cir. 2016) .......................................................................42

*Kerman v. City of New York,*
    261 F.3d 229 (2d Cir. 2001) ..............................................................................19

*Kia P. v. McIntyre,*
    235 F.3d 749 (2d Cir. 2000) ..............................................................................37

*Kisela v. Hughes,*
    138 S. Ct. 1148 (2018) .................................................................................26

*Kurtz v. Hansell,  (PAE),*
    2021 WL 1143619 (S.D.N.Y. Mar. 24, 2021) .......................................44

*LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester,*
    40 F.3d 587 (2d Cir. 1994) ........................................................................33

*Lauer v. City of New York,*
    95 N.Y.2d 95 (2000) ..................................................................................54

*Lebowitz v. City of New York,*
    606 F. App'x 17 (2d Cir. 2015) .................................................................13

*Lebowitz v. City of New York,*
    2014 No. 12 Civ. 8982; 2014 WL 772349 (2014).............................13, 14

*LeClair v. Saunders,*
    627 F.2d 606 (2d Cir. 1980) ......................................................................33

*Leneau v. Ponte,*
    2018 16-cv-776; 2018 WL 566456 (2018) ..................................................8

*Lennon v. Miller,*
    66 F.3d 416 (2d Cir. 1995) ........................................................................30

*Loria v. Gorman,*
    306 F.3d 1271 (2d Cir. 2002) ....................................................................31

*Lozada v. Weilminster,*
    2015 No. 11 CV 2049; 92 F. Supp. 3d 76 (2015)......................................54

*MacPherson v. Town of Southampton,*
    738 F. Supp. 2d 353 (E.D.N.Y. 2010).......................................................13

*Malley v. Briggs,*
    475 U.S. 335 (1986) .............................................................................26, 30

*Manganiello v. City of New York,*
    612 F.3d 149 (2d Cir. 2010)................................................................41, 42

*Marcavage v. City of New York,*
    689 F.3d 98 (2d Cir. 2012) ........................................................................12

*Marom v. City of New York*,
    2016 WL 5900217 (S.D.N.Y. July 29, 2016)....................................................................32

*Marom v. City of New York, 15-CV-2017 (PKC)*,
    2016 WL 916424 (S.D.N.Y. Mar. 7, 2016)...........................................................8, 32, 35

*Martin v. Warren*,
    482 F. Supp. 3d 51 (W.D.N.Y. 2020)...............................................................................14

*Martinez v. City of Schenectady*,
    97 N.Y.2d 78 (2001) .......................................................................................................47

*Martinez v. Simonetti*,
    202 F.3d 625 (2d Cir. 2000) ...........................................................................................30

*McKenzie v. City of New York, -*,
    6913, 2021 WL 3375613 (2021) .....................................................................................24

*McLean v. City of New York*,
    12 N.Y.3d 194 (2009) .....................................................................................................54

*Mesa v. City of New York*,
    2013 No. 09 Civ. 10464; 2013 WL 31002 (2013)......................................12, 15, 17, 47, 50

*Meyer v. Haines*,
    2025 No. 1:24-CV-00791; 2025 WL 1651154 (2025)......................................................49

*Meyers v. City of New York*,
    812 F. App'x 11 (2d Cir. 2020) .............................................................................12, 12, 29

*Monell v. Department of Social Services of the City of New York*,
    436 U.S. 658 (1978) ........................................................................................................42

*Morales v. United States*,
    961 F. Supp. 633 (S.D.N.Y. 1997)...................................................................................51

*Norales v. Acevedo*,
    2022 WL 17958450 (2d Cir. Dec. 27, 2022) ....................................................................8

*Nowlin v. Monroe County*,
    11-CV-712......................................................................................................................47

*O'Neill v. Krzeminski*,
    839 F.2d 9 (2d Cir. 1988)................................................................................................39

*Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985) ...................................................................................43

*Omor v. City of New York,*
    2015 WL 857587 (S.D.N.Y. Feb. 27, 2015) ...................................................29

*Palm v. Brooks,*
    2024 WL 1908388 (S.D.N.Y. May 1, 2024) ....................................................8

*Pandolfo v. U.A. Cable Sys. of Watertown,*
    171 A.D.2d 1013 (4th Dept 1991).................................................................52

*Panetta v. Crowley,*
    460 F.3d 388 (2d Cir. 2006)........................................................................28

*Paul v. Bank of Am. Corp., No. 09–CV–1932 (ENV) (JMA),*
    2011 WL 684083 (E.D.N.Y. Feb. 16, 2011) ...................................................52

*Pearson v. Callahan,*
    555 U.S. 223 (2009) ...................................................................................26

*Penlyn Dev. v. Village of Lloyd Harbor,*
    51 F. Supp. 2d 255 (E.D.N.Y. 1999)..............................................................33

*Picard v. Torneo,*
    2019 WL 4931353 (D. Conn. 2019)...............................................................15

*Posr v. Doherty,*
    944 F.2d 91 (2d Cir. 1991).........................................................................27

*Provost v. City of Newburgh,*
    262 F.3d 146 (2d Cir. 2001)........................................................................55

*Ramos-Torres v. Municipality of Caguas, CV 12-1706 (JAG),*
    2016 WL 3676201 (DPR July 5, 2016) ..........................................................40

*Rasmussen v. City of New York,*
    766 F. Supp. 2d 399 (E.D.N.Y. 2011)............................................................20

*Rattner v. Netburn,*
    733 F. Supp. 162 (S.D.N.Y. 1989)................................................................46

*Rattner v. Netburn,* 930 F.2d 204 (2d Cir. 1991) ...............................................46

*Regels v. Giardono,*
    113 F. Supp. 3d 574 (N.D.N.Y. 2015)............................................................20

x

*Reynolds v. Giuliani*,
    506 F.3d 183 (2d Cir. 2007) ...................................................................43

*Richardson v. New York City Health & Hospitals Corp.*,
    No. 05 Civ. 6278, 2009 WL 804096 (S.D.N.Y. Mar. 25, 2009).........................50

*Rincon v. City of New York*,
    2005 No. 03 Civ. 8276; 2005 WL 646080 (2005)............................................21

*Rodriguez v. City of New York*,
    291 F. Supp. 3d 396 (S.D.N.Y. 2018) ....................................................26, 32

*Rogoz v. City of Hartford*,
    796 F.3d 236 (2d Cir. 2015) ...................................................................39

*Roham v. New York City Transit Authority*,
    215 F.3d 208 (2d Cir. 2000) ...............................................................27, 41

*Roundtree v. City of New York*,
    778 F. Supp. 614 (E.D.N.Y. 1991) ..........................................................20

*Rusfeldt v. City of New York*,
    2024 WL 4354874 (S.D.N.Y. Sept. 30, 2024) ..........................................33, 34

*Saldana v. Village of Port Chester*,
    2010 No. 09 Civ. 6268; 2010 WL 6117083 (GAY 2010) ...................................53

*Santiago v. City of New York,  (BMC)*,
    2009 WL 2734667 (E.D.N.Y. Aug. 25, 2009)................................................44

*Santiago v. Semenza*,
    965 F. Supp. 468 (S.D.N.Y. 1997)............................................................21

*Seabrook v. City of New York*,
    210 F.3d 355 (2d Cir. 2000) ...................................................................16

*Simpson v. City of New York*,
    793 F.3d 259 (2d Cir. 2015) ...................................................................28

*Singletary v. Allen*,
    431 F. Supp. 3d 126 (W.D.N.Y. 2019).......................................................46

*Spring v. Allegany- Limestone Cent. Sch. Dist.*,
    138 F. Supp. 3d 282 (W.D.N.Y. 2015)..............................................8, 18, 49

*Spring v. Allegany-Limestone Cent. Sch. Dist.*,
    655 F. App'x 25 (2d Cir. 2016) ........................................................49

*Stephenson v. Doe*,
    332 F.3d 68 (2d Cir. 2003) ...........................................................26

*Stewart v. City of New York*,
    No. 06 Civ. 15490, 2008 WL 1699797 (S.D.N.Y. Apr.9, 2008) ....................51, 51

*Talarico v. Port Auth. of N.Y. & N.J.*,
    367 F. Supp. 3d 161 (S.D.N.Y. 2019) ................................................48

*Tanner v. San Juan County Sheriff's Off.*,
    864 F. Supp. 2d 1090 (DNM 2012) ..................................................40

*Townes v. City of New York*,
    176 F.3d 138 (2d Cir. 1999) ..........................................................41

*Tracy v. Freshwater*,
    623 F.3d 90 (2d Cir. 2010) .......................................................20, 23

*United States v. Valez*, 479 U.S. 1067 (1987) ...........................................28

*United States v. Alameh*,
    341 F.3d 167 (2d Cir. 2003) ..........................................................35

*United States v. Albertini*,
    472 U.S. 675 (1985) ................................................................11

*United States v. O'Brien*,
    391 U.S. 367 (1968) ................................................................11

*United States v. Rowlee*,
    899 F.2d 1275 (2d Cir. 1990) ........................................................17

*United States v. Valez*,
    796 F.2d 24 (2d Cir. 1986) ..........................................................28

*Valdez v. City of New York*,
    18 N.Y.3d 69 (2011) ................................................................55

*Van de Kamp v. Goldstein*,
    555 U.S. 335 (2009) ................................................................43

*Vann v. City of Rochester*,
    6464, 2019 WL 2646616 (W.D.N.Y. June 27, 2019) ..................................43

*Vassallo v. Lando*,
    591 F. Supp. 2d 172 (E.D.N.Y. 2008) ................................................................................33

*Velez v. Levy*,
    401 F.3d 75 (2d Cir. 2005) ....................................................................................................37

*Vossler v. Phasecom Am., Inc.*,
    No. 04-CV-128 ........................................................................................................................7

*Walker v. Raja,  (PKC) (LB)*,
    2020 WL 606788 (E.D.N.Y. Feb. 7, 2020) ................................................................19, 20

*Wayte v. United States*,
    470 U.S. 598 (1985) ..............................................................................................................35

*Weyant v. Okst*,
    101 F.3d 845 (2d Cir. 1996) .......................................................................................28, 28, 32

*Wims v. N.Y.C. Police Dep't*,
    2011 No. 10 Civ. 6128; 2011 WL 2946369 (2011) ..............................................................22

*Wood v. Moss*,
    572 U.S. 744 (2014) ..............................................................................................................27

*Wood v. Town of East Hampton*,
    4197, No. 08–CV–, 2010 WL 3924847 (E.D.N.Y. Sept. 30, 2010) ....................................33

*Yagel v. Town of Haverstraw, 24-CV-2030 (NSR)*,
    2024 WL 5090174 (S.D.N.Y. Dec. 11, 2024) ....................................................................48

*Yearwood v. LoPiccolo*,
    No. 95 Civ. 2544, 1998 WL 474073 (S.D.N.Y. Aug. 10, 1998) ..........................................22

*Ying Li v. City of New York*,
    246 F. Supp. 3d 578 (E.D.N.Y. 2017) ..................................................................................38

*Zellner v. Summerlin*,
    494 F.3d 344 (2d Cir. 2007) ..................................................................................................28

*Zhang Jingrong v. Chinese Anti-Cult World Alliance*,
    311 F. Supp. 3d 514 (E.D.N.Y. 2018) ..................................................................................49

*Zhao v. City of New York*,
    656 F. Supp. 2d 375 (S.D.N.Y. 2009) ..................................................................................20

**STATUTES**

N.Y. Penal Law § 240.20(6) ................................................................................29

New York Civ. Rights Law § 40-c(2) .....................................................................48

New York Civil Rights Law § 40-c .........................................................................48

New York Civil Rights Law § 79-n ..................................................................49, 50

**FEDERAL RULES**

Fed. R. Civ. P. 12(b)(6) ...........................................................................................1

Fed. R. Civ. P. Rule 8 ..............................................................................................7

Fed. R. Civ. P. Rule 8(a)(2) .....................................................................................7

Fed. R. Civ. P. Rule 12(b)(6) ........................................................................8, 44, 44

## PRELIMINARY STATEMENT

Defendants, Town of Cheektowaga ("Cheektowaga"), Police Officer Matthew Arnold ("Officer Arnold"), Police Officer Miller ("Officer Miller"), and Police Officer Shane Rogers ("Officer Rogers")[1], respectfully submit this Memorandum of Law in support of their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) based on a failure to state a claim against these Defendants.

This case arises from the dispersal and arrests of protesters following a demonstration held at the University at Buffalo's North Campus on May 1, 2024. Plaintiffs allege a sweeping array of statutory and constitutional violations including the alleged use of excessive force, unlawful arrests, suppression of speech, and religious discrimination during and after the protest.

While the Complaint spans over 450 paragraphs and levies wide-ranging allegations against numerous law enforcement agencies, allegations concerning the Town of Cheektowaga and its officers are sparse, and confined to a handful of brief, isolated interactions involving just three plaintiffs, Noor Mohammed, Majd Ayoub, and Jay Ayoub, and lacking any indication of broader involvement or policy-based misconduct. The Complaint only details actions of two officers from the Town of Cheektowaga—Defendants Arnold and Rogers—and references them solely in connection with the arrests of two individuals.[2]

---

[1] The named officers of the Town of Cheektowaga Police Department are referred to collectively as the "Cheektowaga Officers."  The Cheektowaga Officers and the Town of Cheektowaga are referred to collectively as the "Cheektowaga Defendants."

[2] Plaintiffs name three Cheektowaga Officers as defendants: Officer Matthew Arnold, Officer Shane Rogers, and Officer Miller (first name unknown). However, the Complaint is devoid of any factual allegations concerning Officer Miller. His name appears only in the caption and is not referenced in the body of the pleading. It is entirely unclear what conduct, if any, Plaintiffs attribute to Officer Miller. At most, one might speculate that Plaintiffs intended to include him as the unidentified Cheektowaga officer potentially involved in the arrest of Plaintiff Jay Ayoub, but no such allegation is actually pleaded. Absent any specific or even general allegation linking Officer Miller to the events at issue, the claims against him must be dismissed.

1

All consequential decisions involved in the protest response—including the imposition of a curfew policy and the directive to execute the dispersal—are explicitly attributed to UBPD leadership and university administration. (Compl. [1]³ ¶¶ 75–77, 84–87). Similarly, numerous arrests and instances of alleged constitutional violations are explicitly attributed to officers from other agencies, including UBPD, BPD, Erie County Sheriff's Office, and the Towns of Tonawanda and Kenmore (*id.* at ¶¶ 104–107, 178–192), and not the Cheektowaga Officers.

Beyond these discrete allegations, the Complaint includes vague references to "Defendant Officers," "Municipal Defendant Officers," and "other agencies." These generalized groupings appear in allegations concerning the enforcement of the protest dispersal order (*id.* at ¶¶ 88, 95–97, 100–101, 106–107), intimidating patrols and verbal harassment after the protest (*id* .¶¶ 141–142, 145), and purported failures to intervene in unlawful conduct (*id.* at ¶¶ 200, 204–208). These allegations lack any factual content specifically tying the Town of Cheektowaga or its officers to the alleged misconduct in those categories.

As is more fully set forth below, the limited and isolated actions attributed to the Cheektowaga Defendants do not support the nineteen causes of action pleaded against them. Even assuming *arguendo* that any of the conduct alleged could be construed as a violation of constitutional rights, the Cheektowaga Officers would nevertheless be entitled to qualified immunity, as there is no clearly established law prohibiting their actions under the specific circumstances alleged.⁴ Further, Plaintiffs' sparse allegations—confined to a few discrete interactions involving only three individuals—are wholly insufficient to support municipal liability under *Monell.* From the Complaint, there is no plausible basis to infer that the Town of

---

³ Bracketed References are to the document number on CM/ECF for the above-referenced index number.
⁴ *See* Sections I(a)(ii), I(b), II(e), III(b), IV(b), V(a), VI(b) *infra.*

Cheektowaga maintained a policy, practice, or custom that caused the alleged deprivations, nor that any municipal policymaker was deliberately indifferent to constitutional violations.[5] As such, the Complaint fails to state a viable claim against any of the Cheektowaga Defendants.

And while the pleading is facially deficient, it only becomes worse, when inaccurate representations are excised from the Complaint based on the same bodycam footage on which the Plaintiff relies[6]. *Garcia v. Does*, 779 F.3d 84, 88 (2d Cir. 2015) (accepting allegations as true but only to the extent that they were not contradicted by the Complaint). To assist the Court in its review, the Town Defendants attach and exhibit bodycam footage of Officer Arnold and Officer Rogers (Declaration of Lt. Christopher Geelan, dated September 12, 2025 ("Geelan Decl."), Exs. 2, 3) from the night of the incident and the Declaration of James P. Blenk, dated September 12, 2025, which sets forth true and accurate screenshots of the video in order to depict events that refute allegations in the Complaint.

## ALLEGATIONS CONCERNING CHEEKTOWAGA DEFENDANTS

Plaintiff Noor Mohammed is a UB student and practicing Muslim who arrived at the May 1, 2024 protest shortly before the curfew, bringing refreshments at the request of other students and standing near the prayer group while observing and filming the police presence on her phone. (Compl [1] ¶ 194). She allegedly did not participate in the prayer or demonstration, and dispersed in compliance with police orders. (*Id.* at ¶ 194). Despite this, she alleges that officers from various agencies entered Capen Hall and violently apprehended her without provocation, grabbing her by the backpack and slamming her to the ground. (*Id. at* ¶ 195). She specifically identifies

---

[5] *See* Section VII *infra*.
[6] Plaintiff excerpts (¶127) references bodycam footage throughout the Complaint [1]. (*Id.* at ¶¶ 52, 54, 85, 100, 103, 108, 131, 163, 353. The Plaintiff obtained bodycam from the Town of Cheektowaga on February 12, 2025 (Geelan Decl., ¶4.)

Cheektowaga Officers Arnold and Rogers, along with Officer Bauer and unidentified officers from BPD and UBPD, as those who allegedly assaulted and berated her. (*Id.* ¶ 196). Ms. Mohammed further claims that her hijab and keffiyeh were forcibly dislodged, exposing her head and hair in violation of her religious beliefs, while officers taunted her and refused her pleas to readjust her garments. (*Id.* at ¶¶ 197–198). She alleges an unidentified officer also photographed her in this state, and she was ultimately transported, processed, and issued a ticket, resulting in physical injuries and lasting emotional distress. (*Id.* at ¶ 199). She does not identify which individual officers were responsible for the alleged physical takedown, the removal of religious coverings, the mocking and taunting, or the subsequent photographs.

Although the Complaint alleges that Plaintiff Mohammed "complied with all orders from officers" (*id.* at ¶¶ 29, 102), was "standing peacefully" without posing a threat or engaging in resistance (*id.* at ¶¶ 29, 102, 127, 253), and that "without provocation, Ms. Mohammed was slammed to the ground, restrained by multiple officers, and arrested" (*id.* at ¶ 29), bodycam footage shows otherwise. The video depicts Plaintiff Mohammed disregarding repeated orders to back away from the doors, forcefully attempting to kick open a door officers were holding shut to safely effectuate an arrest, and then attempting to retreat further into the building once officers pursued her. The footage also confirms that neither Cheektowaga officer participated in the initial takedown. (*See* Blenk Decl. at ¶¶ 13-16.)

Video demonstrates conclusively contradicts Plaintiff's claim that "[a]s the officers assaulted and harassed Ms. Mohammed, she can be heard crying and begging for her hijab (which the officers had purposefully removed)" (*id.* at ¶ 197), and that "[s]he begged officers to allow her to readjust her religious garments to comply with her religious beliefs, but her pleas were ruthlessly refused." (*Id.* at ¶ 197). Plaintiff Mohammed made her first clear request for adjustment while

4

being escorted towards the UB van, asking, "wait, my hijab, can you at least put it back?" Officer Arnold immediately responded, "How do you want it on? Like that?" and attempted to rewrap it before allowing Plaintiff Jay Ayoub to step in and properly secure it. (*See* Blenk Decl. at ¶¶ 20-22.)

Plaintiff Majd Ayoub is a UB student and organizer affiliated with Students for Justice in Palestine, who participated in the May 1, 2024 protest by joining the prayer group and yet allegedly complied with the officers' dispersal orders. (Compl. [1] ¶ 173). He claims that after Plaintiff Mohammed was arrested and visibly distressed due to the removal of her religious garments, he attempted to assist her but was told to "back the f*** up" by Defendant Ford, who allegedly pushed him in the chest. (*Id.* at ¶ 174). He further alleges that he verbally acknowledged the officers' commands and began backing away, yet was still rushed and tackled by multiple officers, including Cheektowaga Officers Arnold and Rogers, Officer Ford, Officer Soluri, and others. (*Id.*) He contends he was then violently taken to the ground and zip-tied, despite making no attempt to resist. (*Id.* at ¶ 175). As a result, he claims to have sustained physical injuries to his right shoulder, arm, and hip, as well as emotional distress. (*Id.* at [1] ¶ 176).

Although the Complaint alleges that Plaintiff Majd Ayoub approached Plaintiff Mohammed to assist with her hijab (Compl. [1], ¶ 174), the bodycam footage shows otherwise. By the time he approaches, Officer Arnold and Plaintiff Jay Ayoub are already assisting Plaintiff Mohammed and nearly finished adjusting her hijab. Rather than providing help, Majd Ayoub initiates a verbal confrontation with officers in her vicinity and, despite repeated instructions to back up, retreats only slightly, remaining within arm's reach of the officers escorting Plaintiff Mohammed while continuing to argue with them. (*See* Blenk Decl. at ¶ 23.)

And although Plaintiffs allege that both Cheektowaga officers tackled and subdued Plaintiff

5

Majd Ayoub (Compl. [1], ¶ 174), the bodycam footage plainly contradicts this allegation. Officer Arnold is seen escorting Plaintiff Mohammed farther down the sidewalk and plays no role in the arrest of either Plaintiff Majd Ayoub or Plaintiff Jay Ayoub. Officer Rogers remains at a distance and only approaches after Plaintiff Majd Ayoub has already been brought to the ground. (*See* Blenk Decl. at ¶¶ 24-26.)

Plaintiff Jay Ayoub is the father of Plaintiff Majd Ayoub who arrived at the protest on May 1, 2024, to bring food to his son and others, and allegedly observed the event from a distance due to the heavy police presence. (Compl. [1] ¶ 168). He briefly participated in the Maghrib prayer but alleges that he complied with officers' dispersal orders and left the area before the curfew. (Compl. [1]¶ 168.) A short time later, Mr. Ayoub claims he approached the scene as his son was being arrested and was then tackled by Defendant Officers Ford, Palizay, Santiago, Schultz, Serafini, Soluri, and others, including unnamed officers from the Buffalo Police Department, Town of Cheektowaga, and UBPD. (Compl. [1] ¶ 169.) He alleges that while restrained under the weight of multiple officers, he cried out that he couldn't breathe and had asthma, to which some officers allegedly responded dismissively while shouting at him to stop resisting. (*Id.* at ¶ 170). He further alleges that during his arrest, officers applied zip ties to his arms and positioned them behind his back in a manner he characterizes as harsh, that he experienced some difficulty breathing while being escorted, and that officers eventually paused to allow him to recover his breath after effectuating the arrest. (*Id.* at ¶¶ 170–171). He asserts that he suffered bruised ribs, a left shoulder sprain, lingering pain, breathing issues, and emotional distress following the incident. (*Id*. at ¶ 172).

While the Complaint alleges that Plaintiff Jay Ayoub was "assaulted and arrested while attempting to assist in keeping the peace" (*id.* at ¶ 174) and that he "tried to assist Majd while he

was being attacked by police" (*id.* at ¶ 107). The bodycam footage tells a different story. It shows Plaintiff Jay Ayoub placing his hands on an officer who was in the process of subduing his son. As he is brought to the ground, Jay Ayoub's arms remain wrapped around that officer, pulling the officer down with him and further entangling the arrest. (*See* Blenk Decl. at ¶¶ 26-27.)

## LEGAL STANDARD

Under Rule 8(a)(2), a pleading must contain "a short and plain statement of the claim showing the pleader is entitled to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "factual allegations must be enough to raise a right to relief above the speculative level." *Id.* Thus, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 570. "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action does not suffice. … Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations omitted). "Only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* (internal citations omitted).

Significantly, though Rule 8 does not require excessive detail to meet pleading standards, "a civil rights complaint must still allege facts." *Houghton v. Cardone*, 295 F.Supp.2d 268, 276 (W.D.N.Y. 2003); *Vossler v. Phasecom Am., Inc.*, No. 04-CV-128S, 2004 WL 1628903 at *1 (W.D.N.Y. July 19, 2004) (finding that Rule 8 pleading requirement not met when, "no specifics are provided concerning the conduct that allegedly constituted" the legal claim alleged in the complaint).

Critically, this means that a Complaint that "lump[s] all the defendants together in each claim provid[es] no factual basis to distinguish their conduct .... fail[s] to satisfy [the] minimum [pleading] standard." *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001); *see also*

7

*Leneau v. Ponte*, 16-cv-776, 2018 WL 566456, at *15 (S.D.N.Y. Jan. 25, 2018) ("complaints that rely on group pleading and fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim") (internal quotation omitted); *Adamou v. Cty. of Spotsylania, Virginia*, 12-cv-7789, 2016 WL 1064608, at *11 (S.D.N.Y. Mar. 14, 2016) ("Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim").

The prohibition on "group pleading" applies with even greater force to §1983 claims, which require specific, individualized allegations of personal misconduct. *See, e.g.*, *Spring v. Allegany- Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 293 (W.D.N.Y. 2015) ("Because the personal involvement of a defendant is a prerequisite to an award of damages under §1983, a plaintiff cannot rely on a group pleading against all defendants *without making specific individual factual allegations*") (emphasis added); *Marom v. City of New York*, 15-CV-2017 (PKC), 2016 WL 916424 at *14 (S.D.N.Y. Mar. 7, 2016) ("Plaintiffs only surviving claims are . . . false arrest and First Amendment retaliation claims and [a] claim for excessive use of force. If the [plaintiff] fails to plausibly allege the personal involvement of the individual defendants' in each of those claims, those respective claims must be dismissed as to those particular defendants").

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and *documents incorporated by reference in the complaint*." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (emphasis added). "Courts specifically may consider video footage at the motion to dismiss stage when the footage is referenced in the complaint and '[k]ey allegations in the complaint rest[ ] on the ... video.'" *Palm v. Brooks*, 2024 WL 1908388, at *2 (S.D.N.Y. May 1, 2024) (quoting *Norales v. Acevedo*, 2022 WL 17958450, at *2 (2d Cir. Dec.

27, 2022); *see also Boudreau v. Smith*, 2018 WL 4426010, at n. 1 (D. Conn., Sep. 17, 2018) ("I may rely on the police body camera videos for purposes of this motion to dismiss because Plaintiff has incorporated them by reference in his amended complaint.").

## ARGUMENT

I.    Plaintiffs Cannot Sustain a First Amendment Claim (Counts I, II, and VI) Against the Cheektowaga Defendants.

Plaintiffs bring three First Amendment claims against Cheektowaga Officers stemming from the events of May 1, 2024. First (Count I), they allege that law enforcement officers, including those from Cheektowaga, violated their rights to free speech and assembly by enforcing an unlawful dispersal order designed to retaliate against the protest's speech content. (Compl. [1] ¶¶ 222–249). Second (Count II), they claim that Defendants retaliated against individuals who were recording or documenting police conduct during the dispersal with unlawful force and arrests. (*Id.* at ¶¶ 250–259). Third (Count VI), they allege that officers violated the Free Exercise Clause by initiating arrests during evening prayer and denying requests for religious accommodations. (*Id.* at ¶¶ 297–305).

In the sections that follow, Defendants demonstrate that each of these claims fails as a matter of law: (1) there are insufficient allegations regarding the Cheektowaga Defendants' involvement; (2) the curfew was a valid time, place, and manner restriction; (3) even if the curfew was unlawful, it was enforced without retaliatory intent; (4) there was no clearly established right to record police conduct under the circumstances alleged, entitling officers to qualified immunity; and (5) Plaintiffs do not plausibly allege that the Cheektowaga Defendants were motivated by religious animus.

a. Plaintiffs' Claim for Retaliation and Suppression of Protected Speech and Assembly (Count I) Against Cheektowaga Defendants Fails.

i. *There Are Insufficient Allegations Concerning the Cheektowaga Defendants.*

While Plaintiffs speculate that the curfew may have been created for improper viewpoint-discriminatory reasons, they do not allege that the Cheektowaga Defendants played any role in formulating the policy or had any knowledge of its allegedly pretextual basis. Rather, the Complaint concedes that the curfew originated with University administrators—not law enforcement—and contains no factual allegations suggesting that Cheektowaga Officers had reason to question the legality of the directive they were called upon to enforce.[7] Nor do Plaintiffs allege any facts indicating that the Cheektowaga Defendants were motivated by the content of the protest in their limited role at the scene.

Rather, the thrust of Plaintiffs' First Amendment retaliation claim is directed at the decision to blow up the protest through a coordinated and forceful dispersal operation. The Complaint attributes that decision and the accompanying dispersal orders solely to UBPD Defendants Fletcher and Beaty, who issued the commands for law enforcement to advance and disperse the crowd. (Compl. [1] ¶¶ 84, 86). Plaintiffs further allege that UBPD officers were designated as the

---

[7] The Complaint asserts that UB President Tripathi directed the creation of an "arbitrary curfew policy" intended to forcibly disperse protestors after 8:00 p.m., despite the absence of any safety threat or justification, and without sufficient notice, lawful orders, or individualized assessment. (Compl. [1] ¶¶76-77). Plaintiffs allege that the curfew was pretextual and targeted at suppressing protected speech and religious expression. (Compl. [1] ¶¶82–83, 88, 90–91). Plaintiffs themselves allege that Defendant "Tripathi personally approved and/or directed the creation of an arbitrary curfew policy," that he "instructed University officials, including University Police leadership, and Municipal Defendants, to enforce the curfew who remained on campus after the arbitrary deadline, regardless of whether they posed any security threat or had been given lawful orders to disperse. Tripathi's deliberate decisions and directives were a moving force behind the constitutional deprivations suffered by Plaintiffs." (Compl. [1] ¶¶76-77).

"front line" and were primarily responsible for making arrests. (*Id.* at ¶ 87). Notably, while the Complaint explicitly identifies numerous specific agencies present at the initial Flint Loop Lawn arrests—such as UB Campus Police, New York State Police, Buffalo Police Department, Erie County Sheriff's Office, and the Towns of Amherst, Evans, Orchard Park, and West Seneca—the Town of Cheektowaga is conspicuously absent from this detailed list and is referenced only generically as one of the "other Municipal Defendants." (*Id.* at ¶ 108). This vague and conclusory language falls short of plausibly alleging that the Cheektowaga Defendants were involved in, let alone responsible for the initiation of arrests.

> ### ii. The Curfew was a Permissible Time, Place and Manner Restriction

Plaintiffs' first cause of action for retaliation and suppression of protected speech and assembly (Count I) fails as against the Cheektowaga Officers because the conduct alleged against them constitutes a permissible enforcement of a facially neutral time, place, and manner restriction in a public forum. Plaintiffs do not plausibly allege that Cheektowaga Officers played any role in formulating the curfew at issue or that they acted with retaliatory motive. At most, Plaintiffs claim that Cheektowaga Officers were present at the protest, issued warnings about the impending deadline, and effectuated arrests pursuant to a facially valid policy when Plaintiffs knowingly remained past the curfew.[8] These allegations do not state a viable First Amendment violation, nor do they overcome qualified immunity.

As courts have repeatedly recognized, the First Amendment does not preclude the government from imposing neutral regulations that incidentally burden speech. *See United States v. Albertini*, 472 U.S. 675, 688–89 (1985); *see also United States v. O'Brien*, 391 U.S. 367, 377 (1968). Even regulations that limit expressive conduct in a public forum are valid where they are

---

[8] Many of these allegations, however, involve impermissible group pleading which does not attribute any specific conduct to any individual Cheektowaga Officer.

content-neutral, narrowly tailored to serve significant government interests, and leave open ample alternative means[9] of expression. *See Meyers v. City of New York*, 812 F. App'x 11, 15 (2d Cir. 2020).

Curfews and temporary closures of public forums during protests have routinely been upheld as valid time, place, and manner restrictions. *See Meyers*, 812 F. App'x at 15 (holding that City's temporary closure of park pursuant to dispersal order during protests applied content-neutral time, place, and manner restrictions on speech, and thus did not support § 1983 First Amendment discrimination claim against various defendants); *see also In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 413 (S.D.N.Y. 2021) (holding that curfew orders issued during protests were reasonable time, place, and manner restrictions, and thus defendants did not violate First Amendment rights of plaintiff protestors by issuing dispersal orders; noting that protesters were not restricted from gathering to exercise First Amendment rights during the day).

Given the apparent lawfulness of the policy and the apparent illegality of the protestors continued presence[10], the Cheektowaga Officers are entitled to qualified immunity for carrying out dispersal. *See Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *23 (S.D.N.Y. Jan. 3, 2013) ("Thus, for qualified immunity purposes, the officers were not invading

---

[9] "Although an alternative channel for communication must be available, it is clear that the First Amendment does not guarantee protesters access to every or even the best channels or locations for their expression. The requirement that 'ample alternative channels' exist does not imply that alternative channels must be perfect substitutes for those channels denied to plaintiffs by the regulation at hand; indeed, were we to interpret the requirement in this way, no alternative channels could ever be deemed 'ample.' All that is required is that an alternative channel be ample—i.e., an "adequate" channel for communication." *Marcavage v. City of New York*, 689 F.3d 98, 107 (2d Cir. 2012).

[10] As discussed in more fully in Section III *infra*, Plaintiffs were trespassing at the time of the arrests, and they cannot transform their unlawful conduct into constitutionally protected activity by initiating prayer or beginning to film police officers.

Plaintiffs' clearly established rights of association, assembly, and free exercise, as they were executing a lawful order to disperse—a permissible time, place, and manner restriction on speech in a public area."); *see also Collins v. City of New York*, 295 F. Supp. 3d 350, 363 (S.D.N.Y. 2018) ("Defendants are entitled to qualified immunity because it was not clearly established that an order temporarily banning demonstrators from a densely crowded sidewalk violated the First Amendment").

   iii. *Plaintiff*s' Cannot Establish a Retaliation Claim Against the Cheektowaga Defendants.

Even assuming *arguendo* that the curfew implemented at the University at Buffalo was ultimately found to be unconstitutional and that the Cheektowaga Defendants assisted in its enforcement, Plaintiffs' First Amendment retaliation claim still fails as a matter of law. To establish a First Amendment retaliation claim, a plaintiff must plausibly allege: (1) protected speech or conduct; (2) that defendants *took adverse action motivated by that speech*; and (3) that plaintiffs suffered injury as a result. *Dorsett v. Cty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (emphasis added). Crucially, a retaliation claim under § 1983 "must be supported by specific and detailed factual allegations, not stated in wholly conclusory terms." *MacPherson v. Town of Southampton*, 738 F. Supp. 2d 353, 369 (E.D.N.Y. 2010) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)).

Critically, Plaintiffs fail to allege facts supporting the second element—namely, that the Cheektowaga Officers were motivated by disagreement with Plaintiffs' viewpoint, rather than merely enforcing a facially valid curfew. Absent allegations of retaliatory animus, Plaintiffs claim should be dismissed. *See Lebowitz v. City of New York*, No. 12 Civ. 8982 (JSR), 2014 WL 772349, at *4 (S.D.N.Y. Feb. 25, 2014), *aff'd*, 606 F. App'x 17 (2d Cir. 2015); *see also Butler v. City of Batavia*, 08–cv–1361, 2009 WL 910194, at *1 (2d Cir. Apr. 6, 2009) (dismissing complaint

because it was devoid of factual allegations showing that defendants' actions were "motivated or substantially caused by" plaintiffs' exercise of their First Amendment rights) .

Enforcement actions taken only after protestors are given time to engage in expressive activity and then refuse to comply with lawful dispersal orders do not suggest retaliatory intent, but rather reflect standard, content-neutral law enforcement responses to noncompliance. *See Lebowitz*, 2014 WL 772349 at \*4. In *Lebowitz*, the court dismissed a First Amendment retaliation claim where the plaintiffs failed to demonstrate that the defendants acted with retaliatory motive. The court emphasized that the plaintiffs "proffered no competent evidence that defendants' actions were motivated by plaintiffs' exercise of their speech and association rights." *Id.* Instead, the evidence showed that the plaintiffs "were permitted to be present in the park without incident before their arrest, and were arrested only after they lay down, were asked to leave, and refused to do so," and that the "evidence thus shows beyond genuine dispute that defendants were motivated by plaintiffs' failure to leave when asked, and not their speech or associative conduct." *Id.*

Bare assertions of retaliatory animus, unsupported by specific facts linking the challenged action to a retaliatory motive, cannot satisfy the pleading burden for a First Amendment retaliation claim. *See Martin v. Warren*, 482 F. Supp. 3d 51, 64–72 (W.D.N.Y. 2020). In *Martin*, the court upheld the constitutionality of a content-neutral emergency curfew order restricting gatherings between 11:00 p.m. and 5:00 a.m., recognizing that "[d]uring the daylight hours, when most communicative conduct takes place, people may gather together as they see fit." The court rejected plaintiffs' claim that the municipal actions were motivated by racial animus, finding that the assertion that the city's emergency measures targeted "Black and brown neighborhoods" was "completely speculative."

Isolated or stray critical comments during enforcement actions are insufficient, without

more, to plausibly allege that adverse conduct was motivated by retaliatory animus under the First Amendment. *See Edrei v. City of New York*, 254 F. Supp. 3d 565, 577–78 & n.3 (S.D.N.Y. 2017) (granting dismissal of First Amendment retaliation claim where plaintiffs failed to plausibly allege that police officers' use of LRAD to disperse protestors was motivated by the content of their speech; noting that officers gave dispersal orders for safety and traffic concerns and plaintiffs alleged no facts showing viewpoint-based animus; one plaintiff's claim of targeting based on a "critical comment" also held insufficient under *Iqbal* to establish retaliatory motive).

### b. Plaintiff's Claim for Retaliation for Observing and Documenting Police Activity (Count II) Against Cheektowaga Defendants Fails.

Plaintiffs' allegations that the Cheektowaga Officers retaliated against them for observing or recording police activity (Count II) cannot overcome qualified immunity because there was no clearly established First Amendment right to record police conduct at the time of the events in question[11]—particularly not for individuals actively participating in the events they were recording.[12]

The bodycam footage also forecloses Plaintiffs' claim that Plaintiff Mohammed was subjected to First Amendment retaliation for recording police activity. The video depicts numerous students—including many protest participants—openly recording the events on their phones without interference. (*See* Blenk Decl. at ¶ 12.) Plaintiff Mohammed likewise recorded without

---

[11] "Neither the Supreme Court nor Second Circuit precedent has squarely established that an individual who is the subject of police activity has the right to record police performing their official duties." *Adamides v. Warren*, 21-CV-6613 (CJS), 2022 WL 2788435, at *10 (W.D.N.Y. July 15, 2022) (quoting *Picard v. Torneo*, 2019 WL 4931353, at *4 (D. Conn. 2019)); *see also Mesa v. City of New York* 2013 WL 31002, at *25 (S.D.N.Y. Jan. 3, 2013) ("the right to photograph and record police is not clearly established as a matter of constitutional law in this Circuit.").

[12] The very presence of the protestors was unlawful, and they cannot immunize themselves from criminal sanctions by pulling out a camera. *See* footnote 17 *infra*.

issue until she began forcefully kicking the door that officers were holding shut. Only then was she arrested. (*See* Blenk Decl. at ¶¶ 13-15.) Crucially, none of the other protestors in the immediate vicinity who were also filming, but who did not engage in such conduct, were arrested. (*See* Blenk Decl. at ¶ 12.) This distinction makes plain that her arrest was based on her disruptive actions, not her act of recording.

c.   Plaintiff's Free Exercise Claim (Count VI) Against Cheektowaga Defendants Fails.

"To prevail on his Free Exercise claim, [plaintiff] must first show that a state action sufficiently burdened his exercise of religion.... Once a plaintiff demonstrated that his free exercise rights were substantially burdened by state action, courts traditionally upheld the state action only if it was justified by a compelling state interest." *Genas v. State of N.Y. Dep't of Corr. Servs.*, 75 F.3d 825, 831 (2d Cir. 1996). However, "it is not a violation of the Free Exercise Clause to enforce a generally applicable rule, policy, or statute that burdens a religious practice, provided the burden is not the object of the law but merely the 'incidental effect' of an otherwise valid neutral provision." *Seabrook v. City of New York*, 210 F.3d 355 (2d Cir. 2000) (summary order); *Agudath Israel of Am. v. Cuomo*, 980 F.3d 222, 226 (2d Cir. 2020) (per curiam). Courts have "repeatedly refused to find free exercise violations where the laws or rules at issue 'do not bar any particular religious practice,' ... or where the plaintiff does not even allege that the rule targets or was motivated to prohibit certain religious beliefs." *Seabrook*, 210 F.3d 355.

As explained in Section I(a)(i) *supra*, the only alleged state action that interfered with Plaintiffs' prayer was the dispersal directive issued by UBPD officials pursuant to a policy enacted by the UB administration. The Cheektowaga Officers are not alleged to have participated in issuing or shaping that policy. Instead, the claims against them relate solely to post-dispersal arrests, after the prayer group had already disbanded. Accordingly, the Complaint contains no allegations that

could support a Free Exercise claim against the Cheektowaga Officers.[13]

Importantly, courts have declined to recognize Free Exercise violations in nearly identical circumstances. In *Mesa v. City of New York*, the court rejected Free Exercise and related First Amendment claims where officers dispersed an unlicensed religious gathering. 2013 WL 31002, at *23. There, the court found that "the officers were simply there to disperse an unlicensed celebration of several hundred individuals" under a content-neutral rule and emphasized that there was "no evidence … the gathering [was targeted] due to its religious affiliation." *Id.* Likewise here, the Cheektowaga Officers were enforcing a facially neutral curfew in aid of public order. Plaintiffs' initiation of prayer after repeated warnings of the impending curfew does not transform the otherwise lawful enforcement of a neutral dispersal order into a constitutional violation. The Free Exercise Clause does not confer a right to override time, place, and manner restrictions—or to convert trespass into protected activity—merely by choosing to kneel and pray moments before enforcement.[14]

---

[13] The Complaint also contains no allegation that either the curfew policy or its enforcement was intended to prevent prayer. There is no indication that the University or officers even knew prayer would occur during the protest; at most, Plaintiffs allege that the curfew was adopted and enforced in retaliation for protest activity, not religious observance. Plaintiffs may attempt to circumvent this by noting that prayer had already begun shortly before the curfew deadline, that officers observed it, and that they took action anyways. However, this does not establish a Free Exercise violation. Plaintiffs themselves acknowledge that UB had directed protestors to "disperse by dusk" (Compl. [1] ¶ 79) and that the 8:23 p.m. deadline was twice announced over a megaphone (*id.* at ¶¶ 83–85). Even if the timing created some ambiguity, Plaintiffs knowingly chose to begin prayer near the curfew and to unlawfully continue after warnings and orders to disperse.

[14] *See, e.g., Jones v. Parmley*, 465 F3d 46, 58 (2d Cir. 2006) ("We are mindful that the First Amendment does not insulate individuals from criminal sanction merely because they are simultaneously engaged in expressive activity.") (citing to *Cox v. State of La.*, 379 US 536, 554 (1965) ("One would not be justified in ignoring the familiar red light because this was thought to be a means of social protest.")); *see also United States v. Rowlee*, 899 F.2d 1275, 1278 (2d Cir. 1990) ("Speech is not protected by the First Amendment when it is the very vehicle of the crime itself."); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 498 (1949) (constitutional freedom of speech does not extend its immunity to speech used as an integral part of an illegal act).

II.    The Complaint Fails to Sufficiently Plead an Excessive Force Claim (Count III) Against the Cheektowaga Defendants

The conduct attributed to the Cheektowaga Defendants primarily consists of physically bringing Plaintiffs to the ground during arrests, restraining them with body weight, and applying handcuffs or zip ties, with some allegations of punching and kneeing occurring during the process of attempting to subdue and secure arrestees.[15] The resulting injuries alleged in the Complaint primarily consist of minor soft-tissue injuries, including bruising to various parts of the body, a sprain to the left shoulder, generalized lingering pain, unspecified "injuries" to the right shoulder, right arm, and right hip, and emotional trauma.[16] Additionally, while Plaintiffs allege various acts of excessive force by law enforcement during the arrests, the Complaint fails to attribute specific conduct to any particular Cheektowaga officer with the requisite clarity or precision to sustain an individual claim of excessive force.[17]

---

[15] *See* Allegations Concerning the Cheektowaga Defendants *supra*.

[16] Plaintiff Noor Mohammed alleges that as a result of the incident, she sustained bruising on multiple parts of her body and experienced emotional distress. (Compl. [1] at ¶ 199). Plaintiff Majd Ayoub claims the arrest resulted in unspecified "injuries to his right shoulder, right arm, and right hip" as well as emotional trauma. (Compl. [1] at ¶¶ 173–176). Plaintiff Jay Ayoub alleges that the arrest caused bruising, a shoulder sprain, shortness of breath, lingering pain for a few weeks, and emotional trauma. (*Id.* at ¶¶ 169–172).

[17] As with many large-scale police responses involving multiple agencies, Plaintiffs' own pleadings confirm that each of the three relevant plaintiffs—Ms. Mohammed, Majd Ayoub, and Jay Ayoub—were arrested by officers from a combination of departments, including the Buffalo Police Department, University at Buffalo Police, and unnamed officers, alongside the Cheektowaga defendants. (Compl. [1], ¶¶ 169, 173, 195–197). For example, Plaintiff Mohammed alleges she was "grabbed. . . by her backpack and slammed to the ground"—but nowhere specifies which of those officers, if any, were Cheektowaga personnel. (*Id.* ¶ 195). The bodycam footage clarifies that neither Cheektowaga Officer was involved in Plaintiff Mohammed's takedown, and that Officer Arnold only assisted in flipping her onto her stomach and moving her arms behind her back for cuffing. (*See* Blenk Decl. at ¶ 16.) Similarly, while she claims to have been "berated" and had her hijab forcibly removed, she lists multiple officers from several agencies, including the BPD and UBPD, and does not articulate who exactly made the alleged comments, nor which officer(s) committed which act. (*Id.* at ¶ 196). The same defect applies to the claims of Plaintiffs Majd and Jay Ayoub, both of whom describe being "violently tackled" by a group of officers, including but not limited to Cheektowaga defendants, and neither of whom isolates a single act of force to a specific Cheektowaga officer. (*Id.* at ¶¶ 169, 173). The

a.  Excessive Force Standard.

Claims of excessive force in the context of an arrest are analyzed under the Fourth

Amendment's objective reasonableness standard. *Walker v. Raja*, No. 17-CV-5202 (PKC) (LB),

2020 WL 606788, at *5 (E.D.N.Y. Feb. 7, 2020) (citing *Kerman v. City of New York*, 261 F.3d 229,

238–39 (2d Cir. 2001)). The reasonableness of a particular use of force must be judged "from the

perspective of a reasonable officer on the scene, *rather than with the 20/20 vision of hindsight*."

*Id.* (emphasis added) (quoting *Kerman*, 261 F.3d at 239). Importantly, the Fourth Amendment test

is one of objective reasonableness; the subjective motives, intent, or alleged malice of the officer

are irrelevant to the analysis. *Anderson v. Branen*, 17 F.3d 552, 559 (2d Cir. 1994) (citing *Graham*,

490 U.S. at 397 ["an officer's evil intentions will not make a Fourth Amendment violation out of

an objectively reasonable use of force; nor will an officer's good intentions make an objectively

unreasonable use of force constitutional"]).

Courts in this Circuit weigh several factors when evaluating whether an officer's use of

---

bodycam footage, however, confirms that Officer Arnold was completely uninvolved in these
arrests and that Officer Rogers participation was limited to briefly pressing on each Plaintiff after
they had already been tackled and subdued by officers from other agencies. (*See* Blenk Decl. at
¶¶ 26, 29.) To the extent Plaintiffs now seek to hold the Cheektowaga defendants liable for
generalized group conduct, the allegations within their Complaint are facially defective and
contradicted by the bodycam footage on which they repeatedly cite to and rely on. Without
concrete allegations of individual conduct traceable to a named Cheektowaga officer, Plaintiffs
cannot plausibly sustain excessive force claims against these defendants. *Spring*, 138 F. Supp. 3d
at 293 ("Because the personal involvement of a defendant is a prerequisite to an award of
damages under §1983, a plaintiff cannot rely on a group pleading against all defendants *without
making specific individual factual allegations*") (emphasis added). In fact, courts routinely
dismiss similarly vague group pleadings for failure to identify extent of individual involvement.
*Case v. City of New York*, 233 F. Supp. 3d 372, 397–98 (S.D.N.Y. 2017) (dismissing excessive
force claim against individual officer where the complaint alleged that before plaintiff's arrest
"an unidentified NYPD officer stepped on the right side of plaintiff's face with his boot" and
"rear-cuffed" her "with plastic flex-cuffs," but, instead of identifying the officer, pleaded only
that plaintiff "cannot rule out that defendant Conforti was the officer who stepped on her face or
put her in cuffs," which the court held was too speculative to plausibly allege Conforti's personal
involvement in the alleged use of excessive force).

force was objectively reasonable, including: (1) "the nature and severity of the crime leading to the arrest," (2) "whether the suspect poses an immediate threat to the safety of the officer or others," and (3) *"whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (emphasis added).

Moreover, it is well established that "some degree of physical coercion or threat thereof" is inherent in the execution of any arrest, and not every use of force—even if later viewed as unnecessary—violates the Fourth Amendment. *Graham*, 490 U.S. at 396 ("[n]ot every push or shove, *even if it may later seem unnecessary in the peace of a judge's chambers*, violates the Fourth Amendment") (emphasis added). "Indeed, to conclude that a 'push' that does not cause the slightest of physical injuries to the plaintiff is nonetheless an actionable use of excessive force would be to hold that any physical contact by an arresting officer with the arrested person is actionable." *Roundtree v. City of New York*, 778 F.Supp. 614, 622 (E.D.N.Y. 1991).

b.  *De Minimis* Injuries as Evidence of Reasonable Force.

Thus, "[i]n assessing the reasonableness of force used, courts in the Second Circuit also consider whether the plaintiff has sustained injury." *Walker*, 2020 WL 606788, at *7; *see, e.g.*, *Rasmussen v. City of New York*, 766 F. Supp. 2d 399, 406 (E.D.N.Y. 2011) (deeming it a "common-sense notion" to consider "the severity of any injuries that the plaintiff has sustained"); *see also Zhao v. City of New York*, 656 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) (stating that severity of injury is "probative of the amount and type of the force actually used by the arresting officers, and that in turn is likely to reflect on the reasonableness of that force"). Thus, if the plaintiff has merely sustained minor (*de minimis*) injuries, it can be "conclusive evidence" that the use of force was not excessive. *Regels v. Giardono*, 113 F.Supp.3d 574, 599 (N.D.N.Y. 2015) ("[A] *de minimis* use of

force will rarely suffice to state a constitutional claim. Moreover, *de minimis* injury can serve as *conclusive evidence* that *de minimis* force was used." (emphasis added) (quotation marks and citation omitted).

Indeed, numerous decisions within the Second Circuit have held that injuries comparable to those alleged by Plaintiffs amount to no more than *de minimis* harm insufficient to sustain a claim of excessive force. *See, e.g.*, *Borowski v. Mordino*, No. 16-CV-999-LJV-MJR, 2020 WL 6084941, at *9 (W.D.N.Y. July 21, 2020) (finding *de minimis* injuries where plaintiff "did not seek any medical treatment the night of the incident, nor did she complain to any CBP officers of injury or pain"; during a hospital visit the next day, she "reported pain in her back, arm, and wrist" and a bruise "that was not reflected in the medical records," but had "no cuts or lacerations," "did not undergo X-rays, CT scans, or MRI's," "refused prescription pain medication," "took Ibuprofen for a couple of days," and "continued to engage in her normal activities"); *Rincon v. City of New York*, No. 03 Civ. 8276 (LAP), 2005 WL 646080, at *5 (S.D.N.Y. Mar. 21, 2005) (rejecting claim of excessive force based on a *de minimis* injury where plaintiff alleged that the officer threw her to the ground, causing her stitches to open and her leg to bleed); *Cunningham v. Rodriguez*, No. 01 Civ. 1123 (DC), 2002 WL 31654960, at *5-6 (S.D.N.Y. Nov. 22, 2002) (rejecting excessive force claim where plaintiff's injury, muscle pain from hits to the face and back, were considered *de minimis*); *Candelaria v. Coughlin*, 787 F.Supp. 368, 385 (S.D.N.Y. 1992) (finding officer's pushing his fist into a prisoner's neck *resulting in prisoner having trouble breathing* was a *de minimis* use of force), aff'd, 979 F.2d 845 (2d Cir.1992) (emphasis added).[18]

---

[18] *See also Santiago v. Semenza*, 965 F.Supp. 468, 472 (S.D.N.Y. 1997) (holding that an officer's striking an insubordinate prisoner resulting in bruising, abrasions and a scratched face was not excessive force); *Brown v. Busch*, 954 F.Supp. 588, 595 (W.D.N.Y. 1997) (finding that officers' pushing a prisoner into his cell and hitting his lower back resulting in alleged aggravation of back injury was *de minimis* use of force); *Bradley v. Village of Greenwood Lake*, 376 F.Supp.2d

Similarly, courts in the Second Circuit have routinely held that allegations of force similar to or more severe than those at issue here—including tackling, bringing a suspect to the ground, and limited strikes or restraint—constitute only *de minimis* force insufficient to support a constitutional claim. *See, e.g.*, *Bermudez v. Waugh*, No. 9:11-CV-0947 (MAD/DEP), 2013 WL 654401, at *1–2 (N.D.N.Y. Feb. 21, 2013) (tackling of an inmate where plaintiff stated that the defendant "charged [him] like a football player ... [and] pushed his weight against [his] body" which resulted in minor bruising constituted *de minimis* force); *Yearwood v. LoPiccolo*, No. 95 Civ. 2544, 1998 WL 474073, *1, *7 (S.D.N.Y. Aug. 10, 1998) (finding a *de minimis* use of force where guard choked the plaintiff, hit his head with a pair of keys, and punched him in the lip); *Acosta v. City of N.Y.*, No. 11 Civ. 856(KBF), 2012 WL 1506954, at *10–11 (S.D.N.Y. Apr. 26, 2012) (dismissing an excessive force claim where the plaintiff alleged that he was *punched in the chest and thrown to the ground face first*, but did not allege any specific physical injury) (emphasis added); *Wims v. N.Y.C. Police Dep't*, No. 10 Civ. 6128(PKC), 2011 WL 2946369, at *5 (S.D.N.Y. July 20, 2011) (dismissing an excessive force claim where the plaintiff alleged that he was "thrown flat on his face unto the filthy ground") (alteration omitted)); *Gonzalez v. Coughlin*, No. 92 Civ. 7263, 1996 WL 496994, *4–5 (S.D.N.Y. Aug.21, 1996) (finding no excessive use of force where the plaintiff alleged corrections officers tripped him to the ground and hit him in the knee); *Espinal v. Goord*, No. 00 Civ. 2242, 2001 WL 476070, *4, *13 (S.D.N.Y. May 7, 2001) (finding that the use of force was *de minimis* where guard struck the plaintiff in face two or three times, causing his face to turn red, but resulting in no other injuries); *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir.1997) (holding that inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by

---

528, 535 (S.D.N.Y. 2005) (dismissing excessive force claim against arresting officer who kicked plaintiff in the stomach causing only temporary nausea and an abdominal scratch).

prison officials insufficient); *DeArmas v. Jaycox*, No. 92 Civ. 6139, 1993 WL 37501, *4 (S.D.N.Y. Feb.8, 1993) (finding a *de minimis* use of force where the inmate suffered a bruise and injured right knee after being punched and kicked).

The bodycam footage demonstrates that only a very mild degree of force was used against any Plaintiff, and that the most significant uses of force were not carried out by Cheektowaga officers at all. The video shows that Plaintiff Noor Mohammed was tackled by officers from other agencies, with Officer Arnold's role limited to flipping her over and guiding her hands behind her back, and Officer Rogers never touching her. (*See* Blenk Decl. at ¶¶ 16-18.) Moreover, officers were required to manipulate her arms behind her back because she resisted by keeping them raised above her head, and it was this resistance that caused her hijab to become dislodged. (*See* Blenk Decl. at ¶¶ 17-18.)

Likewise, Plaintiffs Majd Ayoub and Jay Ayoub were both taken to the ground by non-Cheektowaga officers. (*See* Blenk Decl. at ¶¶ 26, 29). Officer Rogers was not even in proximity when their arrests began; his involvement consisted only of briefly pressing down after they had largely been subdued, and he never tackled, struck, or otherwise applied force. (*See* Blenk Decl. at ¶¶ 26, 29). Officer Arnold, meanwhile, was entirely uninvolved in the Ayoub arrests, as he was escorting Plaintiff Mohammed to the UB van. (*See* Blenk Decl. at ¶¶ 28, 30).

c.   Attempted Fleeing Can Justify Additional Force.

Courts have consistently recognized that an individual's decision to flee can significantly escalate the situation and justify a greater degree of force by police officers seeking to prevent further flight or secure compliance. *See, e.g.*, *Tracy*, 623 F.3d at 96 (holding that "whether the suspect was. . . attempting to evade arrest by flight" is a significant factor in judging the reasonableness of an officer's use of force). Such use of force to prevent flights can be reasonable

23

even if the underlying offense is minor. *McKenzie v. City of New York*, No. 18-cv-6913, 2021 WL 3375613, at *4-6, (S.D.N.Y. Feb. 26, 2021) (finding it objectively reasonable for police officer to "slam" the plaintiff to the stairs after the plaintiff, who was stopped for a misdemeanor offense, ran from officers attempting to evade arrest and stating that "While the crime McKenzie was originally suspected of was not the most serious, the situation escalated after McKenzie fled from officers").

This reasoning is particularly salient in evaluating the force used against Plaintiff Mohammed as captured on bodycam footage. After she forcefully kicked the door twice in an effort to push it open, officers entered Capen Hall to arrest her, at which point she briefly attempted to flee further into the hallway before being brought to the ground. (*See* Blenk Decl. at ¶¶ 13-14.) The most significant force used against her was the tackle to prevent further flight—and even that was not performed by a Cheektowaga officer. (*See* Blenk Decl. at ¶¶ 14-16.) Officer Arnold's involvement was limited to flipping Plaintiff Mohammed over and assisting in placing her arms behind her back after she had already been subdued, while Officer Rogers's role was confined to keeping nearby students from encroaching during the arrest. (*See* Blenk Decl. at ¶ 16.).

d.   Interference or Encroachment During Arrest Can Justify Additional Force.

Where a plaintiff protests or interferes with the arrest of another individual—particularly a close friend or family member—courts have recognized that such conduct may justify the use of additional force to prevent escalation or interference. *See Davis v. Callaway*, No. 3:05CV00127 (DJS), 2007 WL 1079988, at *4–5 (D. Conn. Apr. 9, 2007). In *Davis*, the court upheld the use of force where an officer tackled the plaintiff, who had jumped up to protest the arrest of his daughter despite a prior command to remain seated. The court found that "Perry's use of force in tackling Davis to the ground was reasonable and justified for the protection of his fellow officers,"

24

particularly where the plaintiff was in close proximity and had just moments earlier engaged in a verbal altercation with a third party. *Id.* at *4. Davis admitted that he was seated by the side of the road after officers arrived on the scene, but "jumped up and yelled to the officers, 'Stop! You're hurting her,'" in response to his daughter's arrest. *Id.* This outburst violated a "direct order by a police officer" to remain seated, and, as the court explained, "*Because of Davis' proximity to the officers and his daughter, it was objectively reasonable for Perry to believe that Davis would attempt to physically interfere [with] the officers' attempt to arrest her.*" *Id.* at *5 (emphasis added). In light of this context, Officer Perry was justified in immediately tackling Davis and placing a knee on his back to restrain him: "Because Perry's use of force in taking Davis to the ground was that which a reasonable police officer in such circumstances would be expected to take to protect his fellow officers, the court finds that there was no Fourth Amendment violation with regard to that incident." *Id.*

This reasoning applies with equal force to the arrests of all three Plaintiffs. Plaintiff Mohammed twice kicked a door that officers were deliberately holding shut to create a barrier around an ongoing arrest, plainly attempting to interfere with the apprehension of her friend. (*See* Blenk Decl. at ¶¶ 13-14.) Plaintiff Majd Ayoub approached officers in the vicinity of Plaintiff Mohammed, berated them, and engaged in a verbal altercation while being repeatedly ordered to back up; he only minimally complied, remaining within arm's reach of the officers escorting her. (*See* Blenk Decl. at ¶¶ 22-23.) Most egregiously, Plaintiff Jay Ayoub placed his hands on the officer arresting his son and, as he was taken to the ground, pulled the officer down with him. (*See* Blenk Decl. at ¶ 25.) The bodycam footage thus makes clear that each Plaintiff either blatantly interfered with an arrest or created a reasonable basis for officers to fear imminent interference, justifying the limited force that was used.

e.  The Cheektowaga Officers Are Entitled to Qualified Immunity on Excessive Force Claims.

"Qualified immunity is an affirmative defense that shields government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stephenson v. Doe*, 332 F.3d 68, 76 (2d Cir. 2003) (quotation omitted); *Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018). A right is clearly established only if "existing law... placed the constitutionality of the officer's conduct *'beyond debate.'*" *Dist. of Columbia v. Wesby*, 583 U.S. 48, 63 (2018) (emphasis added) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). The qualified immunity standard "protects *all but the plainly incompetent or those who knowingly violate the law.*" *Malley v. Briggs*, 475 U.S. 335, 341 (1986) (emphasis added). Furthermore, the qualified immunity inquiry is "*limited to the facts that were knowable to the defendant officers* at the time they engaged in the conduct in question." *Hernandez v. Mesa*, 582 U.S. 548, 553 (2017).

Courts evaluating qualified immunity typically employ a two-step analysis. The first step considers whether the facts alleged establish a violation of a constitutional right. If so, the second step examines whether that right was "clearly established" at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *see also Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) ("[u]se of excessive force is an area of the law in which the result depends very much on the facts of each case," and thus, "police officers are entitled to qualified immunity unless existing precedent '*squarely governs' the specific facts at issue*.") (emphasis added) (internal citation omitted).  Even if a plaintiff satisfies the first two steps, courts may also assess whether it was "objectively reasonable" for the officer to believe their conduct was lawful under the circumstances. *See Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013). An officer's actions are objectively reasonable if "officers of reasonable competence could disagree on the

26

legality of the actions." *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 216 (2d Cir. 2000).[19]

As discussed in Sections II(b), (c), and (d) *supra*, the Cheektowaga Officers had a very limited involvement in each of the three Plaintiffs arrests and the force they used was objectively reasonable under the circumstances of interference and flight risk. To the extent this Court disagrees, the Cheektowaga Officers are entitled to qualified immunity as no clearly established precedent would have alerted reasonable officers that their conduct was unconstitutional, let alone placed its unlawfulness "beyond debate." *Dist. of Columbia*, 583 U.S. at 63.

      f.  Plaintiff's State Law Assault and Battery Claims (Count XI) Also Fail Against the Cheektowaga Defendants.[20]

Plaintiffs' state law assault and battery claims must also be dismissed for the same reasons set forth in the excessive force section, as courts have routinely held that such claims are analyzed under an identical legal standard.[21]

  III.    Plaintiffs Cannot Sustain a False Arrest Claim (Count IV) Against the Cheektowaga Defendants.

      a.  Cheektowaga Defendants Had Probable Cause to Arrest the Plaintiffs.

"A Section 1983 claim for false arrest derives from an individual's right to remain free from

---

[19] Although qualified immunity is often addressed at the summary judgment stage, courts may consider it on a motion to dismiss when appropriate. *Hammond*, 727 F. Supp. 3d at 97. The Supreme Court has "repeatedly 'stressed the importance of resolving immunity questions at the earliest possible stage [of the] litigation.'" *Wood v. Moss*, 572 U.S. 744, 755, n.4 (2014) (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

[20] All of Plaintiffs' New York Common Law claims also fail for the independent reason of being time-barred as discussed more fully in Section VIII *infra*.

[21] "Federal excessive force claims and state law assault and battery claims against police officers are nearly identical," *John v. City of New York*, 406 F. Supp. 3d 240, 245 (E.D.N.Y. 2017) (internal quotation omitted); *see also Graham v. City of New York*, 928 F. Supp. 2d 610, 624–25 (E.D.N.Y. 2013), citing *Humphrey v. Landers*, 344 F. App'x 686, 688 (2d Cir. 2009); *Posr v. Doherty*, 944 F.2d 91, 94–95 (2d Cir. 1991).

unreasonable seizures, including the right to be free from arrest absent probable cause."[22] *Al–Mohammedi v. City of Buffalo*, 13-CV-1020-RJA-MJR, 2016 WL 1748264 at \*6 (W.D.N.Y. Mar. 29, 2016) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). To defeat a false arrest claim, an officer may demonstrate that either: (1) he or she had probable cause for the arrest; or (2) he or she is protected from liability because of qualified immunity. *See Simpson v. City of New York*, 793 F.3d 259 (2d Cir. 2015).

An officer has probable cause when the officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *See Weyant*, 101 F.3d at 852; *see also Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) ("[A]n arrest is not unlawful so long as the officer has knowledge of, or *reasonably trustworthy information* as to, facts and circumstances sufficient to provide probable cause to believe that the person arrested has committed any crime") (emphasis added); *see also Dunaway v. New York*, 442 U.S. 200, 208 (1979). In assessing the existence of probable cause, courts are to "consider those facts available to the officer at the time of the arrest and immediately before it" and must render a decision based upon "the totality of the circumstances." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

Additionally, probable cause may exist even where the arresting officer personally lacks direct knowledge of all facts underlying the arrest. *See United States v. Valez*, 796 F.2d 24, 28 (2d Cir.1986), cert. denied, 479 U.S. 1067, (1987) ("in light of the complexity of modern police work,

---

[22] It is worth noting that the mere fact that a plaintiff was not ultimately prosecuted does not mean that there was no underlying probable cause for the arrest. *See Caravalho v. City of New York*, 13CV4174PKCMHD, 2016 WL 1274575, at \*8 (S.D.N.Y. Mar. 31, 2016) ("Finally, while each plaintiff ultimately was released without charges, the district attorney's decision to forgo prosecution does not, in and of itself, undermine the arresting officers' conclusions that there was probable cause to arrest each of the plaintiffs").

the arresting officer cannot always be aware of every aspect of an investigation; sometimes his authority to arrest a suspect is based on facts known only to his superiors or associates"); *see also Anthony v. City of N.Y.*, 339 F. 3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists.") (internal citation and quotation marks omitted).

As discussed in Section I *supra*, Cheektowaga Officers were acting under directives and information supplied to them by trustworthy sources to enforce a facially valid curfew issued by University at Buffalo officials. The curfew and accompanying dispersal orders were communicated to protestors prior to the arrests, placing them on notice that their continued presence would be unlawful. Based on this refusal to disperse and remain off-campus by the curfew time, officers possessed probable cause to believe that individuals who remained in defiance of those orders had knowingly committed trespass or similar offenses.[23]

Courts in this Circuit have repeatedly found probable cause for trespass and related offenses where individuals remained on premises—otherwise open to the public—after receiving a lawful order to leave.[24] Additionally, independent of their involvement with the protests, each of

---

[23] For example, the Cheektowaga Officers had probable cause to arrest these Plaintiffs for disorderly conduct as well. *See* N.Y. Penal Law § 240.20(6) (failure to heed lawful police order to disperse gathering in public place constitutes disorderly conduct).

[24] *See, e.g.*, *Carpenter v. City of New York*, 984 F. Supp. 2d 255, 265 (S.D.N.Y. 2013) (concluding that there was probable cause to arrest the plaintiff for trespass in a bank that was open to the public because "a reasonable police officer was entitled to conclude that the statements of the bank employees delivered to the protestors," which asked them to move the protest outside the bank, "were lawful orders excluding the protestors from continuing protest activities within the bank's premises"); *Omor v. City of New York*, 2015 WL 857587, at *4 (S.D.N.Y. Feb. 27, 2015) (finding that there was probable cause to arrest the plaintiff for trespass where he refused to leave a local government office that was open to the public after being asked to leave the premises by at least two office staff members); *Meyers v. City of New York*, 812 F. App'x 11, 14-15 (2d Cir. 2020) (affirming dismissal of false arrest claims where plaintiffs refused to comply with a lawful

the three Plaintiffs supplied the Cheektowaga Officers with probable cause through their interference with the arrests of others.[25]

>    b. Cheektowaga Defendants Are Entitled to Qualified Immunity on False Arrests Claims.

In the context of false arrest, an officer is entitled to qualified immunity if there was "arguable probable cause" for the arrest. *Jenkins v. City of N.Y.*, 478 F.3d 76, 87 (2d Cir. 2007). "Arguable probable cause" exists when either "(a) it was objectively reasonable for the officer to believe that probable cause existed; or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991).

Importantly, the standard does not require that the officers be correct in their assessment— only that their belief be reasonable. Courts in this Circuit have repeatedly emphasized that "in situations where an officer may have reasonably, but mistakenly, concluded that there was probable cause to arrest, that officer is entitled to qualified immunity from suit." *Martinez v. Simonetti*, 202 F.3d 625, 636 (2d Cir. 2000); *see also Lennon v. Miller*, 66 F.3d 416, 423 (2d Cir. 1995) ("It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials ... should not be held personally liable.") (internal citation omitted); *Malley v. Briggs*, 475 U.S. 335 (1986) (holding that the objective reasonableness standard "gives ample room for mistaken judgments"). "It follows that a jury or a court viewing events from the defendants' perspective must consider not just what the officers saw and knew, *but also the rapidly evolving, uncertain, and tense circumstances* in which

---

dispersal order during an early morning protest involving approximately 150 individuals in downtown Manhattan; court found that probable cause existed to arrest for trespass once plaintiffs remained in the park after being personally ordered to leave).

[25] *See* Section II(d) *supra*.

they acted." *Edrei v. Maguire*, 892 F.3d 525, 545 (2d Cir. 2018).

The only arrest directly effectuated by a Cheektowaga officer was Officer Arnold's arrest of Plaintiff Mohammed. Having personally observed her forcefully kick the door twice in an effort to push it open while officers were holding it shut, Officer Arnold plainly had at least arguable probable cause to believe she was interfering with an arrest. (*See* Blenk Decl. at ¶¶ 13-14.) Additionally, Officer Arnold had no involvement whatsoever in the arrests of Plaintiffs Majd or Jay Ayoub. Thus, the claims against him fail as a matter of law.

Officer Rogers, for his part, did not participate in Plaintiff Mohammed's arrest, and his role in the Ayoub arrests was exceedingly limited. (*See* Blenk Decl. at ¶¶ 26, 29.) The footage shows that both Majd and Jay Ayoub were already on the ground and being subdued by non-Cheektowaga officers before Rogers arrived, at which point his involvement was confined to briefly pressing down to ensure they remained under control while handcuffs were applied. (*See* Blenk Decl. at ¶ 29.) Notably, Rogers's view of the events leading to Majd Ayoub's arrest was obstructed; although he could perceive some form of verbal altercation, it was not clear what had transpired. (*See* Blenk Decl. at ¶¶ 24-25.) "Absent significant indications to the contrary, [Officer Rogers was] entitled to rely on his fellow officer's determination that an arrest was lawful." *Loria v. Gorman*, 306 F.3d 1271, 1287 (2d Cir. 2002). With respect to Jay Ayoub, the footage shows Rogers could clearly see him place his hands on an officer conducting an arrest which, at minimum, provided arguable probable cause to support an arrest. (*See* Blenk Decl. at ¶ 25.)

c.  Plaintiffs' State Law False Arrest Claims (Count XII) Also Fail.[26]

Plaintiffs' False Arrest and False Imprisonment claim under New York law must be

---

[26] All of Plaintiffs' New York Common Law claims also fail for the independent reason of being time-barred as discussed more fully in Section VIII *infra*.

dismissed for the same reasons as the federal claim.[27]

    IV.    **The Complaint Fails to Sufficiently Plead a Fourteenth Amendment Claim (Counts V, VI, & VII) Against the Cheektowaga Officers.**

        a.    Plaintiffs' Claim for  Selective Enforcement and Viewpoint Discrimination (Count V) Against Cheektowaga Defendants Fails.[28]

Courts recognize multiple avenues through which a plaintiff may assert a violation of the Equal Protection Clause. As the Second Circuit explained in *Brown v. City of Oneonta*, 221 F.3d 329, 337 (2d Cir. 2000), a plaintiff may allege: (1) a law or policy that expressly classifies individuals on an improper basis; (2) a facially neutral law or policy that has been applied in an intentionally discriminatory manner; or (3) a facially neutral policy with a disparate impact that was motivated by discriminatory animus.[29] However, claims of discriminatory animus must rest on more than conclusory accusations of discriminatory intent. *See Marom v. City of New York*, 2016 WL 916424, at *11 (S.D.N.Y. Mar. 7, 2016), *on reconsideration in part*, 2016 WL 5900217 (S.D.N.Y. July 29, 2016).

In the context of alleged selective enforcement, the applicable standard requires plaintiffs

---

[27] "A federal false arrest claim raised under § 1983 is 'substantially the same as a claim for false arrest under New York law.'" *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see also Rodriguez v. City of New York*, 291 F. Supp. 3d 396, 408 (S.D.N.Y. 2018). Because the Cheektowaga Officers had probable cause, or at least arguable probable cause, to effectuate the arrests, Plaintiffs' state false arrest and imprisonment claims fail as a matter of law.

[28] Plaintiffs' claim for an equal protection violation based upon religious discrimination (Count VI) fails for a lack of allegations evincing a discriminatory or retaliatory animus as discussed in Section I *supra*.

[29] It is also entirely unclear what "policy" the Cheektowaga Defendants could have had based on the Complaint.  Here, the Complaint makes clear that Cheektowaga Officers simply responded to assist in a coordinated enforcement action led by UB and its police department. Plaintiffs do not allege that Cheektowaga had any authority to make policy decisions for UB, nor that it had any awareness of, or reason to suspect, that UB's alleged dispersal policy was motivated by impermissible considerations. Absent factual allegations showing that Cheektowaga had the authority to implement or meaningfully evaluate the policy it was assisting in enforcing, liability cannot attach as Plaintiffs cannot even establish a "policy" under any of the three elements.

to plausibly allege that: (1) they were treated differently from others *similarly situated*, and (2) such *differential treatment was based on impermissible considerations* such as race, religion, viewpoint, or an intent to inhibit constitutional rights. *LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994) (emphasis added) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609–10 (2d Cir. 1980)). Plaintiffs' claims fail on both prongs.

   *i. The* Critical Pro-Israeli Students Were Not Similarly Situated.

   Courts in this Circuit have articulated varying standards for the first "similarly situated" prong. *See, e.g., Gentile v. Nulty*, 769 F.Supp.2d 573, 580 (S.D.N.Y. 2011) (collecting cases); *Wood v. Town of East Hampton*, No. 08–CV–4197, 2010 WL 3924847, at *19–20 (E.D.N.Y. Sept. 30, 2010). Some courts have held that the prong requires plaintiff to prove that the comparator's circumstances are "*prima facie* identical," *Gentile*, 769 F.Supp.2d at 580, while other courts apply a slightly lower standard requiring the plaintiff to "present evidence comparing [himself] to individuals that are similarly situated in all material respects." *Id.* (quoting *Vassallo v. Lando*, 591 F.Supp.2d 172, 184 (E.D.N.Y. 2008)). Regardless of the approach, it is clear that the comparator must be closely—as opposed to vaguely or generally—similar to the plaintiff. *See Penlyn Dev. v. Village of Lloyd Harbor*, 51 F.Supp.2d 255, 264 (E.D.N.Y.1999) (noting that "apples should be compared to apples").

   In *Rusfeldt v. City of New York*, 2024 WL 4354874 (S.D.N.Y. Sept. 30, 2024), the district court dismissed a selective enforcement claim brought by a Christian evangelical protester who was arrested during a Pride event after engaging in verbal confrontations with members of the crowd. The plaintiff alleged that the police violated the Equal Protection Clause by arresting him while failing to arrest pro-LGBTQ attendees who had expressed hostility in response to his religious and political speech. However, the court held that the plaintiff had failed to satisfy the "similarly situated" requirement of a selective enforcement claim. It emphasized that there was

"not a high degree of similarity between his circumstance and that of the Pride festivalgoers in the crowd who expressed hostility to his message," noting the absence of any factual showing that members of the crowd were violating any laws or orders, such as a dispersal directive. *Id.* at *15. In contrast, the plaintiff was arrested based on his own conduct, not merely for expressing a viewpoint, but for his role in escalating a public confrontation. The court rejected the notion that opposing viewpoints in the same physical location necessarily render those individuals similarly situated under the law.[30]

Ultimately, while the Complaint [1] makes passing reference to pro-Israeli students who were present on campus during the protest and purportedly made critical or inflammatory remarks toward the demonstrators (*id.* at ¶ 287), it fails to allege any facts establishing that these individuals were similarly situated to Plaintiffs in all material respects, and much less that Cheektowaga Officers knew of these facts. The Complaint [1] contains no specific averments about the size, cohesion, or degree of organization of these alleged "counter-protesters," nor does it describe where they were located on campus, whether they assembled as a group, or whether they defied police orders, remained present during the declaration of an unlawful assembly, or otherwise engaged in conduct comparable to that of Plaintiffs. Absent such allegations, the mere fact that

---

[30] *See also Albert v. Carovano*, 851 F.2d 561, 573–74 (2d Cir. 1988) (rejecting minority students' selective enforcement claim where they were suspended after refusing to vacate a college administration building they had occupied for three days in protest of South Africa divestment policies; plaintiffs identified several instances of misconduct by white students that went undisciplined—including harassment and threats against anti-apartheid protestors, use of racial and sexual slurs, and suspected death threats against a Black woman—but the court held these were not "reasonably comparable to those surrounding appellants' suspensions," because none involved "an outright refusal to obey the orders of a college official" or violations of an active judicial order; emphasizing that plaintiffs' prolonged, defiant occupation was materially distinct in "nature, severity, and legal posture," and cautioning that allowing Equal Protection claims to rest on conclusory or loosely analogous allegations would create "confusing, unmanageable and ultimately incoherent retrial[s] of every [non-enforcement] decision").

other individuals expressed contrary viewpoints in the vicinity of the demonstration is insufficient to support a claim of selective enforcement.

> ii. *Plaintiffs' Allegations of Discriminatory Animus Towards Cheektowaga Defendants Are Conclusory.*

Moreover, even assuming *arguendo* that Plaintiffs could point to appropriate comparators, their claim would still fail under the second prong, which requires a showing that "the disparate treatment was caused by the impermissible motivation. They cannot merely rest on a showing of disparate treatment." *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005). This standard is "deliberately rigorous," *United States v. Alameh*, 341 F.3d 167, 173 (2d Cir.2003) (internal quotations omitted), requiring evidence that Defendants acted "at least in part 'because of,' not merely 'in spite of,'" Plaintiffs' race, religion, or protected speech. *Id.* (quoting *Wayte v. United States*, 470 U.S. 598, 610 (1985)).

Plaintiffs fail to allege any non-conclusory facts suggesting that the Cheektowaga Defendants themselves acted with discriminatory purpose, as opposed to merely carrying out standard law enforcement duties in response to a facially neutral curfew order. While Plaintiffs assert general claims of bias and viewpoint discrimination, most notably towards Defendant Tripathi, none of the pleaded facts tie that alleged animus to the actions or motivations of the Cheektowaga Officers. Without any such particularized allegations, the selective enforcement claim against the Cheektowaga Defendants must be dismissed. *See Marom*, 2016 WL 916424, at *11; *see also Anderson v. City of New York*, 817 F. Supp. 2d 77, 94-95 (E.D.N.Y. 2011).

> b. Plaintiffs Fail to Plead Facts Supporting Religious Animus in Connection with the Dislodging of Plaintiff's Hijab.

Plaintiff Noor Mohammed alleges that her religious garments, including her hijab and keffiyeh, were dislodged during her arrest purposefully, that she was not permitted to readjust her garments while being escorted to the car, and was then photographed by an unidentified officer

while in custody. (Compl. [1] ¶ 197-198). However, Plaintiff does not identify a single statement[31] or action[32] by the Cheektowaga officers suggesting a discriminatory motive, nor any facts supporting the claim that the incidental dislodging of her hijab was done to target her religion or to embarrass her.

In fact, the bodycam footage demonstrates the opposite. The footage reflects that the hijab became only partially displaced during the process of moving Plaintiff Mohammed's arms from above her head—where she was resisting by lodging her hands inside the fabric—to behind her back for handcuffing. (*See* Blenk Decl. at ¶¶ 17-18.) Even then, only the outer red, white, and green covering was affected, while the black underlayer of her hijab remained intact after the initial handcuffing. (*See* Blenk Decl. at ¶¶ 17-18.) The deeper black covering shifted further during her escort to the UB van, at which point Plaintiff Mohammed made her first clear request for assistance in readjusting it. (*See* Blenk Decl. at ¶ 20.) Officer Arnold promptly attempted to accommodate this request himself and then allowed co-plaintiff Jay Ayoub to step in and complete the adjustment properly. (*See* Blenk Decl. at ¶¶ 20-22.) Far from supporting an inference of religious animus, the footage shows officers responding respectfully and accommodating Plaintiff Mohammed's concerns.

---

[31] Plaintiff alleges that unidentified officers berated her during her arrest, allegedly stating: "you wanna keeping talking your shit? Here. Here's your f**king shit." (Compl. [1] ¶ 197). Plaintiff claims that this comment "suggest[s] [an] animus relating to Ms. Mohammed's religious and/or ethnic appearance." (*Id.* at ¶ 197). Firstly, it is not clear from either the pleadings or the bodycam footage if a Cheektowaga Officer was responsible for this comment. Regardless, nothing about this alleged statement plausibly indicates that it was motivated by religious animus. At most, it reflects a profane and inappropriate—but religiously and ethnically-neutral—insult directed at a confrontational arrestee.

[32] In fact, the Complaint appears to attribute responsibility for the removal of the hijab to an officer with the Buffalo Police Department. (Compl. [1] ¶ 353(ii)).

c. Plaintiffs' Claim for Substantive and Procedural[33] Due Process Violations (Count VII) Against Cheektowaga Defendants Fails.

To the extent that Plaintiffs attempt to assert a substantive due process claim, this also fails as it is subsumed under the more well-defined categories of constitutional violations that Plaintiffs alleges.[34]

V. The Complaint Fails to Sufficiently Plead a Failure to Intervene Claim Against the Cheektowaga Defendants.

Under a failure to intervene claim, an officer can be held liable under § 1983 for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). A plaintiff cannot succeed on a claim for failure to intervene under § 1983 when there is no underlying constitutional violation. *See Wieder v. City of New York*, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order) ("Because the underlying constitutional claims were properly dismissed, we also affirm the district court's dismissal of plaintiff's failure to intervene claim.").[35]

---

[33] Plaintiffs' Procedural Due Process claims are subsumed within their malicious prosecution claims addressed in Section VI *infra*.

[34] "[W]here another provision of the Constitution provides an explicit textual source of constitutional protection,' a court must assess a plaintiff's claims under that explicit provision and 'not the more generalized notion of substantive due process.'" *Kia P. v. McIntyre*, 235 F.3d 749, 757-58 (2d Cir. 2000) (quoting *Conn v. Gabbert*, 526 U. S. 286, 293 (1999)); *see, e.g., Velez v. Levy*, 401 F.3d 75, 94 (2d Cir. 2005) ("[W]here a specific constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."); *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019) (dismissing Substantive Due Process claim because it "rest[ed] on the same set of factual allegations" as Equal Protection claim); *Collins v. Putt*, 979 F.3d 128, 136 (2d Cir. 2020) (holding that a First Amendment claim subsumed the Substantive Due Process claim).

[35] For all of the reasons argued in this motion, the Plaintiffs did not suffer any constitutional violations. Thus, their failure to intervene claim must be dismissed for this reason alone.

37

a. Plaintiff's Failure-to-Intervene Allegations Lack the Specificity Required to State a Claim.

A viable failure to intervene claim cannot rest on the conclusory allegation that a broad group of officers happened to be in the general vicinity of the alleged misconduct and therefore must have had an opportunity to stop it; rather, the plaintiff must plead specific facts showing where each officer was, what unconstitutional conduct they personally observed, and how they had a realistic chance to intercede but failed to do so. *See Hardy v. City of New York*, 2013 WL 5231459, at *4 (S.D.N.Y. July 8, 2013); *see also Ying Li v. City of New York*, 246 F. Supp. 3d 578, 598–99 (E.D.N.Y. 2017) ("Plaintiff resorts to conclusory generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively.").

In *Hardy*, although the plaintiff alleged that "the Individual Defendants were all present at the stop, search, and arrest of Plaintiff … he does not say what they did. Instead, he repeatedly makes the bare allegation that all of the Individual Defendants 'lacked either reasonable suspicion or probable cause.'" 2013 WL 5231459, at *4. The court found such allegations deficient because "[w]here were the officers in relation to Plaintiff and in relation to each other? What impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible." *Id.* Likewise, the court observed that "Plaintiff does not differentiate among the Individual Defendants and fails to explain whether any of them was in another's presence at the time of the submission of false evidence or what could have or should have been done to stop the submission," concluding that "because Plaintiff has alleged no underlying constitutional violations and because he has not pleaded facts that give rise to a plausible inference that the Individual Defendants could have intervened anyway, he fails to state a claim for failure to intervene." *Id.*

38

Plaintiffs' allegations here suffer from the same fatal flaws: they lump the Cheektowaga Officers together with other agencies without identifying their location, proximity, or opportunity to act, rely only on conclusory assertions that all officers failed to intervene, and provide no facts showing what the Cheektowaga Officers saw, did, or could have done. As in *Hardy*, these deficiencies compel dismissal.

      b.   Cheektowaga Officers Did Not Have Realistic Opportunity to Intervene.
          i.  *Much of the Alleged Force Was Transient.*

"[F]or liability to attach" for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." *Anderson*, 17 F.3d at 557. Many courts in the Second Circuit have dismissed failure to intervene claims where the alleged misconduct was so transient that the officer had no real opportunity to intervene. *See, e.g., Rogoz v. City of Hartford*, 796 F.3d 236, 251 (2d Cir. 2015) (Arresting officer's "fairly immediate" conduct in jumping on arrestee's back did not give other officers a realistic opportunity to prevent arresting officer's allegedly excessive use of force, as would be required for other officers to be liable for failing to intervene, in arrestee's § 1983 action alleging that arresting officer, by jumping on arrestee's back, broke one of arrestee's ribs and broke his spine in two places); *O'Neill v. Krzeminski*, 839 F2d 9, 11 (2d Cir 1988) (finding evidence insufficient to show that three rapid punches were of sufficient duration to support liability on a theory of failure to intervene); *Johnson v. City of New York*, No. 05-CV-7519 (PKC), 2008 WL 4450270, at *6 (S.D.N.Y. Sept. 29, 2008) (finding that force lasting only "a couple of seconds" did not afford officers sufficient time to intervene). Many of the alleged instances of excessive force in this case—such as rapid takedowns, tackles, strikes, and body holds—were allegedly committed by other officers in fleeting, split-second circumstances, leaving no realistic opportunity for bystanders to assess the constitutionality of the actions, much less intervene.

*ii.  The Officers Were from Different Law Enforcement Agencies.*

Additionally, numerous courts have acknowledged that officers from separate law enforcement agencies—such as those involved here—may lack the practical authority or situational control necessary to meaningfully intervene in the conduct of officers from other jurisdictions. *See Tanner v. San Juan County Sheriff's Off.*, 864 F Supp 2d 1090, 1156 (DNM 2012) ("That officers are from different law enforcement agencies is a fact that may influence whether there is a realistic opportunity to intervene or the extent to which the secondary officer should have deferred to the primary officer"); *see also Ramos-Torres v. Municipality of Caguas*, CV 12-1706 (JAG), 2016 WL 3676201, at n. 11 (DPR July 5, 2016) ("Agent Rodriguez and Agent Vargas are from different  law enforcement agencies and it can be argued that one agency cannot control the other even if the officer from the other agency outranks the other officer."). Plaintiffs fail to allege that the Cheektowaga Officers had any supervisory authority, operational control, or even practical ability to intervene in the conduct of officers from other law enforcement agencies acting under separate leadership.

VI.     Plaintiffs Cannot Sustain a Malicious Prosecution Claim (Count XVIII & XIX) Against Cheektowaga Defendants.

a.     Standard for Malicious Prosecution Claims.

"In order to establish a claim for malicious prosecution under Section 1983, a plaintiff must demonstrate a violation of his or her rights under the Fourth Amendment and must establish the elements of a malicious prosecution claim under state law."[36] *Al–Mohammedi v. City of Buffalo*, 13-CV-1020-RJA-MJR, 2016 WL 1748264 at *8 (W.D.N.Y. Mar. 29, 2016), *report and*

---

[36] Plaintiff asserts both a federal malicious prosecution claim (Count XVIII) and a state law malicious prosecution claim (Count XIX). Because the elements of each claim substantially overlap, the Cheektowaga Defendants address them together. All arguments set forth herein apply equally to both claims with the exception that Plaintiffs' New York Common Law claims fail for the independent reason of being time-barred as discussed more fully in Section VIII *infra*.

*recommendation adopted sub nom. Al-Mohammedi v City of Buffalo*, 1:13-CV-01020(MAT), 2017 WL 163388 (W.D.N.Y. Jan. 17, 2017) (citing *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010)). The elements of a claim for malicious prosecution in New York are "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of a proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as motivation for defendant's actions." *Manganiello*, 612 F.3d at 161.

b.   Cheektowaga Defendants Were Not Involved in the Prosecution of Plaintiffs.

"While police officers do not generally 'commence or continue criminal proceedings,' a claim for malicious prosecution can still be maintained if the officer is found to "play[ ] an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Al–Mohammedi*, 2016 WL 1748264 at *8 (quoting *Roham v. New York City Transit Authority*, 215 F.3d 208, 217 (2d Cir. 2000)). "Initiation or continuation of a proceeding may also be shown where an arresting officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, or withholds relevant and material information." *Id.*; *see also Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999).

Here, the Complaint is entirely devoid of any allegations that the Cheektowaga Defendants played any role in the prosecution of the Plaintiffs, let alone that they "initiated" or "continued" the proceedings through falsified evidence, material omissions, or affirmative urging of prosecutorial action. As such, any malicious prosecution claims against the Cheektowaga Defendants should be dismissed. *See Al–Mohammedi*, 2016 WL 1748264 at *8 (dismissing the malicious prosecution claim against individual police officer, noting that "there is no evidence in the record that Officer Vanyo played a role in the prosecution, generated false information which was passed along to the prosecutor, or withheld relevant and material information. Indeed, there is

41

no credible evidence that any of the information supplied by Officer Vanyo on the police reports was false, nor is there any affirmative evidence in the record indicating that Vanyo passed false information to the Erie County District Attorney and encouraged prosecution.").

    c.   The Arrests of the Plaintiffs Were Supported by Probable Cause.

The existence of probable cause or arguable probable cause is an absolute defense to malicious prosecution claims, whether asserted under § 1983 or New York State law. *Manganiello*, 612 F.3d at 161–62; *see also Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004) (a police officer is entitled to qualified immunity as to a malicious prosecution claim if he or she can demonstrate that there was at least *arguable probable cause* to arrest the plaintiff); *Keith v. City of New York*, 641 Fed. Appx. 63, 67 (2d Cir. 2016) (a finding that a police officer had arguable probable cause to arrest necessarily entitled the officers to qualified immunity on the arrestee's malicious prosecution claim). For the reasons discussed in Section III *supra*, Cheektowaga Defendants had probable cause (or at least arguable probable cause) for the arrests of the Plaintiffs. Thus, they are entitled to qualified immunity on any malicious prosecution claim.

VII.    The Complaint Does Not Sufficiently Plead a *Monell* Claim (Count VIII) Against the Cheektowaga Defendants.

A municipality may incur liability under § 1983 where it either enacts "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [municipality's] officers," or maintains practices so "permanent and well settled" that they amount to a governmental "custom," and those policies or customs cause the deprivation of a constitutional right. *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 690 (1978). A plaintiff can plead a "policy" or "custom" by alleging one of the following:

> (1) a formal policy officially endorsed by the municipality; (2) actions taken
> by government officials responsible for establishing the municipal policies

that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

*Jones v. Westchester County*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quotations omitted).

"*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citations omitted). In order to establish the claim, plaintiff must plead and prove "deliberate indifference" by policymakers -- a "stringent" standard of fault. *Id.* (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). It is well-settled that "evidence of one instance" in which municipal employees violated a citizen's rights is not enough to show an actionable custom or practice. *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006) (citation omitted).

A plaintiff's burden is high with failure to train claims. The Supreme Court has cautioned that "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Vann v. City of Rochester*, 18-cv-6464, 2019 WL 2646616 at *7 (W.D.N.Y. June 27, 2019), quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011); *see also Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) ("a 'policy' of 'inadequate training' is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*"); *Van de Kamp v. Goldstein*, 555 U.S. 335, 343-44, 347-48 (2009) (failure to train or supervise claim against a municipal entity … is ill-advised and almost universally prohibited).

The pleadings necessary to support a *Monell* claim must go beyond a factual recitation of the underlying events paired with the conclusory assertion that the violation was pursuant to an official policy. *See A.P. v. Dannhauser*, 23-CV-6687 (PKC) (RML), 2025 WL 917233, at *7 (E.D.N.Y. Mar. 25, 2025) ("To meet the plausibility pleading standard, a plaintiff must plead more than a boilerplate allegation that a municipality had a widespread custom or practice that caused the underlying constitutional deprivation.") (citing to *Santiago v. City of New York*, No. 09-CV-0856 (BMC), 2009 WL 2734667, at *3 (E.D.N.Y. Aug. 25, 2009) (explaining that "boilerplate *Monell* claim[s]" are insufficient "to state a claim upon which relief could be granted"); *see also Kurtz v. Hansell*, No. 20-CV-3401 (PAE), 2021 WL 1143619, at *18-19 (S.D.N.Y. Mar. 24, 2021)

Courts in the Second Circuit routinely dismiss *Monell* claims at the pleadings stage when they merely state the elements of *Monell* in a conclusory fashion, unsupported by prior instances or widespread custom. *See Cipolloni v. City of New York*, 758 F. App'x 76, 78–80 (2d Cir. 2018) (affirming dismissal of *Monell* claim under Rule 12(b)(6), holding that plaintiff failed to plausibly allege a persistent and widespread municipal practice of false arrests based on NYPD database errors where only three isolated incidents over a 20-year span were cited, and further failed to allege deliberate indifference or that the City had actual or constructive knowledge of a pattern of constitutional violations; emphasizing that conclusory allegations and unsupported statistical speculation were insufficient to state a claim); *see also Garcia v. Bloomberg*, 865 F. Supp. 2d 478, 492–94 (S.D.N.Y. 2012) (dismissing *Monell* and supervisory liability claims under Rule 12(b)(6) where plaintiffs failed to plausibly allege that the City of New York or its officials implemented, tolerated, or acquiesced in a municipal policy or practice of "indiscriminate mass false arrest of protesters," finding allegations regarding past protests and the NYPD's "Disorder Control Guidelines" insufficient to show a pattern of similar constitutional violations or a policy that

caused the alleged arrests; holding plaintiffs failed to bridge the gap between the broad policy they alleged and the specific conduct at issue; also rejecting claims against Mayor Bloomberg and Commissioner Kelly for ratification, participation, or failure to train, finding no factual support for deliberate policy choices or a pattern of misconduct necessary to establish deliberate indifference under *Connick v. Thompson*, 563 U.S. 51 (2011)); *Aguilar v. County of Nassau*, 425 F. Supp. 2d 320, 324 (E.D.N.Y. 2006) (dismissing *Monell* claim supported only by factual allegations concerning a single incident and unsupported conclusory allegations).

In this case, Plaintiff's *Monell* allegations fail for the same reasons articulated in *Cipolloni* and *Garcia*. The Complaint does not plausibly allege the existence of any specific Cheektowaga policy, custom, or practice that caused the purported constitutional violations. Instead, it relies on conclusory and boilerplate recitations of *Monell* elements without identifying any prior incidents involving the Town of Cheektowaga that could support a finding of a widespread and persistent practice. Nor does the Complaint identify any policymaker within the Cheektowaga Police Department who made a deliberate choice to implement an unconstitutional policy, nor does it assert facts showing a pattern of misconduct that could give rise to a plausible inference of deliberate indifference to constitutional rights. The pleading lacks factual support for any theory of *Monell* liability—whether based on a formal policy, widespread custom, policymaker ratification, or failure to train or supervise.

As in *Garcia*, Plaintiffs attempt to ascribe broad and speculative municipal liability based on generalized claims about protest policing but fail to bridge the gap between those broad assertions and any concrete facts connecting Cheektowaga's municipal decisionmakers to the alleged conduct in this case. *Garcia*, 865 F. Supp. 2d at 492. Accordingly, the *Monell* claim against the Cheektowaga Defendants should be dismissed.

45

VIII.    Plaintiff's State Law Claims Are Time Barred.

Plaintiffs' claims under New York law should be dismissed because they failed to comply with the strict notice-of-claim requirements of General Municipal Law § 50-e. "[S]tate notice-of-claim statutes apply to state-law claims asserted as pendant claims in a federal action." *Singletary v. Allen*, 431 F. Supp. 3d 126, 129 (W.D.N.Y. 2019) (quotation omitted). "Under New York law, a notice of claim is a mandatory precondition to bringing a tort claim against a municipality or any of its officers, agents or employees." *Grant v. City of Syracuse*, No. 5:15-cv-445, 2017 WL 5564605, at *10 (N.D.N.Y. Nov. 17, 2017) (internal quotation marks and citation omitted); *Hardy v. Daly*, 748 Fed.Appx. 379, 381 (2d Cir. 2018) ("Under New York law, service of a notice of claim is a condition precedent to tort actions against a municipal entity or its employees.") (*citing Fincher v. Cty. of Westchester*, 979 F. Supp. 989, 1002 (S.D.N.Y. 1997)). "Notice of claim requirements are construed strictly by New York state courts. Failure to comply with these requirements ordinarily requires a dismissal for failure to state a cause of action." *Hardy v. N.Y.C. Health & Hosp. Corp.*, 164 F.3d 789, 793-94 (2d Cir. 1999) (citation omitted).

Here, the alleged tortious conduct occurred on May 1, 2024. Thus, the 90-day period to serve a notice of claim under § 50-e(1) expired on or about August 1, 2024, and the outer limit for a court to grant leave to file a late notice of claim under § 50-e(5) was August 1, 2025—one year and 90 days from accrual. *Davis v. County of Erie*, No. 22-CV-554JLS(F), 2022 WL 18215866, at *5 (W.D.N.Y. Dec. 1, 2022), *report and recommendation adopted*, 2023 WL 145581 (W.D.N.Y. Jan. 10, 2023); *Rattner v. Netburn*, 733 F. Supp. 162, 166 (S.D.N.Y. 1989), *rev'd on other grounds*, 930 F.2d 204 (2d Cir. 1991); *Cohen v. Pearl River Union Free Sch. Dist.*, 51 N.Y.2d 256, 414 N.E.2d 639, 640 (1980). Plaintiffs did not serve timely notices of claim or seek leave to file late notices within that statutory period. Accordingly, their state law claims are untimely and must be dismissed. *See Delaney v. City of Albany*, No. 1:12–cv–1575

46

(LEK/RFT), 2014 WL 733913, at *2–3 (N.D.N.Y. Feb. 24, 2014) (dismissing state assault claim against municipality and individual police officers where plaintiff failed to file a notice of claim or timely move for an extension against either); *see also Davis*, 2022 WL 18215866, at *4-5 (dismissing state tort claim filed two days after statute of limitations expired with prejudice).

IX.    The Complaint Does Not Sufficiently Plead New York State Constitutional (Counts IX & X) Claims Against the Cheektowaga Defendants.

"A cause of action for damages based on official conduct in violation of the State's constitution is a 'narrow remedy' available only when 'necessary to effectuate the purposes of the State constitutional protections [that the plaintiff] invokes' or 'appropriate to ensure full realization of her rights.'" *Bogart v. City of New York*, No. 13-1017, 2016 WL 4939075, at *12 (S.D.N.Y. Sept. 6, 2016) (Buchwald, J.) (quoting *Martinez v. City of Schenectady*, 97 N.Y.2d 78, 83 (2001)). Consequently, the state constitutional tort is usually available only in cases in which a plaintiff has no alternative remedy. *See Bogart*, 2016 WL 4939075, at *12. As such, "it is a common view among District Courts in this Circuit . . . that there is no right of action under the New York State Constitution for claims that can be brought under § 1983." *Gounden v. City of New York*, No. 14-7411, 2015 WL 5793625, at *5 n. 3 (E.D.N.Y. Oct. 2, 2015).[37]

Thus, "where a complaint alleges no theories of liability that are cognizable *exclusively*

---

[37] *See, e.g., Nowlin v. Monroe County*, 11-CV-712S, 2013 WL 4455429 at *4 (W.D.N.Y. Aug. 16, 2013) ("there is no private right of action under the New York State Constitution for claims that are remediable under Section 1983 or other state laws.") (quoting *Batista v. City of New York*, No. 05–CV–8444(KMK), 2007 WL 2822211, at *9 (S.D.N.Y. Sept. 25, 2007); *Mesa*, 2103 WL 31002, at *33 (dismissing all of plaintiff's New York State Constitutional claims because "[p]laintiffs have not only asserted federal analogs of their state constitutional claims under § 1983, but also have included several corresponding state law tort claims, including: malicious prosecution, false arrest, assault, and battery."); *Flores v. City of Mount Vernon*, 41 F. Supp. 2d 439, 447 (S.D.N.Y. 1999) (dismissing New York State Constitutional claims "because no private right of action exists for violations of the New York State Constitution where a Plaintiff has alternative damage remedies" under § 1983).

under the New York State Constitution, any claims brought under the state constitution are ordinarily dismissed." *Talarico v. Port Auth. of N.Y. & N.J.*, 367 F. Supp. 3d 161, 171–72 (S.D.N.Y. 2019) (dismissing New York State constitutional claims as duplicative of federal § 1983 claims where complaint alleged no independent theories of liability cognizable *exclusively* under the New York Constitution, and noting the presumption that state constitutional protections are generally coextensive with federal guarantees; thus concluding that plaintiff's "state-law claims rise or fall with her Section 1983 claims.") (emphasis added).[38]

Accordingly, Plaintiffs' allegations sound in violations that are subject to § 1983 and New York common law remedies, and thus they cannot simultaneously pursue claims for New York State constitutional violations.

X. The Complaint Does Not Sufficiently Plead New York State Statutory Claims (Count XVI & XVII) Against the Cheektowaga Defendants.

a. Plaintiffs' Claim for New York Civil Rights Law § 40-c Violations (Count XVI) Against Cheektowaga Defendants Fails.

Section 40-c provides that "[n]o person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation or disability, ... be subjected to any discrimination in his or her civil rights, or to any harassment ... by any other person or by any firm, corporation or institution...." New York Civ. Rights Law § 40-c(2). "The use of 'because of' and 'be subjected to' in the statute signals a requirement that the defendants' alleged conduct rise to the level of

---

[38] "While the New York free speech standard can be more generous in protecting speech than the federal standard, § 1983 'need not provide the exact same standard of relief in order to provide an adequate remedy.'" *Yagel v. Town of Haverstraw*, 24-CV-2030 (NSR), 2024 WL 5090174 at *3 (S.D.N.Y. Dec. 11, 2024) (dismissing analog state constitutional claims because plaintiff "neither argues that his § 1983 claims offer him inadequate protection as to free speech rights granted by the New York State Constitution; nor does he argue that there are no remedies available under § 1983.") (quoting *Biswas v. City of New York*, 973 F. Supp. 2d 504, 522 (S.D.N.Y. 2013).

intentional or purposeful discrimination, not merely that defendants' conduct have the effect of discriminating against plaintiff". *Brown v. St. John's Univ.*, 2010 WL 11627391, at *7 (E.D.N.Y. June 29, 2010).

Moreover, a police officer's act of executing a facially neutral trespass order cannot, standing alone, support a claim of intentional discrimination under the statute. *Meyer v. Haines*, No. 1:24-CV-00791 (AJB/DJS), 2025 WL 1651154, at *20-21 (N.D.N.Y. June 11, 2025) (dismissing plaintiffs' claims under New York Civil Rights Law § 40-c as inadequately pleaded where observant Jewish guests alleged they were evicted from a hotel due to their religious affiliation, and rejecting aiding-and-abetting liability against municipal officers who enforced the hotel's trespass notice, explaining: "Plaintiffs have not plausibly alleged discrimination perpetuated by defendants—intentional or otherwise. Assuming momentarily that plaintiffs have established discrimination by the Hotel defendants, plaintiffs have still not sufficiently alleged that any Town defendant aided or abetted it."). For all the reasons discussed in previous sections regarding the absence of allegations indicating a discriminatory animus against the Cheektowaga Defendants, Plaintiffs' claims fail.

> b. Plaintiffs' Claim for New York Civil Rights Law § 79-n Violations (Count XVII) Against Cheektowaga Defendants Fails.

Section 79-n provides a private right of action[39] against individuals who "intentionally commit" damage to person or property "because of a belief or perception regarding [that person's] . . . religion [or other protected characteristic]." *Zhang Jingrong v. Chinese Anti-Cult World*

---

[39] Courts have emphasized that Section 79-n applies narrowly to acts of "bias-related violence or intimidation," and is not intended as an alternative remedy where general discrimination statutes already apply. See *Spring v. Allegany-Limestone Cent. Sch. Dist.*, 138 F. Supp. 3d 282, 300 (W.D.N.Y. 2015), *aff'd in part, vacated in part on other grounds*, 655 F. App'x 25 (2d Cir. 2016) (quoting Governor's Approval Mem. No. 7, ch. 227).

*Alliance*, 311 F. Supp. 3d 514, 555 (E.D.N.Y. 2018). Thus, to state a claim, Plaintiffs must plausibly allege: (1) intentional conduct, (2) that causes harm to a person or property, (3) motivated by bias against a protected class. *Id.*

Plaintiffs' claim under New York Civil Rights Law § 79-n must be dismissed as against the Cheektowaga Defendants because the Complaint fails to plead facts that plausibly satisfy the statutory elements or establish any specific discriminatory animus on the part of these defendants. The Complaint's references to the Cheektowaga Defendants are sparse and conclusory and entirely fail to connect them to any conduct plausibly motivated by religious or ethnic bias. Thus, this civil rights claim must be dismissed as well.

XI.    The Complaint Does Not Sufficiently Plead New York State Common Law Claims (Counts XIII, XIV, & XV)  Against the Cheektowaga Defendants.

a.    Plaintiffs' Common Law Claim for Abuse of Process (Count XIII) Against Cheektowaga Defendants Fails.

To properly state an abuse of process claim under New York common law or § 1983, the plaintiff must plead three elements: "(1) [a defendant] employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) [does so] in order to obtain a collateral objective that is outside the legitimate ends of the process."" *Mesa v. City of New York*, No. 09 Civ. 10464 (JPO), 2013 WL 31002, at *26 (S.D.N.Y. Jan. 3, 2013) (quoting *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). Crucially, courts in this Circuit have never held that an abuse of process claim can arise solely from the issuance of process itself, and to the contrary have emphasized that the "gist of abuse of process is the improper use of process after it is regularly issued." *Cook*, 41 F.3d at 80.

Thus, courts in this circuit have routinely dismissed abuse of process claims which allege nothing more than an improper motive to initiate arrest. *See, e.g.*, *Richardson v. New York City*

*Health & Hospitals Corp.*, No. 05 Civ. 6278, 2009 WL 804096, at \*16 (S.D.N.Y. Mar. 25, 2009) ("The Court is bound by the law of the Circuit, and persuaded by the ... cases from this District. Accordingly, the dicta quoted by Plaintiffs from Parkin [suggesting that process alone can give rise to an abuse of process claim] does not alter the established law governing malicious abuse of process claims."); *Stewart v. City of New York*, No. 06 Civ. 15490, 2008 WL 1699797, at \*9 (S.D.N.Y. Apr.9, 2008) ("[T]o prevail on his malicious abuse of process claim, Stewart must establish that [Defendant] sought to bring about a *collateral objective separate and distinct from any malicious intent to initiate proceedings against him....* Thus, the collateral objective must arise after process has issued.") (emphasis added) (internal citations omitted); *Morales v. United States*, 961 F.Supp. 633, 638 (S.D.N.Y.1997) ("Thus, because plaintiffs have, *at most, simply adduced evidence that the defendants had potentially unlawful motives in initially arresting* and criminally charging [Plaintiffs], and nothing beyond, their claim must fail.") (emphasis added).

The abuse of process claim against the Cheektowaga Defendants must be dismissed for the same reasons articulated in *Mesa* and *Morales*. As in those cases, Plaintiffs here fail to allege that any Cheektowaga officer misused legal process *after* it was issued, or that they pursued a "collateral objective separate and distinct from any malicious intent to initiate proceedings against [plaintiffs]." *Stewart*, 2008 WL 1699797, at \*9. The Complaint's sparse references to the Cheektowaga Defendants contain no allegations of any conduct occurring *after* the issuance of process, let alone any actions taken to advance a collateral objective separate from the purported initial motive for arresting Plaintiffs. Accordingly, this claim must be dismissed.

      b.  Plaintiffs' Common Law Claim for Negligence (Counts XIV & XV) Against Cheektowaga Defendants Fails.

          i.  *Negligence for Police for Law Enforcement Activity is Not Actionable* (Count XIV).

Plaintiff's other claim for Negligence as it relates to negligent planning or execution of the

protest response must be dismissed as "New York does not, as a matter of public policy, recognize a claim for negligence arising out of an arrest or prosecution." *Dotson v. Farrugia*, 11CIV1126PAE, 2012 WL 996997 at *10 (S.D.N.Y. Mar. 26, 2012) (quoting *Paul v. Bank of Am. Corp.*, No. 09–CV–1932 (ENV) (JMA), 2011 WL 684083, at *3 (E.D.N.Y. Feb. 16, 2011)); *see also Pandolfo v. U.A. Cable Sys. of Watertown*, 171 A.D.2d 1013, 1014, (4th Dept 1991) ("As a matter of public policy, there is no cause of action in the State of New York for negligent prosecution or investigation."); *Boose v. City of Rochester*, 71 A.D.2d 59, 62 (4th Dept 1979) (holding that a plaintiff seeking damages for an injury resulting from a wrongful arrest and detention "may not recover under general principles of negligence . . . but must proceed by way of the traditional remedies of false arrest and imprisonment."); *Bernard v. United States*, 25 F.3d 98, 103 (2d Cir. 1994).

### ii. *Plaintiffs' Have Not Alleged Facts Sufficient to Support a Negligent Hiring, Training, and Supervision Claim* (Count XV).

Under New York law, a plaintiff may state a claim for negligent hiring, supervision, or retention, by showing, "(1) that the tort-feasor and the defendant were in an employee-employer relationship ...; (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence ...; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004).

"Generally, where an employee is acting within the scope of his or her employment ..., no claim may proceed against the employer for negligent hiring or retention." *Karoon v. N.Y.C. Transit Auth.*, 659 N.Y.S.2d 27, 29 (1st Dep't 1997). "As a result, courts in this circuit have consistently dismissed negligent hiring, retention, and supervision claims where the defendant was acting within the scope of employment." *Fraser v. City of New York*, 2022 WL 3045524, at *5 (E.D.N.Y.,

Aug. 1, 2022) (collecting cases). Here, "the Officers were acting within the scope of their employment as police officers at the protest. They were not attending in their personal capacities." *Id.* at *6. In fact, Plaintiffs concede as much, as they allege that "[a]t all times relevant hereto, each Municipal Defendant Officer was acting within the scope of his or her employment and under the supervision and control of their respective municipal or county law enforcement agency." (Compl. [1] ¶¶ 45, 219).

Additionally, "an essential element of a cause of action in negligent hiring, retention, supervision, and training is that the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Bouche v. City of Mount Vernon*, No. 11 Civ. 5246 (SAS), 2012 WL 987592, at *9 (S.D.N.Y. Mar. 23, 2012) (quoting *Saldana v. Village of Port Chester*, No. 09 Civ. 6268 (SCR) (GAY), 2010 WL 6117083, at *5 (S.D.N.Y. July 21, 2010)). This "requires allegations that the employer failed to investigate a prospective employee notwithstanding knowledge of facts that would lead a reasonably prudent person to investigate that prospective employee." *Bouchard v. New York Archdiocese*, 719 F.Supp.2d 255 (S.D.N.Y.2010) (internal quotation marks, alterations, and citation omitted). Thus, when a plaintiff fails to allege any facts which indicate an officer's propensity to engage in illegal conduct, their claim fails. *See Estate of Jaquez ex rel. Public Adm'r of Bronx Cnty. v. City of New York*, 2014 WL 2696567, at *7 (S.D.N.Y. Jun. 9, 2014) ("In this case, plaintiffs have made no allegation that the City knew or should have known an investigation of the individual defendants was warranted. For this reason too, plaintiffs' claim fails as a matter of law."); *see also Edrei v. City of New York*, 254 F.Supp.3d 565, 583-84 (S.D.N.Y., 2017) ("Plaintiffs have also not alleged facts sufficient to infer that Defendant NYC knew of the Defendant officers' propensity to act in the manner alleged, namely using a powerful sound magnifier in an unnecessarily forceful manner.").

In sum, Plaintiffs' negligent hiring, training, and supervision claim fails because the Plaintiffs (1) have conceded that the Cheektowaga Officers were acting within the scope of their employment; and (2) have not identified any facts sufficient to infer that the Cheektowaga Officer's had a propensity to engage in this particular conduct.

### iii.   *Intentional Conduct Cannot* Form Basis of a Negligence Claim.

Plaintiffs' allegations that the defendants' conduct was intentional and/or reckless preclude him from arguing any theory sounding in negligence. "[W]hile plaintiff is generally permitted to plead different causes of action in the alternative . . . when a plaintiffs' factual allegations are only consistent with a theory of intentional or perhaps reckless conduct, negligence claims must be dismissed." *Lozada v. Weilminster*, No. 11 CV 2049 (MKB), 92 F. Supp. 3d 76, 107 (E.D.N.Y. Mar. 23, 2015); *see also Busch v. City of New York*, No. 00 CV 5211 (SJ), 2003 WL 22171896, at *7 (E.D.N.Y Sep 30, 2003) ("when a plaintiff asserts an excessive force and assault claims, which are premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie.").

### iv.   *Plaintiffs Have Not Plead*ed a Special Duty.

"[A]n agency of government is not liable for the negligent performance of a governmental function unless there existed *a special duty* to the injured person, in contrast to a general duty owed to the public. Such a duty, we have explained—a duty to exercise reasonable care toward the plaintiff—is born of a special relationship between the plaintiff and the governmental entity." *McLean v. City of New York*, 12 N.Y.3d 194, 199 (2009) (internal citations omitted).

It is the plaintiff's obligation to prove that the government defendant owed a special duty of care to the injured party and in situations where the plaintiff fails to meet this burden, the analysis ends and liability may not be imputed to the municipality that acted in a governmental capacity. *Applewhite v. Accuhealth, Inc.*, 21 N.Y.3d 420, 426 (2013) (citing *Lauer v. City of New*

*York*, 95 N.Y.2d 95, 100 (2000)); *Valdez v. City of New York*, 18 N.Y.3d 69, 75 (2011); *see also Bryant*, 267 F.Supp.3d at 479. Here, Plaintiff has not alleged any special duty or special relationship that would differentiate Plaintiffs from the public at large and as such this claim should be dismissed.

XII.    Plaintiffs has not Pleaded Any Cause of Action Against Police Officer Miller.

The Plaintiff names "Police Officer Miller" of the Cheektowaga Police Department. (Complaint [1] ¶42.)  The Plaintiff pleads no act by Police Officer Miller; the Plaintiff does not plead that Police Officer Miller was present and personally involved in the events on May 1, 2024; and the Plaintiff pleads no facts sufficient to state a cause of action for supervisory liability, "such as ordering or helping others to do [an] unlawful act[]." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001). Thus, separate and apart from the arguments above, this Court should at least dismiss "Police Officer Miller" from the case.

## CONCLUSION

Plaintiffs have failed to meet fundamental pleading requirements for their claims against the Cheektowaga Defendants. The Court is therefore respectfully urged to dismiss the Complaint in its entirety as to the Cheektowaga Defendants.

Dated: September 12, 2025

**LIPPES MATHIAS LLP**
*s/ James P. Blenk*
James P. Blenk, Esq.
Anthony J. Masse, Esq.
jblenk@lippes.com
amasse@lippes.com