UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————

YOUSEF AHMED,
JAY AYOUB,
MAJD AYOUB,
ELVI JO DOUGHERTY,
SOLIEGH M. DOUGHERTY,
JAZMINE C. FRAZIER,
TIMOTHY P. GEORGER,                                         Civil Action No.:  25-cv-00391
IBRAHIM KHATIB,
HANNAH R. KRULL, AND
NOOR A. MOHAMMED,
                                             Plaintiffs,

v.

CITY OF BUFFALO, et al.,

                                             Defendants.

———————————————————————

**PLAINTIFFS' OMNIBUS MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF FACTS ..................................................................................... 3

    A.    The May 1, 2024 Peaceful Protest at UB North Campus................................ 3

    B.    The Ad Hoc 8:23 p.m. Curfew and Interference with Mandatory Prayer...................... 4

    C.    The Coordinated Dispersal and Mass Arrest Operation.................................. 5

    D.    Charges Were Dismissed; Plaintiffs Allege Ongoing Retaliation and Harms ................ 6

STANDARD OF REVIEW ..................................................................................... 6

ARGUMENT ..................................................................................................... 8

I.    The Complaint Satisfies Rule 8 and Adequately Pleads Personal Involvement and Failure-to-Intervene ................................................................................................. 8

    a.    Defendants Mischaracterize the Rule 8 Standard ................................................ 8

    b.    Rule 8 Requires Fair Notice........................................................................ 8

    c.    Failure-to-Intervene Allegations Should Survive at This Stage ......................... 11

    d.    Where Identification Is Unreasonably Difficult Pre-Discovery, Dismissal Is Not the Remedy ................................................................................................. 11

    e.    The Complaint Includes Sufficient Allegations Relating to Each Officer ....................... 11

    f.    The Complaint Includes Sufficient Allegations Relating to Tonawanda Officers ........... 14

    g.    The Complaint Includes Sufficient Allegations Relating to Cheektowaga Officers ......... 15

    h.    The Complaint Includes Sufficient Allegations Relating to Amherst Officers ................ 18

II.    The Court Should Not Resolve Disputed Facts on Rule 12(b)(6) Using Extrinsic Materials 22

    a.    Defendants' Reliance on Extrinsic Materials ................................................... 22

    b.    Extraneous Documents Cannot Be Considered Unless Incorporated by Reference or Integral to the Complaint ........................................................................... 22

    c.    District Courts Uniformly Decline to Consider Bodycam Footage Not Referenced in the Complaint.................................................................................................. 23

    d.    Plaintiffs Did Not Rely on Bodycam Footage in Drafting the Complaint........................ 24

    e.    Considering the Bodycam Footage Would Require Conversion to Summary Judgment.. 26

    f.    Cheektowaga's Brief Misapplies the 'Integral Footage' Precedent ................................. 27

    g.    Amherst's Request for Judicial Notice is Improper........................................................ 28

III.   Qualified Immunity and Probable Cause Are Fact-Intensive Defenses Inappropriate for Resolution at the Motion to Dismiss Stage ............................................................. 29

a.   Defendants Mischaracterize the Qualified Immunity Standard ........................ 29

b.   Qualified Immunity Faces a "Formidable Hurdle" at the Motion to Dismiss Stage ......... 30

c.   The "Fair Warning" and Individualized-Probable-Cause Requirements in Protest Contexts Preclude Qualified Immunity ............................................................. 31

d.   Clearly Established Excessive-Force Principles Independently Defeat Qualified Immunity 34

e.   Claim- and Defendant-Specific Applications Appear Below ............................. 36

IV.   Plaintiffs Plausibly Plead First and Fourteenth Amendment Violations (Counts I, II, V, VI) 36

a.   Count I (Speech, Assembly, Petition): Suppression and Retaliation for Protected Protest Activity ............................................................................. 37

b.   Count II (Right to Record) — Retaliation for Recording Public Officials ...................... 43

c.   Count V (Equal Protection) — Selective Enforcement / Discriminatory Treatment ........ 45

d.   Count VI (Free Exercise and Equal Protection) — Interference with Prayer / Religious Discrimination .......................................................................... 46

V.    Plaintiffs Plausibly Plead Fourth Amendment Violations For Excessive Force and False Arrest (Counts III, IV) .......................................................................... 47

a.   Count III (Excessive Force) ......................................................... 48

i.    Every Plaintiff Alleges Substantial Force and Injury ................................. 48

b.   Count IV (Unlawful Seizure / False Arrest) — Lack of Probable Cause and Lack of Fair Warning .............................................................................. 55

VI.   Plaintiffs Plausibly Plead Substantive and Procedural Due Process Violations (Count VII) 56

a.   Procedural Due Process ........................................................... 57

b.   Substantive Due Process .......................................................... 57

c.   The Ad Hoc Curfew and Dispersal Cutoff is Void for Vagueness and Invited Arbitrary Enforcement ......................................................................... 58

VII.  Plaintiffs Plausibly Plead Malicious Prosecution (Count XVIII) ........................ 59

VIII. Plaintiffs Plausibly Plead Municipal Liability Under *Monell* (Count VIII)............... 62

a.   The Complaint Pleads a Coordinated Municipal Policy Implemented Through the Mutual Aid Agreement ....................................................................... 64

b.  Plaintiffs Plausibly Plead Deliberate-Indifference Failures to Train, Supervise, and Discipline for Protest Policing and Religious Accommodation ................................................ 65

c.  The Complaint's Allegations Are Municipality-Specific Enough to Survive Dismissal .. 67

d.  Erie County Is a Proper *Monell* Defendant Because the Sheriff Is the County's Final Policymaker for the Challenged Operational Conduct ........................................................... 68

e.  Defendants' *Monell* Case Strings Do Not Require Dismissal of These Detailed, Coordinated-Policy Allegations ................................................................................................. 69

IX.  Plaintiffs' State-Law Claims Should Not Be Dismissed (Counts IX-XVII, XIX) ............ 70

a.  Notice of Claim and Related State-Law Procedural Prerequisites ................................... 70

b.  New York Constitutional Claims (Counts IX and X) ....................................................... 77

c.  New York Civil Rights Law Claims (Counts XVI and XVII) ............................................ 79

d.  New York Common-Law Claims (Counts XI-XV and XIX) ............................................ 81

X.  Remedies ........................................................................................................................... 86

a.  Punitive Damages ............................................................................................................. 87

b.  Injunctive and Declaratory Relief .................................................................................... 87

XI.  Supplemental Jurisdiction Over State-Law Claims Is Proper ........................................... 89

CONCLUSION ............................................................................................................................ 90

## PRELIMINARY STATEMENT

Plaintiffs Yousef Ahmed, Jay Ayoub, Majd Ayoub, Elvi Jo Dougherty, Soliegh M. Dougherty, Jazmine C. Frazier, Timothy P. Georger, Ibrahim Khatib, Hannah R. Krull, and Noor A. Mohammed submit this omnibus opposition to the six motions to dismiss filed by the County of Erie, the City of Buffalo, the Town of Amherst, the Town of Cheektowaga, the Town of Tonawanda, and the State Defendants (collectively, "Defendants").

Although filed separately, the motions largely overlap. Defendants raise four recurring themes. First, they argue the Complaint violates Rule 8 and fails to plead personal involvement. Second, they invoke qualified immunity and probable cause based on disputed facts about the dispersal orders, the adequacy of fair warning, and what each Plaintiff did. Third, they attack the *Monell* allegations by treating this coordinated multi-agency operation as if it were a set of unrelated, one-off incidents. Fourth, they press state-law procedural and doctrinal defenses, including notice-of-claim issues, § 50-i pleading, an alleged bar on New York constitutional claims, and challenges to negligence theories.

Buffalo and Erie County filed motions limited to Count VII, Count VIII, and certain state law defenses and remedies. They do not seek dismissal of Counts I through VI, and they do not challenge Count XVIII. (Dkt. Nos. 63-1, 51-4). The State Defendants filed a partial motion. They do not seek dismissal of Count I or Counts III through VI. Their only First Amendment merits challenge is limited to Count II and President Tripathi. (Dkt. No. 49-1). Each of Buffalo, Erie County, and the State Defendants forgo arguments relating to probable cause or qualified immunity. (*See* Dkt. Nos. 63-1, 51-4, 49-1). Tonawanda does not move to dismiss Count V. (Dkt. No. 46-1).

The Complaint describes a coordinated, multi-agency law-enforcement operation to disperse a peaceful campus protest at the University at Buffalo on May 1, 2024. Plaintiffs allege Defendants imposed an ad hoc "curfew" while Muslim protesters were engaged in mandatory sunset prayer, refused a brief accommodation, and then executed mass arrests and forceful takedowns.

The Complaint also alleges that several Plaintiffs had already dispersed and were arrested away from the Flint Loop lawn site. Noor Mohammed, for example, was not at the protest when officers assaulted and arrested her inside Capen Hall, an academic building, after officers from multiple agencies entered and began chasing individuals through the hallway. Taken as true, these allegations describe suppression and retaliation for protected speech and assembly, selective enforcement and religious discrimination, and unreasonable seizures and force. (Compl. ¶¶ 1-10, 20-29, 80-91, 104-107, 122-127, 154-167, 194-199).

Certain Defendants' efforts to recast these pleaded facts through extrinsic materials (including selective body-worn-camera clips and judicial-notice requests for alleged "sunset times") invert the Rule 12 standard. The Court cannot weigh competing accounts or resolve factual disputes by crediting Defendants' videos, timelines, or policy gloss at the pleadings stage. Those issues are for discovery and, if appropriate, summary judgment.

Some motions also assume that the negligence and due process counts rise or fall only on the arrests. But the Complaint pleads an independent set of wrongs in the lead-up to the arrests, including negligent and arbitrary enforcement of a facially baseless 8:23 p.m. "curfew." Plaintiffs allege the curfew was imposed and executed without meaningful notice or time to comply and was used to suppress protected speech and religious exercise even as Plaintiffs were

dispersing or trying to disperse. Those theories do not warrant dismissal on a Rule 12(b)(6) record.

Where particular arguments are genuinely defendant-specific, Plaintiffs address them in targeted sections rather than through duplicative mini-briefs. Those arguments include Cheektowaga's "integral document" theory, Erie County's Sheriff/County separation position as to policymaking, Tonawanda's "only two allegations" posture and its attempt to collapse personal involvement into an impossible pre-discovery identification requirement, and the State Defendants' framing on injunctive relief and their Tripathi-specific retaliation arguments.

For the reasons set forth below, each motion to dismiss should be denied in substantial part (and, in most respects, in full). To the extent the Court identifies any curable pleading defects as to state-law procedural prerequisites, the appropriate remedy is leave to amend. Dismissal with prejudice is inappropriate in an early, pre-discovery posture involving a multi-agency mass arrest.

## STATEMENT OF FACTS

### A.  The May 1, 2024 Peaceful Protest at UB North Campus

Plaintiffs are students, faculty, alumni, and community members who assembled at the University at Buffalo ("UB") on May 1, 2024 to engage in peaceful protest and related religious observance. (Compl. ¶¶ 1-4, 56-62). The demonstration centered on core political expression. Plaintiffs allege participants opposed ongoing state-led violence in Gaza and called for university divestment. The demonstration also included speeches, chants, and prayer. (*Id*. ¶¶ 2-3, 58, 67-68).

The Complaint alleges that the protest remained peaceful and orderly throughout the day: no threats to public safety, no blocked building entrances, no weapons, vandalism, violence, or disruption of campus operations. (*Id*. ¶¶ 3, 66-69). It was also modest in size (between a few dozen and approximately 80 people). (*Id*. ¶ 4).

Despite the absence of any imminent threat, law enforcement from multiple agencies deployed to UB in a coordinated response that, as pleaded, outnumbered the demonstrators. (*Id*. ¶¶ 5-6, 65, 80). Plaintiffs allege that this multi-agency deployment was planned and briefed in advance, including by UBPD supervisors who coordinated the protocol across responding agencies. (Id. ¶¶ 5, 84-87).

## B. The Ad Hoc 8:23 p.m. Curfew and Interference with Mandatory Prayer

As the evening approached, Muslim demonstrators prepared to perform Maghrib prayer, a time-sensitive religious obligation dictated by sunset. (*Id*. ¶¶ 7-9, 81-83). Several Plaintiffs (including Yousef Ahmed, Jay Ayoub, Majd Ayoub, and Ibrahim Khatib) were engaged in Maghrib prayer as officers issued the final warnings and initiated the mass-arrest operation. (Id. ¶¶ 96-101). Plaintiffs allege that officers were staged in tactical gear and that, shortly after 8:00 p.m., officers announced by megaphone an 8:23 p.m. deadline to vacate the protest site or face arrest. (*Id*. ¶¶ 7-8, 80-83).

The Complaint alleges that the basis for this "curfew" was unclear, unsupported by any written UB policy, and imposed to suppress the protest without reasonable notice, individualized orders, or lawful justification. (*Id*. ¶¶ 7, 76, 83, 90-91, 230). Plaintiffs further allege that certain protesters repeatedly sought a brief accommodation to allow prayer to conclude. They asked for an extension of only a few minutes, but supervisory officers refused. (*Id*. ¶¶ 83, 85, 89).

Plaintiffs allege that officers issued multiple megaphone announcements in the minutes leading up to 8:23 p.m., but that the method and circumstances were constitutionally inadequate for fair warning in a dispersed outdoor setting, particularly where officers proceeded while prayer was ongoing and the crowd was attempting to comply. (*Id.* ¶¶ 7-9, 83-89).

## C.  The Coordinated Dispersal and Mass Arrest Operation

At exactly 8:23 p.m., dozens of officers charged the protest site while Maghrib prayer was ongoing. (*Id.* ¶¶ 8-9, 83-90, 108-110). Plaintiffs allege that, although most individuals attempted to comply by leaving the immediate area, officers pursued people across campus, re-engaged, and made arrests at other locations. (*Id.* ¶¶ 8, 100-101, 104-107, 121-127).

The Complaint details three distinct geographic and temporal "parts" to the arrests. One set of arrests occurred at the prayer circle on the Flint Loop lawn. There, Plaintiff Ibrahim Khatib was tackled from behind, moments after engaging in Maghrib prayer, and was shoeless due to the requirements of prayer. (*Id.* ¶¶ 188-190). Another set occurred after protesters had retreated from the lawn; Plaintiff Hannah Krull had relocated in compliance and was tackled face-first into the pavement and pinned. (Id. ¶¶ 191-193).

As is particularly relevant on these motions, Plaintiffs Yousef Ahmed, Majd Ayoub, and Jay Ayoub had already dispersed and were arrested near or inside Capen Hall. None was on the Flint Loop lawn at the time of arrest. Plaintiff Noor Mohammed was not at the protest when she was assaulted and arrested inside Capen Hall. (*Id.* ¶¶ 104-107, 154-167, 194-199). As alleged, after Mr. Ahmed dispersed, officers followed him, prevented him from entering Capen Hall, and then chased, tackled, and arrested him. (*Id.* ¶¶ 128-129, 162-167). The Complaint further alleges that officers from numerous agencies, including City of Buffalo/BPD, entered Capen Hall (an

academic building) and continued to chase individuals through the hallway, arresting nonparticipants. (*Id*. ¶¶ 122-127).

As detailed in the Complaint, the dispersal was accompanied by force that far exceeded what was necessary in a peaceful demonstration context. Protesters were tackled and pinned, punched and kneed after restraint, zip-tied so tightly that fingers went numb, and subjected to the dislodging or removal of religious garments, including hijabs. (*Id*. ¶¶ 8-9, 110-115, 197-199). Defendant officers joked about the protest and protesters, including an officer stating, "Hopefully they didn't plant an IED in there." (*Id*. ¶ 132).

Plaintiffs allege that many arrests targeted individuals while they were praying, filming, attempting to retreat, or linking arms in silent solidarity; none of which constitutes criminal conduct or a public-safety threat. (*Id*. ¶¶ 9, 162-199 (plaintiff-specific allegations)).

### D. Charges Were Dismissed; Plaintiffs Allege Ongoing Retaliation and Harms

Plaintiffs allege that the criminal charges arising from May 1 were unsupported and pretextual, and that judges or prosecutors dismissed the charges. (*Id*. ¶¶ 10, 139, 148). Several Plaintiffs' charges were dismissed at their first appearance for lack of evidence. (*Id*. ¶ 148).

The Complaint further alleges continuing harms and retaliation following the protest, including surveillance, targeting of Muslim and pro-Palestinian students, campus bans, and efforts to recommence prosecution without new evidence as to Plaintiff Frazier. (*Id*. ¶¶ 244, 452-456).

### STANDARD OF REVIEW

On a motion to dismiss under Rule 12(b)(6), the Court must accept the well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. A complaint

need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); see *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At this stage, the question is not whether Plaintiffs will ultimately prevail, but whether the Complaint plausibly alleges facts that, if proven, would entitle them to relief.

As a general rule, review on a Rule 12(b)(6) motion is confined to the Complaint. The Court may consider documents attached to the Complaint, incorporated by reference, or "integral" to it, but only where Plaintiffs relied upon the document in drafting the pleading. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). Even where judicial notice is available for the existence of certain facts, the Court may not use judicial notice or extrinsic materials to resolve factual disputes or to credit Defendants' competing narrative over Plaintiffs' allegations. *See id.*; *see also Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008).

If consideration of material outside the pleadings is necessary, the motion must be converted to one for summary judgment under Rule 12(d), and Plaintiffs must be afforded an opportunity for discovery. Fed. R. Civ. P. 12(d).

Qualified immunity is an affirmative defense. Defendants bear the burden of proving it. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). At the pleading stage, it is rarely resolved because the Court must accept the Complaint's allegations as true and draw all reasonable inferences for Plaintiffs, including inferences that defeat the defense. *McKenna v. Wright*, 386 F.3d 432, 434-36 (2d Cir. 2004). Dismissal is proper only if the defense is established on the face of the Complaint. *McKenna*, 386 F.3d at 436.

In excessive force cases, dismissal on qualified immunity is especially disfavored because the Fourth Amendment reasonableness inquiry tends to converge with the qualified

immunity reasonableness inquiry. *Baumeister v. Erie Cnty.*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *5 n.10 (W.D.N.Y. Sept. 30, 2024) (citing *Spencer v. Sullivan County*, 2019 WL 4514011, at *7 n.5 (S.D.N.Y. Sept. 19, 2019), and *Wang v. Vahldieck*, 2012 WL 119591, at *11 (E.D.N.Y. Jan. 9, 2012)). *Eaton v. Estabrook* underscores the point. *Eaton* vacated qualified immunity in a protest setting because disputed facts about what the officer saw mattered, and because the unlawfulness could be apparent under existing Second Circuit law without a fact-matched case. 144 F.4th 80, 92-97 (2d Cir. 2025).

## ARGUMENT

### I. The Complaint Satisfies Rule 8 and Adequately Pleads Personal Involvement and Failure-to-Intervene

#### a. Defendants Mischaracterize the Rule 8 Standard

Cheektowaga, Amherst, and Tonawanda (and at points other moving Defendants) argue the Complaint violates Rule 8 and impermissibly "lumps" defendants together. They contend Plaintiffs must, pre-discovery, identify which officer from which agency used which force, issued which directive, or made which arrest decision, and seek dismissal of claims (and, in some instances, individual defendants) based on that asserted lack of granular attribution.

#### b. Rule 8 Requires Fair Notice

Rule 8 requires only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The question is whether the pleading gives *fair notice* of the claims and the grounds on which they rest. It does not require Plaintiffs to reconstruct,

before discovery, a limb-by-limb account of who did what during a coordinated, fast-moving group arrest and use-of-force event.

Defendants' emphasis on personal involvement does not change the Rule 8 analysis. Plaintiffs must plead each defendant's own conduct, and Plaintiffs do. *See* T*angreti v. Bachmann*, 983 F.3d 609 (2d Cir. 2020). Personal involvement includes direct participation and failure to intervene, which is actionable conduct. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Nothing in *Tangreti*, *Raspardo*, or *Bass* imposes a pleading-stage requirement that arrestees identify, without discovery, which officer grabbed which limb, applied which restraint, or joined which pile-on in a multi-officer takedown.

Recent decisions in this District reject the premise of Defendants' Rule 8 attack. In *Baumeister v. Erie County*, Judge Vilardo addressed an improper "group pleading" argument in the context of a multi-agency law-enforcement operation and held that "context matters." 2024 WL 4362311, at *3 (W.D.N.Y. Sept. 30, 2024). Relying on *Bryant v. Monroe County*, the court explained that in "situations involving an alleged assault by a group of police officers or corrections officers, courts do not insist that the complaint set forth in detail the actions of each officer where it would be unreasonable to expect the plaintiff to be able to do so." *Baumeister*, 2024 WL 4362311, at *3 (quoting *Bryant*, 2022 WL 119184, at *10 (W.D.N.Y. Jan. 12, 2022)). The court found that standard satisfied and held that the plaintiff was "not required to more specifically identify each officer's actions" at the pleading stage. *Baumeister*, 2024 WL 4362311, at *4.

*Baumeister* also emphasized that the pleading-stage question is notice, not pre-discovery proof. Quoting *Buari*, the court stated that "[t]he crux of the inquiry" is whether the complaint gives each defendant "fair notice of what the plaintiff's claim is and the ground upon which it

rests." *Baumeister*, 2024 WL 4362311, at *3 (quoting *Buari v. City of New York*, 530 F. Supp. 3d 356, 390–91 (S.D.N.Y. 2021)). Where, as here, the alleged misconduct occurred in close quarters with multiple officers and multiple jurisdictions, that standard does not require plaintiffs to plead internal allocation of tasks that is uniquely within defendants' control.

The same point is reflected in *Boehner*, another protest-policing case involving officers from multiple jurisdictions. There, the court rejected an "impermissible group pleading" argument because plaintiffs made plaintiff-specific allegations that "unknown Sheriff's Deputies and/or unknown RPD Officers" used force, and "[g]iven the presence of law enforcement from multiple jurisdictions at the protests, such a claim is not implausible." *Boehner v. City of Rochester*, 609 F. Supp. 3d 220, 229 (W.D.N.Y. 2022). That reasoning applies with equal force where a complaint pleads that officers from multiple agencies acted together in a coordinated surge and arrests.

Finally, courts recognize the basic practical reality of group arrests and force. As *Messina* held, "[i]t would be asking too much for an arrestee to remember and plead the role each of several police officers played in an alleged instance of police brutality." *Messina v. Mazzeo*, 854 F. Supp. 116, 126 (E.D.N.Y. 1994). And where Plaintiffs plead both direct participation and failure to intervene, a complaint "need not specify which officers directly participated" and which "failed to intervene" before discovery. *Baumeister*, 2024 WL 4362311, at *6 (citing *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012)).

Taken together, this authority answers Defendants' demand for a pre-discovery, officer-by-officer reconstruction. Rule 8 requires fair notice. Plaintiffs' allegations of coordinated action, combined with plaintiff-specific narratives and failure-to-intervene theories, satisfy that standard.

### c.   Failure-to-Intervene Allegations Should Survive at This Stage

As detailed in V(a) below, where agencies deploy together pursuant to mutual-aid arrangements and operate as a coordinated unit, the pleading-stage question is whether Plaintiffs plausibly allege presence, knowledge, and opportunity for the defendant officers.

Officers are liable under § 1983 not only for direct participation, but also for failing to intervene when they have a realistic opportunity to prevent a constitutional violation. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Plaintiffs set out the failure-to-intervene standard and its application in the Excessive Force discussion (Count III) and incorporate that analysis by reference as it applies to the other federal Counts against the Defendant Officers.

### d.   Where Identification Is Unreasonably Difficult Pre-Discovery, Dismissal Is Not the Remedy

This is also the kind of case where dismissal for lack of granular identification would reward Defendants for the very conditions alleged to have impeded identification (coordinated formations, riot gear and lack of visible identifiers, and disputed/withheld camera evidence). If any Defendant genuinely believes a portion of the pleading is so unclear that it cannot be answered, the proper procedural mechanism is a Rule 12(e) motion for a more definite statement, not Rule 12(b)(6) dismissal.

And where discovery is needed to identify subordinate actors and their roles, courts recognize the appropriateness of maintaining claims long enough to permit targeted discovery. *See Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998).

### e.   The Complaint Includes Sufficient Allegations Relating to Each Officer

This case concerns a coordinated, multi-agency mass-arrest operation at UB on May 1, 2024. The Complaint pleads that dozens of officers from at least ten different agencies converged and acted in coordinated formations. It alleges that officers in riot gear formed a wall-like phalanx and converged inward to enforce the curfew. It alleges that the surge occurred at 8:23 p.m. And it alleges that officers in riot gear executed rapid arrests involving tackling, pile-ons, zip ties, handcuffs, dragging, and chases, including while individuals were praying or attempting to comply. (Compl. ¶¶ 5-6, 48-55, 80, 104-116, 108-115).

Plaintiffs allege that dozens of officers from at least ten agencies deployed pursuant to a Mutual Aid Agreement establishing coordinated operational control. When agencies formalize their coordination through such agreements, they create unified operations in which officers from participating agencies share operational authority and responsibility. The Complaint alleges that officers from all ten agencies deployed in coordinated formations, operated under unified command, and executed synchronized tactics pursuant to a joint operational plan. This coordinated deployment demonstrates that officers were not operating as separate agencies with independent authority, but rather as a unified force under joint command. (Compl. ¶¶ 84-86, 108-112, 200-206, 340).

Given these allegations of a chaotic scene, "[i]t would be asking too much for an arrestee to remember and plead the role each of several police officers played" in this alleged instance of false arrest. *Messina v. Mazzeo*, 854 F. Supp. 116, 126 (E.D.N.Y. 1994). Under these circumstances, it is entirely unreasonable to expect plaintiffs to identify which specific officer from which specific agency performed each discrete action during a chaotic mass arrest.

Against that backdrop, the Complaint does not "lump" defendants in the way Rule 8 forbids. It pleads (i) the unified operational context, (ii) agency participation, (iii) named officers

where known, and (iv) plaintiff-specific events sufficient to provide fair notice and to permit discovery to fill in remaining identification gaps.

For example, the Complaint alleges that Plaintiff Hannah Krull "was tackled face-first into pavement by multiple Tonawanda and other officers while pinned and zip-tied." (Compl. ¶¶ 106, 192-193). This allegation specifically identifies Tonawanda officers as involved in Ms. Krull's arrest and describes the constitutional violation as excessive force through tackling and restraint.

Similarly, the Complaint alleges that after the Flint Loop protest was dispersed, officers from numerous agencies, including BPD and Cheektowaga Police Department, entered Capen Hall (an academic building), chased individuals through the hallway, and effected arrests of nonparticipants who were not defying any dispersal order. (Compl. ¶¶ 104-107, 122-129, 194-199). The Complaint also pleads BPD's direct personal involvement in Plaintiff Yousef Ahmed's arrest: after dispersing, Ahmed attempted to enter Capen Hall, but BPD officers prevented his entry, chased him, tackled him, and arrested him. (Compl. ¶¶ 128-129, 162-167). And within Capen Hall, Defendant Officers Arnold and Rogers (Cheektowaga) and Bauer (BPD), among others grabbed Plaintiff Noor Mohammed by her backpack and slammed her to the ground; multiple officers pinned her; and her hijab and keffiyeh were forcibly dislodged from her head and neck. (Compl. ¶¶ 42, 194-199). These allegations identify the agency (BPD and Cheektowaga), the location (Capen Hall), and the specific constitutional violations (excessive force, false arrest, and religious discrimination).

Courts have consistently held that such allegations are sufficient. Given the presence of law enforcement from multiple jurisdictions at the protests, such claims are not implausible. Here, Plaintiffs have provided at least as much specificity as required. Each plaintiff's individual

allegations identify the agency or agencies involved, describe the nature of the constitutional violation, and explain the injuries sustained. This satisfies Rule 8's fair notice requirement.

Those are not conclusory, speculative allegations of the type rejected in *Case v. City of New York*, 233 F. Supp. 3d 372 (S.D.N.Y. 2017). *Case* rejected a plaintiff's inability to do more than say she "cannot rule out" that a particular named officer might have been the one who stepped on her face. Here, by contrast, Plaintiffs plead a coordinated operation pursuant to the Mutual Aid Agreement, agency participation, named on-scene officers, explained the Defendant officers' collective enforcement of the baseless curfew, described Defendant officers' presence during the arrests of individuals who had complied with the dispersal order (and individuals who were not involved in the protest) and multi-step uses of force and restraint supporting direct participation and failure-to-intervene theories.

### f.    The Complaint Includes Sufficient Allegations Relating to Tonawanda Officers

Tonawanda's Rule 8 and personal involvement arguments fail on the face of the pleading. Plaintiffs identify Tonawanda officers as participants in the operation and plead Tonawanda involvement in plaintiff-specific force and arrest events, including the Krull allegations. (Compl. ¶¶ 106, 192-193). The Complaint also alleges Tonawanda officers participated in the multi-agency "phalanx" that surged at 8:23 p.m. to enforce the curfew and in subsequent chases and arrests as the crowd dispersed. (Compl. ¶¶ 105, 108-109, 192-193, 333).

Tonawanda's contention that only one plaintiff can proceed ignores failure-to-intervene liability on behalf of all Plaintiffs. The identity and precise roles of individual Tonawanda officers are matters for discovery (including video, radio traffic, and deployment records) not a basis for dismissal at the threshold. At the pleading stage, Plaintiffs need only plausibly allege

that Tonawanda officers were present during the coordinated arrests and uses of force and had realistic opportunities to prevent constitutional violations committed in their vicinity.

### g. The Complaint Includes Sufficient Allegations Relating to Cheektowaga Officers

Cheektowaga's attempt to narrow the case to only the few plaintiffs whose narratives expressly name Cheektowaga personnel improperly collapses Rule 8 into a pre-discovery identification requirement. The Complaint pleads Cheektowaga participation in the coordinated mutual-aid operation and alleges that Cheektowaga officers were present during arrests and force events where failure-to-intervene liability plausibly applies. The Complaint likewise alleges Cheektowaga officers (named and Doe) participated in the multi-agency surge and in violent takedowns and arrests during and after dispersal, including the tackle of Jay Ayoub by unknown Cheektowaga officers and the assault and arrest of Noor Mohammed by Defendants Arnold and Rogers. (Compl. ¶¶ 34, 169, 194-197, 340).

Whether a particular Cheektowaga officer's role was direct participation, failure to intervene, or supervisory direction is a discovery question in this multi-officer setting. The Complaint alleges that Defendants' officers were present during the coordinated mass-arrest operation and had realistic opportunities to intervene to prevent constitutional violations committed by officers from other agencies. (Compl. ¶¶ 42, 52-55, 108-116, 175, 196-197). Plaintiffs allege that officers in close proximity witnessed colleagues tackle peaceful protesters, arrest individuals during prayer, forcibly dislodge religious garments, and use excessive force against nonresisting individuals. (Id. ¶¶ 83-90, 108-116, 122-124, 126, 195-199, 324). Cheektowaga officers allegedly participated in a coordinated operation at a confined location over a compressed timeframe. The coordinated nature of the operation, the geographic

concentration, and the simultaneous execution of arrests support a reasonable inference that Cheektowaga officers observed violations and had opportunities to intervene.

Cheektowaga's argument that it is "conspicuously absent" from the list of agencies in Complaint paragraph 108 is misleading and incorrect. (Dkt. No. 54-7, at 11). Paragraph 108 names only a subset of responding agencies by name and then refers to "the other Municipal Defendants that had been staging nearby." (Compl. ¶ 108.) That is not a vague "catch-all." It is a collective reference to many of the municipal defendants sued here, including Cheektowaga. (Compl. ¶ 34). Cheektowaga's suggestion that paragraph 108 separately names Evans, Orchard Park, and West Seneca is also wrong. (Dkt. No. 54-7, at 11).

Cheektowaga likewise cannot limit the allegations against it to "post-dispersal arrests." (Dkt. No. 54-7, at 16). The Complaint alleges that municipal agencies, including Cheektowaga, staged and then moved in together at Flint Loop at 8:23 p.m., during Maghrib prayer, and then participated in the ensuing chases and arrests. (Compl. ¶¶ 83-90, 104-116, 122-127).

To the extent Cheektowaga emphasizes the Complaint's allegations that UB officials, including President Tripathi, approved the curfew and instructed municipal agencies to enforce it through arrests, that allegation supports municipal involvement and liability. It does not negate it. (Dkt. No. 54-7, at 10 n.7; Compl. ¶¶ 76-77).

Cheektowaga's 'transient force' and cross-agency arguments are addressed in Count III, *infra*.

Cheektowaga's effort to have Officer Miller dismissed from the case fails at the pleading stage. The Complaint alleges that all Cheektowaga defendant officers, including Officer Miller, participated in the coordinated May 1, 2024 operation as part of the unified multi-agency response. Officer Miller is named as a defendant because he was deployed by Cheektowaga as

part of this coordinated operation. Discovery will establish Officer Miller's specific role, including where he was positioned, what violations he observed, what opportunities he had to intervene, and whether he directly participated in arrests or use of force. (Compl. ¶¶ 34, 42-45, 340).

In addition, the Second Circuit has explained the "appropriateness of maintaining supervisory personnel as defendants in lawsuits stating a colorable claim until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability." *Davis v. Kelly*, 160 F.3d 917, 921 (2d Cir. 1998); *Grayson v. City of Rochester*, No. 21-CV-6719-FPG, 2022 WL 16856661, at *4 (W.D.N.Y. Nov. 10, 2022) (declining to dismiss claims against a supervisory defendant "until Plaintiff has an opportunity to conduct discovery as to the identities of the Sheriff's deputies"); *Murphy v. Goord*, 445 F. Supp. 2d 261 (W.D.N.Y. 2006) (denying supervisor's motion to dismiss so that plaintiff could conduct discovery to ascertain identity of John Doe defendants).

Upon information and belief, Officer Miller is a Sergeant with the Cheektowaga Police Department who supervised Defendants Arnold, Rogers, and potentially other John Doe defendants.[1] At this stage, the Complaint identifies Officer Miller as a Cheektowaga Police Department officer and alleges that each Municipal Defendant Officer was present on UB's campus as part of the multi-agency response and either directly caused or failed to prevent the violations pleaded. (Compl. ¶¶ 42-45). Plaintiffs are entitled to discovery to identify which specific officers participated in each constitutional violation. Dismissing claims at the pleading stage would deprive Plaintiffs of this opportunity and reward Defendants for deploying

---

[1] To the extent that amending the Complaint to reflect the same would be useful at this stage, Plaintiffs request leave to do so.

overwhelming numbers of officers from multiple jurisdictions in a manner that makes individual identification difficult.

Cheektowaga's argument that officers from different agencies "may lack the practical authority or situational control necessary to meaningfully intervene" fundamentally misunderstands the nature of coordinated multi-agency operations executed pursuant to Mutual Aid Agreements. (Dkt. No. 54-7, at 40). When law enforcement agencies coordinate operations through formal Mutual Aid Agreements, they create unified command structures in which officers from different agencies operate as a single coordinated force. Under such circumstances, the "different agencies" distinction Cheektowaga invokes is inapplicable because the agencies have deliberately integrated their operations and created joint authority structures.

### h. The Complaint Includes Sufficient Allegations Relating to Amherst Officers

Amherst separately contends that the Complaint's length violates Rule 8. But Rule 8 does not impose a page limit; it asks whether defendants have fair notice. This case involves a planned, multi-agency deployment and mass-arrest operation at UB, with multiple departments (including Amherst and Buffalo) acting in concert pursuant to a mutual-aid request and a synchronized tactical response. (Compl. ¶¶ 5, 6, 33, 108-110, 324-326, 331-332). The Complaint is detailed because it must plead both the unified operation and each plaintiff's encounter, including post-dispersal chases and arrests in and around Capen Hall. (Id. ¶¶ 104-107, 122-129, 154-167, 194-199).

Amherst also mischaracterizes the Complaint as resting on "narrow facts" that end at 8:23 p.m. (Dkt. No. 50-1, at 9). That framing ignores the individualized allegations that follow. The Complaint alleges that most arrests and the most serious force occurred after 8:23 p.m., in

multiple locations, during chases and apprehensions away from Flint Loop and in or near Capen Hall. (Compl. ¶¶ 104-107, 162-176, 194-199). *Roberto's Fruit Mkt. v. Schaffer* is not comparable. It was a sprawling, redundant RICO complaint. 13 F. Supp. 2d 390 (E.D.N.Y. 1998). Here there are ten plaintiffs, each with a distinct arrest narrative, in a coordinated multi-agency operation. Rule 8 does not require ten separate complaints that repeat the same background allegations.

Nor can Amherst plausibly claim it lacks notice of why it is sued: Plaintiffs allege Amherst had jurisdiction over UB North Campus and played a lead role coordinating and executing the dispersal and arrests, and that Amherst officers were among the phalanx of "Municipal Defendant Officers" that charged the prayer circle and remaining protesters at 8:23 p.m. (Compl. ¶¶ 33, 108, 325-326). Plaintiffs further allege that supervisory officers from Amherst PD were present and actively involved in enforcement decisions and actions, including issuance and enforcement of the curfew order and the refusal to accommodate religious practices. (Id. ¶¶ 331-332). Where officers wore riot gear without visible identifiers and body-worn camera footage has been withheld or manipulated, plaintiffs cannot be required pre-discovery to identify which Amherst officer did what. (Id. ¶¶ 48-55, 200.) If Amherst genuinely seeks clarification, the remedy is Rule 12(e), not dismissal.

Amherst's "mere presence" cases, *Carey*, *Dispenza*, and *Burris*, are inapposite. Those decisions hold that an officer's incidental presence, without more, does not establish personal involvement. *See Carey v. Maloney*, 480 F. Supp. 2d 548, 557 (D. Conn. 2007). *See also Dispenza v. City of New York*, No. 19 CV 5645 (DG)(CLP), 2023 WL 11845608 (E.D.N.Y. Mar. 7, 2023). *See also Burris v. Whitney Cap.* Inc., 2021 WL 11443382 (E.D.N.Y. Feb. 25, 2021). Those cases do not involve allegations of a coordinated mass-arrest phalanx, pursuits of

dispersing demonstrators, or officers standing by while significant force was used at close range. (Compl. ¶¶ 108-114).

Here, Amherst officers are alleged to have been among the contingent that "charged into" the prayer circle and remaining protesters and then tackled, restrained, zip-tied, and handcuffed individuals who had complied with the dispersal order. Other officers pursued and took protesters to the ground away from the lawn. (Compl. ¶¶ 20-29, 108-114). Those allegations go well beyond incidental presence and also implicate a duty to intervene. *Perkins* is also distinguishable. Amherst is not a defendant named only in the caption. *See Perkins v. City of New York*, No. 14 CV 3779, 2017 WL 1025987 (S.D.N.Y. Mar. 15, 2017). The Complaint repeatedly identifies Amherst and Amherst officers as participants in the events at issue. (Compl. ¶¶ 33, 108-110, 325-326, 331-332).

Amherst repeatedly insists that the Complaint is contradictory and "internally inconsistent," but it does not identify a single actual contradiction. Rule 8 expressly permits pleading in the alternative, even if theories are "inconsistent." Fed. R. Civ. P. 8(d)(2)-(3). Amherst's supposed inconsistency is a false dichotomy. It is not contradictory to allege both (i) that Amherst and other municipalities failed to properly train and supervise officers on First Amendment assemblies and crowd control and (ii) that Amherst and other municipalities maintained a policy or custom of suppressing peaceful demonstrations. (Compl. ¶¶ 327, 344, 359). A policy of suppressing protest speech can be implemented through training and supervision that treats protected expression as a public-order problem to be stamped out. And policymakers can direct suppression while officers remain untrained on constitutional limits. The Complaint alleges both.

Amherst's reliance on *Azzarmi* is misplaced. *Azzarmi* dismissed a sprawling pro se pleading under Rule 8 because it was "labyrinthian" and failed to give coherent notice; Amherst's invocation of "internal inconsistency" (there, a passing observation about basic facts such as whether the plaintiff was charged) does not support dismissal here. *Azzarmi v. Neubauer*, No. 20-CV-9155 (KMK), 2024 WL 4275589 (S.D.N.Y. Sept. 24, 2024). *Azzarmi* did not hold that a civil-rights complaint must be dismissed whenever it pleads multiple municipal-liability theories, nor does it bless Amherst's attempt to label Plaintiffs' *Monell* allegations "inconsistent" simply because they include both a failure-to-train theory and a policy/custom theory.

Amherst also asserts that the Complaint "does not describe who gave orders, who effectuated arrests, or who used force." (Dkt. No. 50-1, at 5). That is incorrect. The Complaint identifies at least some of the senior officials who issued and reiterated the dispersal directive, including UBPD Chief Beaty and Major Fletcher. It also alleges a coordinated decision to send a multi-agency phalanx into the prayer circle and remaining protesters at 8:23 p.m. (Compl. ¶¶ 83-89, 108-116). The Complaint then sets out each Plaintiff's arrest and the force used, including arrests after dispersal, away from Flint Loop, and inside or near Capen Hall. (Compl. ¶¶ 104-107, 122-129, 154-167, 168-176, 194-199). At the pleading stage, ten civilians cannot reasonably be expected to identify each officer in a chaotic scene involving over a hundred officers from multiple agencies, many in riot gear without visible identifiers. (Compl. ¶¶ 48-55, 200). Those details are uniquely within Defendants' control and are the subject of discovery.

Amherst also mislabels Complaint paragraph 86 as a "dispersal order." Paragraph 86 describes Chief Beaty instructing officers to begin moving forward. It does not describe an audible, crowd-directed order that could supply individualized probable cause. (Compl. ¶ 86), Whether any order was clear, audible, lawful, and allowed compliance is a factual dispute that

cannot be resolved on a motion to dismiss. Amherst's claim that it cannot mount a defense without knowing each officer's role is not credible. Amherst and its officers have access to the information that would identify roles, including mutual-aid rosters, radio traffic, command logs, and body-worn camera footage. Rule 8's notice function is satisfied. The additional particulars Amherst seeks are for discovery.

## II.    The Court Should Not Resolve Disputed Facts on Rule 12(b)(6) Using Extrinsic Materials

### a.    Defendants' Reliance on Extrinsic Materials

Cheektowaga submits and relies upon body-worn-camera footage and urges the Court to treat that footage as "integral" to the Complaint, or otherwise to credit it over Plaintiffs' allegations.

Amherst similarly invokes an "integral document" and judicial-notice theory (citing, among other things, an alleged sunset time from the Old Farmer's Almanac and purported university policies) to argue that Plaintiffs received adequate warning and that their pleaded timeline is purportedly refuted.

### b.    Extraneous Documents Cannot Be Considered Unless Incorporated by Reference or Integral to the Complaint

On a motion to dismiss under Rule 12(b)(6), review is limited to the Complaint. Extraneous documents may be considered only if they are incorporated by reference or integral to the complaint. Even where documents are attached or referenced, plaintiffs need not adopt as true the full contents of such documents, but only the portions actually relied upon.

The Second Circuit limits the Rule 12 record to the complaint, documents attached to it, and documents incorporated by reference. A court may also consider a document "integral" only where the complaint relies heavily upon its terms and effect and there is no dispute as to the document's authenticity or accuracy. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006); *see Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995). It is not enough that a plaintiff merely had notice of the material. The complaint must actually rely on it in drafting. *Chambers*, 282 F.3d at 153 (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)).

### c. District Courts Uniformly Decline to Consider Bodycam Footage Not Referenced in the Complaint

District courts throughout this Circuit consistently reject defendants' attempts to introduce bodycam footage at the motion to dismiss stage, even where the plaintiff had viewed versions or where the complaint's allegations align with video content.

For example, in *Pluma v. City of New York*, the district court declined to consider a video offered by the defendants in support of their motion to dismiss because the video was not referenced in the complaint and was not relied upon in bringing the lawsuit.  No. 13-CV-2017, 2015 WL 1623828, at *3 (S.D.N.Y. March 31, 2015). In addition, "[t]he fact that evidence is inconsistent with a complaint's allegation is not a reason to consider it on a motion to dismiss." *Gonzalez v. City of New York*, No. 14 CIV. 7721 LGS, 2015 WL 6873451, at *5 (S.D.N.Y. Nov. 9, 2015); *see DiFolco,* 622 F.3d at 113 (finding district court erred in considering document that purportedly undermined a plaintiff's breach of contract claim where that document was neither incorporated in nor integral to the complaint).

Amherst's reliance on judicial notice and "integral document" doctrines does not expand the Rule 12 record. Cheektowaga's "integral footage" framing does not expand the record either, and neither doctrine permits the Court to credit Defendants' curated materials over Plaintiffs' pleaded facts. While a court may take judicial notice of facts that are "not subject to reasonable dispute," judicial notice cannot be used to adjudicate contested factual questions (including what warnings were actually given, how they were communicated to a dispersed crowd, what Plaintiffs heard and reasonably understood, and whether any purported policies were enforced or even known to protesters). *See* Staehr v. Hartford Fin. Servs. Grp., Inc., 547 F.3d 406, 425 (2d Cir. 2008). Nor can defendants convert a motion to dismiss into a credibility contest by selectively proffering materials that Plaintiffs did not rely upon in drafting the Complaint. *See Chambers v. Time Warner*, 282 F.3d at 152-53.

### d.  Plaintiffs Did Not Rely on Bodycam Footage in Drafting the Complaint

Courts consider video at the pleading stage only in the narrow circumstance where the plaintiff affirmatively relied on the recording in the complaint or expressly incorporated it by reference. See *Garcia v. Does*, 779 F.3d 84, 87 n.2 (2d Cir. 2015); *Nikci v. Quality Bldg. Servs.*, 995 F. Supp. 2d 240, 244 n.1 (S.D.N.Y. 2014); *Hershey v. Goldstein*, 938 F. Supp. 2d 491, 498 n.1 (S.D.N.Y. 2013*); Burck v. Mars, Inc.*, 571 F. Supp. 2d 446, 449 n.1 (S.D.N.Y. 2008).

To the extent the Complaint references the existence of body-worn-camera footage, Plaintiffs do not attach or incorporate any particular recording and do not adopt Defendants' curated clips or screenshots as an undisputed account of what occurred. Plaintiffs plead from their own experiences and other information, and they dispute Defendants' interpretation and the completeness of the excerpts. Under Second Circuit law, that is not enough to render Defendants' proffered footage integral to the Complaint or to permit dismissal based on Defendants' version

of disputed facts. *See DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010);

*Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). Critically, the Complaint does not cite,

quote, reference, incorporate, or rely on any Cheektowaga bodycam recording for any element of

any claim. (Compl. ¶¶ 52-55).

The Complaint does not attach or incorporate by reference Defendants' selectively

curated body-worn-camera clips, nor does it plead claims based on the "terms and effect" of any

specific recording. To the contrary, the Complaint alleges that FOIL-produced bodycam footage

was incomplete, often lacked audio, and frequently omitted identifying information, and that

officers manipulated cameras throughout the operation, making pre-discovery identification and

reconstruction difficult. (Compl. ¶¶ 52-55). While the Complaint cites certain non-Cheektowaga

bodycam and witness videos in limited ways (e.g., to corroborate targeting and the coordinated

phalanx), those limited references do not render the Cheektowaga recordings (or any other video)

"integral" or authorize the Court to resolve factual disputes by crediting Defendants' preferred

interpretation of selected clips. (Compl. ¶¶ 103, 108, 128-129, 163).

Cheektowaga's submission underscores why Defendants' "integral footage" premise

fails. It asserts, "***upon information and belief***," (while moving to dismiss) that the bodycam

footage referenced in the Complaint is the same Arnold and Rogers footage attached to the

Geelan Declaration. (Dkt. No. 54-6, Blenk Decl. ¶ 5.) But Plaintiffs cite multiple sources of

information, including bystander footage and Plaintiffs' own recordings. For example, the video

and audio that informed the allegations concerning Ms. Mohammed's takedown was captured on

Ms. Mohammed's personal cell phone while she was inside Capen Hall. It was not produced by

Cheektowaga in response to any FOIL request. *See* January 30, 2026 Declaration of Robert M.

Corp, Esq. ("Corp Decl.") ¶ 18. As explained in the Corp Declaration, that recording captures

Ms. Mohammed being rushed by multiple officers and tackled, and then continues (after the phone is knocked to the ground) with audio of officers' taunts and the dislodging of her religious garments. Corp Decl. ¶ 18. This is not the posture for weighing, comparing, and crediting selectively excerpted law-enforcement footage over Plaintiffs' pleaded allegations at Rule 12(b)(6).

Even if the Court were to consider Defendants' body-worn-camera footage, it would not warrant dismissal. The Complaint alleges, and Defendants' footage at most confirms, substantial force. Plaintiffs allege multi-officer tackles, pile-ons, and pinning of nonresistant individuals. During these arrests, Yousef Ahmed was violently tackled from behind and piled on by numerous officers. Jay Ayoub was tackled, pinned, struck, kneed, and left struggling to breathe. Majd Ayoub was rushed, tackled, and slammed after complying with commands. Noor Mohammed was rushed by multiple officers, slammed to the floor, and pinned, with her hijab and keffiyeh forcibly dislodged. (Compl. ¶¶ 162-167, 168-172, 173-176, 194-199, 336 (officers bragged that they "f**king blasted" Ahmed and celebrated the "linebacker tackle" of Ahmed, and explained that the crackdowns were "fun")).

And even if the Court were to accept Defendants' false, misleading, and bombastic characterizations of Plaintiffs' conduct, the degree of force used and alleged would still be sufficient to survive at this stage. *See infra* Section V(a) discussing Count III (Excessive Force).

### e. Considering the Bodycam Footage Would Require Conversion to Summary Judgment

If the Court considers video evidence outside the complaint, the motion must be converted to summary judgment under Rule 12(d), affording Plaintiffs an opportunity for discovery. At a minimum, conversion requires notice and a reasonable opportunity to take

discovery directed to the extrinsic materials. The alternative would violate due process by depriving Plaintiffs of the opportunity to develop a factual record.

Amherst's "sunset" and policy arguments fail even on their own terms. The Complaint pleads that officers announced a hard 8:23 p.m. deadline, refused a brief accommodation to complete prayer, and initiated forceful dispersal at 8:23 p.m. (Compl. ¶¶ 7-9, 83-90). Whether sunset in Buffalo occurred at the time Amherst cites on May 1, 2024 says nothing about whether Defendants provided constitutionally adequate fair warning, whether Plaintiffs were aware of that timing, whether the order was arbitrary and unsupported by policy, whether it was communicated effectively to a dispersed crowd, or whether officers' refusal to allow prayer to conclude was discriminatory or retaliatory. Amherst's citations to "integral document" cases, such as Weiss v. Village of Sag Harbor, 762 F. Supp. 2d 560, 567 (E.D.N.Y. 2011), do not authorize dismissal based on documents or web sources Plaintiffs did not rely upon in framing the Complaint.

### f. Cheektowaga's Brief Misapplies the 'Integral Footage' Precedent

Cheektowaga's effort to treat selective bodycam clips as dispositive "integral" materials is precisely the approach the Second Circuit has cautioned against. Where the Complaint does not rely on video footage, and where the parties dispute what the footage shows (or what is omitted), Rule 12(b)(6) does not permit the Court to credit Defendants' characterization of the recordings (as explained above). (Compl. ¶¶ 52-55).

Cheektowaga's submission of screenshots (rather than a full, authenticated recording in a Rule 56 posture) underscores why the Court should not treat these materials as dispositive. Still images are curated and stripped of temporal context, require factual inferences about what occurred immediately before and after the frame, and invite the Court to resolve factual disputes

about warnings, crowd dispersion, and officer-protester interactions. That kind of evidentiary weighing is improper on a Rule 12(b)(6) record. *See Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006) (integral-document review requires no dispute as to authenticity or accuracy).

### g.   Amherst's Request for Judicial Notice is Improper

Amherst's request to take judicial notice of a sunset time and then use that fact to resolve the adequacy of warnings and the reasonableness of enforcement is an improper merits determination on a Rule 12 record. The Complaint alleges that the basis for the 8:23 p.m. "curfew" was unclear and unsupported, that officers' megaphone announcements were constitutionally inadequate in a dispersed outdoor setting, and that officers refused a brief accommodation to allow Maghrib prayer to conclude. (Compl. ¶¶ 7-9, 76, 83-90, 93-98). To the extent Amherst relies on materials outside the Complaint, the proper path is discovery and, if appropriate, summary judgment. Not dismissal now.

Amherst's reliance on a single still image is equally misplaced. Amherst claims that a photograph reproduced in its brief undercuts Plaintiffs' allegations. (Dkt. No. 50-1, at 22). But the image is outside Capen Hall, after demonstrators had already dispersed from Flint Loop, and it does not depict anyone defying a dispersal order. (Compl. ¶¶ 104-107). A curated still image cannot defeat Plaintiffs' well-pleaded allegations on a motion to dismiss.

Amherst's attempt to justify the 8:23 p.m. crackdown by equating "overnight assemblies" with the moment of "sunset" is not supported by the pleadings. (*See* Dkt. No. 50-1, at 16). The operative UB policy language Amherst invokes concerns "overnight" events, not "night" events. (*See* Dkt. No. 50-1, at 16). Amherst offers no authority for the legal conclusion that an "overnight" assembly begins the instant the sun sets. The Complaint pleads the opposite. It defines "overnight" as lasting into the following day, alleges that the May 1 demonstration was

dismantled that evening, and alleges that UB has allowed large protests to continue into nighttime hours without police interference. (Compl. ¶¶ 90-94). Amherst's reliance on an almanac screenshot underscores why discovery is required on what UB's policy meant, how it was interpreted, and whether it was applied neutrally on May 1. (*See* Dkt. No. 50-1, at 9, n. 3).

### III.    Qualified Immunity and Probable Cause Are Fact-Intensive Defenses Inappropriate for Resolution at the Motion to Dismiss Stage

#### a.  Defendants Mischaracterize the Qualified Immunity Standard

The Amherst, Cheektowaga, and Tonawanda officers seek dismissal on qualified immunity by reframing May 1 as a routine, lawful "curfew" enforcement and insisting that, at minimum, they had arguable probable cause to arrest Plaintiffs for misdemeanors such as disorderly conduct and trespass. Buffalo and Erie County do not raise qualified immunity or probable cause, and the State Defendants do not raise those defenses in their partial motion. That effort fails at the pleadings stage for two independent reasons.

First, qualified immunity is an affirmative defense, and defendants bear the burden of proving it. *Outlaw v. City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018). It is ordinarily resolved on a developed record, not on the pleadings. *Edrei v. Maguire*, 892 F.3d 525, 532 (2d Cir. 2018). When defendants raise qualified immunity on a Rule 12(b)(6) motion, the Court must accept the Complaint's factual allegations as true and draw all reasonable inferences for Plaintiffs, including inferences that defeat the defense. *Id.*; *McKenna v. Wright*, 386 F.3d 432, 434-36 (2d Cir. 2004). Dismissal is proper only when the defense is established on the face of the Complaint. *McKenna*, 386 F.3d at 436.

Qualified immunity protects only individual officers from damages. It does not apply to municipal defendants. It also does not bar Plaintiffs' requests for injunctive or declaratory relief. *Rodriguez v. City of New York*, 72 F.3d 1051, 1065 (2d Cir. 1995).

Even if defendants later show that a campus curfew or dispersal directive was lawful on its face, that does not confer qualified immunity for unconstitutional enforcement. Officers had fair notice that constitutional rules must be enforced in a constitutional manner. *Field Day, LLC v. County of Suffolk*, 463 F.3d 167, 193-195 (2d Cir. 2006).

Second, even setting aside the procedural bar, the Complaint alleges conduct that violated clearly established First and Fourth Amendment principles governing the policing of peaceful demonstrations, including the "fair warning" requirement and the ban on mass arrests without individualized probable cause. *Jones v. Parmley*, 465 F.3d 46, 60 (2d Cir. 2006). Those principles have been clearly established in this Circuit for decades, and they foreclose qualified immunity here.

### b.  Qualified Immunity Faces a "Formidable Hurdle" at the Motion to Dismiss Stage

This action is exactly the kind of protest-policing dispute where qualified immunity cannot be decided on a paper record assembled by defendants. As the Second Circuit explained in *McKenna*, the defense faces a "formidable hurdle" on a qualified immunity defense at this stage of the pleadings. 386 F.3d at 434.

Plaintiffs allege a peaceful campus demonstration. They allege an ad hoc and shifting dispersal timeline, from "by dusk" to 8:23 p.m. They allege constitutionally inadequate warning and insufficient opportunity to comply. They allege a coordinated surge and mass arrest operation that continued after individuals dispersed. And they allege force that was objectively

unreasonable for a nonviolent, nonthreatening setting. (*See, e.g.*, Compl. ¶¶ 67-71, 79-90, 94-107, 108-127, 154-167, 194-199). Under *Edrei* and *McKenna*, defendants cannot obtain dismissal by disputing those allegations or inviting the Court to credit defendants' preferred narrative of lawful curfew enforcement.

Courts in this Circuit recognize that qualified immunity should typically not be decided at the pleading stage in excessive force cases because the Fourth Amendment reasonableness inquiry overlaps with the qualified immunity reasonableness inquiry. *Baumeister v. Erie Cnty.*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *5 n.10 (W.D.N.Y. Sept. 30, 2024). At a minimum, factual disputes that are material to objective reasonableness defeat qualified immunity. *Mickle v. Morin*, 297 F.3d 114, 122 (2d Cir. 2002). *Eaton v. Estabrook* illustrates the point in the protest setting. *Eaton* vacated qualified immunity because uncertainty about what the officer saw and the lack of warning required a factfinder. 144 F.4th 80, 90-97 (2d Cir. 2025).

### c. The "Fair Warning" and Individualized-Probable-Cause Requirements in Protest Contexts Preclude Qualified Immunity

#### i. Peaceful Protest Cannot be Dispersed Without constitutionally Adequate Notice and Justification

In *Jones*, the Second Circuit held that police may not interfere with orderly, nonviolent protest activity absent an "immediate threat to public safety, peace, or order," and emphasized that even when some demonstrators transgress the law, they "still enjoy[] First Amendment protection" and, absent imminent harm, officers may not disperse them "without giving fair warning." *Jones v. Parmley*, 465 F.3d 46, 56-60 (2d Cir. 2006) (*quoting Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)). *Jones* also rejected the notion that the constitutional protections for demonstrators were "too general" to be clearly established, explaining that the governing

principles were "well articulated" and that officers had fair notice of their obligations. *Jones*, 465 F.3d at 56-60.

*Edrei* applied *Jones* in the protest-dispersal context and held that officers had "fair warning" that the prohibition on excessive force applies to protesters. 892 F.3d at 540-41. Critically for this case, *Edrei* reiterates that protest dispersal may be permissible only when faced with an "immediate threat," and that officers must still provide adequate warning and avoid unreasonable force. *Edrei*, 892 F.3d at 539-41 (citing *Jones*). At the motion to dismiss stage, *Edrei* affirmed denial of qualified immunity where protest plaintiffs plausibly alleged excessive force used to disperse them. *Edrei*, 892 F.3d at 541-42.

Accepting the Complaint's allegations as true, the *Jones/Edrei* framework squarely governs here. Plaintiffs allege a peaceful protest on a campus lawn, followed by an abrupt coordinated enforcement action at 8:23 p.m. while prayer was underway, after a public message that the deadline was "by dusk" and amid confusion about the actual enforcement time and meaning of compliance. (Compl. ¶¶ 67-71, 79-90, 94, 108-110). On those facts, no reasonable officer could believe that mass arrests and force were constitutionally permissible without a constitutionally adequate warning and opportunity to comply.

### ii.  Mass Arrests Require Individualized Probable Cause

Defendant officers' 'arguable probable cause' theory also fails because the Complaint alleges mass arrests and seizures in a protest setting where individualized suspicion (and individualized opportunity to comply) is required. In *Dinle*r, the court denied summary judgment on qualified immunity in a demonstration case because the Fourth Amendment does not permit arrests untethered to "individualized probable cause"; officers could be entitled to qualified immunity only if they actually believed that "every individual arrested personally violated the

law." *Dinler v. City of New York*, No. 04 Civ. 7921, 2012 WL 4513352 (S.D.N.Y. Sept. 30,

2012). *Dinler* also emphasized that protest policing requires more than a generic "leave"

command: officers must provide a meaningful opportunity to comply and may not treat peaceful

demonstrators as a unified group when only some violate the law. *Dinler*, 2012 WL 4513352, at

*11.

Those principles are devastating at Rule 12 here because Plaintiffs specifically allege that

(a) the warning was confusing and constitutionally deficient, and (b) multiple plaintiffs were

arrested after dispersing or away from the protest site (including arrests inside or near Capen

Hall), and one plaintiff was not at the protest at all when assaulted and arrested. (Compl. ¶¶ 20-

29, 104-107, 122-127, 162-167, 194-199). If those allegations are true, as they must be taken at

this stage, there is no arguable probable cause to arrest "every individual" swept up, and

qualified immunity cannot be resolved in defendants' favor. *Dinler*, 2012 WL 4513352.

Amherst's reliance on *Mediavilla v. City of New York* is misplaced. *Mediavilla* involved a

protester who repeatedly approached and remained within arm's length of an officer using a

bullhorn, and who continued yelling in the officer's face after repeated orders to stop. 259 F.

Supp. 3d 82 (S.D.N.Y. 2016). Here, Plaintiffs allege they were peaceful, attempted to comply,

and were arrested and subjected to force after dispersal (Compl. ¶¶ 20-29, 83-90, 104-107, 108-

115, 162-176, 194-199). Crediting those allegations, probable cause and arguable probable cause

are lacking, and qualified immunity cannot be resolved at the pleading stage.

     **iii.  Supervisors and On-Scene Commanders Face Liability Where the
Complaint Alleges They Directed Mass Arrests and Gave Inadequate
Dispersal Orders**

Defendant officers also cannot evade the fair-warning/individualized-cause problem by implying that any deficiencies were attributable to "policy" decisions made elsewhere. Where a supervisory officer or on-scene commander makes the determination to engage in mass arrests and gives inadequate dispersal orders, those allegations suffice to plead personal involvement and defeat dismissal. *See Case v. City of New York*, 233 F. Supp. 3d 372 (S.D.N.Y. 2017) (allegations that supervisory officer directed subordinates to make mass arrests to prevent protest activity, and gave inadequate dispersal orders, adequately pleaded personal involvement in false arrest/excessive detention claims).

Here, Plaintiffs allege a coordinated multi-agency operation (planned, directed, and executed as a single dispersal-and-arrest event) followed by pursuit and arrests after dispersal. (Compl. ¶¶ 83-90, 100-107, 121-127). Under *Case*, those allegations foreclose dismissal based on the theory that particular defendants can hide behind 'someone else's order' or behind the operational complexity of a joint action.

### d.  Clearly Established Excessive-Force Principles Independently Defeat Qualified Immunity

*Eaton v. Estabrook* is directly on point. The Second Circuit vacated a grant of qualified immunity on an excessive force claim arising from protest policing. The court held that *Amnesty America*, *Jones*, and *Edrei* gave officers fair notice that substantial, gratuitous force against nonresisting protesters is unconstitutional. It also rejected the argument that a plaintiff must find a fact-matched protest case before qualified immunity can be denied. 144 F.4th 80, 95-97 (2d Cir. 2025). *Eaton* turned on the disputed facts about what the officer saw in a chaotic protest setting. *Id.* at 90-93, 96-97.

In the excessive-force context, dismissal on qualified-immunity grounds is rarely appropriate at Rule 12 because the Fourth Amendment "objective reasonableness" analysis substantially overlaps with the qualified-immunity "reasonableness" inquiry. Where the pleaded facts plausibly show objectively unreasonable force, qualified immunity typically cannot be resolved without a factual record. *Spencer v. Sullivan County*, 2019 WL 4514011, at *7 n.5 (S.D.N.Y. Sept. 19, 2019) (quoting Wang v. Vahldieck, 2012 WL 119591, at *11 (E.D.N.Y. Jan. 9, 2012)). *See also Baumeister v. Erie Cnty.*, No. 23-CV-1150-LJV, 2024 WL 4362311, at *5, n.10 (W.D.N.Y. Sept. 30, 2024). Defendants may renew qualified immunity on summary judgment after discovery.

Even apart from the illegality of mass arrest without fair warning and individualized cause, Plaintiffs also allege objectively unreasonable force. The Second Circuit recently reaffirmed that where officers initiate force without warning or opportunity to comply, qualified immunity is not available if clearly established law would put a reasonable officer on notice that the force was unlawfully excessive. *Benny v. City of Long Beach*, No. 22-1863, 2023 WL 8642853 (2d Cir. Dec. 14, 2023) (summary order) (accepting allegation that plaintiff was not given opportunity to comply before being thrown to the ground and affirming denial of qualified immunity on excessive force).

That principle applies with even greater force in the protest context alleged here, where Plaintiffs assert they were tackled, pinned, punched and kneed after restraint, and zip-tied excessively tight during a peaceful demonstration and after retreating. (Compl. ¶¶ 108-115, 126, 162-176, 194-199). Under *Edrei* and *Benny*, those allegations plausibly describe force that no reasonable officer could believe was lawful, particularly in a setting where Plaintiffs allege they

posed no immediate threat and many were attempting to comply or were not engaged in any unlawful conduct at the time of seizure.

### e.   Claim- and Defendant-Specific Applications Appear Below

To the extent defendants invoke qualified immunity against Plaintiffs' state-law claims, dismissal is not warranted. Where the state-law claims rest on the same facts that drive the federal claims, the defense turns on the same disputed reasonableness questions and cannot be resolved on a Rule 12 motion. *Jones v. Parmley*, 465 F.3d 46, 64 (2d Cir. 2006).

For efficiency and to avoid repetition, Plaintiffs address Defendant officers' probable-cause, 'arguable probable cause' and qualified-immunity arguments as applied to the Fourth Amendment seizure/force claims (including Counts III, IV, XVIII, and XIX) and the First Amendment retaliation theories (Counts I and II) below, where the analysis is tethered to (i) the adequacy and audibility of the dispersal orders, (ii) whether Plaintiffs had a meaningful opportunity to comply, (iii) whether individualized probable cause existed for each plaintiff, and (iv) the objective reasonableness of the force used in the circumstances alleged.

## IV.   Plaintiffs Plausibly Plead First and Fourteenth Amendment Violations (Counts I, II, V, VI)

Buffalo and Erie County do not move to dismiss Counts I, II, V, or VI. (Dkt. Nos. 63-1, 51-4). The State Defendants do not move to dismiss Count I, Count V, or Count VI, and their Count II challenge is limited to President Tripathi. (Dkt. No. 49-1). Tonawanda does not move to dismiss Count V. (Dkt. No. 46-1.)

Several Defendants try to reframe this case as routine enforcement of neutral campus "time, place, and manner" rules. The Complaint alleges far more. It pleads a coordinated, multi-

agency crackdown on a peaceful, student-led protest. It pleads an ad hoc dispersal order with shifting and contradictory deadlines. It pleads mass arrests and force, including arrests of individuals who had already dispersed or were not participating in the protest. And it pleads selective enforcement and religious targeting that plausibly reflect viewpoint discrimination. (Compl. ¶¶ 56-57, 67-71, 79, 83-90, 94, 103-107, 122-127, 154-167, 185-200, 223-231, 324). Accepting those allegations as true, Plaintiffs plausibly plead First and Fourteenth Amendment violations in Counts I, II, V, and VI.

### a. Count I (Speech, Assembly, Petition): Suppression and Retaliation for Protected Protest Activity

#### i. The Constitutional Right to Protest is Clearly Established

The Second Circuit has held that "police may not interfere with orderly, nonviolent protests merely because they disagree with the content of the speech or because they simply fear possible disorder." *Jones v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006). And public demonstrations may be restricted only where there is "clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order." *Jones*, 465 F.3d at 57 (quoting *Cantwell v. Connecticut*, 310 U.S. 296, 308 (1940)).

Plaintiffs allege the May 1 protest was peaceful. Protesters sat on a lawn, chanted, displayed signs, and prayed. After being directed earlier in the day, they removed any tents within minutes. (Compl. ¶¶ 67-71, 135). They further allege there was no violence, no threat to public safety, and no obstruction of traffic or university operations. Some Plaintiffs were arrested away from the lawn after they had already dispersed, and Plaintiff Noor Mohammed was seized and arrested inside Capen Hall. (Compl. ¶¶ 20-29; 122-127, 194-199). These allegations more

than suffice to plead protected activity and a lack of any "immediate threat" that could justify

abrupt dispersal and mass arrest at the pleading stage.

### ii.  Fair Warning Is Required Before Dispersal

Even where some demonstrators have transgressed the law, protesters "still enjoy[] First

Amendment protection, and absent imminent harm, the troopers could not simply disperse them

without giving fair warning." *Jones*, 465 F.3d at 60.

Fair warning and fair notice are especially critical where, as here, the dispersal order

itself is the pivot point between lawful presence and mass arrest. *See City of Chicago v. Morales*,

527 U.S. 41, 56 (1999); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). The

Complaint plausibly alleges the warning here was constitutionally deficient for multiple

independent reasons:

- Vagueness and shifting deadlines. The initial public announcement of a "curfew" issued

  around 7:00 p.m. stated that the protest must end "by dusk." UB's student newspaper

  reported dusk would be 8:48 p.m. (Compl. ¶ 79). Defendants then announced an 8:23

  p.m. deadline, 25 minutes earlier, creating confusion and failing to provide fair notice of

  when enforcement would begin. (Compl. ¶¶ 79, 83-85, 89-90).

- Inadequate communication. Plaintiffs allege that megaphone announcements to a

  dispersed crowd on a large outdoor lawn were insufficient to ensure all participants

  received and understood the order, particularly individuals positioned away from the

  speaker or preparing for prayer. (Compl. ¶¶ 83, 85, 95-96).

- Insufficient opportunity to comply and no opportunity for safe egress. Plaintiffs allege

  they were given little time to comply, were not provided clear routes or a meaningful

opportunity to leave, and were effectively kettled as officers advanced. (Compl. ¶¶ 95,
109, 115, 189-190).

- Interference with mandatory prayer. Plaintiffs allege officers announced and enforced the
  8:23 deadline while Muslim protesters were preparing for mandatory Maghrib prayer.
  They allege officers refused requests for a brief accommodation to complete that prayer
  and then arrested individuals while kneeling in prayer positions. (Compl. ¶¶ 81, 83-85,
  89, 96-101).

Defendants' reliance on cases arising from the summer 2020 demonstrations does not
warrant dismissal. Those cases involved formally issued emergency orders with defined start
times, geographic scope, and published parameters, and courts still examined whether police
provided a realistic opportunity to comply. *See, e.g.*, *In re New York City Policing During
Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 401-02 (S.D.N.Y. 2021) (analyzing curfew
orders as time, place, and manner restrictions). Likewise, in *Meyers v. City of New York*, the
Second Circuit affirmed dismissal on a record involving a written closure order and clear
directions to leave before arrests were made. 812 F. App'x 11, 15 (2d Cir. 2020) (summary
order). By contrast, Plaintiffs allege that UB's own communications shifted from "dusk" to a
specific 8:23 p.m. deadline, officers refused a brief accommodation for time-sensitive prayer,
and arrests began without a meaningful opportunity for compliance or safe egress. (Compl. ¶¶
79, 83-85, 89, 95-98, 109, 115). That is exactly the kind of fact-dependent dispute that cannot be
resolved on a motion to dismiss.

Cheektowaga's assertion that the curfew was "apparently lawful" is unsupported. (Dkt.
No. 54-7, at 12). Cheektowaga identifies no written UB policy and no statutory or regulatory
authority that would permit a multi-agency task force to arrest students and observers for being

on campus after a brief post-sunset cutoff, including individuals who had already left Flint Loop and retreated inside or near Capen Hall. (Compl. ¶¶ 79-90, 102-107, 122-127, 194-199). At the pleading stage, the Court must credit Plaintiffs' allegation that the curfew and dispersal cutoff were baseless and enforced without fair notice. (Compl. ¶¶ 79-90).

Cheektowaga's heavy reliance on *Mesa v. City of New York* is also misplaced. *Mesa* was decided on summary judgment on a developed record involving an unlicensed gathering and a lawful order to disperse. 2013 WL 31002 (S.D.N.Y. Jan. 3, 2013). It does not support dismissal of claims challenging an ad hoc dispersal cutoff at a public university, particularly where Plaintiffs plead viewpoint discrimination, lack of notice, and unnecessary force.

### iii.   The Dispersal Order Was Not Content-Neutral

Even a facially neutral restriction violates the First Amendment if it is adopted or enforced because of disagreement with the message conveyed. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). And an on-the-spot dispersal order is no exception; it must be justified and applied without viewpoint discrimination. *See Case v. City of New York,* 233 F. Supp. 3d 372, 391-92 (S.D.N.Y. 2017).

The Complaint pleads multiple facts supporting a plausible inference that Defendants' dispersal decision and enforcement were viewpoint discriminatory:

- Governor's directive. The Complaint alleges that Governor Hochul sent a letter to all New York college and university presidents on April 29, 2024, two days before the protest. Plaintiffs allege the letter urged security preparations specifically against pro-Palestinian protests, directed campuses to "aggressively guard," and stated that "extensive security preparations . . . must be considered now." (Compl. ¶ 56).

- Selective enforcement. Plaintiffs allege counter-protesters expressing pro-Israeli viewpoints and making racist remarks were permitted to remain while pro-Palestinian protesters were violently arrested. (Compl. ¶¶ 103, 127, 287, 289, 293, 436). On these allegations, the differential response supports an inference of discriminatory intent.

- Disparate treatment of prior protests. Plaintiffs allege UB tolerated other politically controversial campus events and protests that extended beyond sunset without police interference, including protests against Allen West (2003) and Michael Knowles (2023). (Compl. ¶ 94). They allege the heightened response here was motivated by the specific pro-Palestinian message. (Id.).

- Targeting of Muslim protesters. Plaintiffs allege officers targeted visibly Muslim individuals, including those wearing hijabs and keffiyehs, forcibly removed religious garments, and arrested individuals during prayer. (Compl. ¶¶ 83-90, 103, 108-110, 126, 195-199). Those allegations support the inference that religious targeting and viewpoint discrimination were intertwined.

- Arbitrary enforcement. Plaintiffs allege shifting and arbitrary enforcement of an "overnight" policy that had not been uniformly applied, combined with the sudden imposition of a specific 8:23 p.m. deadline.

UB's policy restriction concerns "overnight" assemblies, meaning assemblies that continue into the following day. (Compl. ¶¶ 91, 160). Plaintiffs allege that the May 1 demonstration was dismantled that evening and was not an overnight assembly. (Compl. ¶¶ 90-94). Amherst cannot convert a brief post-sunset period into an "overnight" assembly to justify dispersal, especially where the 8:23 p.m. deadline was abruptly announced and selectively enforced. (Compl. ¶¶ 83-90).

Those allegations plausibly plead viewpoint discrimination in both the decision to disperse and the manner of enforcement.

At the Rule 12(b)(6) stage, those allegations must be accepted as true, and they plausibly state that the May 1 dispersal and mass arrest were not a content-neutral "time, place, and manner" restriction but a viewpoint-discriminatory suppression of protected expression.

### iv.   Universities Require Heightened Protection of Constitutional Freedoms

The Supreme Court has emphasized that "[t]he college classroom with its surrounding environs is peculiarly the 'marketplace of ideas.'" *Healy v. James*, 408 U.S. 169, 180 (1972). It has also observed that "[t]he vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools." *Shelton v. Tucker*, 364 U.S. 479, 487 (1960).

This Court has likewise recognized that UB and its officials may violate the First Amendment and Equal Protection Clause through discriminatory treatment of campus expression and unequal enforcement. *See Center for Bio-Ethical Reform, Inc. v. Black*, 234 F. Supp. 3d 423, 436 (W.D.N.Y. 2017) (denying motion to dismiss where plaintiffs plausibly alleged discriminatory treatment of campus speech and unequal enforcement at UB).

Here, the University at Buffalo, a state institution, coordinated with multiple law enforcement agencies (the Municipal Defendants) to suppress a peaceful student-led protest on a matter of significant public concern. The involvement of university officials, including President Tripathi's approval of the dispersal and *persona non grata* designations, implicates heightened First Amendment scrutiny applicable to public educational institutions. Those allegations state a plausible suppression of speech and association in the university "marketplace of ideas."

### v. Retaliation Claims Are Adequately Pleaded

To plead First Amendment retaliation, Plaintiffs must allege protected activity, adverse action, and a causal connection, *i.e.*, facts permitting a plausible inference that Defendants' actions were motivated (at least in part) by the protected activity. *See Dorsett v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

Plaintiffs have alleged all three elements. They allege core protected activity, peaceful protest, association, and prayer, and adverse actions that would deter an ordinary person, including mass arrests, force, and campus bans or persona non grata designations. (Compl. ¶¶ 67-71, 122-127, 154-167, 194-199, 223-231, 324). They also allege circumstantial facts supporting retaliatory motive, including political pressure directed at pro-Palestinian campus protests, selective enforcement against pro-Palestinian protesters as compared to contemporaneous counter-protesters, and close temporal proximity between protected speech and the coordinated police action. (*Id.* ¶¶ 56-57, 83-90, 103-107, 127, 154-167). Defendants' efforts to recast these allegations or to import an alternate narrative are improper at Rule 12(b)(6).

### b. Count II (Right to Record) — Retaliation for Recording Public Officials

Recording police activity in public and gathering information about government conduct are protected First Amendment activities, subject to reasonable limitations. *See Higginbotham v. City of New York*, 105 F. Supp. 3d 369, 380-81 (S.D.N.Y. 2015). New York has also codified the right of persons not in custody to record law enforcement activity. N.Y. Civ. Rights Law § 79-p(2).

Plaintiffs allege that Noor Mohammed was observing and recording police activity when she was seized and arrested inside Capen Hall, and that Defendants targeted recording and

journalistic activity during the dispersal operation. (Compl. ¶¶ 194-195, 251-258). he Complaint further alleges that Ms. Mohammed did not participate in the demonstration or the prayer circle, dispersed from Flint Loop, and went inside Capen Hall to avoid conflict with officers. (Compl. ¶¶ 194-196). Those allegations plausibly state a First Amendment Right to Record claim at this stage. Defendants' contrary factual narrative, premised on disputed events and extrinsic body-camera footage, is not a basis for dismissal. (*See* Section II).

Cheektowaga also asks the Court to credit its extra-pleading narrative that "numerous" other students were filming without incident, and that Ms. Mohammed was arrested only after she kicked a door or otherwise engaged in conduct independent of her recording. (Dkt. No. 54-7, at 15-16; Blenk Decl. ¶ 12). Those assertions rest on Cheektowaga's disputed interpretation of body-worn camera footage and do not appear in the Complaint. They are not a basis for dismissal. Blenk Decl. ¶ 12 does not establish that no other person who was recording was arrested that evening. It states only that, in a brief clip, no action was taken against two other students filming in the immediate vicinity at that moment. It is unclear how Cheektowaga could possibly know whether any of the other individuals who were recording were later arrested, as the Plaintiffs in this lawsuit do not make up all individuals arrested during the May 1, 2024 incident.

Plaintiffs also allege that Mr. Ahmed and Ms. Krull were recording police activity with their respective phones at the time that police chose to arrest them, and that their recording activity was the reason for the arrests. (Compl. ¶¶ 252-255).

To the extent State Defendants argue Count II fails as to President Tripathi, the Complaint alleges he approved the coordinated dispersal and mass-arrest operation directed at

the protest itself. (Compl. ¶¶ 75-77, 251). Those allegations plausibly plead personal

involvement in the adverse action and are addressed further in Section I.

### c. Count V (Equal Protection) — Selective Enforcement / Discriminatory Treatment

Amherst and Cheektowaga are the only moving defendants that seek dismissal of Count

V. Tonawanda does not move to dismiss Count V, and Buffalo, Erie County, and the State

Defendants do not seek dismissal of Count V. (Dkt. Nos. 50-1, 54-7, 46-1, 63-1, 51-4, 49-1).

The Equal Protection Clause prohibits selective enforcement and discriminatory

treatment based on impermissible considerations, including intent to inhibit constitutional rights

and discrimination based on religion or viewpoint. *See Brown v. City of Oneonta*, 221 F.3d 329,

337 (2d Cir. 2000); *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980). At the pleading

stage, Plaintiffs need only allege facts supporting a plausible inference of differential treatment

and discriminatory intent; they are not required to prove their comparators or intent before

discovery. *Hu v. City of New York*, 927 F.3d 81, 91-92 (2d Cir. 2019).

Plaintiffs plausibly plead both elements. They allege differential treatment at the same

event. Pro-Palestinian protesters engaged in peaceful assembly were subjected to dispersal, mass

arrests, and force, while contemporaneous counter-protesters expressing opposing views were

permitted to remain and, on the pleaded facts, engaged in harassment and racist remarks without

comparable enforcement. (Compl. ¶¶ 83-90, 103-107, 122-127, 287, 289, 293). Plaintiffs also

allege differential treatment within the pro-Palestinian group. On body camera footage, non-

Muslim-presenting pro-Palestinian protesters can be seen screaming "free Palestine" and "f**k

12" at officers without retribution, while Muslim protesters were arrested. (Compl. ¶ 131).

Amherst and Cheektowaga argue pro-Israel counter-protesters were not similarly situated because they did not violate the dispersal order. Amherst argues there are "no allegations" that Israeli-supporting individuals outside Capen Hall failed to comply with a dispersal order and that, accordingly, they were not similarly situated with the Pro-Palestinian supporters. (Dkt. No. 50-1, at 22-23). But Plaintiffs allege that the Palestinian-supporting individuals arrested outside or inside Capen Hall had already dispersed from Flint Loop and were not defying any order. (Compl. ¶¶ 104-107, 162-167, 194-199). On these pleadings, differential enforcement in that post-dispersal setting states a plausible selective-enforcement claim.

Plaintiffs also allege disparate treatment compared to other UB protests and events, including other controversial speakers and protests that occurred without a militarized crackdown. (Compl. ¶ 94). The Complaint also describes Defendant officers joking about the protest and protesters, including an officer stating, "Hopefully they didn't plant an IED in there." (Id. ¶ 132). Those allegations plausibly support discriminatory intent and differential treatment.

The Complaint further alleges discriminatory targeting of Muslim protesters and religious attire during arrests, including interference with Maghrib prayer and forcible removal of a hijab and keffiyeh. (Compl. ¶¶ 96-103, 125-126, 197-199). Whether Defendants' conduct was incidental or discriminatory is a factual question. Defendants cannot defeat Count V at Rule 12(b)(6) by invoking extrinsic body-camera footage or by demanding proof beyond what Rule 8 requires. (*See* Section II.)

### d. Count VI (Free Exercise and Equal Protection) — Interference with Prayer / Religious Discrimination

Plaintiffs also plausibly plead Free Exercise and Equal Protection violations based on alleged deliberate interference with mandatory Maghrib prayer and targeting of Muslim religious

practice and attire. Government action that is not neutral toward religion, or that targets religious conduct, triggers heightened scrutiny under the Free Exercise Clause. *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531-32 (1993); *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990).

Here, Plaintiffs allege officers announced and enforced the 8:23 p.m. dispersal deadline while Muslim protesters were preparing for time-sensitive prayer, refused requests for a brief accommodation to complete that prayer, and then arrested individuals while they were kneeling in prayer. (Compl. ¶¶ 83-85, 89, 96-101). They also allege officers forcibly removed Noor Mohammed's hijab and keffiyeh during arrest and initially refused to permit readjustment. (Compl. ¶¶ 197-199). Plaintiffs further allege that, after dislodging her hijab, an officer photographed her without her hijab while she was handcuffed and in distress. (Compl. ¶ 198). Majd Ayoub alleges he attempted to assist Ms. Mohammed with her displaced religious attire while she was handcuffed, and officers shoved him away and arrested him. (Compl. ¶¶ 173-176). These allegations are not incidental effects of a neutral rule; they plausibly allege targeted interference with religious exercise and discriminatory enforcement. At minimum, they raise factual questions about neutrality, general applicability, and intent that cannot be resolved on a motion to dismiss.

For all of these reasons, Defendants' motions to dismiss Counts I, II, V, and VI should be denied.

## V.    Plaintiffs Plausibly Plead Fourth Amendment Violations For Excessive Force and False Arrest (Counts III, IV)

Only Amherst, Cheektowaga, and Tonawanda seek dismissal of Counts III and IV. Buffalo and Erie County do not. The State Defendants do not. (Dkt. Nos. 50-1, 54-7, 46-1, 63-1, 51-4, 49-1).

Counts III and IV arise from Defendants' seizures of Plaintiffs during the May 1, 2024 protest at the University at Buffalo. The Complaint alleges that officers from multiple agencies used violent takedowns, pile-ons, and painful restraints on nonviolent individuals who were praying, filming, or dispersing, causing concrete physical injuries and significant emotional trauma. (Compl. ¶¶ 104-116, 154-199, 262-266). At the pleading stage, those well-pleaded allegations must be accepted as true, and they plausibly state Fourth Amendment claims for excessive force (Count III) and arrest without probable cause (Count IV).

### a. Count III (Excessive Force)

#### i. Every Plaintiff Alleges Substantial Force and Injury

The Cheektowaga Defendants urge the Court to view these events through the narrow lens of "de minimis" injury. That framing is backwards. The Fourth Amendment analysis begins with the force used and the circumstances confronting the officers.

Here, each Plaintiff pleads that officers used significant force, often in multi-officer takedowns and pile-ons, despite the absence of violence, weapons, or any immediate threat, and each pleads resulting injury. (Compl. ¶¶ 70-72, 82, 104-108, 164-199).

- Yousef Ahmed. Officers chased and tackled him from behind. Multiple officers piled on, and his head was slammed into the ground. He suffered a concussion and thumb nerve damage requiring medical care. (Compl. ¶¶ 162-167).

- Jay M. Ayoub. Officers tackled and pinned him. Plaintiffs allege officers punched and kneed him while compressing his chest and wrenching his arms, and that he feared for his life because he could not breathe. He was treated at a hospital and suffered bruised ribs, a shoulder sprain, and other injuries. (Compl. ¶¶ 168-172).

- Majd Ayoub. After being told to "back up" and complying, he was tackled and slammed to the ground by multiple officers and zip-tied. He suffered injuries to his shoulder, arm, and hip. (Compl. ¶¶ 173-176).

- Elvi Jo Dougherty. Plaintiffs allege officers zip-tied her so tightly that her hands became numb and discolored. Her repeated requests to loosen the restraints were refused. (Compl. ¶¶ 177-178).

- Soliegh M. Dougherty. While linking arms, officers swept her legs and slammed her to the ground face-first. Plaintiffs allege she was pinned by at least three officers. She suffered deep bruising, abrasions, and emotional trauma. (Compl. ¶¶ 179-180).

- Jazmine C. Frazier. Plaintiffs allege officers shoved, tackled, and pinned Plaintiff Frazier to the pavement. After zip ties failed, officers tackled and pinned Plaintiff Frazier again and then handcuffed them. Plaintiff Frazier suffered bruises and required treatment for psychological injury. (Compl. ¶¶ 181-185).

- Timothy P. Georger. Plaintiffs allege officers ripped his shirt during his arrest and handed him off to be zip-tied. He suffered emotional distress from the violent seizure. (Compl. ¶¶ 186-187).

- Ibrahim Khatib. Shoeless due to prayer, he attempted to disperse when police advanced. Plaintiffs allege multiple officers tackled him from behind and zip-tied him tightly, injuring his wrists and causing numbness. (Compl. ¶¶ 105, 188-190).

- Hannah R. Krull. While filming from a distance, she was tackled face-first into the ground and pinned by multiple officers. She suffered shoulder injury and abrasions. (Compl. ¶¶ 191-193).

- Noor A. Mohammed. After moving inside Capen Hall to comply, she was grabbed by her backpack, slammed to the floor, and pinned by multiple officers. Plaintiffs allege her hijab and keffiyeh were forcibly dislodged. She suffered bruising and severe emotional distress. (Compl. ¶¶ 102, 194-199).

### ii.   Under *Graham*, the Alleged Force Is Objectively Unreasonable

Under the Fourth Amendment, the question is whether the force used was objectively reasonable under the circumstances. *See Graham v. Connor*, 490 U.S. 386, 396 (1989) (reasonableness depends on, inter alia, the severity of the suspected offense, whether the suspect poses an immediate threat, and whether the suspect is actively resisting or attempting to flee). This is a fact-intensive inquiry that rarely can be resolved on a Rule 12(b)(6) record.

Accepting the Complaint's allegations, none of the *Graham* considerations support the level of force used here. Plaintiffs allege the demonstration was peaceful and orderly, with no threats, weapons, vandalism, or violence. (Compl. ¶¶ 3, 70-72, 82). Plaintiffs further allege they were praying, filming, standing peacefully, or dispersing, yet were tackled to pavement, piled on, kneed or punched, had heads slammed into hard surfaces, and were restrained with painfully tight zip-ties that officers refused to loosen. (Compl. ¶¶ 104-108, 164-199). On these allegations, Count III is plausibly pleaded.

### iii.   Defendants' "De Minimis Injury" and "Flight/Interference" Arguments Do Not Support Dismissal

First, Defendants' attempt to recharacterize Plaintiffs' injuries as "de minimis" fails for two independent reasons. In the Fourth Amendment context, injury severity is not a pleading gatekeeper. Instead, the core issue is whether the force was reasonable. And even if injury were dispositive (it is not), Plaintiffs allege far more than momentary discomfort: concussion and nerve damage (Ahmed), hospital treatment and rib/shoulder injuries (Ayoub), deep bruising and abrasions (Soliegh Dougherty), and bruising, numbness, and other physical harms alongside documented emotional injury. (Compl. ¶¶ 164-199).

Second, several moving defendants assert that certain Plaintiffs were 'fleeing' or 'interfering,' and therefore any force was justified. But the Complaint alleges the opposite: Plaintiffs were dispersing as directed (or had already dispersed), were not threatening officers, and were not actively fleeing in any way that could justify violent takedowns. (Compl. ¶¶ 104-107, 165, 173, 187, 190, 193; *see also* Compl. ¶¶ 263-264). At minimum, Defendants' contrary narrative raises fact disputes that cannot be resolved on a motion to dismiss.

Cheektowaga also invites the Court to credit selected body-worn camera footage to reject Plaintiffs' pleaded facts. As explained above (*see* Section II), that is improper at the Rule 12 stage unless the footage is properly before the Court, relied upon in the Complaint, and "blatantly contradicts" the Complaint. Plaintiffs did not incorporate or rely on any of the footage submitted by Cheektowaga in drafting the Complaint.

In fact, Plaintiffs specifically allege that video evidence is incomplete and does not capture all relevant conduct, and that many officers lacked identifying information at the scene. These are additional facts that underscore why discovery is necessary. (Compl. ¶¶ 52-55).

### iv.  The Complaint Also Pleads Failure-to-Intervene Liability

Defendants attempt to collapse Count III into a claim only against the officers who personally applied each discrete use of force. That is not the law. Under settled Second Circuit authority, an officer is liable under § 1983 for "the preventable harm caused by the actions of the other officers" where the officer "observes or has reason to know that (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed," and the officer has "a realistic opportunity to intervene to prevent the harm from occurring" but fails to do so. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Plaintiffs plead that theory expressly and in a way tied to concrete allegations. These are not boilerplate allegations. The Complaint alleges that municipal, state, and Doe officers were deployed together, were personally present at or near the arrests and uses of force, and that each Defendant Officer had a realistic opportunity to intervene to prevent unlawful acts but deliberately failed to take reasonable steps to do so. (Compl. ¶¶ 200-208). It also pleads multi-officer tactics and continuing restraint, including pile-ons, knee pressure, zip-tying and cuffing, and force applied to already subdued people, in a coordinated, geographically concentrated operation. (Id. ¶¶ 108-116, 117-121, 122-127, 194-199, 263-271). Those allegations plausibly support the inference that officers in close proximity had reason to know what was occurring and had opportunities to stop or mitigate it. That is what failure-to-intervene liability addresses.

Several Municipal Defendants lean on *Hardy* and *Ying Li* in an effort to demand pre-discovery pleading of each officer's precise "location, proximity, or opportunity to act." But those cases rejected failure-to-intervene claims where the plaintiff did little more than recite the legal standard and assert that a large set of defendants must have been nearby. They do not include facts supporting proximity, observation, or opportunity. *See Hardy v. City of New York*, 2013 WL 5231459 (S.D.N.Y. July 8, 2013); *Ying Li v. City of New York*, 246 F. Supp. 3d 578,

620 (E.D.N.Y. 2017). Here, by contrast, Plaintiffs plead a coordinated multi-agency mass-arrest deployment, a phalanx converging on seated demonstrators, multi-officer restraint tactics, and continued pursuit and arrests in and around Capen Hall. (Compl. ¶¶ 108-116, 122-127, 162-167). In that setting, courts do not require plaintiffs, before discovery, to plead each officer's exact field of vision and split-second sequencing to "nudge" a failure-to-intervene claim from possible to plausible.

This District has recognized that pleading close proximity and awareness during ongoing violations is enough to proceed to discovery on failure-to-intervene. *See Boehner v. City of Rochester*, 609 F. Supp. 3d 220, 231 (W.D.N.Y. 2022) (allegations that defendants were in close proximity to the violations as they occurred, and were therefore aware, were sufficient to proceed). And Second Circuit district courts have also allowed alternative pleading, *i.e.*, that a particular officer directly participated in one aspect of a constitutional violation while failing to intervene in another, because the precise division of labor is a discovery issue in multi-officer events. *Matthews v. City of New York*, 889 F. Supp. 2d 418, 444 (E.D.N.Y. 2012); *Breton v. City of New York*, 404 F. Supp. 3d 799, 814 (S.D.N.Y. 2019).

Cheektowaga's effort to defeat this theory by labeling the alleged force "transient" fails for an additional, controlling reason: the Second Circuit rejects hard-and-fast temporal cutoffs. In *Figueroa*, the Circuit vacated summary judgment and made clear that whether an officer had a realistic chance to intercede must be evaluated "on [the] own facts," turning on considerations like the number of officers present, their placement, the environment, the nature of the assault, and other context-specific factors. *Figueroa v. Mazza*, 825 F.3d 89, 107-08 (2d Cir. 2016).

Plaintiffs here allege far more than a single instantaneous act. Rather, they plead multi-step, ongoing conduct. The allegations include coordinated enforcement of an allegedly unlawful

dispersal deadline, pursuit and apprehension of dispersing students, prolonged restraint pinning and piling-on, excessively tight restraints, and the removal and withholding of religious coverings during arrest and restraint. (Compl. ¶¶ 83-90, 108-116, 122-127, 194-199, 207). On a motion to dismiss, Defendants cannot recharacterize that pleaded sequence as uniformly "split-second" conduct and thereby extinguish a fact-intensive opportunity-to-intervene inquiry.

Nor does Cheektowaga defeat failure-to-intervene by asserting that officers from "different agencies" may lack authority over each other. The duty to intervene turns on knowledge and realistic opportunity, not formal supervisory status. Plaintiffs allege that agencies operated as a coordinated unit pursuant to mutual-aid arrangements in a unified deployment. (Compl. ¶¶ 5-6, 84-87, 324-326). Whether any particular officer lacked a practical ability to intervene across agency lines is, at most, a factual dispute not resolvable against Plaintiffs at Rule 12(b)(6).

Amherst does not meaningfully contest this theory at all: the word "intervene" appears **<u>nowhere</u>** in Amherst's 41-page memorandum. (Dkt. No. 50-1). Amherst therefore never engages Plaintiffs' failure-to-intervene allegations under the Fourth Amendment, including the express allegation that officers present during the arrests and uses of force "failed to intervene" despite realistic opportunities to do so. (Compl. ¶¶ 207-208, 270). Amherst's insistence that a viable Fourth Amendment claim must allege that Amherst officers personally arrested Plaintiffs without probable cause or personally applied excessive force ignores this separate, well-established theory of liability. To the extent Amherst officers were present for, and part of, the coordinated assault on peaceful demonstrators, the post-dispersal chase and arrests, and the multi-officer restraint tactics alleged, Plaintiffs have pleaded a plausible failure-to-intervene theory, and Amherst offers no basis for dismissal. (Id. ¶¶ 108-116, 122-127, 162-176, 194-199).

For the reasons set forth in the qualified-immunity section above, qualified immunity cannot be resolved on a motion to dismiss on these excessive-force allegations.

### b. Count IV (Unlawful Seizure / False Arrest) — Lack of Probable Cause and Lack of Fair Warning

#### i. The Complaint Plausibly Alleges Arrests Without Probable Cause

Probable cause is a complete defense to a Fourth Amendment false-arrest claim. But probable cause cannot be decided as a matter of law at the pleading stage unless it appears on the face of the complaint. Here, Plaintiffs allege they were arrested without individualized probable cause in a coordinated mass-arrest operation that followed unclear and unlawfully imposed "curfew" and dispersal directives. (Compl. ¶¶ 79-90, 95-98, 104-107, 274-279).

Critically, Plaintiffs allege they were given essentially no meaningful opportunity to comply before officers charged, tackled, and seized people, many of whom were already dispersing, already away from the protest lawn, or (in Ms. Mohammed's case) had moved inside Capen Hall to comply. (Compl. ¶¶ 95-98, 102-107, 193-194, 276-277). On these alleged facts, Defendants cannot establish probable cause as a matter of law to arrest Plaintiffs for offenses such as trespass or disorderly conduct.

Amherst's probable-cause theory is premised on the claim that Plaintiffs "failed to comply" with dispersal orders. (Dkt. No. 50-1, at 22-23). The Complaint alleges the opposite. It alleges that an initial instruction to leave "by dusk" was abruptly converted into a hard 8:23 p.m. deadline, that megaphone announcements in a dispersed outdoor setting were constitutionally inadequate, and that most Plaintiffs attempted to comply and were arrested only after dispersing or while leaving. (Compl. ¶¶ 7-10, 20-29, 83-90, 104-107, 122-129, 162-167, 194-199). At this stage, those allegations defeat both probable cause and arguable probable cause.

### ii. Arguable Probable Cause Cannot Be Resolved on This Record

Defendants' fallback "arguable probable cause" theory likewise turns on disputed,

fact-bound questions about what was announced, what each Plaintiff could hear and understand,

where each Plaintiff was located, and whether there was a meaningful opportunity to comply.

For the reasons explained above, it cannot be resolved on a Rule 12(b)(6) motion.

### VI.     Plaintiffs Plausibly Plead Substantive and Procedural Due Process Violations (Count VII)

Defendants argue that Plaintiffs' due process claim is duplicative of other constitutional

theories, fails to allege a protected liberty or property interest, and does not plausibly plead

arbitrary or conscience-shocking government action.

Defendants attack Count VII as (i) "duplicative" of Plaintiffs' First and Fourth

Amendment theories and (ii) insufficiently tied to any protected liberty or property interest.

Count VII does not need to do the work of Plaintiffs' seizure, force, or speech claims to survive.

It addresses distinct due-process problems the other counts do not fully capture, including: (1)

vagueness in the ad hoc "dusk" dispersal rule and the enforced 8:23 p.m. arrest cutoff; (2)

exclusion and persona-non-grata (PNG) designations imposed without meaningful pre- or

prompt post-deprivation process. On the pleadings, those are more than enough to proceed past

Rule 12.

Defendants are right about one limited point: where a specific constitutional provision

supplies the governing standard for particular conduct (e.g., Fourth Amendment for arrest/seizure

and force; First Amendment for suppression of protected speech), courts generally analyze that

conduct under the more specific provision rather than substantive due process. *See*, *e.g., Graham v. Connor,* 490 U.S. 386, 395 (1989); *Hu v. City of New York*, 927 F.3d 81, 104 (2d Cir. 2019).

Plaintiffs do not need Count VII to "double count" what is already pleaded as Fourth or First Amendment violations. But that principle does not justify dismissing Count VII outright, because Plaintiffs also plead independent due process deprivations, including lack of fair notice and arbitrary enforcement and exclusionary bans imposed without process. Plaintiffs may plead overlapping theories in the alternative at this stage, particularly where the proper doctrinal fit (Fourth versus Fourteenth) can depend on factual development.

### a.  Procedural Due Process

Procedural due process turns on two questions: (1) whether the State interfered with a protected liberty or property interest; and (2) whether the procedures attending that deprivation were constitutionally sufficient. Where feasible, due process requires notice and a meaningful opportunity to be heard; where pre-deprivation process is not feasible, post-deprivation review must be prompt and meaningful. *See, e.g., Mathews v. Eldridge*, 424 U.S. 319 (1976).

Plaintiffs plead ongoing liberty harms that are not merely 'incidental' to arrest. Most significantly, Plaintiffs allege that UB issued persona non grata designations, banning them from campus space, without any meaningful pre-deprivation hearing and without prompt or meaningful post-deprivation process. (Compl. ¶¶ 149, 244, Prayer for Relief.)  Those allegations plausibly state a procedural due process claim at the pleading stage because a continuing exclusion order is a forward-looking restraint that demands some mechanism for individualized determination and review.

### b.  Substantive Due Process

To the extent Defendants argue that substantive due process can never apply in a protest-policing case where arrests occurred, that is overbroad. The Second Circuit recognizes that where challenged police force does not fall within a Fourth Amendment "seizure," the Fourteenth Amendment provides a "shocks the conscience" framework that (in the excessive-force context) incorporates objective unreasonableness and requires more than negligence. *Edrei v. Maguire*, 892 F.3d 525 (2d Cir. 2018) (discussing objective unreasonableness and a culpability threshold beyond negligence); *see also Kingsley v. Hendrickson*, 576 U.S. 389 (2015).

Plaintiffs plead a coordinated operation involving punitive and humiliating tactics, including interference with prayer and treatment that Plaintiffs allege was unnecessary to any legitimate law-enforcement objective. To the extent any of that conduct is ultimately found to fall outside the immediate arrest or seizure rubric, or to involve arbitrary executive abuse disconnected from legitimate governmental ends, Count VII remains a plausible Fourteenth Amendment backstop. Count VII also survives on its procedural due process and fair-notice theories even if the Court later narrows any overlap with Fourth Amendment claims.

### c. The Ad Hoc Curfew and Dispersal Cutoff is Void for Vagueness and Invited Arbitrary Enforcement

Plaintiffs plausibly plead vagueness, a classic due-process defect. Due process is violated where an order is so vague and standardless that it fails to provide fair notice of what is required or prohibited, or where it invites arbitrary and discriminatory enforcement. *Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162-65 (1972); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972) (fair notice and prevention of arbitrary enforcement are the core vagueness concerns, especially in public-order regulation).

Plaintiffs allege exactly that. UB issued an announcement that protesters must disperse by "dusk," while public reporting pegged last light at 8:48 p.m. (Compl. ¶ 79). Then, officers enforced an 8:23 p.m. arrest deadline and began the surge and mass arrests at that time, despite the absence of any clear, written policy supporting that cutoff and despite shifting, on-the-spot directives. On these allegations, the "dusk" directive and the enforced 8:23 cutoff plausibly failed to provide fair notice and invited arbitrary enforcement, particularly where the operation allegedly proceeded even as people attempted to comply or requested a brief religious accommodation to complete time-sensitive prayer.

Plaintiffs also allege that UB's Assembly policy itself was modified or obscured in a way that further undermined notice. Those are not defects that can be cured by characterizing the curfew as a generic time-place-manner restriction. Those defects go to whether the rule was intelligible, administrable, and non-arbitrary in the first place.

For all of these reasons, Count VII should not be dismissed at the pleadings stage.

## VII.    Plaintiffs Plausibly Plead Malicious Prosecution (Count XVIII)

The Complaint alleges that Defendant Officers caused criminal proceedings to be commenced and maintained against Plaintiffs Jazmine Frazier and Jay Ayoub, arising from the May 1, 2024 protest dispersal and mass arrests, without probable cause and with malice, and that those proceedings terminated in Plaintiffs' favor by dismissal. (Compl. ¶¶ 10, 139, 148, 452-456). Additionally, the Complaint alleges a post-process seizure. As a result of the criminal proceedings, Frazier and Ayoub were required to appear in court and remained under the control of the criminal justice system. These are restrictions that constitute a Fourth Amendment seizure. (Compl. ¶ 457). Accordingly, whether analyzed as a federal malicious prosecution claim (Count

XVIII) or the parallel New York common-law claim (Count XIX), dismissal is unwarranted at this stage.

State Defendants are right that "malicious prosecution" is properly analyzed under the Fourth Amendment (and not substantive due process), but that point does not justify dismissal of Count XVIII. Count XVIII pleads the substance of a Fourth Amendment malicious-prosecution claim: initiation and continuation of criminal proceedings without probable cause and a seizure pursuant to legal process. (Compl. ¶¶ 451-459).

Several Municipal Defendants argue (in different ways) that Plaintiffs plead only legal conclusions and fail to allege facts showing these officers "initiated" or "continued" a prosecution. But New York law recognizes initiation and continuation where officers play an "active role" in the prosecution, such as by causing process to issue, giving advice or encouragement, or providing accusatory information that forms the basis for charges. *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 217 (2d Cir. 2000).

The Complaint plausibly alleges each of those requirements here: (i) Jay Ayoub and Jazmine Frazier were issued citations charging them with, inter alia, trespass, disorderly conduct, and obstructing governmental administration; (ii) the prosecutions continued after commencement; and (iii) Defendant Officers continued participating in the prosecution against Jay Ayoub and Jazmine Frazier for months, even after Jazmine Frazier's initial dismissal, Defendant Officers began renewed efforts to arrest her based on the re-filing of the previously dismissed charges. (Compl. ¶¶ 451-456). At the pleading stage, especially in a coordinated, multi-agency operation, Plaintiffs are not required to identify which individual officer physically penned each accusatory document. It is enough that Plaintiffs plausibly allege that the Defendant Officers who arrested them, issued the charged citations caused the criminal proceedings to

commence and be maintained, and continued to play a role in the lengthy prosecutions. (Compl. ¶¶ 451-456).

*Townes*, relied upon by the Cheektowaga Defendants, does not support dismissal here; it merely underscores that post-process damages are pursued through a malicious-prosecution theory rather than a false-arrest theory. *Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999). Plaintiffs have pleaded malicious prosecution counts, and, unlike the pleading defect *Townes* addressed, Plaintiffs specifically allege favorable termination, lack of probable cause, malice, and a seizure pursuant to legal process. (Compl. ¶¶ 451-457, 463).

Defendants are correct that probable cause is a complete defense to malicious prosecution, and that probable cause for malicious prosecution is assessed as of the commencement of the prosecution. *Keith v. City of New York*, 641 F. App'x 63 (2d Cir. 2016). But that does not help Defendants on a Rule 12(b)(6) motion where the Complaint plausibly alleges the absence of probable cause for the charged protest-related offenses and alleges prosecutions maintained despite the constitutional defects underlying the arrests. (Compl. ¶¶ 451-456). *Keith*'s qualified-immunity discussion is likewise fact-bound. It turns on the presence (or dissipation) of probable cause given the particular information available. These are questions that cannot be resolved on this record at the pleadings stage.

Here, Plaintiffs allege the opposite of a clear individualized criminal predicate. The Complaint describes an amorphous and shifting dispersal policy, selective enforcement during mandatory religious observance, and the arrests and prosecutions of peaceful protesters or observers under a constitutionally defective directive. On these allegations, whether probable cause existed when the charges were commenced, and whether any arguable probable cause

dissipated as the groundless nature of the charges became apparent, is a fact question not resolvable on a motion to dismiss.

Finally, Cheektowaga's and Tonawanda's "no involvement" arguments ignore that Count XVIII and Count XIX incorporate, by reference, the detailed factual narrative of the arrests and the ensuing prosecutions, and then allege renewed pursuit of Jazmine Frazier after dismissal and continued prosecution of Jay Ayoub through mid-September 2024. (Compl. ¶¶ 451-456, 461-464). Certainly, the Complaint alleges Cheektowaga's direct involvement in the arrest of Mr. Ayoub. (Compl. ¶ 169). Those allegations plausibly plead initiation and continuation for purposes of malicious prosecution, particularly where the charged citations necessarily reflect officer-supplied accusatory information that caused legal process to issue.

Accordingly, Plaintiffs plausibly plead each required element (initiation and continuation, favorable termination, lack of probable cause, malice, and a seizure pursuant to legal process) and Defendants' Rule 12(b)(6) dismissal arguments as to Counts XVIII and XIX should be rejected.

## VIII.   Plaintiffs Plausibly Plead Municipal Liability Under *Monell* (Count VIII)

Municipal Defendants' motions attempt to reframe the May 1 crackdown as a collection of isolated, split-second actions by line officers and then demand that Plaintiffs, before discovery, identify a history of prior, similar incidents for each municipality. That is not what the Complaint alleges, and it is not what Rule 12(b)(6) requires. The Complaint alleges a coordinated, planned, multi-agency protest operation, implemented through mutual aid and command decisions, that predictably produced the mass seizure of peaceful demonstrators and

the use of force to clear the protest at an arbitrary deadline. (Compl. ¶¶ 33-34, 83-88, 95, 340-42).

A municipality is liable under § 1983 when the challenged constitutional violation was caused by an official policy, custom, or practice. See *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690-91, 694 (1978). Actionable municipal policy includes not only written rules, but also decisions by final policymakers, persistent practices, and deliberate-indifference failures to train or supervise that are the moving force behind the violation. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986).

Municipal-liability claims are not subject to a heightened pleading standard. *Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993). At the pleading stage, Plaintiffs must allege facts "tending to support, at least circumstantially, such an inference" of municipal policy, custom, or deliberate indifference; they are not required to prove their *Monell* case before discovery. *Cotto v. City of New York*, 803 F. App'x 500, 503 (2d Cir. 2020) (summary order). Courts in this Circuit routinely recognize that this is "not a high bar." *DiPippo v. County of Putnam*, No. 17-cv-7948, 2019 WL 1004152, at *6 (S.D.N.Y. Feb. 28, 2019). In the protest-policing context specifically, this District has denied dismissal where the pleadings describe coordinated protest-response planning and execution sufficient to support an inference of municipal policy or deliberate indifference. *Flannery v. City of Rochester*, 640 F. Supp. 3d 267, 278 (W.D.N.Y. 2022) (denying motion to dismiss where complaint contained no specific allegations of prior instances in which department used excessive force against protesters).

Here, the Complaint plausibly alleges *Monell* liability through multiple, reinforcing theories: (1) a coordinated, multi-agency policy implemented through the Mutual Aid Agreement

to disperse and arrest peaceful demonstrators at a manufactured, arbitrary deadline; (2)

deliberate-indifference failures to train, supervise, and discipline for protest dispersal, First

Amendment activity, use of force, and religious accommodation; and (3) post-incident

ratification and continued enforcement actions consistent with the challenged policy.

### a. The Complaint Pleads a Coordinated Municipal Policy Implemented Through the Mutual Aid Agreement

This is not a "rogue officer" case. The Complaint alleges a planned, county-wide, multi-

agency operation executed as a unified force. It alleges that UB and the municipal entities are

parties to a Mutual Aid Agreement; that UB requested outside agency assistance in advance; and

that the responding municipalities had an agreed-upon plan to respond to the protest. (Compl. ¶¶

33-34, 340). It further alleges that the Municipal Defendants "authorized their officers to

participate in this operation," which "included a plan to arrest demonstrators who had committed

no crime to silence their respective First Amendment-protected speech and conduct," and an

"understood tactic of forcibly removing protesters at an arbitrary set time." (Compl. ¶ 340).

The Complaint also pleads concrete, contemporaneous indicia of pre-planning and

unified execution: the 8:23 p.m. deadline was enforced "to the minute" across multiple agencies;

the dispersal operation (including use of a university shuttle bus to transport detainees) "was

planned in advance"; and "no written policy supported the 8:23 p.m. curfew," yet officers

referenced that time without lawful basis. (Compl. ¶¶ 83-88, 95, 341). Plaintiffs also plead that

UBPD command briefed "all responding agencies on law enforcement's plan and protocol prior

to dispersal efforts," and that supervisors were present and involved. (Compl. ¶¶ 84, 331-332).

Those allegations describe an operational decision and course of conduct implemented

through formal inter-municipal coordination. That is the kind of 'decision officially adopted' or

'course of action' attributable to municipalities under *Monell* and *Pembau*r. The Municipal

Defendants' "single incident" rhetoric misses the point. Plaintiffs are not trying to infer policy

from an unrelated, one-off act by a low-level employee. They allege the challenged conduct was

itself the policy. Plaintiffs allege a coordinated decision to disperse and arrest peaceful

demonstrators at an arbitrary, unlawful deadline, implemented through a unified multi-agency

operation with supervisory participation and planning. See *Pembau*r, 475 U.S. at 480-85

(municipal liability may attach where supervisors make a "deliberate choice to follow a course of

action").

Municipal Defendants likewise err by demanding (at the pleading stage) that Plaintiffs

identify a prior history of similar incidents for each municipality. A pattern of similar violations

is one way to show deliberate indifference; it is not a categorical prerequisite where Plaintiffs

plausibly plead an existing policy decision and coordinated implementation. *See Flannery v. City

of Rochester*, 640 F. Supp. 3d 267, 278.

Finally, the Complaint pleads that this policy was not content-neutral in purpose or

execution: it alleges viewpoint-based suppression and retaliation (Compl. ¶¶ 228-239), and that

the operation was timed and executed in a way that foreseeably and actually interfered with

Muslim religious observance (Compl. ¶¶ 81-88, 99-103). Those allegations go directly to the

unlawfulness of the municipal policy being implemented.

### b. Plaintiffs Plausibly Plead Deliberate-Indifference Failures to Train, Supervise, and Discipline for Protest Policing and Religious Accommodation

Even if Municipal Defendants attempt to recast May 1 as "mere implementation" rather

than "policy," the Complaint independently pleads deliberate-indifference failures to train and

supervise that plausibly caused the constitutional violations.

In the failure to supervise context, the Second Circuit has held that "a single, usually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was inadequate training or supervision." *Sorlucco v. New York City Police Dept.*, 971 F.2d 864, 873 (2d Cir. 1992) (citing *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980)) (if the single incident is "sufficiently out of the ordinary," it may warrant "an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or gross negligence on the part of the officials in charge").

A municipality's failure to train (or supervise) can constitute actionable policy where it reflects "deliberate indifference" to the constitutional rights of persons with whom municipal employees interact. *City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989); *Connick v. Thompson*, 563 U.S. 51, 61 (2011). In the Second Circuit, deliberate indifference is plausibly alleged where policymakers know "to a moral certainty" that employees will confront a given situation, the situation presents a difficult choice that training would make less difficult (or there is a history of mishandling), and the wrong choice will frequently cause constitutional deprivations. *Walker v. City of New York*, 974 F.2d 293, 297-98 (2d Cir. 1992).

The Complaint pleads all of that here. It alleges the municipalities knew or should have known that multi-agency deployments on a college campus posed a predictable risk of constitutional violations without adequate training, supervision, and clearly articulated crowd-management policies. It alleges they failed to implement or enforce such policies. (Compl. ¶ 339). It alleges "no written policy supported the 8:23 p.m. curfew," yet officers enforced it and executed a planned mass-arrest operation without constitutional safeguards. (Compl. ¶ 341). It alleges supervisors failed to establish an organized approach, resulting in chaos and over-

policing, captured in real-time statements such as "So much for lines" and "So much for a formation." (Compl. ¶ 342). And it alleges the Municipal Defendants failed to instruct officers how to distinguish between passive protest, prayer, observation, and unlawful conduct, leading to arrests and force against people kneeling in prayer, standing silently, filming, or attempting to retreat. (Compl. ¶¶ 346-348).

The Complaint further pleads deliberate indifference with respect to religious accommodation. Municipal and UBPD supervisors knew or should have known that Plaintiffs were engaged in protected religious observance and peaceful protest, and nevertheless proceeded with an inflexible 8:23 p.m. deadline timed to coincide with Maghrib prayer. They refused repeated requests for a minutes-long accommodation and charged into the crowd while prayer continued. (Compl. ¶¶ 81-88, 95-101). Those allegations plausibly describe an obvious need for training and supervision in managing First Amendment assemblies where protected religious activity is occurring. They also describe a foreseeable risk of constitutional injury when officers are trained, or permitted, to treat prayer and peaceful presence as arrestable conduct.

At minimum, the Complaint plausibly alleges that the predictable result of inadequate training and supervision and a chaotic, force-driven dispersal tactic was exactly what occurred: indiscriminate force and arrests without individualized warnings or probable cause, interference with prayer, and targeting of visibly Muslim arrestees. (Compl. ¶¶ 95-103, 347-348). That is enough to proceed to discovery under City of Canton and Connick, especially given the detailed factual allegations tying failures in planning, policy, and supervision to the violations at issue.

### c. The Complaint's Allegations Are Municipality-Specific Enough to Survive Dismissal

Municipal Defendants also argue that Plaintiffs plead policy and deliberate indifference only in the abstract. The Complaint alleges far more.

As to Amherst, Plaintiffs plead that the Town has jurisdiction over UB North Campus and "played a lead role in coordinating and executing the protest dispersal," and that Amherst officers and supervisors were present and involved. (Compl. ¶¶ 33, 331-332).

As to Buffalo, Plaintiffs plead direct BPD involvement in post-dispersal arrests and assaults, and they plead BPD-specific evidence of unconstitutional custom and ratification captured on body cameras. For example, Plaintiffs allege BPD officers provided instructions and strategy to other agencies, were actively involved in enforcement decisions, a BPD lieutenant assaulted a journalist attempting to film arrests, and officers celebrated violence. (Compl. ¶¶ 331-336).

As to Tonawanda, Plaintiffs plead supervisory direction to officers to get "physically involved," active involvement in enforcement decisions, and participation in the unified operation. (Compl. ¶¶ 331, 333).

And as to Cheektowaga and the other municipal entities, the Complaint alleges they participated through the Mutual Aid Agreement and authorized officers' participation in the pre-planned operation. (Compl. ¶¶ 34, 340).

At the pleading stage, Plaintiffs are not required to litigate municipal org charts or identify, by name, every final policymaker for each municipality before obtaining discovery, particularly where the Complaint alleges a formal mutual-aid framework, an agreed-upon plan, unified implementation, and supervisory participation.

### d. Erie County Is a Proper *Monell* Defendant Because the Sheriff Is the County's Final Policymaker for the Challenged Operational Conduct

Erie County's principal *Monell* argument is that it cannot be liable because the Sheriff independently hires, trains, and supervises deputies. That position conflates respondeat superior (which does not apply) with policy-based municipal liability (which does).

Under controlling Second Circuit law, the inquiry is who has final policymaking authority for the "particular issue" involved. *Jeffes v. Barnes*, 208 F.3d 49, 57-61 (2d Cir. 2000). For operational law-enforcement decisions, such as use of force and arrest practices, New York law makes the Sheriff the County's final policymaker, and the County may be liable under *Monell* for constitutional violations caused by those policies. *Id.* at 61-64. Courts in this District have rejected Erie County's attempt to claim a municipal-liability immunity carveout based on the Sheriff's independent personnel authority. See Okongwu v. County of Erie, No. 17-cv-359, 2018 WL 1383233, at *3 (W.D.N.Y. Mar. 19, 2018) (discussing *Jeffes*), *Lin v. County of Monroe*, 66 F. Supp. 3d 341, 351 (W.D.N.Y. 2014), and *Dudek v. Nassau Cnty. Sheriff's Dep't*, 991 F. Supp. 2d 402, 413 (E.D.N.Y. 2013).

Here, the Complaint alleges that Sheriff Garcia approved and authorized the deployment of Sheriff's deputies to UB and their participation in the coordinated suppression of the protest and mass-arrest operation. (Compl. ¶ 78). That is an allegation of policymaker participation in operational policy and is sufficient under *Jeffes* to proceed against the County.

### e.  Defendants' *Monell* Case Strings Do Not Require Dismissal of These Detailed, Coordinated-Policy Allegations

Cheektowaga (and others) cite a string of decisions for the propositions that *Monell* claims are disfavored, that failure-to-train claims are "almost universally prohibited," and that plaintiffs must plead an extensive prior-incident history. None of that is correct.

First, *Van de Kamp v. Goldstein*, 555 U.S. 335 (2009), is an absolute prosecutorial-immunity case about individual prosecutors. It does not alter *Monell* municipal-liability doctrine, and it does not remotely announce that police failure-to-train claims are "almost universally prohibited." Second, cases dismissing boilerplate *Monell* pleadings, including those defendants cite, apply ordinary *Twombly* and *Iqbal* plausibility principles to complaints that lack factual content linking the municipality to the constitutional harm. They do not foreclose a *Monell* claim where the pleadings, as here, allege a coordinated multi-agency plan implemented through a Mutual Aid Agreement, an arbitrary and unlawful dispersal and arrest deadline enforced to the minute without written policy, supervisory participation, failures in organization and training captured on body cameras, and post-incident ratification and continued enforcement decisions. (Compl. ¶¶ 340-348, 331-336, 240-244).

Count VIII is supported by specific factual allegations plausibly linking Plaintiffs' injuries to municipal policy, deliberate-indifference failures to train and supervise, and policymaker decisions. The Municipal Defendants' motions to dismiss should be denied as to the *Monell* claim.

## IX. Plaintiffs' State-Law Claims Should Not Be Dismissed (Counts IX-XVII, XIX)

### a. Notice of Claim and Related State-Law Procedural Prerequisites

Several Municipal Defendants argue that Plaintiffs' state law claims must be dismissed for alleged failure to comply with General Municipal Law § 50-e notice of claim requirements or § 50-i pleading requirements. Town Defendants also invoke Town Law § 67. These arguments fail.

### i.        Federal § 1983 Claims Are Exempt from State Notice of Claim Requirements

Defendants' notice-of-claim arguments are misplaced as to Plaintiffs' federal

constitutional claims brought under 42 U.S.C. § 1983. The Supreme Court has squarely held that

states cannot impose notice-of-claim requirements as a precondition to § 1983 suits in federal

court. Such state-law procedural prerequisites are preempted. *Felder v. Casey*, 487 U.S. 131, 153

(1988). New York courts apply the same rule. *See Rowe v. New York City Police Dept.*, 85

A.D.3d 1001, 1002 (2d Dep't 2011). Accordingly, Plaintiffs' First through Eighth Causes of

Action (all § 1983 claims) are not subject to General Municipal Law §§ 50-e or 50-i and cannot

be dismissed on notice-of-claim grounds.

### ii.   Town Law § 67 Governs Notice Requirements for Town Defendants

Town Law § 67 requires that any damages claim against a town for wrong or injury to

person or property be served in compliance with General Municipal Law § 50-e and commenced

pursuant to § 50-i. Town Law § 67 is broader than § 50-i because it also reaches claims for

"wrong ... to person" and is not limited by the statute's title. *Arnold v. Town of Camillus*, 222

A.D.3d 1372, 1374-75 (4th Dep't 2023).

### iii.   Plaintiffs Timely Served Notices of Claim and Participated in § 50-h Examinations

On or about July 30, 2024, Plaintiffs Ahmed, J. Ayoub, M. Ayoub, E. Dougherty, S.

Dougherty, Georger, Khatib, Krull, and Mohammed served respective Notices of Claim upon the

municipal defendants identified in their respective Notices of Claim (including Erie County, the

City of Buffalo, the Town of Amherst, and the Town and/or City of Tonawanda), certain

individual officers identified as of that date, and John Doe officers (each of these Defendants was served within 90 days of the May 1, 2024 incident). Those respective Notices of Claim (with the corresponding Affidavits of Service) are attached as Exhibits A-I of January 30, 2026 declaration of Robert M. Corp, Esq., filed contemporaneously with this motion.

Each of these nine Plaintiffs completed § 50-h examinations between November 26, 2024 and February 7, 2025. *See* Corp Decl. ¶ 16.

Plaintiffs request that the Court take judicial notice of these timely served Notices of Claim and their participation in § 50-h examinations more than 30 days prior to the filing of the Complaint, in accordance with General Municipal Law § 50-e. Alternatively, to the extent the Court deems any further pleading detail necessary, Plaintiffs respectfully request leave to amend to allege compliance with § 50-e and related prerequisites.

The possibility of involvement of the Town of Cheektowaga Police Department was not ascertained by Plaintiffs until January 2025 and was not confirmed until February 2025. Corp Decl. ¶17. Plaintiffs were unable to discern the identity of all responding agencies and officers due to the more than 100 officers present during the events described herein. Plaintiffs will make themselves available for pre-discovery examinations by Cheektowaga, if necessary.

Where a municipality is mistakenly identified or unidentified, courts apply the typical late-notice factors, including actual knowledge of the essential facts within 90 days or a reasonable time thereafter, excusable error as to municipal identity, lack of substantial prejudice, and a reasonable excuse. *Cockburn v. Town of Mina*, 53 Misc. 3d 1002, 1006 (Sup. Ct. Chautauqua Cnty. 2016). Courts treat a municipal identity mistake as excusable when corrected promptly after discovery.

### iv.   Plaintiffs' Notices of Claim Satisfy § 50-e for State Law Claims

For Plaintiffs' state law claims, the notices of claim filed on July 30, 2024 satisfy General Municipal Law § 50-e. The statute requires notice of "the time when, the place where and the manner in which the claim arose." N.Y. Gen. Mun. Law § 50-e(2). The sufficiency test is functional: whether the notice includes information sufficient to enable the municipality to investigate the claim. "Circumstances must determine in each case whether the notice served is sufficient." *Schwartz v. City of New York*, 250 N.Y. 332, 165 N.E. 517, 517-18 (1929); *see also Parise v. New York City Dept. of Sanitation*, 306 F. App'x 695, 696 (2d Cir. 2009). This functional standard is fully consistent with *Hardy*, cited by several Defendants. *Hardy v. New York City Health & Hospitals Corp.*, 164 F.3d 789 (2d Cir. 1999).

The requirements of § 50-e(2) need not be stated with "literal nicety or exactness" so long as the municipality is given a fair opportunity to investigate. *Parise*, 306 F. App'x at 696.

Here, Plaintiffs' notices of claim described the May 1, 2024 incident at the University at Buffalo in detail, including the time (including, as applicable, the hours leading up to and around approximately 8:20 p.m.), place (UB's North Campus in Amherst, including locations in and near the Flint Loop area and, for some claimants, Capen Hall), and manner (interruption of a peaceful demonstration and prayer, followed by officers tackling, pushing, and piling onto claimants while taking them into custody, causing injury). Corp Decl., Exs. A-I.

The notices alleged personal injuries and civil-rights violations, including (as stated in the Notices) assault, battery, excessive force, police brutality, freedom of speech, equal protection, right to monitor, negligence, abuse of process, and failure to train and supervise, and injuries sustained during the police response. Each Notice also attaches the UB police report relating to the incident. Corp Decl., Exs. A-I. This information was more than sufficient to enable Defendants to investigate the circumstances of Plaintiffs' claims.

**v.  Specific Legal Theories Need Not Be Named in the Notice**

Defendants contend that Plaintiffs' Twelfth (False Arrest/False Imprisonment), Sixteenth (N.Y. Civil Rights Law § 40-c), Seventeenth (N.Y. Civil Rights Law § 79-n), and Nineteenth (Malicious Prosecution) Causes of Action must be dismissed because these specific legal theories were not explicitly named in the notices of claim. This argument fails.

In assessing whether a notice of claim provided sufficient notice, courts review the notice of claim broadly and do not look for magic language setting forth each claim. *DC v. Valley Cent. Sch. Dist.*, No. 7:09-CV-9036 WWE, 2011 WL 3480389, at *2 (S.D.N.Y. June 29, 2011) (emphasis added); *see Gonzalez v. Bratton*, 147 F.Supp.2d 180, 193 (S.D.N.Y.2001) ("Thus, not every claim need be set forth in haec verba, as long as the details pertaining to such a claim are described sufficiently with respect to time, place and manner to enable the city to investigate the claims."), aff'd, 48 Fed. Appx. 363 (2d Cir. 2002).

Recent decisions in this District apply these principles in a practical way. In *Green-Page v. United States*, the court held that a notice of claim that alleged plaintiffs were "illegally and unlawfully assaulted, abused, harassed, arrested, imprisoned, seized" provided adequate notice of a battery theory even though the notice did not use the word "battery." No. 1:20-cv-00837, 2024 WL 3584194, at *2, 5 (W.D.N.Y. July 30, 2024). And in *Riordan v. Erie County*, a notice alleging, among other things, failure to properly train and supervise employees was sufficient to support negligent training and supervision theories at the pleading stage. No. 1:23-CV-584-JLS-JJM, 2024 WL 1810333, at *9 (W.D.N.Y. Feb. 13, 2024), report and recommendation adopted, No. 23-CV-584 (JLS), 2024 WL 1810217 (W.D.N.Y. Apr. 25, 2024).

False Arrest and False Imprisonment: Even where a Notice does not use the label "false arrest" or "false imprisonment," the Notices here plainly identify that Plaintiffs were taken into

custody/arrested during the May 1, 2024 UB incident (including stating that claimants had been "apprehended" and were "not resisting [their] arrest") while lawfully present and engaged in constitutionally protected activity, and they attach the UB police report relating to the incident. That is sufficient to permit the municipalities to investigate the basis for the seizures and any resulting detention. Corp Decl., Exs. A-I.

Civil Rights Law §§ 40-c and 79-n: The Notices expressly allege interference with Plaintiffs' protected activity and rights (including freedom of speech, assembly, petition, and equal protection), and describe the disruption of prayer and (for at least some claimants) interference with religious clothing during the takedown/arrest. Those factual allegations are sufficient to alert Defendants to investigate statutory civil-rights theories arising from the same incident, even if the Notices do not cite the sections by number. Corp Decl., Exs. A-I.

Malicious Prosecution: The Notices attach the UB police report relating to the incident and expressly include a claim for "abuse of process," which necessarily directs Defendants' attention to the charging and prosecution process flowing from the May 1, 2024 arrests. In these circumstances, Defendants cannot plausibly claim surprise or inability to investigate prosecution-related tort theories arising from the same arrests and criminal process.

Defendants cannot claim surprise or inability to investigate. The notices described a coordinated multi-agency police operation resulting in mass arrests during a peaceful protest, with detailed factual allegations regarding the circumstances, the officers' conduct, and the injuries sustained. This provided Defendants with all the information necessary to investigate every theory of liability Plaintiffs have advanced.

   vi.  **General Municipal Law § 50-i Pleading Deficiencies Can Be Cured by Amendment**

Several Municipal Defendants argue that Plaintiffs failed to plead compliance with General Municipal Law § 50-i, which requires a plaintiff to allege that: (1) a notice of claim was served; (2) at least thirty days elapsed before filing suit; and (3) the defendant refused to adjust the claim. While Plaintiffs dispute that § 50-i imposes strict pleading requirements at the motion to dismiss stage, any technical pleading deficiency can be cured by amendment.

Even assuming § 50-i's conditions precedent must be pleaded with specificity, the appropriate remedy for any technical pleading omission (where, as here, Notices were timely served and Defendants had a full opportunity to investigate) is leave to amend, not dismissal.

Here, Plaintiffs timely filed notices of claim on July 30, 2024, within ninety days of the May 1, 2024 incident. More than thirty days elapsed before this action was commenced. Defendants have not and cannot claim prejudice; they have had full notice and opportunity to investigate. To the extent the Court finds any technical pleading deficiency regarding § 50-i attestations, Plaintiffs respectfully request leave to amend the Complaint to include such language. Dismissal is not warranted where the underlying notice was timely and proper.

### vii.  Plaintiff Frazier's Claims Are Not Barred

Several Municipal Defendants argue that Plaintiff Jazmine C. Frazier's state law claims must be dismissed because she allegedly failed to serve a notice of claim. To the extent there is any dispute regarding service or timeliness, such issues are properly resolved through discovery and summary judgment, not on a motion to dismiss that accepts all allegations as true. Moreover, Plaintiff Frazier's federal claims are entirely exempt from notice requirements, as explained above. And to the extent any municipal defendant attempts to bootstrap an alleged notice defect into dismissal of intentional-tort claims against individual officers, whether notice is required

turns on indemnification and scope-of-employment issues that are not suitable for resolution on the pleadings.

### b. New York Constitutional Claims (Counts IX and X)

Defendants argue Plaintiffs' Ninth and Tenth Causes of Action under the New York Constitution must be dismissed because § 1983 supplies an 'adequate alternative remedy,' and because New York recognizes a constitutional tort damages remedy only in narrow circumstances. *See Brown v. State of New York*, 89 N.Y.2d 172 (1996). That framing elides a settled and dispositive point: § 1983 is not an 'adequate alternative remedy' for state constitutional claims asserted against municipalities under a respondeat superior theory, because federal law bars respondeat superior municipal liability. *See Monell v. Department of Social Services*, 436 U.S. 658 (1978); *Brown*, 89 N.Y.2d 172.

Courts in this Circuit repeatedly apply *Brown*'s general principle (no state constitutional tort where an adequate alternative exists) while recognizing a critical exception when plaintiffs seek to hold a municipality liable vicariously for its employees' constitutional torts. For that purpose, § 1983 is not "adequate," because § 1983 does not authorize respondeat superior municipal liability. *See Buari v. City of New York*, 530 F. Supp. 3d 356, 409-410 (S.D.N.Y. 2021) (allowing malicious prosecution claim asserted against municipality under the doctrine of *respondeat superior* to proceed); *Reyes v. City of New York*, 992 F. Supp. 2d 290, 299 (S.D.N.Y. 2014) (allowing state law claims to proceed against municipality due to potential for vicarious liability for actions of police officers).

That exception fits this case. Plaintiffs plead parallel federal constitutional claims under § 1983, but Plaintiffs also plead the New York constitutional claims as an alternative municipal-liability path, *i.e.*, that the municipal defendants are vicariously liable under respondeat superior

for their employees' unconstitutional conduct. This is not duplicative of § 1983 municipal liability because federal *Monell* liability requires proof of policy or custom and deliberate indifference. Respondeat superior does not.

If Plaintiffs ultimately cannot satisfy *Monell*'s more demanding "policy or custom" standard for one or more municipal defendants, § 1983 will provide no municipal remedy for those constitutional torts even if Plaintiffs prove underlying violations by municipal employees. That remedial gap is exactly why courts allow state constitutional claims to proceed against municipalities under respondeat superior. *Buari*, 530 F. Supp. 3d 356.

*Buari* provides the practical framework courts apply at the pleading stage. Pursuant to that framework, state constitutional claims may be dismissed as against individual defendants where § 1983 supplies an adequate remedy against those individuals, but the same state constitutional claims survive against the municipality to the extent they proceed on *respondeat superior*. *Buari*, 530 F. Supp. 3d 356; *see also Logan v. City of Schenectady*, 1:18-cv-01179 (BKS/CFH), 2019 WL 3803631, at *9 (N.D.N.Y. Aug. 13, 2019) (dismissing state constitutional claims against individual defendants because § 1983 provided remedy but declining to dismiss those claims against the municipality).

Plaintiffs' pleading here aligns with that framework. At minimum, Counts IX and X should proceed against the municipal defendants under *respondeat superior*; any narrowing as to individual defendants, if needed, can be handled consistent with *Buari* without dismissing the municipal theories.

Defendants' cited district cases do not compel a different result. *Talarico* and *Yagel*, for example, apply the general "adequate alternative remedy" principle where § 1983 fully covered the same defendants and theories, or where the respondeat superior exception was not properly

pleaded or argued. *Talarico v. The Port Authority of NY and NJ*, 367 F. Supp. 3d 161 (S.D.N.Y. 2019); *Yagel v. Town of Haverstraw*, 24-CV-2030, 2024 WL 5090174 (S.D.N.Y. Dec 11, 2024). They do not disturb the consistent line of cases holding that § 1983 is not "adequate" for a respondeat superior municipal-liability theory.

Finally, Plaintiffs' state constitutional claims are not superfluous for another reason: New York's constitutional protections (including Article I's explicit nondiscrimination language) may in some contexts be broader than their federal analogs, reinforcing the propriety of maintaining Counts IX and X at least as alternative theories against municipal defendants.

Accordingly, Defendants' motions to dismiss Plaintiffs' state constitutional claims should be denied as to all municipal defendants.

### c.   New York Civil Rights Law Claims (Counts XVI and XVII)

#### i.   Civil Rights Law § 40-c: Attorney General Notice Under § 40-d Is a Curable Procedural Issue

Multiple Defendants argue that Plaintiffs' Sixteenth Cause of Action under New York Civil Rights Law § 40-c must be dismissed because Plaintiffs failed to serve notice on the New York Attorney General as required by § 40-d.

Nine Plaintiffs served timely Notice of Intention to File a Claim with the New York State Attorney General relating to the incident at issue herein in July of 2024. [2] All Plaintiffs, including Frazier, proceeded to file a Claim in the Court of Claims (Claim No. 143674) and serve that

---

[2] All Plaintiffs served timely Notices of Intention to File a Claim other than Jazmine Frazier. Jazmine Frazier filed and served a Motion for Leave to File a Late Claim in the Court of Claims on April 30, 2025 (M-102177), before the Complaint was filed. Corp Decl. Ex. J. That motion was granted with respect to a variety of causes of action by the Court of Claims on December 12, 2025. In January 2026, Jazmine Frazier filed that Claim in the Court of Claims (Claim # E26-6775) and served it upon the Attorney General. Corp Decl. Ex. K. To the extent it would be necessary and useful, Plaintiffs request leave to amend their Complaint to include these facts.

Claim upon the Attorney General on May 1, 2025 before filing this Complaint. *See* Corp Decl., Ex. L.

Courts construe the notice requirement flexibly where plaintiff's intent to notify is clear. In *Dipilato*, courts held that plaintiffs' letter to Attorney General describing civil rights litigation satisfied notice even though defendants raised technical objections. *DiPilato v. 7-Eleven, Inc.*, 662 F. Supp. 2d 333, 354 (S.D.N.Y. 2009).

Here, Plaintiffs filed both a Claim in the New York State Court of Claims (served upon the Attorney General) and a comprehensive federal complaint alleging widespread civil rights violations at a state university involving multiple municipalities. Any technical deficiency can be promptly cured without prejudice to the Attorney General or Defendants. Any omission should be treated as a curable procedural defect (or a matter of proof), not as a merits determination warranting dismissal with prejudice at the outset of a complex multi-defendant case

### ii.  Counts XVI and XVII Are Substantively Plausible on the Pleaded Facts

Count XVI (§ 40-c) alleges discrimination in Plaintiffs' civil rights based on protected characteristics, including religion and national origin or ethnicity, during a coordinated law-enforcement operation. (Compl. ¶¶ 433-438). Count XVII (§ 79-n) alleges intentional harassment, intimidation, and deprivation of civil rights "in whole or in substantial part" because of protected characteristics including religion and religious practice. (Id. ¶¶ 442-446).

Defendants' motions do not negate these allegations. The Complaint alleges that the Defendant Officers forcibly dislodged a hijab and a keffiyeh, interfered with Maghrib prayer, and that those officers and the Municipal Defendants selectively enforced dispersal against visibly Muslim and Arab students. That states actionable claims under §§ 40-c and 79-n.

Tonawanda argues that political viewpoint is not a listed category under § 79-n. Plaintiffs do not contend that "viewpoint" itself is an enumerated § 79-n category. Rather, the Complaint pleads discrimination and harassment based on religion (Islam), religious practice (Maghrib prayer), and ethnicity and ancestry (Arab and Palestinian descent), which are expressly covered. (Compl. ¶¶ 9, 435-436, 443-446). On these allegations, whether Defendants' conduct was motivated "in whole or in substantial part" by those protected traits is a quintessential fact question not resolvable on the pleadings.

Tonawanda also seeks dismissal of § 79-n claims as to Plaintiff Krull on the theory that she is not Muslim and not of Arab or Palestinian descent. (Dkt. No. 46-1, at 13). But § 79-n extends to injury "because of a belief or perception" about protected traits. The Complaint plausibly alleges that Defendants targeted individuals engaged in prayer and those associating with or protecting those engaged in religious observance. (Compl. ¶¶ 81-83, 88-89, 435-436, 443-446). Whether particular officers perceived Plaintiffs as members of, or allied with, a protected group, or targeted them to suppress protected religious practice, is not a Rule 12 question.

### d. New York Common-Law Claims (Counts XI-XV and XIX)

Defendants' attacks on Plaintiffs' New York common-law claims largely recycle the same pleading-stage disputes already addressed in the federal claims: (i) personal involvement (addressed in Section I), (ii) probable cause and fair warning (addressed in Sections II-III and in the Fourth Amendment discussion), and (iii) objective reasonableness of force (addressed in Count III). At Rule 12(b)(6), those disputes cannot be resolved against Plaintiffs.

Amherst separately argues that the individual officers are entitled to immunity on the state-law tort claims under New York's discretionary-act immunity doctrine. (Dkt. No. 50-1, at

39) That defense is fact bound and cannot be resolved on a Rule 12 record where Plaintiffs plausibly allege arrests without probable cause, gratuitous force, and viewpoint- and religion-based targeting. *See Jones v. Parmley*, 465 F.3d 46, 63 (2d Cir. 2006) (state-law immunity requires objective reasonableness). Discovery is required to assess whether any officer acted reasonably and in good faith for purposes of state-law immunity.

Cheektowaga's "special duty" argument is to no avail. (Dkt. No. 54-7, at 54-55). New York law, particularly in the wake of *Ferreira*, requires that element where police were acting in a governmental capacity, but courts have repeatedly held that allegations of targeted protest-response planning and police "tak[ing] positive control of a known and dangerous condition" are sufficient to plead a special duty and to defeat a motion to dismiss. *Maring*, 2022 WL 2356721, at *9 (citing *Ferreira v. City of Binghamton*, 38 N.Y.3d 298, 306, 194 N.E.3d 239, 244 (2022)).

### i.  Assault and Battery (Count XI)

As with excessive force claims brought under § 1983, assault and battery claims against officers under New York law rise or fall on whether the force used was privileged as reasonable under the circumstances. *Lin v. Cnty. of Monroe*, 66 F. Supp. 3d 341, 356 (W.D.N.Y. 2014). Because Plaintiffs plausibly plead unreasonable force in the context of a peaceful protest and non-resisting arrestees (including tackling, pile-ons, pinning, dragging, and overly tight restraints), the same allegations that sustain Count III also sustain Count XI. Defendants' personal-involvement objections are addressed in Section I (including direct participation and failure-to-intervene pleading in a coordinated operation), and Defendants' "reasonableness" arguments depend on disputed facts inappropriate for Rule 12(b)(6).

Amherst argues that assault and battery are not properly pleaded because Plaintiffs have not identified which specific officer committed each act. (Dkt. No. 50-1, at 41). Count XI incorporates the preceding factual allegations (Compl. ¶ 385), and the Complaint includes detailed plaintiff-specific descriptions of force, including tackles, multi-officer pile-ons, painful restraint, and forced removal of religious garments. (Compl. ¶¶ 120-29, 62-199). In a chaotic multi-agency scene where many officers wore riot gear and lacked visible identifiers, Plaintiffs cannot be required at the pleading stage to name every individual actor. Those particulars are uniquely within Defendants' control and will be developed in discovery. Officers who were present and had a realistic opportunity to prevent unreasonable force may also be liable under failure-to-intervene principles. (Compl. ¶ 270).

### ii.    False Arrest and False Imprisonment (Count XII)

Plaintiffs' state-law false arrest/false imprisonment claims turn on the absence of probable cause, and they survive for the same reasons the federal unlawful seizure/false arrest theory survives. *Graham v. City of New York*, 928 F. Supp. 2d 610, 624 (E.D.N.Y. 2013) (false arrest under New York law is "substantially the same" as a 1983 claim for false arrest).

Defendants' probable-cause and arguable-probable-cause arguments depend on disputed facts about dispersal orders, notice, timing, and opportunity to comply (including the pleaded shifting deadline and inadequate communication), and also on disputed facts about what Plaintiffs did. Those are not Rule 12(b)(6) issues. (*See* Sections II-III and the unlawful seizure/false arrest discussion.)

### iii.    Abuse of Process (Count XIII)

In New York, malicious abuse of process requires a defendant who "(1) employs regularly issued legal process … (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process," and "collateral objective" includes retribution. *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)

Cheektowaga argues Plaintiffs plead only improper motive. (Dkt. No. 54-7, at 50). That misreads the pleading. Plaintiffs allege Defendants used the criminal process (arrests, charging, and prosecution tools) not merely to enforce neutral rules, but for the collateral objective of suppressing and chilling protected protest activity and justifying downstream restrictions (including exclusionary measures and retaliation). Plaintiffs also allege concrete interference with person and liberty under color of process as a result of the prosecutions and related restrictions. Those allegations go beyond "malice alone" and plausibly plead abuse of process at this stage.

### iv.    Negligence / Gross Negligence (Count XIV)

Defendants correctly note New York does not recognize "negligent arrest," "negligent prosecution," or negligence claims that merely repackage intentional torts. But that is not what Plaintiffs plead here.

Plaintiffs plead operational and planning negligence in a coordinated multi-agency crowd-control operation. The allegations included failure to implement adequate dispersal and fair-warning protocols, negligent coordination and supervision of a large joint deployment, failure to train and supervise officers for constitutional protest policing (including religious accommodation), and negligent operational decision-making that foreseeably resulted in unlawful arrests and force. (*See*, e.g., Compl. ¶ 421; and *see* Sections I and III regarding multi-agency operation, identification barriers, and fair warning.) Those negligence theories are

not simply "negligent arrest." Rather, they target systemic operational duties and breaches. *Maring v. City of Rochester*, No. 21-CV-6720-FPG, 2022 WL 2356721, at \*9 (W.D.N.Y. June 30, 2022).

Defendants' "no negligent arrest" cases do not compel dismissal of these operational negligence theories at the pleading stage. At most, if the Court later concludes a narrow sub-theory overlap with an intentional tort theory, the remedy is narrowing. It is not wholesale dismissal of Count XIV.

To the extent any municipal Defendant invokes a "special duty" defense, that is a fact-intensive inquiry generally inappropriate for resolution on a motion to dismiss, particularly where Plaintiffs plead a targeted operation directed at an identifiable protest population in a confined location with foreseeable risk of harm from operational failures.

### v.    Negligent Hiring, Training, and Supervision (Count XV)

Cheektowaga argues negligent hiring, training, and supervision claims do not lie when employees act within the scope of employment. Cheektowaga invokes *Karoon* for that proposition. *Karoon v. N.Y.C. Transit Auth.*, 241 A.D.2d 323, 324, 659 N.Y.S.2d 27 (1997) (1st Dep't 1997)).

Plaintiffs do not rely on a propensity-based "bad hire" theory as the core of Count XV. Instead, Plaintiffs plead systemic failures in training, supervision, and operational oversight for protest policing and coordinated mutual-aid deployments. They allege failures in training on First Amendment protest activity and fair warning, religious accommodation during arrests, and use-of-force limits. They also allege inadequate supervisory oversight during the planning and execution of the May 1 operation. Those theories target direct municipal wrongdoing in training, supervision, and protocols, not merely vicarious liability for an employee's tort.

Consistent with that distinction, courts recognize that respondeat superior does not automatically extinguish all negligent training and supervision theories, especially where the claim is framed as systemic, foreseeable operational negligence rather than a pure "unfit employee" hiring theory. *See Barton v. City of New York*, 15 Misc. 3d 504, 512-13 (Sup. Ct. 2007).

Plaintiffs plead these theories in the alternative to their respondeat superior and *Monell* theories. Federal *Monell* failure-to-train claims require deliberate indifference. State negligent training and supervision requires only negligence. At Rule 12(b)(6), Plaintiffs may proceed on alternative theories, particularly where the Complaint alleges specific operational failures tied to a coordinated multi-agency deployment.

### vi.    Malicious Prosecution (Count XIX)

Under New York law, malicious prosecution requires "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Mazzone v. Town of Southampton*, 283 F. Supp. 3d 38, 52 (E.D.N.Y. 2017).

For the same reasons set forth in the malicious prosecution discussion above, Plaintiffs' state-law malicious prosecution claim is adequately pleaded. Here, Plaintiffs allege initiation and continuation without probable cause, favorable terminations, and resulting deprivations. Defendants' probable cause and immunity arguments depend on disputed facts and are premature at the motion-to-dismiss stage.

## X.    Remedies

### a. Punitive Damages

Municipal Defendants argue that punitive damages are unavailable against municipal entities. They are correct. Under § 1983, municipalities are not subject to punitive damages. New York law likewise bars, under most circumstances, punitive damages against municipalities.

Accordingly, to the extent the Complaint seeks punitive damages from municipal defendants, Plaintiffs do not oppose dismissal of those punitive damages demands. That concession does not affect Plaintiffs' entitlement to seek punitive damages from individual defendants in their individual capacities.

Punitive damages remain available against individual defendants under § 1983 where the Complaint plausibly alleges conduct motivated by evil intent or involving reckless or callous indifference to federally protected rights. *Smith v. Wade*, 461 U.S. 30, 30, 103 S. Ct. 1625, 1627 (1983).

### b. Injunctive and Declaratory Relief

The State Defendants argue in Point I that Plaintiffs cannot obtain injunctive relief against the UBPD Defendants and President Tripathi because these defendants are named in their individual capacities only. (Dkt. No. 49-1, at 3-4). The State Defendants cite *Marsh* (and other cases) for the proposition that "injunctive relief against a state official may be recovered only in an official capacity suit*." Marsh v. Kirschner*, 31 F. Supp. 2d 79, 80 (D. Conn. 1998). This argument fails for several reasons.

First, the State Defendants' argument rests on a factual error regarding President Tripathi. While the State Defendants assert that President Tripathi is sued "in his individual capacity only," the Complaint actually names President Tripathi in both his individual and official

capacities for certain claims. (Compl. ¶ 35, Prayer for Relief). Where a complaint names a state

official in his official capacity and seeks relief that runs against the institution, the suit in

substance is treated as one against the governmental entity itself. *Kentucky v. Graham*, 473 U.S.

159, 166, 105 S. Ct. 3099, 3105 (1985)

Where the Complaint names a defendant in both capacities, injunctive relief is properly

sought through the official capacity designation. Federal Rule of Civil Procedure 8 requires

liberal construction of pleadings, and courts permit plaintiffs to seek different forms of relief

based on alternative theories of capacity.

To the extent there is any ambiguity regarding whether specific counts naming President

Tripathi include official capacity allegations, such ambiguity should be construed in Plaintiffs'

favor at the motion to dismiss stage. The Complaint's allegations make clear that Plaintiffs seek

institutional policy changes at the University. The requested relief necessarily runs against the

University through its officials in their official capacities, not against individuals personally.

Even accepting the State Defendants' characterization that certain counts name

defendants in individual capacity only, courts applying Federal Rule of Civil Procedure 8's

liberal pleading standards permit plaintiffs to amend capacity designations or construe injunctive

relief requests as directed to defendants in their official capacities.

Where, as here, a complaint clearly seeks institutional policy changes, the substance of

the relief sought demonstrates that Plaintiffs are pursuing official capacity claims against the

governmental entities.

The injunctive relief Plaintiffs seek (including policy changes regarding protest policing,

training requirements, and procedural safeguards and rescission of persona non grata

designations) necessarily runs against the State University of New York at Buffalo as an

institution, not against individual officers in their personal capacities. (Compl. Prayer for Relief). These sorts of institutional relief are the hallmark of official capacity suits.

When plaintiffs sue government officials seeking to enjoin enforcement of allegedly unconstitutional policies or to compel implementation of constitutional safeguards, they are by definition seeking official capacity relief against the governmental entity. Here, Plaintiffs seek to enjoin unconstitutional protest policing practices at a state university and to require implementation of policies protecting constitutional rights. This relief necessarily implicates the University's official policies and can only be provided through defendants acting in their official capacities as University officials.

Dismissal of injunctive relief requests at the motion to dismiss stage would be premature. Whether injunctive relief is appropriate turns on factual questions that cannot be resolved on a Rule 12(b)(6) motion. Those questions include whether Plaintiffs can establish a likelihood of future harm, whether legal remedies are adequate, and whether the balance of equities favors injunctive relief. These issues are better resolved later in the case. Dismissing injunctive relief requests at the pleading stage would foreclose remedies before Plaintiffs have had an opportunity to develop the factual record.

Plaintiffs also seek declaratory relief. Declaratory relief is authorized by the Declaratory Judgment Act, 28 U.S.C. § 2201. Like injunctive relief, declaratory relief may be pursued against state officials in their official capacities under *Ex parte Young*, 209 U.S. 123 (1908), where Plaintiffs challenge ongoing policies and practices. Any fact-bound dispute about the necessity of declaratory relief is premature at the motion-to-dismiss stage.

### XI.    Supplemental Jurisdiction Over State-Law Claims Is Proper

Amherst argues that, if the Court were to dismiss Plaintiffs' federal claims, it should decline supplemental jurisdiction over Plaintiffs' state-law claims under 28 U.S.C. § 1367(c). That argument is premature and discretionary. Plaintiffs have plausibly pled multiple federal constitutional claims under § 1983. As long as any federal claim remains, this Court has original jurisdiction and may exercise supplemental jurisdiction over related state-law claims arising from the same nucleus of operative facts.

Even if the Court were to dismiss some (or even all) federal claims, § 1367(c)(3) permits, *but does not require*, declining jurisdiction. The usual factors (judicial economy, convenience, fairness, and comity) support retaining jurisdiction at this early stage given the coordinated, multi-defendant nature of this case and the overlap between the federal and state claims. At minimum, Defendants' request is not a basis for Rule 12(b)(6) dismissal of otherwise well-pled state-law claims.

Finally, Amherst's suggestion that Plaintiffs must separately establish diversity jurisdiction misunderstands the jurisdictional posture. Plaintiffs invoke federal-question jurisdiction under 28 U.S.C. § 1331 for their § 1983 claims and supplemental jurisdiction under § 1367 for related state-law claims. Diversity jurisdiction under 28 U.S.C. § 1332 is neither alleged nor required.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that this Court deny Defendants' motions to dismiss, except to the limited extent Plaintiffs do not oppose dismissal of punitive damages demands against municipal defendants.

Dated:   Buffalo, New York
         January 30, 2026

**LIPSITZ GREEN SCIME CAMBRIA, LLP**

*/s/ Robert M. Corp*
Robert M. Corp, Esq.
Attorneys for Plaintiffs
42 Delaware Ave., Suite 120
Buffalo, NY 14202
(716) 849-1333, ext. 314
rcorp@lglaw.com